**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SIDNEY E. SMITH, III and JILL   :
P. SMITH, Executors of the      :
Estate of SIDNEY E. SMITH, JR., :
deceased,                       :
        Plaintiff               :
                                :
    v.                          :  Case No. 2002-264E Erie
                                :
UNITED STATES OF AMERICA,       :
        Defendant               :
```

       Deposition of MATTHEW J. MINNAUGH, taken before
and by Sondra A. Black, Notary Public in and for the
Commonwealth of Pennsylvania, on Friday, February 11,
2005, commencing at 8:57 a.m., at the offices of
MacDonald Illig Jones & Britton, LLP, 100 State Street,
Suite 700, Erie, Pennsylvania 16507.

For the Plaintiff:

    W. Patrick Delaney, Esquire
    MacDonald Illig Jones & Britton, LLP
    100 State Street, Suite 700
    Erie, PA 16507

For the Defendant:

    Lindsey W. Cooper, Jr., Esquire
    U.S. Department of Justice
    P.O. Box 227
    Ben Franklin Station
    Washington, DC 20044

                    Reported by Sondra A. Black
                    Ferguson & Holdnack Reporting

**Page 2**

                         I N D E X

MATTHEW J. MINNAUGH

    Direct Examination by Mr. Cooper..................3
    Cross-Examination by Mr. Delaney.................76
    Redirect Examination by Mr. Cooper...............84

EXHIBITS

    Deposition Exhibit No. 1..........................4
    Deposition Exhibit No. 2..........................6

DEFENDANT'S EXHIBIT 7

**Page 3**

  M A T T H E W   J.   M I N N A U G H, first having
been duly sworn, testified as follows:

                    DIRECT EXAMINATION
BY MR. COOPER:

    Q. Would you state your name and business address.
    A. Matthew J. Minnaugh, M-I-N-N-A-U-G-H, 1001 State
Street, Suite 1300, Erie, Pennsylvania 16501.
    Q. Mr. Minnaugh, we were talking earlier, but my name
is Lindsey Cooper, for a formal introduction, and I'm the
attorney on behalf of the United States, who's the Defendant
in this lawsuit. Before we begin, I'm going to give you some
instructions that hopefully will help make things go better.
Ms. Black is helping record everything on paper so whatever
communications have to be verbal. You have to say yes no or
give an answer. Do you know that?
    A. Yes, I do.
    Q. Second thing is, we can't talk simultaneously
because it will make her job very difficult. So I will wait
until you're done answering, or I think you're done
answering, and if you'll do the same with me. Do you
understand that?
    A. Yes, I do.
    Q. And the third thing, when I ask a question, if you

**Page 4**

don't understand it, please ask me to rephrase it because we
want the record to be clear, and we want you to answer the
question that was asked. And also, if you'll give a moment,
because your attorney may want to object, before you start
answering. Do you understand that instruction?
    A. Yes, I do.
    Q. And the fourth rule, which is even more important,
if you need a break at any time, let me know and we'll
accommodate you.
    A. Thank you.
    Q. Marked as Exhibit 1 is the subpoena that I issued
for your deposition today. Mr. Minnaugh, have you seen that
document before?
         (Deposition Exhibit No. 1 marked for
          identification.)
    A. I have not.
    Q. What is your understanding of why you're here today?
    A. My understanding is that I'm here to be deposed
relative to an expert report submitted to Patrick Delaney of
MacDonald, Illig, Jones, and Britton in the case of Smith
versus US.
    Q. Do you have of an understanding that you're here
today pursuant to a judicial subpoena?
    A. I do not.
    Q. If you look behind the subpoena, there's an

```
 1    Q. Client development?
 2    A. Yes.
 3    Q. Turning to Page 2 of your report. There are four
 4  initial questions --
 5    A. Yes.
 6    Q. -- and were those the opinions that Mr. Delaney
 7  asked you to opine upon?
 8    A. Yes.
 9    Q. What type of expert are you -- I guess, on what
10  subject matter are you giving an expert opinion in this case?
11    A. I would say on income and estate tax matters.
12    Q. Do you believe your expert opinion is to valuation
13  in this case?
14    A. I'm sorry, could you repeat the question.
15    Q. Is your expert opinion to evaluation in this matter?
16  I used the wrong word. Is your opinion to valuation in this
17  matter?
18    A. No. My opinion -- my opinion is limited to
19  discussing the impact of the Internal Revenue Code sections
20  on the valuation, but in no way to opine on the value of the
21  gift in question.
22    Q. When you give services to your client, and your
23  valuation opinion, do you usually discuss the impact of the
24  different code sections on the valuation?
25    A. I can recall one instance where, yes, there was a
                                                            29
```

```
 1  discussion of certain code sections and its potential impact
 2  on the value of the business.
 3    Q. But as a certified valuation analyst, I mean, are
 4  your opinions based on economies or on legal code sections?
 5    A. What do you mean by "economies"?
 6    Q. Finances, balance sheets, perspective growth rates.
 7  Things I don't delve into.
 8    A. For the most part we are asked to prepare valuations
 9  on either a fair market basis or a fair value basis.
10  Depending on the standard of value premised governing either
11  a given proceeding or circumstance.
12    Q. What is a fair market basis?
13    A. Fair market value is enumerated, and most valuators
14  refer to the standard outlined in Revenue Ruling 59-60, fair
15  market value is the price at which property would change
16  hands between a willing buyer and a willing seller, both
17  having reasonable knowledge of the relevant facts.
18    Q. When you do the valuation, is the willing buyer and
19  seller a hypothetical buyer and seller or is it two specific
20  people?
21    A. Hypothetical.
22    Q. And then you used another word. You used fair
23  market value, and then you used another term. Do you recall
24  what that was?
25    A. Fair value.
                                                            30
```

```
 1    Q. What's fair value?
 2    MR. DELANEY: There's a good question.
 3    Q. Let me ask you this: Which value are we concerned
 4  with here in the Smith case?
 5    A. We're concerned with fair market value.
 6    MR. DELANEY: Let me go off the record.
 7    (Discussion held off the record.)
 8    Q. Fair market value, can you assign a fair market
 9  value to an interest rate?
10    A. Certainly.
11    Q. What would be the components that would make up that
12  fair market value?
13    A. Well, for example, you would have a transaction
14  between two parties, seller financing, and negotiations
15  between the parties as to establishment of a rate associated
16  with that obligation. So, you know, that -- there would, I
17  guess, be an element of negotiations between the two to
18  establish the rate for that purpose.
19    Q. Well, I guess I'm concerned about what would the
20  different characteristics be that would be negotiated upon to
21  establish the rate? For example, the duration of the
22  obligation?
23    A. Duration of the obligation would be germane. What
24  is the existing rate of interest that can be earned in the
25  marketplace. What is the underlying credit worthiness of the
                                                            31
```

```
 1  obligor. What's the applicable federal rate.
 2    Q. What about the transferability of the obligation?
 3    A. That may have a bearing on the rate as well.
 4  Certainly.
 5    Q. Let me ask you this: In your retention in this
 6  case, did you look at the factors you just told me about, the
 7  rate of interest in the market, the credit worthiness of Erie
 8  Nav, and the applicable federal rate, and the transferability
 9  of the obligation, in determining if the AFR was a fair
10  market value rate in 1998?
11    A. I didn't need to look at those because, by
12  definition, the AFR is the market rate of interest.
13    Q. I guess my question is, did you look at those
14  different characteristics?
15    A. No.
16    Q. I mean, would you agree then that the fair market
17  rate for an interest rate can be different than the AFR?
18    A. Certainly. It could be.
19    Q. So if they can be different, how is it, by
20  definition, that the AFR is fair market value?
21    A. If I could expound slightly on that question.
22    Q. You're the expert.
23    A. Let's presuppose that the partnership agreement
24  called for payment over 15 years at no interest. What rate
25  would the Government's expert use to establish the market
                                                            32
```

```
 1  value of the obligation under those terms and conditions.
 2  They would use the AFR because any payments deemed made under
 3  that section of the code apply for purposes of all the code.
 4       MR. DELANEY:  Which section?  I'm sorry to
 5          interrupt.
 6       THE WITNESS:  7872.
 7    A.  So from my perspective, the Government has
 8  established a safe harbor to allow taxpayers to enter into
 9  transactions with a degree of certainty regarding the
10  establishment of an interest rate for those transactions.  So
11  when I say that, definitionally, it's an arm's length
12  transaction if interest is charged at a rate at least equal
13  to the AFR.
14       Your premise of, well, could the fair market value
15  be different than the AFR, to my knowledge, there's no
16  prohibition between taxpayers deciding, we're going to have a
17  rate of the AFR plus two points or the AFR plus three points.
18  But the AFR, in essence, sets the floor on fair market value.
19  So as a consequence, could the rates be different negotiated
20  between parties, absolutely.  But that doesn't take away the
21  fact that the purpose of the AFR, the purpose of the below
22  market loan rules -- the AFR is basically a safe harbor for
23  the taxpayer.
24    Q.  Where in the code does it say that?
25    A.  "The term below market loan means any loan if in the
                                                              33
```

```
 1  case of a demand loan interest is payable on the loan at a
 2  rate less than the applicable federal rate, or in the case of
 3  a term loan, the amount loaned exceeds the present value of
 4  all payments due under the loan."  That's Section 7872(e).
 5    Q.  Doesn't that section explicitly talk to the
 6  recharacterization of certain gifts or interest-free loans?
 7  Just your understanding.  I don't want you --
 8    A.  Basically my interpretation of the section is, if
 9  you have an interest-free loan, it is recharacterized using
10  the applicable federal rate for what it is.  A
11  compensation-related transaction between employer/employee, a
12  gift between family members, et cetera.  And the AFR is, in
13  fact, used as a valuation technique to value the gift in the
14  case of intrafamily loans.
15    Q.  Under Section 7872?
16    A.  Correct.
17    Q.  Doesn't that section explicitly refer to Section
18  1272, which sets out the AFR?
19    A.  It refers to 1274.
20    Q.  Right.  Thank you.  What does 1274 set out?
21    A.  1274 sets out the applicable federal rate.
22    Q.  Does --
23       MR. DELANEY:  I don't think the answer is -- I
24          didn't think he was finished, unless you are.
25    A.  Which basically states, "The determination of
                                                              34
```

```
 1  present value under Section 1274 is done by using a discount
 2  rate equal to the applicable federal rate compounded
 3  semiannually."
 4    Q.  I guess my question is, doesn't 7872 explicitly
 5  refer to 1274?
 6    A.  Yes, it does.
 7    Q.  Now, under the first issue that you're opining to,
 8  as to the safe harbor under 2703, which is applicable to the
 9  case here --
10    A.  Yes.
11    Q.  -- where in 2703 does it refer to the applicable
12  federal rate?
13    A.  The answer is, it does not.
14    Q.  Where in the regs that are associated with 2703 does
15  it refer to the applicable federal rate?
16    A.  It does not.
17    Q.  Now, how do you come to the conclusion that the safe
18  harbor encompasses the applicable federal rate?
19    A.  Well, I reference the excerpts from the Joint
20  Committee on Taxation "Bluebook" General Explanation of the
21  Revenue Provisions of the Deficit Reduction Act of 1984,
22  which states, "Payments deemed made under this provision,
23  Section 7872, are, in general, treated as actually made for
24  all purposes of the code."
25    Q.  That's in your report as well, on Page 4?
                                                              35
```

```
 1    A.  Yes.  And as a consequence, I don't think that one
 2  can look to 2703 in a vacuum ignoring all of the other
 3  relevant provisions of the Internal Revenue Code.
 4  Particularly since the valuation methodology employed by the
 5  Government itself in family-related loans reference the AFR
 6  as a market rate of interest.  It seems wholly inconsistent
 7  to me that you can take an AFR provision under 2703 as --
 8  that that's not market value, and then at the same time say,
 9  well, we're going to value for gift tax purposes loans
10  between father and son using the AFR.
11    Q.  But turning to the reg that you cited on Page 3, it
12  says, "A right of restriction is considered a fair bargain
13  among unrelated parties in the same business if it conforms
14  with the general practice of unrelated parties under
15  negotiated agreements in the same business."  So from that
16  definition, how do you imply that that encompasses the AFR?
17    A.  On its face, that does not refer to the AFR;
18  however, it does say, "Similar arrangements entered into by
19  persons in arm's length transactions, if the right of
20  restriction is one that could have been obtained in a fair
21  bargain among unrelated parties."  My experience, in
22  representing businesses from a buy/sell perspective, I have
23  seen, in practice, agreements between unrelated parties, with
24  seller financing, where the interest rate is pegged to the
25  applicable federal rate.
                                                              36
```

```
 1   Q. In those instances, were the businesses similar to
 2  Erie Navigation?
 3   A. No.
 4       MR. DELANEY: Let me just ask for a clarification,
 5       do you mean the operations? The type of market
 6       they're in? Do you mean service versus
 7       manufacturing, versus shipping, for example? Is
 8       that what you mean?
 9       MR. COOPER: You can define it for me, but I asked
10       a broad question.
11       MR. DELANEY: Okay. I'll go back and define it.
12   Q. I guess my next question would be, why weren't they
13  similar?
14   A. Well, in -- in one instance you have a circumstance
15  where the Smith partnership is holding stock of Erie
16  Navigation. So I'm not sure that it's necessarily germane to
17  look to what Erie Navigation does or does not do because of
18  the fact that we're not talking about a restriction, per se,
19  with Erie Navigation. We're talking about a restriction that
20  governs a transfer of interest in the Smith FLP, No. 1.
21       No. 2, my experience in looking at the AFR, in terms
22  of unrelated parties, dealt with, in one example, a transfer
23  of a 100 percent interest in a sole proprietorship. In
24  another instance, I believe it was a similar transaction.
25  You have, though, a circumstance where you're still looking
                                                              37
```

```
 1  at the transfer of an asset, in this case a business
 2  interest, between unrelated parties where the AFR was the
 3  benchmark rate.
 4   Q. But didn't we say coming to a fair market value that
 5  the duration of the obligation, the rate of interest in the
 6  marketplace, the credit worthiness of the concern or the
 7  underlying asset, and the transfer of the obligation would
 8  all be taken into account of fair market value?
 9   A. Certainly.
10   Q. So in the other businesses you're referring to in
11  negotiating and coming to an interest rate you would have
12  taken into account those factors I just talked about,
13  correct?
14   A. Well, I -- it was not up to me to establish the
15  interest rate. I'm simply referencing a negotiated
16  transaction that occurred between two unrelated parties. I
17  mean, I was not, for lack of a better term, the architect, if
18  you will.
19   Q. But what I'm trying to get to is -- just for
20  reference, you were making a distinction between the Smith
21  FLP owning 100 percent stock as compared to the underlying
22  asset of Erie Navigation.
23   A. Right.
24   Q. But for the Smith FLP, what would you look to within
25  the corporation to get a fair market rate?
                                                              38
```

```
 1   A. I guess I'm confused on your question.
 2   Q. If you're a hypothetical buyer and seller trying to
 3  negotiate a fair market interest rate, and we're talking
 4  about the transfer of an interest in Smith FLP, what
 5  characteristics of the FLP are you going to take into account
 6  in negotiating the market rate?
 7   A. Well, I guess I would step back and say, we wouldn't
 8  have to negotiate a rate because, by definition, we have to
 9  use the AFR.
10   Q. You have to?
11   A. Well, that's what the agreement indicates.
12   Q. I understand what the agreement says. I'm saying,
13  hypothetical buyer and seller, as a valuation expert, you
14  look at.
15   A. Correct.
16   Q. And you're trying to come to a fair market interest
17  rate for Smith FLP, what characteristics of that concern are
18  you going to take into account?
19   A. Well, let me back up and take some exception with
20  your question. The agreement, No. 1, for the Smith FLP
21  states that the interest is to be valued at fair market
22  value. There is no, what I would term, subset that says you
23  also have to use a fair market value interest rate in lieu of
24  the AFR. What the agreement provides is that the buyer has
25  the option to require the seller to accept payments over a
                                                              39
```

```
 1  15-year term with interest at the AFR.
 2       Now, I would step back and argue that if I am a
 3  hypothetical seller of that interest, and that is a fact
 4  known to me and known to the buyer, wouldn't I logically
 5  demand a higher price if my perception is that the AFR is a
 6  below-market rate. And as a consequence of that, I would
 7  argue that I don't see how that provision can be dilutive to
 8  value.
 9   Q. Well, first of all, who has the right to demand the
10  payment over 15 years at AFR?
11   A. My understanding of the partnership agreement is
12  that the buyer of the interest has the right to demand that
13  of the seller of the interest.
14   Q. Any buyer?
15   A. I believe that that is limited to either the
16  partnership or the other limited partners acting in capacity
17  as buyers under the right of first refusal provision.
18   Q. The partnership and the limited partners, are they
19  hypothetical buyers?
20   A. No. They are specific buyers.
21   Q. As a valuation expert, would you take into account
22  the hypothetical buyer or the Smith FLP as a buyer or the
23  limited partnership -- the limited partners as a buyer?
24   A. You would take into account the hypothetical buyer
25  and the hypothetical seller, but nonetheless, that buyer and
                                                              40
```

```
 1  seller have the same operative conditions of the partnership
 2  agreement to wrestle with.
 3       Q.  Wouldn't the hypothetical buyer take into account
 4  these conditions that he may have to sell to the partnership
 5  at the AFR over 15 years?
 6       A.  Certainly the buyer and seller would both take that
 7  into account.
 8       Q.  My question was, would the buyer take that into
 9  account?
10       A.  Yes, the buyer; yes, the seller.
11       Q.  How would those conditions affect the value to the
12  buyer?  That was a vague question.  How would the conditions
13  that you'd have to pay out over 15 years at the AFR affect
14  the value of the partnership interest to the buyer?
15       A.  To the buyer, that would depend.  That would depend
16  whether or not the AFR was higher or lower than a market rate
17  of interest.  Similarly, it would be higher or lower from the
18  seller's perspective, depending on if the AFR is higher than
19  a market rate of interest.
20       Q.  What was the market rate of interest in 1998 for
21  similar concerns such as Smith FLP?
22       A.  I guess I'm unclear on what your question is.  If
23  you could rephrase.
24       Q.  In 1998, when the transferred happened and valuation
25  was done, what was the market rate for the transfer of
                                                              41
```

```
 1  interest that are similar to the Smith FLP?
 2       A.  Well, the market rate, as I stated, by definition is
 3  the AFR.
 4       Q.  But you just said if the AFR was below the market
 5  rate it would depend on how it affected the value; is that
 6  correct?
 7       A.  That's correct.
 8       Q.  What was the market rate in 1998?
 9       A.  I don't know what the market rate was because there
10  are multiple rates in the marketplace, i.e., prime, rates of
11  return on treasury bonds and bills, rates of return on
12  corporate obligations, rates of return on equities, rates of
13  return on municipal bonds.  There are multiple reference
14  points to the term market rate.  And I would be unable to sit
15  here and say to you, the market rate was specifically X.
16       Q.  Well, that's my question.  Did you do an analysis to
17  determine what the appropriate market rate would have been
18  for lending money back by Smith FLP interest?
19       A.  No, I did not.
20       Q.  If you don't know what the market rate is, how can
21  you come to a conclusion that the AFR either increases or
22  decreases what a hypothetical buyer or seller would pay?
23       A.  Because one would have to presume that both buyer
24  and seller are taking that fact, that restriction, into
25  account in negotiating an appropriate fair market value.
                                                              42
```

```
 1       Q.  I'm going to turn your attention to Page 7 of your
 2  report.
 3       A.  I think I have it.
 4       Q.  And you say, "The use of the AFR and 15-year term of
 5  the buyer's option does not have a substantial dilutive
 6  affect on value, as that constitutes a relevant fact to be
 7  considered by both buyer and seller."  What's the basis for
 8  that statement?
 9       A.  My basis for that statement is that I think it is
10  reasonable to conclude that if both buyer and seller have
11  equivalent knowledge of the requirement -- or I should say
12  the option of a 15-year term and AFR, that if they looked in
13  the marketplace and ascertained that a long-term rate of
14  return on an installment obligation should produce a rate
15  higher than the AFR by reference to multiple benchmarks, I
16  would call it, in the market, that that would logically cause
17  the buyer and seller to negotiate -- hypothetical buyer and
18  seller to negotiate fair market value, such that it has the
19  potential to actually be accretive as opposed to dilutive to
20  value.
21       Q.  What does accretive mean?
22       A.  Enhancement.  Dilutive, a deduction in value;
23  accretive, advancement in value.
24       Q.  But you just told me you did no analysis as to what
25  the appropriate market rate would be for installment payments
                                                              43
```

```
 1  for an interest such as Smith FLP.
 2       A.  What I'm saying --
 3       Q.  It's a yes or no question.
 4       A.  Yes.
 5            MR. DELANEY:  Now he can explain.
 6            MR. COOPER:  No.  No.  I think --
 7            MR. DELANEY:  No.  No.  Now he can explain.
 8       Q.  Yes, you did do an analysis, or no, you did not do
 9  an analysis?
10       A.  No, I did not do an analysis.
11            MR. DELANEY:  And if he has more to offer in that
12       answer, he's going to be allowed to offer it.
13            Do you have anything more to offer in that
14       question?
15       A.  My observation is that it is not necessary to look
16  specifically to 1998 and conclude, well, the AFR is higher or
17  lower than a market rate of interest simply because the buyer
18  and seller are going to take that fact into account in
19  establishing fair market value.
20       Q.  But isn't that something different than what Section
21  2703 requires?  That that be a market value negotiated
22  between unrelated buyer and seller.  And may I remind you,
23  2703 talks of the restriction not to the ultimate value
24  negotiated.
25       A.  2703 implies that that agreement or right has to
                                                              44
```

```
 1  result in a price less than fair market value of the
 2  property.
 3      Q.  It doesn't say "price."  It says, "A right or
 4  restriction is considered a fair bargain among unrelated
 5  parties of the business if it conforms with the general
 6  practice on unrelated parties in negotiated agreements in the
 7  same business."  The right or restriction we're talking about
 8  is the AFR over 15 years on a nonnegotiable interest.  Isn't
 9  that something different than the ultimate price negotiated?
10      A.  Could you rephrase?
11      Q.  Let me ask this:  What analysis did you do to
12  understand that the 15-year payout at the AFR on a
13  nonnegotiable interest was a fair bargain between unrelated
14  parties in 1998?
15      A.  I relied on my experience in dealing with
16  transactions involving sales of business interest between
17  unrelated parties that used a fixed rate equivalent to the
18  AFR over a long-term installment note.
19      Q.  But I believe you testified earlier that those
20  businesses were different than the Smith FLP.
21         MR. DELANEY:  Object to the form.  He didn't say
22         that.
23      Q.  You can either agree or disagree with me.
24      A.  Relative to the fact that they were not FLP
25  interests, that's correct.  They were -- they were different
                                                              45
```

```
 1  in terms of form.
 2      Q.  Were they different as to the underlying assets?
 3      A.  Yes.
 4      Q.  Besides your personal experience, did you do any
 5  research in the marketplace what would have been a fair
 6  bargain on unrelated parties for an interest such as Smith
 7  FLP?
 8      A.  No.
 9      Q.  Let's assume that -- I mean, how would you
10  characterize the underlying asset of Smith FLP?
11      A.  I would characterize it as an investment in stock of
12  a closely held corporation.
13      Q.  I guess a better question is the term you used.
14  What's your opinion as to the credit worthiness of Smith FLP?
15      A.  I have not formed an opinion on that.
16      Q.  Did you form an opinion as to -- strike that.
17         THE WITNESS:  May we break?
18         MR. COOPER:  Of course.
19         (Pause in the proceedings.)
20      Q.  I believe when we went off we were talking about
21  your efforts to ascertain in the marketplace with the
22  applicable rate.  If I understood you correctly, you said you
23  didn't do that analysis.
24      A.  In terms of going to the marketplace itself,
25  independent of my experience with my own clientele, that's
                                                              46
```

```
 1  correct.  I did not do that.
 2      Q.  So looking to the third issue that was presented to
 3  you, "Is there statistical data to support that the AFR is a
 4  commercially reasonable rate?"  Is that statistical data just
 5  your personal experience?
 6      A.  Well, as a -- no would be the answer to that
 7  question.
 8      Q.  What other statistics were there?
 9      A.  Incorporated into this report in Exhibit 1 is a
10  comparison of the applicable federal rate with the commercial
11  prime rate published by the Federal Reserve.  You will note
12  from 1984 through, I believe, October of '04 the various
13  rates are listed and compared on a month-to-month basis.
14         If you were to, for example, take a look at January
15  1998, the applicable federal rate listed on Exhibit 1 was
16  6.13 percent.  If we were to look at the prime rate for all
17  of 2002, 3, and 4, you would note that the AFR, in fact,
18  exceeds the prime rate for that entire three-year period.
19  There are months in which the AFR was more or less than
20  prime.  Months in which prime was more or less than the AFR.
21  The point being that the AFR is designed to provide a
22  long-term indicator of interest.  Prime, by definition, is a
23  short-term borrowing rate.
24         The Government has, from my recollection, indicated
25  that at times they have the authority to actually lower the
                                                              47
```

```
 1  AFR, if, in fact, they find it is not commercially
 2  reasonable.  That's not the exact phrase that's used, I
 3  believe, in either the regs or the committee reports.  But
 4  the point is that one can't sit here and reasonably predict
 5  what's going to happen in the future.  And in January of
 6  1998, it may not have looked like a good bargain to take 6.13
 7  percent over a 15-year time frame; though, I would suspect
 8  that many people today would be more than satisfied with it.
 9         So in response to your question, you know, would I
10  conclude that that is a statistical analysis to support that
11  it's commercially reasonable.  I'm not sure I would go that
12  far.  It's simply an indicator that using the AFR is not what
13  I would term "grossly unreasonable."
14      Q.  That's a good point.  In 1998, how would you know
15  what the AFR was going to be compared to prime in 2000, 2004?
16      A.  You wouldn't.
17      Q.  So when you're negotiating or putting a value
18  between a hypothetical and the seller, would you take that
19  into account?
20      A.  You would absolutely take into account the term of
21  the instrument, and the fact that there is interest rate risk
22  for both buyer and seller.  Rates may go up; they may go
23  down.
24      Q.  What I'm saying is -- that was a vague question.
25  Sorry for the confusion -- a hypothetical buyer and seller,
                                                              48
```

**Page 57**

```
 1    A.  Could you repeat the question, please.
 2    Q.  Right.  I mean, in the same regard, if the
 3  Government wanted to lighten the administrative burden, it
 4  could have referred to the AFR and statutory provision 2703.
 5  Wouldn't that be true?
 6    A.  Certainly they could have done many things relative
 7  to the construct of that code section.
 8    Q.  Would you consider the tax code to be a pretty
 9  technical statute?
10    A.  I think that is safe to say, yes.
11    Q.  And doesn't the IRS, and I guess people in the tax
12  profession, don't they read it very strictly?
13    A.  Yes.
14    Q.  Isn't your interpretation of implying the AFR into
15  2703 contrary to that strict interpretation?
16    A.  Not when one reads the legislative history of 7872.
17    Q.  Which is a different statutory provision than 2703?
18    A.  Yes, it is.
19    Q.  Mr. Delaney's comment, why are you opining onto the
20  applicability of Statute 1274 as -- why, in your expert
21  report, do you opine on the applicability of 1274 as to 2703?
22    A.  My reference point, I believe, is 7872 as relates to
23  2703, and not 1274.
24    Q.  Right.  But you're opining that through statutory
25  construction the AFR is, by definition, a fair bargain under
                                                              57
```

**Page 58**

```
 1  2703; isn't that correct?
 2    A.  That is -- that is my interpretation, yes.
 3    Q.  And my question is, why are you interpreting
 4  provisions of the tax code in your opinion?
 5    A.  Why am I interpreting those provisions?
 6    Q.  Are you an expert in statutory construction?
 7    A.  No.  I am not an attorney.
 8    Q.  Then my question is, why are you providing legal
 9  analysis in your report?
10       MR. DELANEY:  I'm going to object to the form.  I
11       don't know that it is legal analysis.
12    Q.  How would you characterize it?
13    A.  I practice as a certified public accountant in the
14  tax arena.  I'm authorized to practice before the internal
15  revenue service, and I'm providing my expert opinion in my
16  capacity as a CPA in working in the tax area.
17    Q.  As applied to what?
18    A.  As opposed to an attorney opining based on statutory
19  construction, as you referred to.
20    Q.  I'm asking you, as to what are you opining?
21    A.  I'm opining as to the inconsistencies in the AFR
22  issue raised under 2703 by the Government, comparing that to
23  the provisions of Section 7872.  In my opinion, there are
24  inconsistencies with the Government failing to take a look at
25  7872 as relates to this issue.
                                                              58
```

**Page 59**

```
 1    Q.  Aren't the inconsistencies you're talking about
 2  statutory inconsistencies?
 3    A.  One could term them -- well, I guess I would
 4  interpret that question as a legal question.  I'm simply
 5  saying from the standpoint of administration, tax compliance,
 6  if you will, that I find those provisions to be inconsistent.
 7    Q.  Again, where are the inconsistencies you're talking
 8  about?  I'm not looking in your report, I'm asking you.
 9    A.  The Government has asserted that the AFR is not a
10  market rate.  I find that position to be inconsistent with
11  the definitional elements of 7872, which states that
12  instruments that do not carry the AFR are recharacterized as
13  arm's length transactions, which, in fact, require the use of
14  the AFR.  Further, that payments deemed made under Section
15  7872 are treated as being made for all purposes of the code.
16  So I keep going back to the fact that you cannot basically
17  turn a provision in an agreement following 7872 and say, that
18  simply doesn't work under 2703.  That seems to me to be
19  inconsistent with the legislative intent of 2703.
20    Q.  Right.  You're interpreting legislative intent.
21    A.  No.  I'm simply reading legislative intent and
22  giving you my opinion as a tax professional.
23       MR. DELANEY:  Just for the record, you said
24       legislative intent of 2703 as you read it.  Are you
25       referring to 2703 of the 7872 section or both?
                                                              59
```

**Page 60**

```
 1       THE WITNESS:  Both.
 2    Q.  Where in your report do you refer to the legislative
 3  history of 2703?
 4    A.  I do not refer to it in my report.  I simply have
 5  that as background material in my file.
 6    Q.  Well, if it's relevant, why is it not in your
 7  report?
 8    A.  I think the more relevant provision is the 7872,
 9  which is cited in the report.
10    Q.  So, Mr. Minnaugh, do you believe that the portion of
11  your report where you talk about interpreting the provisions
12  of Section 2703 in a vacuum that you are not giving a legal
13  analysis?
14    A.  I am not an attorney.  I'm not giving a legal
15  opinion.
16    Q.  That's not my question.  Are you giving it a legal
17  analysis?
18    A.  Am I giving it a legal analysis?
19    Q.  Are you giving a legal analysis?
20    A.  No.
21    Q.  Are you giving an analysis of statutory provisions?
22    A.  Yes.  I'm analyzing the statutes in my capacity as a
23  tax professional.
24       MR. COOPER:  If you just give me a second, I'm
25       just --
                                                              60
```

Q. Just for clarification, are there situations when the fair market value for an interest rate can be different than the AFR?

A. I think, as stated before, there are a broad array of market measures that an investor would look to, whether it's municipal bond yields, corporate bond yields, equity rates of return, that certainly differ, and could differ substantially, from the federal applicable rate, yes.

Q. Again for clarification, did you do any analysis to determine what the fair market value of an interest rate would be for an instrument backed by the Smith FLP partnership?

A. I did not.

Q. In 1998 -- let me ask a more general question. Would Erie Navigational, Inc.'s bankers -- what kind of position would they have been in to understand what an appropriate interest rate would be for lending money to that entity?

MR. DELANEY: Object to the form. Go ahead, answer.

A. What would Erie Navigation's bankers have viewed as an appropriate rate of interest?

Q. No. My question is, would they have been in a good position to understand what the appropriate rate would be?

A. For Erie Navigation, certainly.

73

Q. And in your opinion, would the fair market rate interest -- the fair market interest rate applicable to Smith FLP be different than the fair market value of the interest rate applied to Erie Navigation?

A. One would think it would have to be.

Q. In what regard would it be different?

A. Well, you have a circumstance where a -- Erie Navigation is an operating business entity, Smith FLP simply holds an interest in Erie Navigation, has no other liquid assets, and one would think that the ability of one entity, as compared to the other, that their borrowing rates would not necessarily be synonymous.

Q. Would lending to Smith FLP, from a banker's perspective, in your opinion be more risky than lending to the ongoing concern of Erie Navigation?

MR. DELANEY: I'm going to object to the form. Foundation issues, but go ahead.

Q. Your opinion.

MR. DELANEY: Still foundation issues.

A. Well, my opinion is that I'm not certain I can necessarily answer that question from a qualification perspective. Whether a lender would view loaning to an FLP which has a 100 percent controlling interest in the stock of this corporation would be preferable to loaning directly to the entity would be subject to a wide variety of factors,

74

collateral base, you know, are there environmental issue -- I mean, what I would term a typical banker's checklist. They may actually prefer to loan to the FLP. I mean, I don't know enough about the underlying business to tell you it would absolutely be one or the other.

Q. Well, because the FLP owns just the stock of the, I guess, underlying business, isn't their, I guess, credit worthiness directly reflected by the financial condition of the underlying business?

MR. DELANEY: Object to the form. Foundation issues.

A. One would think that's true, yes.

Q. So in that line of reasoning, would that be the interest rates the bankers would be willing to lend the comparable?

A. They may be.

Q. As far as foundations, you did no analysis of the underlying financial conditions of Erie Nav?

A. I did not.

Q. And you did no analysis of the underlying financial condition of Smith FLP?

A. I did not.

MR. COOPER: Mr. Minnaugh, thank you.

MR. MINNAUGH: Thank you.

MR. DELANEY: I have a few questions.

75

CROSS-EXAMINATION

BY MR. DELANEY:

Q. Matt, just to stay on that same vein, if you assume for a moment that the general partners of the Smith FLP would have recourse -- that there would be recourse against the general partners in any FLP in a commercial loan transaction, would that have an impact or could that have an impact on the credit worthiness of the FLP as opposed to the credit worthiness of the underlying corporate asset that the FLP owns?

A. No question.

Q. You have used the phrase -- there was an exchange you had with Mr. Cooper earlier where you talked about market rate. And I just want to have some clarity to this. Is this market rate a specific number at any given point in time?

A. I'm not sure I can answer that question in the context in which it's asked.

Q. Well, in your subsequent testimony I thought I heard you say that there were various components that one might look at to determine market rate. And my question really is, if one refers to market rate at any given point in time, is that a specific number or a range of numbers?

A. My opinion is that it would be a range of numbers because, as we had talked about earlier, negotiating, based

76