**EXHIBIT 1**

**Form 843**

(Rev. January 1997)

Department of the Treasury
Internal Revenue Service

**Claim for Refund and Request for Abatement**

► See separate instructions.

**RECEIVED**

DEC 2 8 2001

**EXAMINATION DIVISION**

*Use Form 843 only if your claim involves (a) one of the taxes shown on line 3a or (b) a refund or abatement of interest, penalties, or additions to tax on line 4a.*

**Do not** *use Form 843 if your claim is for—*
- An overpayment of income taxes;
- A refund of fuel taxes;
- An overpayment of excise taxes reported on Form 720, 730, or 2290 (see **General Instructions**).

| | |
|---|---|
| Name of claimant<br>Sidney E. Smith, Jr. | Your social security number<br>112 14 2495 |
| Address (number, street, and room or suite no.)<br>1201 Lord Road | Spouse's social security number |
| City or town, state, and ZIP code<br>Fairview, PA 16415 | Employer identification number |
| Name and address shown on return if different from above<br><br>N/A | Daytime telephone number<br>( 814 ) 453-6721 |

**1** Period—prepare a separate Form 843 for each tax period
From **January 1**, 19 **98**, to **December 31**, 19 **98**

**2** Amount to be refunded or abated
$ 360,803

**3a** Type of tax, penalty, or addition to tax:
☐ Employment  ☐ Estate  ☒ Gift  ☐ Excise (unless reported on Form 720, 730, or 2290—see instructions.)
☐ Penalty—IRC section ► _____

**b** Type of return filed (see instructions):
☐ 706  ☒ 709  ☐ 940  ☐ 941  ☐ 943  ☐ 945  ☐ 990-PF  ☐ 4720  ☐ Other (specify)

**4a** Request for abatement or refund of:
☐ Interest caused by IRS errors or delays (if applicable—see instructions).
☐ A penalty or addition to tax as a result of erroneous advice from the IRS.

**b** Dates of payment ►

**5 Explanation and additional claims.** Explain why you believe this claim should be allowed, and show computation of tax refund or abatement of interest, penalty, or addition to tax.

See Attached

**COPY**

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the signature must be accompanied by the officer's title.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.)

Date December 26, 2001

Signature

Date

For Paperwork Reduction Act Notice, see separate instructions.

Form **843** (Rev. 1-97)

# SIDNEY E. SMITH, JR.
## SSN: 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

### Form 843 - Attachment
### Part 5 - Explanation and Additional Claims

The Taxpayer is filing Form 843, Claim for Refund and Request for Abatement, to correct the valuation of Taxpayer's 1998 taxable gifts of Limited Partnership Interests in the Sidney E. Smith, Jr. Family Limited Partnership. The value of these gifts was incorrectly adjusted by the Internal Revenue Service on Forms 890, 3233, and 886-A dated December 4, 2001. Forms 890, 3323, and 886-A are attached hereto as Exhibit "A". The Taxpayer is filing Form 843 to adjust the value of the taxable gifts to their actual fair market value at the time the gifts were made, which is in accordance with the requirements of Internal Revenue Code Section 2512.

The correct valuation of the gifts was previously reported on the Taxpayer's timely filed 1998 United States Gift Tax Return, Form 709, a copy of which is attached as Exhibit "B". As reflected on Form 709, the fair market value of Taxpayer's 1998 gifts amounted to $1,025,392. This is $803,206 less than the $1,828,598 value as adjusted by the Internal Revenue Service. Adjusting the valuation of the gifts to their originally reported value results in a refund due the Taxpayer in the amount of $360,803. The computation of the correct gift tax was reflected on the originally filed Form 709. A summary of the gift tax calculation and refund due the Taxpayer is as follows:

| | |
|---|---|
| Total value of gifts in 1998 | $ 1,025,392 |
| Less: Annual Exclusions | (20,000) |
| Add: Prior Taxable Gifts | 281,801 |
| Total Taxable Gifts | $ 1,287,193 |
| | |
| Gift Tax | $ 464,293 |
| Less: Unified Credit | (202,050) |
| Less: Gift tax paid with original Gift Tax Return | (262,243) |
| Less: Gift tax paid on IRS Assessment | (360,803) |
| | |
| Refund due Taxpayer | $ 360,803 |

In support of Taxpayer's refund claim, attached are two (2) appraisals which establish the correct values of Taxpayer's 1998 gifts. Attached as Exhibit "C" is the appraisal of the Sidney E. Smith, Jr. Family Limited Partnership ("Appraisal") dated September 30, 1998 prepared by Gregory F. Pashke, CBA, CVA, CPA, of the Pashke Consulting Company. The Appraisal was included with the Taxpayer's originally filed Form 709. Attached as Exhibit "D" is the appraisal titled "Erie Navigation Company Fair Market Value Marketable, Controlling Ownership Interest in Common Stock" dated September 30, 1998 prepared by Gregory F. Pashke, CBA, CVA, CPA, of the Pashke Consulting Company.

The methods used to value Taxpayer's 1998 taxable gifts, as originally reported and as claimed herein, are consistent with the applicable provisions of IRS Revenue Ruling 59-60 and in accordance with the Internal Revenue Code Section 2512 and its corresponding Treasury Regulation (§§ 25.2512 et. seq.) which establish the procedures for valuing gifts.

# SIDNEY E. SMITH, JR. FAMILY LIMITED PARTNERSHIP

## Fair Market Value

## Nonmarketable, Minority Limited Partnership Interest

## as of December 31, 1997

# TABLE OF CONTENTS

Page #

Introduction
- Purpose and Function of Appraisal — 1
- Definition of Value Estimated — 1
- Highest and Best Use — 2
- Definition of Property Appraised — 2
- Effective Date of Value Estimate — 2
- Valuation Procedures — 2
- Valuation Synthesis and Conclusion — 3
- Valuation Terms and Conditions — 3

Description of the Assignment — 4

Approaches to Estimating Value — 4

Nature and History of the Business
- Nature of Business — 5
- History of Business — 6
- Ownership — 6
- Location — 6

Economic and Industry Outlook
- The National & Regional Economic Outlook — 6
- Industry Outlook — 6
- Implications of Economic/Industry Outlook for Valuation Subject — 6

Book Value of Stock and Financial Condition of the Business — 7

Dividend Paying (Income Distribution) Capacity — 7

Existence of Goodwill or Other Intangible Value — 7

Sales of Partnership Interests and Size of Block to be Valued — 7

Willing Buyer and Willing Seller — 8

Articles of the Sidney E. Smith Jr. Family Limited Partnership & their Valuation Impact — 8

Market Price of Comparable Partnerships — 12

The Valuation Process (Appraisal of Fair Market Value) — 12
- Adjusted Net Assets Method — 12
- Minority Interest Discount — 13
  - Background & Theory — 13
  - Market Evidence & Analysis to Valuation Subject — 13
- Lack of Marketability Discount — 14
  - Background & Theory — 14
  - Market Evidence — 15
    - Restricted Stock Studies — 16
    - Pre-IPO Studies — 17
    - Cost of "Flotation" Studies — 19
    - Tax Court Cases — 19
  - The Quantitative Marketability Discount Model (QMDM) — 19
    - The QMDM & its Application to the Valuation Subject — 21
    - Marketability Discount Indicated by use of the QMDM — 23
  - Concluded Marketability Discount — 24

Valuation Synthesis & Conclusion — 25

**APPENDICES**

|  | Appendix |
|---|---|
| ● Relationships between Minority Interest Discounts, Control Premiums, & Discounts for Lack of Marketability | A |
| ● Closed-End Funds & "Herzfeld Averages" | B |
| ● Summary Results of Nine Restricted Stock Studies | C |
| ● The Emory Studies (1985-1995) | D |
| ● The Williamette Management Studies (1975-1993) | E |
| ● Relationships of Enterprise Level of Value & Shareholder Level of Value | F |
| ● Build-Up of Required Holding Period Rate of Return for Valuation Subject | G (1 & 2) |
| ● The QMDM Valuation of the Valuation Subject | H (1 & 2) |
| ● Principal Information Sources & References Relied Upon in this Valuation | I |
| ● Appraisal Certification | J |
| ● Appraiser's Qualifications | K(1 & 2) |
| ● Statement of Contingent and Limiting Conditions | L |



**pashke consulting**

A Division of
The Pashke Group

2005 West Eighth Street
Suite 208
Erie, PA 16505-4760
814/453-6594
Fax 814/455-3642
Cellular 814/450-3539

**Gregory F. Pashke**
CMC, CMA, CFM, CVA,
CPA, CPCM, MBA

A Member of:

*Institute of Management
Consultants*

*National Association of
Certified Valuation Analysts*

*Institute of Business
Appraisers*

*Institute of Management
Accountants*

*American Institute of Certified
Public Accountants*

*Pennsylvania Institute of
Certified Public Accountants*

September 30, 1998

Sidney E. Smith, Jr. Family Limited Partnership

At your request, we have been engaged to estimate the fair market value of a nonmarketable minority limited partnership interest in the Sidney E. Smith, Jr. Family Limited Partnership (**"Sidney E. Smith, Jr. FLP"**) as of December 31, 1997. The purpose of the valuation is to be used in connection with estate and business planning by the Smith Family. We are pleased to submit the results of our findings in the following report.

## PURPOSE AND FUNCTION OF APPRAISAL

The purpose of the appraisal was to estimate the Fair Market Value, as of December 31, 1997, of a 1% nonmarketable minority limited partnership interest in the **Sidney E. Smith, Jr. FLP**.

The information is to be used in connection with estate and business planning by the Smith Family.

## DEFINITION OF VALUE ESTIMATED

The standard of value for gift and estate taxes is fair market value. Consistent with IRS Revenue Ruling 59-60, "Fair Market Value" is defined as:

> **"the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."**

Implied within this standard of value is that the consideration for the fair market value is expressed in cash, or the customary economic equivalent, paid at closing.

www.ncinter.net/~ogene
e-mail: ogene@
personal e Pashke Consulting
enesispr@aol.com

1

## HIGHEST AND BEST USE

It is a maxim of appraising that the value of property is estimated in anticipation of its being used for its "highest and best use."

Highest and best use can be defined as "the legally permissible and reasonably feasible present use, or series of future uses, that will result in the greatest economic benefit to the owner or user of the property."

In the case of the present appraisal, it is evident that the highest and best use of the property is a continuation of the present use, namely operation of a family limited partnership to manage invested economic assets.

## DEFINITION OF PROPERTY APPRAISED

The property appraised consists of a one percent (1%) nonmarketable minority limited partnership interest in the **Sidney E. Smith, Jr. FLP.**

The **Sidney E. Smith, Jr. FLP** is a closely held partnership organized to manage and invest partnership assets. The partnerships initial asset is 100% of the common stock of Erie Navigation Company, **("Navigation")**. **Navigation** sells construction aggregates, conducts sand-dredging operations, and operates cargo transportation vessels on the Great Lakes.

## EFFECTIVE DATE OF VALUE ESTIMATE

Value is estimated as of December 31, 1997.

## VALUATION PROCEDURES

This appraisal was performed in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP), as promulgated by the Appraisal Foundation.

We relied on an appraisal of the Fair Market Value of a Marketable, 100% Controlling Interest in Common Stock of **Navigation** as of December 31, 1997 to determine the value of the **Sidney E. Smith, Jr. FLP's** initial sole asset. *That accompanying valuation report is an integral part of this Sidney E. Smith, Jr. FLP valuation report.*

A more detailed description of our quantitative and qualitative analyses and valuation conclusions is presented in the attached narrative valuation opinion report.

## VALUATION SYNTHESIS AND CONCLUSION

The fair market value of a 1% nonmarketable minority limited partnership interest in the **Sidney E. Smith, Jr. FLP** was estimated as of an appraisal effective date of December 31, 1997. The estimate is to be used in connection with estate and business planning by the Smith Family.

Based on our analysis and considering all relevant information contained in the detailed narrative report that follows, it is our opinion that the Fair Market Value of a 1% nonmarketable minority limited partnership interest in the **Sidney E. Smith, Jr. FLP** as of December 31, 1997 is estimated as:

### APPROXIMATELY TWENTY FOUR THOUSAND SEVEN HUNDRED DOLLARS

### (<u>$24,700</u> PER 1% INTEREST)

## VALUATION TERMS AND CONDITIONS

We are independent of the **Sidney E. Smith, Jr. FLP** and we have no financial interest in the securities subject to appraisal. Our fee for this appraisal is in no way influenced by the result of our valuation conclusion.

This valuation opinion report is prepared solely for the purpose stated herein. No other purpose is intended or should be inferred.

The attached valuation opinion report and appendices further describe the analyses performed and conclusions reached during this appraisal.

The attached appraisal certification, statement of contingent and limiting conditions and qualifications of the appraiser are integral parts of this valuation opinion.

*Pashke Consulting*

Pashke Consulting
September 30, 1998

*Gregory F. Pashke*

Gregory F. Pashke
CBA, CVA, CPA

Appra    of Sidney E. Smith, Jr. Family Limite    artnership

## DESCRIPTION OF THE ASSIGNMENT

We were retained to appraise the fair market value of a 1% nonmarketable minority limited partnership interest in the **Sidney E. Smith, Jr. FLP.**

The valuation date is December 31, 1997. The information is to be used in connection with estate and business planning by the Smith Family.

## APPROACHES TO ESTIMATING VALUE

The methods used to estimate value for the purpose of this appraisal were consistent with the applicable provisions of IRS Revenue Rulings 59-60 and 68-609.

According to Revenue Ruling 59-60, a determination of fair market value, being a question of fact, will depend on the circumstances in each case. . . . A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance.

The valuation factors listed in Revenue Ruling 59-60 as among those to be considered in valuing stock of closely-held corporations are:

◆ Nature and history of the business.

◆ Economic outlook in general and outlook for the specific industry in particular.

◆ Book value of the stock and financial condition of the business.

◆ Earning capacity.

◆ Dividend paying capacity.

◆ Existence, or nonexistence, of goodwill or other intangible value.

◆ Sales of the stock and size of the block to be valued.

◆ Market price of traded stocks of companies engaged in the same or a similar line of business.

The remainder of this report deals with various aspects of the aforementioned value-related considerations.

## NATURE AND HISTORY OF THE BUSINESS

### Nature of Business

The **Sidney E. Smith, Jr. FLP** is a closely held partnership organized to manage and invest partnership assets. The Partnership Agreement indicates its overall purpose is to pool together the Partners' resources as co-owners so that they can be more effectively managed and invested as a business to the end of increasing the profit derived from, and the value of, such resources as a whole. The agreement goes on to list further motivating factors for the partners. These include:

- the ability to conduct a business without an entity level tax
- the ability to separate management control in the general partnership interest from the bulk of equity ownership represented by the limited partnership interest
- the ability to help protect the Property from the creditors of the partners through the mechanism of such creditor having the status only of assignee of an Interest
- the ability to limit the liability of those co-owners who are Limited Partners to no more than capital contributions
- the ability to decide whether certain transferees of a limited partner will be admitted with full ownership rights, and thereby select the individuals with whom the prior owners will be in partnership with
- the ability to obtain for the General Partners as the managers of the business the benefits and burdens of the "business judgment rule" as the basic criterion of management accountability
- the ability to conduct business with mandatory arbitration as the mechanism for resolving any business dispute among the co-owners
- the ability to discourage frivolous disputes among the co-owners by requiring the payment of costs to be shifted to the non-prevailing party
- the ability to conduct business among the co-owners while protecting the confidential aspects of that business from improper disclosure which harms the business, while providing a mandatory mechanism to resolve any such claims of harm

The agreement provides for the partnership to engage in the business of investing in any kind of property, real or personal, which the Partnership may deem advisable.

The partnerships initial asset is 100% of the common stock of Erie Navigation Company, ("Navigation"). **Navigation** sells construction aggregates, conducts sand-dredging operations, and operates cargo transportation vessels on the Great Lakes.

## History of Business

The **Sidney E. Smith, Jr. FLP** formed on December 29, 1997 has no real operating history.

## Ownership

Its founders, Sidney E. Smith, Jr. and his children, Sidney E. Smith, III and Jill P. Smith, hold the initial partnership interests. Sidney E. Smith, Jr. and Sidney E. Smith, III are the General Partners of the **Sidney E. Smith, Jr. FLP**.

## Location

The partnership has no operating facilities but administers its affairs in Erie, Pennsylvania.

## THE NATIONAL & REGIONAL ECONOMIC OUTLOOK

The outlook for the partnership coincides with that of its principle asset, the stock of **Navigation**.

See the attached valuation report for **Navigation** for a discussion of the national and regional outlook for the company.

## INDUSTRY OUTLOOK

The outlook for the partnership coincides with that of its principle asset, the stock of **Navigation**.

See the attached valuation report for **Navigation** for a discussion of the industry outlook for the company.

## IMPLICATIONS OF NATIONAL, REGIONAL, & INDUSTRY ECONOMIC OUTLOOK ON VALUATION SUBJECT

The implications for the partnership coincide with that of its principle asset, the stock of **Navigation**.

See the attached valuation report for **Navigation** for a discussion of the national, regional and industry economic outlook for the company.

Appraie̜ of Sidney E. Smith, Jr. Family Limited Partnership

## BOOK VALUE OF STOCK AND FINANCIAL CONDITION OF THE PARTNERSHIP

The partnership operates on a fiscal year ending December 31st. The sole asset of the **Sidney E. Smith, Jr. FLP** is 100% of the common stock (105 shares) of **Navigation**. The Fair Market Value of **Navigation**, per the accompanying valuation report is $5,200,000. *It is noteworthy that the sole asset of the Sidney E. Smith, Jr. FLP is a closely held corporation with little prospects for short term liquidity and this fact will be considered during the valuation process.*

The earning capacity of the partnership coincides with that of its principle asset, the stock of **Navigation**.

## DIVIDEND PAYING (INCOME DISTRIBUTION) CAPACITY OF THE PARTNERSHIP

The **Sidney E. Smith, Jr. FLP** agreement provides for the General Partners to conduct the affairs of the partnership. They are the sole determinants of whether distributions and the amount thereof are made. The Limited Partners have no ability to declare partnership distributions. If distributions are deemed to be made by the General Partners, the Limited Partners do have the right to share in such distributions in proportion to their respective interest in the **Sidney E. Smith, Jr. FLP**.

## EXISTENCE OF GOODWILL OR OTHER INTANGIBLE VALUE

The existence of goodwill for the **Sidney E. Smith, Jr. FLP** is potentially present in its initial asset, 100% of the common stock (105 shares) of **Navigation**.

See the attached valuation report for **Navigation** for a discussion of the potential goodwill associated with that business enterprise.

## SALES OF PARTNERSHIP INTERESTS AND SIZE OF BLOCK TO BE VALUED

The **Sidney E. Smith, Jr. FLP** has not had any sale transactions of partnership interests. As of the valuation date, there was no established market for a limited partnership interest in the **Sidney E. Smith, Jr. FLP** and so there is no access to arms length transactions in the marketplace for the purpose of establishing fair market value. The size of partnership interest being valued is a 1% nonmarketable minority limited partnership interest in the **Sidney E. Smith, Jr. FLP**.

Case 1:02-cv-00264-SJM    Document 79-2    Filed 09/13/2005    Page 14 of 46

Apprais⌐ ⌐f Sidney E. Smith. Jr. Family Limited⌐ ⌐rtnership

## WILLING BUYER AND WILLING SELLER

It is noteworthy that a "willing buyer" is not buying a 1% direct underlying interest in the package of assets of the **Sidney E. Smith, Jr. FLP**, but rather is purchasing the "bundle of rights" which a limited partner has pursuant to the **Sidney E. Smith, Jr. FLP** agreement. This factor has a depressing effect on value when compared with a comparable *"direct""* investment in the underlying assets.

It is important to realize that throughout the valuation report any reference to a **"willing buyer"** is also an indirect reference to the **"willing seller"** who finds him or herself in the "exact position" of any hypothetical buyer. The "willing seller" has the best perspective of the impact of the limited management rights and the restrictions inherent in the articles of the limited partnership agreement in affecting the ability to market such an investment interest.

## ARTICLES OF THE SIDNEY E. SMITH, JR. FLP AND THEIR VALUATION IMPACT

The **Sidney E. Smith, Jr. FLP** was formed under Pennsylvania law, and accordingly, Pennsylvania law governs the interpretation of the Agreement as a contract of partnership. The **Sidney E. Smith, Jr. FLP** legal counsel advises that the partnership agreement is no more restrictive than applicable Pennsylvania Partnership law. It is noteworthy that a "willing buyer" is not buying a 1% direct underlying interest in the package of assets of the **Sidney E. Smith, Jr. FLP**, but rather is purchasing the "bundle of rights" which a limited partner has pursuant to the **Sidney E. Smith, Jr. FLP** agreement. These "bundle of rights" of a limited partner are governed by the provisions of the **Sidney E. Smith, Jr. FLP** partnership agreement. A review of the principal partnership articles and the valuation implications for both the "willing buyer" and the "willing seller" was considered in the valuation process.

### Term (Life) of FLP (Section 1.4)

The term commences December 29, 1997 and ends December 31, 2050, unless dissolved and terminated earlier. The partnership shall terminate and be dissolved before December 31, 2050 only upon the consent of the General Partners (GP) and the Limited Partners (LP), or upon the sale or other disposition of all or substantially all of the assets of the partnership. As of December 31, 1997, the GP's had no plans to sell or otherwise liquidate the partnership property ("Navigation") and no plans on that date to liquidate or dissolve the **Sidney E. Smith, Jr. FLP**. Any "willing buyer" would therefore be faced with the prospect of having his or her investment tied up for a long period of time, without any ability under his or her control to recover that

investment. Section 7.2 also provides that no LP has the right to voluntarily retire or withdraw from the FLP prior to the stated expiration of the partnership, which is December 31, 2050.

*Generally the longer the term of the FLP, the more negative the impact on the valuation of a limited partnership interest.*

### Nature of Management Rights (Section 4.1)

The GP's shall make all decisions and have the exclusive right to manage the business of the Partnership. The GP's shall have the exclusive authority to make all decisions with respect to planning, financing, management, and maintenance of partnership assets and operations.

The LP's have no ability to influence the management or decision making of the FLP. The limited partner is relegated to the role of a *"passive investor"*.

*The fact that the LP's have significant limitations on their management rights tends to decrease the valuation of a limited partnership interest.*

### Extent of Voting and other Rights (Section 4.2)

*The relatively few and limited voting rights of the LP's tend to decrease the valuation of a limited partnership interest.*

### Restrictions on Transfer of Limited Partnership Interests (Article V)

The FLP agreement has rigid restrictions on the transferability of a limited partnership interest.

There is a general prohibition (Section 5.1) on the transfer of a limited partnership interest. LP's generally can not assign, mortgage, sell, exchange, gift, bequeath, transfer or otherwise dispose of their interest, in whole or in part.

The agreement does permit (Section 5.2) LP's to transfer (sell, exchange, assign, bequeath, or gift) their interest to lineal biological descendants. The partnership agreement specifically prohibits any transfers to spouses. Any such permitted transfers require the affirmative consent of the GP's of the FLP.

The FLP agreement (Section 7.1) provides for the admission of substitute limited partners only with the consent of the GP's and LP's in addition to other approval conditions. The intent here is to allow for the possibility of non-family limited partners but to have substantial approval requirements to protect the existing partnership and partners.

The LP's are prohibited (Section 7.3) from selling or disposing of their respective limited partnership interest and from pledging, encumbering or causing the creation of a security interest in any or all of his or her limited partnership interest. The FLP and the other remaining limited partners have the right to purchase any such interest at terms specified in the partnership agreement (Section 7.5). The FLP also provides for any person or entity that acquires such a limited partnership interest to have only the rights of an "assignee" of the interest. *These rights are strictly limited to the transferring partner's rights to partnership allocations and distributions. The "assignee" has no rights to any partnership information and has none of the rights associated with the limited partners under the terms of the Sidney E. Smith, Jr. FLP agreement.*

*The nature of the restrictive provisions regarding transference of a LP interest tends to decrease the value of a limited partnership interest.*

## Allocation of Income & Loss (Article III)

The FLP agreement provides for any "profit or loss" to be allocated to partners in proportion to their respective interests in the partnership. It also provides for "net cash flow" to be distributed to partners in proportion to their respective interests in the partnership. Any such distributions are at the sole discretion of the GP's in their capacity as the managers of the partnership.

*These "equal" allocation and distribution rights tend to have no effect on the value of a limited partnership interest. (See also Section 4.1 commentary)*

## Cash Distribution Requirements (Section 4.1)

There are no minimum cash distribution requirements in the partnership agreement. Any such distributions are at the sole discretion of the GP's in their capacity as the managers of the partnership. This ability of the GP's to withhold distributions is limited only by the "business judgment" rule of management accountability.

*The lack of minimum cash distribution rights to the LP's tends to decrease the valuation of a limited partnership interest. The additional risk that there might be a tax liability without a corresponding distribution of cash is a depressing factor in the valuation of a limited partnership interest.*

## Admission of Substitute Limited Partners (Section 7.1)

No person shall be admitted as a substitute limited partner unless approved by the existing GP's and the LP's. In addition, legal counsel of the partnership must review certain tax ramifications and give his or her favorable opinion

on the potential admission. Any potential substitute partner must also agree
to be bound by the provisions of the **Sidney E. Smith, Jr. FLP** agreement.

*The difficult restrictions to obtain substitute limited partner status can have a
depressing effect on the valuation of a limited partnership interest.*

Withdrawal Rights (Section 7.2)

No LP shall have the right to voluntarily retire or withdraw from the FLP
prior to the stated expiration of the partnership, which is December 31, 2050.

*This difficulty of withdrawal from the FLP tends to decrease the valuation of
a limited partnership interest, due to restrictions that impedes an effective
"exit strategy" for a hypothetical investor.*

Transfer or Assignment of a Limited Partnership Interest (Section 7.3)

This provision grants a "first right of refusal" to the partnership and to other
limited partners to purchase the interest of any limited partner wishing to sell
or otherwise dispose of his or her interest in the **Sidney E. Smith, Jr. FLP.** In
addition, the agreement also provides the opportunity for the partnership
and the other limited partners to match any purchase price negotiated
between the limited partner wishing to dispose of his or her interest and any
potential purchaser. Thus, any attempt to sell to an outsider during the
lifetime of the "willing buyer" would subject that "willing buyer" to the
possibility of receiving payment over as long as 15 years (see comments
regarding Section 7.5). A hypothetical buyer and the hypothetical seller can
face an extensive time hurdle of 270 days before the hypothetical buyer can
obtain even the restrictive rights of an **assignee.** An assignee's rights are
limited to the transferring partner's rights to allocations and distributions.
An assignee has no rights to any information or accounting of the affairs of
the partnership. In order to obtain substitute limited partner rights, the
hypothetical buyer must still obtain the approval of the GP's and LP's as well
as meet certain other requirements (see section 7.1 comments).

*The nature of the restrictive provisions regarding transference of a LP interest
tends to decrease the value of a limited partnership interest.*

Death, Insolvency, or Divorce of a Limited Partner (Section 7.4)
Purchase Price and Terms of a Limited Partnership Interest (Section 7.5)

These provisions state that in the event of the death, insolvency or divorce of
a limited partner, that the partnership and the other limited partners shall
have the right to purchase said interest at the price and on the terms provided
in section 7.5. "Fair market value" under section 7.5 would be as agreed
between the parties at that time, but in the absence of an agreement there is a

mandatory appraisal process.   A jointly selected appraiser shall take into account any applicable discounts based upon the minority status of such interest, the marketability of such interest, and the voting power or control of such interest.  If a jointly selected appraiser can not be determined, then a multiple appraiser process is undertaken to determine the fair market value of said interest.  The terms of the purchase price require promissory notes of up to 15 years (with the length of payment term selected by the purchaser) with interest based upon the applicable federal long-term debt rates.  The possibility that upon the death of the "willing buyer", his or her estate might have to be paid out over as long as 15 years would have a depressing effect upon the value of the limited partnership interest, when compared with a comparable "*direct*" investment in the fair market value of the underlying assets in the limited partnership.

*The prospect of a long-term pay out at a modest interest rate would tend to decrease the valuation of a limited partnership interest.*

## MARKET PRICE OF COMPARABLE PARTNERSHIPS

The assumption underlying the comparative entity approach is that prices of publicly traded similar entities provide objective evidence as to values at which investors are willing to buy and sell interests in those types of entities.

However, due to size and nature of the **Sidney E. Smith, Jr. FLP**, no comparable partnerships were found.  *(The appraisal of fair market value using the Adjusted Net Assets Method considered closed-end funds and their market information to aid in the assessment of an appropriate minority discount.)*

## THE VALUATION PROCESS
## (APPRAISAL OF FAIR MARKET VALUE)

### *Adjusted Net Assets Method*

The adjusted net assets method is an asset oriented approach.  This method is used to value an entity based on the difference between the fair market value of the entity assets and its liabilities.

The net asset value of the Partnership consists of the asset value of its initial asset, namely 100% of the common stock of **Navigation** ($5,200,000).  (See the attached valuation report for **Navigation**).  Since the Partnership has  no liabilities, the net asset value of the Partnership is also $5,200,000.  Deducting the General Partner's interest (3%) from net asset value yielded the total value attributable to the Limited Partners (97%) of $5,044,000, prior to appropriate discounts.

Appraisal of Sidney E. Smith, Jr. Family Limited Partnership

## OVERVIEW INDICATION OF VALUE
## SIDNEY E. SMITH, JR.
## FLP

|  | Total $ (100%) | GP's $ (3%) | LPs $ (97%) |
|---|---|---|---|
| FMV Navigation | 5,200,000 | 156,000 | 5,044,000 |

### Minority Interest Discount

*Background & Theory*

The minority interest discount is designed to reflect the decreased value of an economic interest that does not convey control of a closely held entity. Considering the conceptual levels of value reflected in Appendix A, it can be seen that the minority interest discount and the control premium measure the same net differential between the controlling interest level of value and the marketable minority interest level of value.

*Market Evidence & Analysis Relative to Valuation Subject*

The control premium has been the object of study and analysis because control premiums are observable in the marketplace when public companies are sold or merged.[1] While no direct market evidence is available regarding the magnitude of minority interest discounts for operating companies, there is direct market evidence for certain asset holding companies. *(Which compares to the Sidney E. Smith, Jr. FLP which is in essence an asset holding entity.)*

Closed-end mutual funds sell a limited number of shares and invest in securities. Unlike open-end funds, closed-end funds generally do not buy their shares back from investors who wish to sell.[2] The logic (in using closed-end funds as a proxy for assessing a minority discount level) is that if the closed-end fund could be liquidated for its adjusted net asset value (NAV), then that value represents a "control value". The price (discount from NAV) at which the minority interests actually trade would be indicative of the applicable minority interest discount.

---

[1] Mercer, Christopher Z., *Quantifying Marketability Discounts.* (Memphis Tennessee: Peabody Publishing, LP, 1997), p. 24.

[2] Barron's Market Week Closed-End Funds

The Herzfeld Closed-End Average measures 16 equally weighted closed-end funds based in the U.S. that invest principally in American equities.[3] *(This is similar to the valuation subject whose initial asset is 100% of the stock of Navigation.)* During 1997 the Herzfeld Index which charts the "% **discount from net asset value**" (Appendix B), fluctuates between 10% - 12% during the first three quarters of year and fluctuates between 5% - 10% during the last quarter. The market tended to reduce the required discount from market value near the end of 1997 with a 5% rate indicative of conditions at that time.[4] (Barron's and the Wall Street Journal also periodically report on the relationships of trading price to NAV for closed-end funds.)

Upon review of the existing market evidence, a **5% minority discount** was felt appropriate for the valuation subject (a 1% nonmarketable minority limited partnership interest in the **Sidney E. Smith, Jr. FLP**). After application of the 5% minority interest discount, a **marketable minority interest level** of value was determined for the total value attributable to the Limited Partners (97%) of $4,791,800, prior to consideration of an appropriate discount for lack of marketability.

## OVERVIEW INDICATION OF VALUE
## SIDNEY E. SMITH, JR. FLP

|  | Total $ (100%) | GP's $ (3%) | LPs $ (97%) |
| --- | --- | --- | --- |
| FMV Navigation | 5,200,000 | 156,000 | 5,044,000 |
| Minority Discount (5%) |  |  | (252,200) |
| Marketable Minority Interest |  |  | 4,791,800 |

### Lack of Marketability Discount

*Background & Theory*

According to the IRS: "Lack of marketability is defined as the absence of a ready or existing market for the sale or purchase of the securities being valued."[5]

Shannon Pratt defines *marketability* as "the ability to convert the property to cash quickly, with minimum transaction and administrative costs in so doing, and with a high degree of certainty of realizing the expected amount of

---

[3] Barron's Market Week Closed-End Funds History.

[4] Ibid.

[5] *IRS Valuation Guide for Income, Estate and Gift Taxes* (Commerce Clearing House, Inc. 1994), p. 9-3.

net proceeds."[6] All other things being equal, an interest is worth more if it is readily marketable or, conversely, worth less if it is not.[7] The concept of marketability deals with the "liquidity of the interest" -- that is, how quickly and certainly it can be converted to cash at the owner's discretion.[8] It is generally accepted within the appraisal profession that the standard for marketability (or liquidity) of minority interests in closely held business is "cash in three days."[9]

Theoretically, the marketability discount is that discount necessary to *generate a sufficient increment in return* to the (prospective) purchaser of a minority interest ..... to induce the purchaser to make this particular investment rather than an alternative investment identical in all respects save marketability.[10] Conceptually the lack of marketability discount is a methodology to equate required investment return with the commensurate risk of the investment. It is assumed that a rational investor would expect to pay somewhat less for a nonmarketable investment as opposed to a freely tradable one.

*Market Evidence*

Business appraisers generally cite four sources of evidence when determining the magnitude of marketability discounts:

- Restricted stock studies

- Pre-IPO studies

- Cost of "flotation" studies

- Tax Court Cases[11]

Restricted Stock Studies

One body of empirical evidence specifically isolates the value of the factor of marketability from all other factors: the body of data on transactions in letter

---

[6] Pratt, Shannon P., Reilly, Robert F., and Schweihs, Robert P., Valuing *a Business: The Analysis and Appraisal of Closely Held Companies*, Third Edition (Chicago, IL, Irwin Professional Publishing 1996)., p.332.

[7] Ibid.

[8] Ibid.

[9] Mercer, Christopher Z., *Quantifying Marketability Discounts*, (Memphis Tennessee: Peabody Publishing, LP, 1997), p. 6.

[10] Ibid., p. 28.

[11] Ibid., p. 37.

stocks. A *letter stock* is identical in all respects to the freely traded stock of a public company except it is restricted from trading on the open market for a certain period. The duration of the restrictions varies from one situation to another. Since marketability is the only difference between the letter stock and its freely tradable counterpart, the appraiser should try to find differences in the price at which letter stock transactions take place compared with open market transactions in the same stock on the same date. This difference will provide some evidence of the price spread between a readily marketable security and one that is identical but subject to certain restrictions on its marketability.[12]

Mercer reminds us:

> The restricted stock studies indicate that restricted shares of public companies trade, on average, at significant discounts to the market prices of their otherwise freely traded shares. Appraisers use the restricted stock studies for guidance in determining the magnitude of *marketability discounts* that might be applicable to the nonmarketable minority interests of private companies. We should not forget, however, an underlying premise imbedded in the results of the restricted stock studies: *Restricted stock is expected to gain liquidity (i.e. marketability) in two-to-three years.* This is not the case with minority interests of closely held businesses.[13]

The implication is that time impacts marketability. Closer prospects for liquidity require smaller discounts while longer term prospects for liquidity would require more significant discounts.

Appendix C, displays a summary of the results of nine restricted stock studies, The SEC Institutional Investor Study (1969), The Gelman Study (1968-1970), The Trout Study (1968-1972), The Moroney Study (about 1968-1972), The Maher Study (1969-1973), The Pittock/Stryker (Standard Research Consultants) Study (1978-1982), Willamette Management Restricted Stock Study (1981-1984), Silber Restricted Stock Study (1981-1988), and the Hall/Polacek (FMV) Study (1969-1992).

The summary indicates an amazing closeness of the medians and means in all the studies despite the significant time span of the specific studies. The summary indicates an average median discount of 33.0% and an average mean discount of 31.4% which encompass the nine individual studies.

---

[12] Pratt, et. al., p. 335.

[13] Mercer, p. 39.

The other significant information depicted in the summary is the *extreme range of discounts* (lows of negative discounts to highs of 90% marketability discounts) indicated by the studies. Mercer suggests that the early studies focused on the factors that might tend to explain this wide variation in discounts. Later studies have not followed in a similar fashion so that the knowledge of marketability discounts, and the technology or methodology for developing them in specific cases, has not advanced as rapidly as other areas of the appraisal profession.[14]

Pratt implies there is a consensus that discounts for lack of marketability for shares of closely held companies **should be greater** than those for restricted shares of publicly held companies, since closely held shares have no established market in which they can eventually sell following the removal of certain trading restrictions.[15]

The summary however does provide an initial base of reference for how the markets factor lack of marketability in restricted stock situations.

Pre-IPO Studies

After the mid-1970's, the number of restricted stock issues of existing public companies declined. Attention turned to the steady stream of initial public offerings (IPOs) as potential evidence of lack of marketability valuation information.

A pre-IPO discount reflects a comparison of the pricing of transactions that occur in the period preceding a company's initial public offering of its shares with the actual pricing of the IPO.[16] The pre-IPO discount is an attempt to assess the impact of the lack of marketability.

*The Emory Studies (1980-1995):*

These studies analyzed the relationship between the shares of companies whose shares were initially offered to the public in IPOs and the prices at which their shares were traded within a short period (five months) of time immediately prior to their related public offerings.

The summary of the Emory Studies (Appendix D) suggests fairly consistent means (average 44%) and medians (average 43%) with a significant variation between high to low discounts. These results are similar to those observed in the restricted costs studies.

---

[14] Ibid., p. 69.

[15] Pratt, et. al., p.342.

[16] Mercer, p.36.

The studies appear to indicate that many presumably arms length transactions taking place within a short time of actual IPO's occur at substantial discounts to the ultimate public offering prices.[17]

**Emory suggests that for many smaller and/or less profitable, closely held companies with little or no prospects for an IPO or for other liquidity options, the implied marketability discounts should be even greater than those indicated by his studies.[18]**

### _The  Williamette  Management  Associates  Studies  (1975-1993):_

These studies analyzed similar relationships between the shares of companies whose shares were initially offered to the public in IPOs and the prices at which their shares were traded within a period of time immediately prior to their related public offerings. The time frame was longer than the five months used in the Emory Studies and included transactions from 1 to 36 months prior to the related IPO.  The Williamette studies used different SEC registration information resulting in a more comprehensive listing of potential transactions than those used by Emory.  The summary of the Williamette Studies (Appendix E) indicates similar results to those of Emory by suggesting average discounts near 41%.

Shannon Pratt observes that the evidence from the Emory and Williamette studies taken together seems compelling.  The studies covered hundreds of transactions over 19 years.  Average differentials between private transaction prices and public market prices varied under different market conditions, ranging from about 40 to 63 percent, after eliminating the outliers.  This is very strong support for the hypothesis that the fair market values of minority ownership interests in privately held companies are greatly discounted from their publicly traded counterparts.[19]

Chris Mercer concludes that the pre-IPO data should be considered indicative of - but, like restrictive stock discounts, not conclusive of - the magnitude of marketability discounts that might be applicable to minority discounts of private companies.[20]  He further cautions that the pre-IPO studies capture the net effect of lack of marketability in combination with other factors that are specific to each initial public offering.[21]

---

[17]  Ibid., p.82.

[18]  Ibid., p.82.

[19]  Pratt, p. 348.

[20]  Mercer, p. 91.

[21]  Ibid., p. 77.

Cost of "Flotation" Studies

*(These studies have relevance under "Controlling Interest" circumstances and therefore were not considered for this "Minority Interest" situation.)*

Tax Court Cases

Appraisers often cite court opinions when supporting their development of lack of marketability discounts.

Chris Mercer makes three broad observations about recent Tax Court decisions and trends:

- The Tax Court increasingly relies upon the side that is better prepared and has a well-developed, well-documented, and reasonable conclusion consistent with all the facts and circumstances.

- The Tax Court has a growing desire for business appraisers to treat the facts and circumstances of each particular case *with specificity*. The desire is for documented facts and circumstances along with consideration regarding each important fact, circumstance, assumption and conclusion.

- The Tax Court is giving more focus to the specific background, experience, education, professional credentials, and training that is relevant to business valuations.[22]

Tax Court cases can provide guidance under similar facts and circumstances but often are not relevant to the specifics of a distinct valuation. Tax Court cases in general seem supportive of the concept of marketability discounts but the degree and extent of such discounts are valuation specific.

*The Quantitative Marketability Discount Model (QMDM)*

Chris Mercer, ASA, CFA, of Mercer Capital has developed the QMDM in an attempt to **quantify** marketability discounts by considering "**the fundamental elements of value**" used by investors in making investment decisions. *(Mercer has developed an analytical tool to assist valuators in quantifying discounts rather than merely using average discounts indicated by historical studies.)* The investor elements of value used in the QMDM are:

- **Capital Appreciation.** Investors are concerned with the anticipated growth of their investment. *(How fast will my investment grow?)*

---

[22] Ibid., p. 95-96.

- **Dividend Yield.** Investors are concerned with the interim cash flows (distributions) of their investment. *(How much periodic cash flow can I anticipate while I hold my investment?)*

- **Term of Investment.** Investors are concerned with the anticipated term of their investment. *(How long will I likely be tied to my investment?)*

- **Prospects for Liquidity.** Investors are concerned with their anticipated prospects for liquidity during or at the end of the investment term. *(How will I finally liquidate my investment and get my cash back?)*

- **Investor's Required Holding Period Return.** Investors are concerned with achieving a commensurate return given all the factors related to a specific investment. *(What return will I require considering the risks associated with my investment?)*

The objective of the QMDM is to provide a valuation model to estimate marketability discounts that reflect the fair market value of business interests at the nonmarketable minority interest level. The model attempts to simulate the way market participants actually behave and to fit the facts and circumstances as they are known, with respect to their behavior.[23]

*The QMDM challenges the logic of most appraiser determined marketability discounts being constrained to the 30% to 40% range without a careful assessment of the underlying facts and circumstances that may indicate widely divergent discounts outside the routinely used range.*[24] The previously discussed "restricted stock studies" summary demonstrates the *extreme range of discounts* (lows of negative discounts to highs of 90% marketability discounts) indicated by the studies. Mercer suggests that the early studies focused on the factors that might tend to explain this wide variation in discounts. Later studies have not followed in a similar fashion so that the knowledge of marketability discounts, and the technology or methodology for developing them in specific cases, has not advanced as rapidly as other areas of the appraisal profession.[25] The model attempts to deal with the "specific facts and circumstances" of the valuation subject. This should enhance the ability of the valuation profession to move beyond simply using "average" discounts when empirical evidence suggests a wide dispersion of discounts depending on the specific facts and circumstances.

---

[23] Ibid., p. 156-157.

[24] Ibid., p. 162.

[25] Ibid., p. 69.

Appendix F distinguishes between enterprise levels of value and the shareholder level of value. The enterprise level of value pertains to the "control value" and to the "as if freely tradable minority interest value", while the shareholder level of value relates to the "nonmarketable minority interest value". The term "nonmarketability minority interest level" describes the level of value at which real-life transactions involving illiquid minority interests might take place.[26] The marketability discount reflects the shareholder's (equity interest holder's) inability to liquidate an investment at will.

The QMDM approach addresses the elements of investor value and attempts to more extensively quantify (rather than subjectively qualify) the appropriate marketability discount for a specific investment choice. The QMDM was designed to help an appraiser focus on the critical factors that influence marketability discounts and to quantify their impact in the context of real-life valuation situations.[27]

## The QMDM and its Application to the Valuation Subject

### The underlying assumptions of the QMDM are:

**Rate of Growth (Capital Appreciation): 3.0%**
The anticipated growth rate for the partnership interest would seem to coincide with the anticipated underlying growth rate of its underlying asset, (Navigation). The accompanying valuation report of Navigation indicates an assumed growth rate of 3.0%, which seems appropriate to use in the QMDM.

**Interim Cash Flows (Dividend Yield): .2191%**
The anticipated interim cash flows for the partnership interest would seem to coincide with the anticipated dividend flows from the underlying asset (Navigation). The company has a nominal annual dividend history of $10,500 during the four years 1994 through 1997. There is no evidence that amount will significantly change in the future. Although the Sidney E. Smith, Jr. FLP may receive such dividend streams, it is at the sole discretion of the GP's as to whether such income and how much of such income will be distributed to the partners. It is quite possible that the limited partners could be allocated a pro rata portion of such dividends without receiving any cash distributions, which would require them to pay taxes without receiving any cash. However, given that the amount of the anticipated Navigation dividend stream is nominal, it was assumed that all such dividends would be redistributed to the partners with the limited partners receiving their pro rata share. The $10,500 annual dividends compared to the freely tradable

---

[26] Ibid., p. 157.

[27] Ibid., p. 209.

marketable minority interest value of $4,791,800 indicates an unattractive annual yield of .2191%.

### The Expected Growth Rate in Dividends/Distributions: 3%
Dividends are expected to grow at approximately the same rate as the expected value growth rate of 3%. This seems a reasonable assumption given the facts and circumstances of the valuation subject.

### Probable Holding Period: 7-15 Years
The expected holding period is an important assumption in the QMDM. Mercer emphasizes that when an appraiser applies a marketability discount to a marketable minority interest (as if freely tradable) valuation indication of value, and justifies that discount by reference to the aforementioned restricted stock studies and pre-IPO studies, he or she is making an implicit assumption about the probable (expected) holding period and the required holding period rate of return.[28] The QMDM attempts to deal more directly with this underlying assumption.

The provisions of the Sidney E. Smith, Jr. FLP prevent the voluntary retirement or withdrawal of a limited partner prior to the stated expiration of the partnership, which is December 31, 2050. Other provisions (right of first refusal and substitute partner approval) make it very difficult for the seller of a limited partnership interest to entice a buyer from outside the family. A hypothetical buyer of an equity interest (assuming they could get by the provisions of the partnership agreement) would have the potential (how probable becomes the issue) for the voluntary termination and liquidation of the partnership which would in essence require the liquidation of the underlying assets and the approval of all the limited and general partners to dissolve the partnership. A 50+ year potential holding period seems remote since changes do take place but a short time horizon of less than five years seems also remote. Most investments in closely held entities are for longer as opposed to shorter periods of time. A seven to fifteen year holding period was chosen as being a reasonable expectation for the anticipated length of time the investment would be held.

### Probable Holding Period (Rate of) Return: 21% to 24%
The required holding period rate of return is a *discount rate* applicable to the cash flows from the subject illiquid investment *from the perspective of the minority interest holder*. The required holding period return reflects the investor's required rate of return, or the opportunity cost of investing in the subject company versus another, similar investment that has immediate market liquidity.[29] The required holding period return of the QMDM is based

---

[28] Mercer Quantitative Marketability Discount Model Tutorial.

[29] Mercer p. 213-214.

upon a modified version of the Capital Asset Pricing Model, that is called the Adjusted Capital Asset Pricing Model (ACAPM). The ACAPM is adjusted to include **shareholder level** concerns rather than enterprise level issues. Appendix G-1 summarizes the computation and assumptions related to the development of the ACAPM for the valuation subject.

The development of the required rate of return is as follows:

- The long-term "risk free" rate of 6.04% representing the December 15, 1997 20 year Treasury Bond rate was obtained from Shannon Pratt's Cost of Capital recap in the **Shannon Pratt's Business Valuation Update** publication.

- An equity risk premium of 7.50% (representing the expected risk premium over the risk-free rate that investors expect to get by investing in a broad index of the common stock market) was obtained from from Shannon Pratt's Cost of Capital recap in the **Shannon Pratt's Business Valuation Update** publication and added to the risk-free rate.

- A size related premium of 3.50%, to reflect the expected micro-size premium for capitalization below $171 million, was obtained from from Shannon Pratt's Cost of Capital recap in the **Shannon Pratt's Business Valuation Update** publication and added to the risk-free rate.

- *Investor Specific Risk Premiums* for the valuation subject were also considered. Additional risk factors include:

  - Uncertainties of the expected holding period of the investment. The partnership has a fifty+ year stipulated life and the opportunities to liquidate the investment are significantly limited by the partnership agreement. (Premium of 1% to 2%)

  - General illiquidity of the limited partnership investment. (Premium of 1% to 2%)

  - Lack of expected interim cash flows due to no anticipated cash distributions. (Premium of .5%)

  - Rights of first refusal that exist in the **Sidney E. Smith, Jr. FLP** that are a significant impediment to a hypothetical buyer and the hypothetical seller who is in the same shoes that the hypothetical buyer may find him or her self.  (Premium of 1% to 2%)

  - Restrictions on the use of the limited partnership interest as loan collateral, which decreases financial flexibility for a hypothetical buyer. (Premium of .5%)

Chris Mercer, in assessing the QMDM and its relationship to the aforementioned restricted stock studies concludes: "If one accepts the validity of restricted stock studies as providing market evidence of the cost of illiquidity, other things being equal, he has accepted holding period return expectations beginning at least in the 20% to 30% range."[30]

---

[30] Ibid., p. 256.

The aforementioned process derived an estimated range of 21% to 24% for the required holding period return.

## Marketability Discount indicated by use of the QMDM : 70%

Appendix H-1 suggests, using the aforementioned discussed investment parameters, a range of marketability discounts of 67% to 93%. This range covers assumed investment holding periods of 7 to 15 years and assumed required holding period returns of 21% to 24%. Appendix H-2 (which provides the underlying components of Appendix H-1) displays the calculated present values of the periodic dividend streams and the investment terminal values. The present value of the dividend streams is negligible due to the extremely low annual dividend rate of .2191%, while the present value of the investment terminal value is what drives the implied marketability discounts. ( *Additional factors not specifically addressed in the QMDM process that were considered are the nature of the underlying asset of the Sidney E. Smith, Jr. FLP ("Navigation") which is an illiquid asset as compared to cash or readily tradable market securities), and the fact that there were no plans to sell or dispose of the underlying asset of the FLP as of December 31, 1997.*

A marketability discount of **near** 70% was indicated by the QMDM which is slightly above the lower end of the implied range.

*Concluded Marketability Discount*

A concluded marketability discount of 50% was chosen which is below the rate implied by the QMDM and a conservative reflection of the marketability discount. This appears to be a reasonable marketability discount for an investment decision by a hypothetical buyer given the existing facts and circumstances. It is also a reasonable discount for a hypothetical seller who finds him or her self in the current position contemplated by the hypothetical buyer.

It is significant to note that the courts are increasingly recognizing the depressing effect that the restricted rights of limited partners can have on valuations of their interests. The recent Marriott Hotel Properties case before the Delaware Chancery Court discusses the restricted rights of limited partners and the potentially adverse impact on value.[31]

Upon consideration of the relevant facts and circumstances, a 50% lack of marketability discount appears reasonable given the restricted nature of the

---

[31] Marriott Hotel Properties II Limited Partnership Unitholders Litigation, 1997 WL 589028 (Del. Ch., Sept. 17, 1997). Vice Chancellor Taub.

partnership agreement, the nature of the underlying partnership assets, the prospect for no or nominal interim cash flows, the prospect for a long-term investment holding period, and the mitigating factor of average growth prospects for the underlying partnership asset.

OVERVIEW INDICATION OF VALUE
SIDNEY E. SMITH,
JR. FLP

| | Total $ 100% | GP's $ 3% | LPs $ 97% |
|---|---|---|---|
| FMV Navigation | 5,200,000 | 156,000 | 5,044,000 |
| Minority Discount (5%) | | | (252,200) |
| | | | 4,791,800 |
| Lack of Marketability Discount (50%) | | | (2,395,900) |
| | | | 2,395,900 |
| Implied Value of 1% limited partnership interest | | | 24,700 |
| Rounded 1% limited partnership interest | | | 24,700 |

## VALUATION SYNTHESIS & CONCLUSION

It is our considered opinion that the fair market value of a 1% nonmarketable minority limited partnership interest in the **Sidney E. Smith, Jr. FLP** as of December 31, 1997 is:

### APPROXIMATELY TWENTY FOUR THOUSAND SEVEN HUNDRED DOLLARS

### $24,700

VAL 1/97                                                                            8-15

### EXHIBIT 8-8

### EXAMPLE OF RELATIONSHIPS BETWEEN MINORITY INTEREST DISCOUNTS, CONTROL PREMIUMS, AND DISCOUNTS FOR LACK OF MARKETABILITY



**Note:**

[a]  Control shares in a privately held company may also be subject to some discount for lack of marketability, but usually not nearly as much as minority shares.

SOURCE: Practitioners Publishing Company Guide to Business Valuations, Chapter 8, page 8-15.

Appraisal of Sidney E. Smith, Jr. Family Limited Partnership

February 9, 1998

BARRON'S • MARKET WEEK

# CLOSED-END FUNDS

Closed-end funds sell a limited number of shares and invest in securities. Unlike open-end funds, closed-end funds generally do not buy their shares back from investors who wish to sell. Instead, shares trade on a stock exchange. The following list, provided by Lipper Analytical Services, shows the ticker symbol and exchange where each fund trades (A: American; C: Chicago; N: NYSE; O: Nasdaq; T: Toronto; z: does not trade on an exchange). The data also include the fund's most recent net asset value (NAV), as well as its closing share price (or its respective exchange or the bid), the NAV was adjusted, and the percentage difference between the market price and NAV (the premium or discount), unless indicated by a dagger as otherwise, for equity funds,

the fund column provides 52 week returns based on market prices plus dividends, the past 12 months' income distributions as a percentage of the current income at the Net Asset Value and the market price are ex-distribution. In the NAV, market price and premium or discount are as of Thursday's close. d: NAV and premium or discount are as of Wednesday's close. e: NAV assumes rights subscribed. v: NAV is corrected at the commercial fund rate. y: NAV and income in Canadian dollars. N/A: Information is not available or is not applicable. ♦ Free annual reports are available by phoning 1-800-965-2929 or faxing 1-800-717-7688.



TRACKING CLOSED-END FUNDS

The tables below show data for closed-end funds as of Friday, February 06, 1998.

## General Equity Funds

| Fund Name (Symbol) | Stock Exch | NAV | Market Price | Prem /disc | 52 Week Market Return |
|---|---|---|---|---|---|
| Adams Express (ADX) | | | | | |
| Alliance All-Mkt (AMO) | | | | | |
| Avalon Capital (MGI) | | | | | |
| Baker Fentress (BKF) | | | | | |
| Bergstrom Cap (BEM) | | | | | |
| Blue Chip Value (BLU) | | | | | |
| Central Secs (CET) | | | | | |
| Corp Renaissance (CREN) | | | | | |
| Engex (EGX) | | | | | |
| Equus II (EQS) | | | | | |
| Gabelli Equity (GAB) | | | | | |
| General American (GAM) | | | | | |
| Liberty AllStar Eq (USA) | | | | | |
| Liberty AllStr Gr (ASG) | | | | | |
| MFS Special Val (MFV) | | | | | |
| Morgan FunShares (MFUN) | | | | | |
| Morgan St San Cap (MSG) | | | | | |
| NAIC Growth (GRF) | | | | | |
| Royce Value (RVT) | | | | | |
| Royce JS BFC v | | | | | |
| Salomon SBF (SBF) | | | | | |
| Source Capital (SOR) | | | | | |
| Tri-Continental (TY) | | | | | |
| Zweig (ZF) | | | | | |

## Specialized Equity Funds

Appraisal of Sidney E. Smith, Jr. Family Limited Partnership

| Summary Results of Nine Restricted Stock Studies | | | | | Range | |
|---|---|---|---|---|---|---|
| Study | Number of Observations | Medians | Means | Standard Deviations | Low | High |
| 1  SEC Institutional Investor Study | 398 | 24% | 26% | na | (15%) | 80% |
| 2  Gelman Study | 89 | 33% | 33% | na | <15% | >40% |
| 3  Moroney Study | 146 | 34% | 35% | 18% | (30%) | 90% |
| 4  Maher Study | 34 | 33% | 35% | 18% | 3% | 76% |
| 5  Trout Study | 60 | na | 34% | na | na | na |
| 6  Stryker/Pittock Study | 28 | 45% | na | na | 7% | 91% |
| 7  Willamette Management Assoc. | 33 | 31% | na | na | na | na |
| 8  Silber Study | 69 | na | 34% | 24% | (13%) | 84% |
| 9  Hall/Polacek Study | 100+ | na | 23% | na | na | na |
| Averages | | 33.0% | 31.4% | | | |

Figure 2-2

SOURCE: Quantifying Marketability Discounts, Z. Christopher Mercer, ASA, CFA, Peabody Publishing, LP Memphis, 1997 p. 45.

## The Emory Studies (1985-1995)

| Period | Number of IPOs | Discount to IPO | | Dispersion of Observations | | |
|---|---|---|---|---|---|---|
| | | Mean | Median | High | Low | Std. Dev. |
| 1985-1986 | 21 | 43% | 43% | 83% | 3% | 21% |
| 1987-1989 | 27 | 45% | 45% | 82% | 4% | 21% |
| 1989-1990 | 23 | 45% | 40% | 94% | 6% | 22% |
| 1990-1992 | 35 | 42% | 40% | 94% | -6% | 22% |
| 1992-1993 | 54 | 45% | 44% | 90% | -4% | 21% |
| 1994-1995 | 46 | 45% | 45% | 76% | 6% | 18% |
| All Years | 206 | 44% | 43% | 94% | -6% | 21% |

Figure 3-2

SOURCE: Quantifying Marketability Discounts, Z. Christopher Mercer, ASA, CFA, Peabody Publishing, LP Memphis, 1997 p. 80.

Appra[...] of Sidney E. Smith, Jr. Family Limite[...] Partnership

| | Number of | Number of | Standard | Trimmed | | |
|---|---|---|---|---|---|---|
| Time Period | Companies Analyzed | Transactions Analyzed | Mean Discount | Mean Discount* | Median Discount | Standard Deviation |
| 1975-1978 | 17 | 31 | 34.0% | 43.4% | 52.5% | 58.6% |
| 1979 | 9 | 17 | 55.6% | 56.8% | 62.7% | 30.2% |
| 1980-1982 | 58 | 113 | 48.0% | 51.9% | 56.5% | 29.3% |
| 1983 | 85 | 214 | 50.1% | 55.2% | 60.7% | 34.7% |
| 1984 | 20 | 33 | 43.2% | 52.9% | 73.1% | 65.9% |
| 1985 | 18 | 25 | 41.3% | 47.3% | 42.6% | 43.5% |
| 1986 | 47 | 74 | 38.5% | 44.7% | 47.4% | 44.2% |
| 1987 | 25 | 40 | 36.9% | 44.9% | 43.8% | 49.9% |
| 1988 | 13 | 19 | 41.5% | 42.5% | 51.8% | 29.5% |
| 1989 | 9 | 19 | 47.3% | 46.9% | 50.3% | 18.6% |
| 1990 | 17 | 23 | 30.5% | 33.0% | 48.5% | 42.7% |
| 1991 | 27 | 34 | 24.2% | 23.9% | 31.8% | 37.7% |
| 1992 | 36 | 75 | 41.9% | 47.0% | 51.7% | 42.6% |
| 1993 | 51 | 110 | 46.9% | 49.9% | 53.3% | 33.9% |
| Overall Averages | | | 41.4% | 46.1% | 51.9% | 40.0% |

**Summary of Discounts for Private Transaction P/E Multiples Compared to Public Offering P/E Multiples Adjusted for Changes in Industry P/E Multiples**

* Excludes the highest and lowest deciles of indicated discounts

Figure 3-4

SOURCE: Quantifying Marketability Discounts, Z. Christopher Mercer, ASA, CFA, Peabody Publishing, LP Memphis, 1997 p. 84.

Appraisal of Sidney E. Smith, Jr. Family Limited Partnership



Figure 5-1

SOURCE: Quantifying Marketability Discounts, Z. Christopher Mercer, ASA, CFA, Peabody Publishing, LP Memphis, 1997 p. 164.

# THE QUANTITATIVE MARKETABILITY DISCOUNT MODEL (QMDM)

as presented in *Quantifying Marketability Discounts (QMD)*

For the Sidney E. Smith, Jr. Family Limited Partnership
December 31, 1997

BUILD-UP OF THE REQUIRED HOLDING PERIOD RATE OF RETURN
USING THE ADJUSTED CAPITAL ASSET PRICING MODEL.

DERIVATION OF SHAREHOLDER-LEVEL REQUIRED HOLDING PERIOD RATE OF RETURN

| Components of the Required Holding Period Return | | Lower | Higher | Source/Brief Rationale |
|---|---|---|---|---|
| Long-Term Government Bond Yields-to-Maturity | | 6.04% | 6.04% | Shannon Pratt's Cost of Capital 12/15/97 |
| Ibbotson Common Stock Premium | 7.50% | | | Shannon Pratt's Cost of Capital 12/15/97 |
| x Market Beta | 1.00 | | | Assumed to be 1 |
| = Beta Adjusted Common Stock Premium | 7.50% | | | |
| + Small Cap Stock Premium | 3.50% | | | Shannon Pratt's Cost of Capital 12/15/97 |
| = Total Equity Premium | | 11.00% | 11.00% | |
| Base Holding Period Required Return | | 17.04% | 17.04% | *Base equity discount rate* |

Investor Specific Risk Premium(s) for This Entity:

| | Lower | Higher | |
|---|---|---|---|
| + Uncertainties Related to Expected Interim Cash Flows | 0.00% | 0.00% | |
| + Potential for Adverse Cash Flow | 0.00% | 0.00% | |
| + Uncertainties due to Potential for Unfavorable Exit | 0.00% | 0.00% | |
| + General Unattractiveness of the Investment | 0.00% | 0.00% | |
| + More Onerous Restrictions on Transfer | 0.00% | 0.00% | |
| + Lack of Diversification of Assets | 0.00% | 0.00% | |
| + Unattractive Asset Mix | 0.00% | 0.00% | |
| + Uncertainties due to risks of future investment strategies | 0.00% | 0.00% | |
| + Unlikely Candidate for Merger/Sale/Acquisition/IPO | 0.00% | 0.00% | |
| + Uncertainties Related to Buy/Sell Agreement | 0.00% | 0.00% | |
| + Small Shareholder Base | 0.00% | 0.00% | |
| + Adjustment for Large Size of the Entity | 0.00% | 0.00% | |
| + Large Size of the Investment Limits Market | 0.00% | 0.00% | |
| + Other | 0.00% | 0.00% | |
| Total Investor Specific Risk Premium for This Entity | 4.00% | 7.00% | |
| Estimated Range of Required Holding Period Returns | 21.04% | 24.04% | |

| | Lower | Higher | |
|---|---|---|---|
| Estimated Range of Required Holding Period Returns | 21% | 24% | Rounded |

# LEGAL AND COURT CASE UPDATE

**LIMITED PARTNERSHIP DISPUTE**

# Court interprets limited partners' rights to be very restricted
## Important implications for FLP formation and valuation

*In Re Marriott Hotel Properties II Limited Partnership Unitholders Litigation,* 1997 WL 589028 (Del. Ch., Sept. 17, 1997). Vice Chancellor Taub.

**Key words:**
Limited partnership. Tender offer. Hotels. Partnership agreement

In 1988, Host Marriott arranged to form a limited partnership to own three hotels and a 50% interest in a fourth. It created "Marriott MLP" to be the general partner, and sold 745 limited partnership units for $100,000 each on a subscription basis or $89,247 cash.

In April 1996. Host, through "Acquisition Corp." tendered to purchase any or all of the limited partnership units at $125,000 each, provided that it obtained at least 50.1%. At expiration of the tender offer, only 30% were tendered. Marriott raised the offer to $150,000 per unit, extended it one month, and received tenders for 50.6%

Suits claiming an unfair price, breach of fiduciary duty and lack of full disclosure were brought by separate limited partners in the Delaware Chancery Court and Florida state court, the latter action subsequently removed to the U.S. District Court for the Southern District of Florida.

In the instant action, the Delaware plaintiffs seek to dismiss the Delaware action and consolidate it with the Florida action. They apparently seek a tactical advantage, expecting the Florida court to be more favorable to the plaintiffs' case. The plaintiffs' motion was granted.

*SP Comments: Language from the Delaware Chancery Court Opinion is very interesting, perhaps worthy of note by those valuing FLP interests:*

"In important respects, the rights of the limited partners are restricted by the partnership agreement. First, while the limited partners have the right to assign their entire economic interest in the partnership without the General Partners's consent (subject only to certain limitations intended to preserve the entity's partnership tax status), the General Part-

ner has the right to decide, in its "absolute discretion," whether or not to admit an assignee of a limited partner's interest as a substituted limited partner. A limited partner's right to vote terminates upon the assignment of his interest, but only by becoming a substituted limited partner does the assignee of a limited partner's interest become entitled to vote. Second, the partnership agreement names Marriott MHP as the General Partner and states that it cannot be removed from this position by the limited partners unless it has breached a fiduciary duty. Third, the partnership agreement also provides that the general partner "shall have the exclusive right and power to conduct the business and affairs of the partnership and to do all things necessary to carry on the business of the Partnership in accordance with the provisions of this Agreement and applicable law ...." Fourth, consistent with the broad managerial powers conferred on the General Partner, the voting rights of the limited partners are restricted to extraordinary transactions, such as a sale of the partnership's assets, a merger or a dissolution.

The restrictions on the ability of the limited partners to assign the right to vote and to replace the General Partner significantly curtail the ability of the limited partners, even acting together, to exercise control over the partnership or to transfer control thereof to any other person."

*The Delaware court, in the instant action, also had the following to say about Chancellor Allen's prior denial of the plaintiffs' motion to enjoin the tender offer:*

"express provisions of detailed limited partnership agreements concerning the rights and duties of the parties thereto, and not broad concepts of fiduciary duties, will "form the metric for determining breach of duty."

"Thus, he rejected plaintiffs' contention that defendants breached their fiduciary duties by failing to solicit possible alternative transactions, finding instead that the "absolute discretion" enjoyed by the General Partner under the partnership agreement was entirely

inconsistent with the existence of a fiduciary duty to locate or approve a sale at a higher price to a third party. This conclusion would seem to be consistent with and, indeed, compelled by applicable Delaware precedent."

"The Chancellor also grounded his denial of the preliminary injunction motion on the well-established precedent that Host was under no fiduciary duty to offer a "fair" price for the limited partnership interest, so long as the tender offer did not entail coercion and was made with full disclosures."

*Courts often say that one criterion in evaluating the validity of FLP provisions is whether or not arms' length buyers would buy into such provisions. In Marriott Hotel Properties II, people certainly bought into some very restrictive provisions (See full text of the case on BVU Online for details of some of the important provisions.)*

*It seems to me that the buyers' acceptance of the provisions and the Delaware court's interpretation of the very stringent limitations on the rights of limited partners is an important point of reference in valuing limited partnership interests.* **BVU**

## COST OF CAPITAL

| Treasury yields (12/15/97)[1] | Equity risk premium[1] Arithmetic | Geometric |
|---|---|---|
| 30-day: 5.02% | 3.9% | 7.0% |
| 5-year: 5.78% | 7.7% | 6.0% |
| 20-year: 6.04% | 7.3% | 5.6% |
| Small stock premium (< $197 mil. mkt. cap)[1] | | 3.5% |
| 10th-decile-size prem. (< $94 mil. mkt. cap)[1] | | 5.8% |
| Prime lending rate[2] | | 6.93% |
| Dow Jones 20-bond yield[3] | | 7.06% |
| Barron's intermediate-grade bonds[3] | | 7.05% |
| High yield estimate[4] | | |
| | Mean 9.43% | Median 8.42% |

Dow Jones Industrial P/E ratios[3]:
Current: 20.2   On '77 ests: 18.7   On '78 ests: 16.3
Long-term inflation estimate[4]:   2.90%

[1] Computed using data from Stocks, Bonds, Bills, and Inflation 1997 Yearbook™ (Chicago: Ibbotson Associates, 1997; annual update with 1st Quarter '97 Ibbotson and Associates. Used with permission. All rights reserved. We highly recommend that analysts using Ibbotson data for cost of capital have the current year's book and thoroughly understand the derivation of the numbers used.
[2] Wall Street Journal, December 18, 1997; convictions by SYU
[3] Barron's, December 15, 1997
[4] Federal Reserve Bank of Philadelphia, Livingston Survey, June 1997

# THE QUANTITATIVE MARKETABILITY DISCOUNT MODEL (QMDM)
as presented in *Quantifying Marketability Discounts (QMD)*

## Sidney E. Smith, Jr. Family Limited Partnership
### December 31, 1997

| | |
|---|---|
| Base Value (Marketable Minority Interest) | $1.00 |
| Expected Growth Rate of Underlying Value | 3.00% |
| Expected Dividend Yield | 0.2191% |
| Expected Growth Rate of Dividend | 3.00% |

| | |
|---|---|
| Beginning Table Return | 18% |
| Increasing by | 1% |

| | |
|---|---|
| Average of 2-4 Year III* | 39% |
| Average of 5-7 Year III* | 63% |
| Average of 8-10 Year III* | 78% |
| Average of 10-20 Year III* | 89% |

| | |
|---|---|
| Average of 7-10 Year III* | 76% |

| | |
|---|---|
| **Concluded Marketability Discount** | **50%** |

| Required Holding Period Return (Annual %) | Assumed Holding Periods in Years | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 15 | 20 | 25 | 30 |
| | Implied Marketability Discounts | | | | | | | | | | | | | |
| 18.0% | 13% | 23% | 33% | 41% | 49% | 55% | 60% | 65% | 69% | 73% | 86% | 92% | 95% | 97% |
| 19.0% | 13% | 25% | 35% | 43% | 51% | 57% | 63% | 67% | 72% | 75% | 87% | 93% | 96% | 97% |
| 20.0% | 14% | 26% | 36% | 45% | 53% | 59% | 65% | 70% | 74% | 77% | 89% | 94% | 96% | 98% |
| 21.0% | 15% | 27% | 38% | 47% | 55% | 61% | 67% | 71% | 75% | 79% | 90% | 95% | 97% | 98% |
| 22.0% | 15% | 28% | 39% | 49% | 56% | 63% | 69% | 73% | 77% | 81% | 91% | 95% | 97% | 98% |
| 23.0% | 16% | 30% | 41% | 50% | 58% | 65% | 70% | 75% | 79% | 82% | 92% | 96% | 98% | 98% |
| 24.0% | 17% | 31% | 42% | 52% | 60% | 66% | 72% | 76% | 80% | 83% | 93% | 96% | 98% | 98% |
| 25.0% | 17% | 32% | 44% | 53% | 61% | 68% | 73% | 78% | 82% | 85% | 93% | 97% | 98% | 99% |
| 26.0% | 18% | 33% | 45% | 55% | 63% | 69% | 75% | 79% | 83% | 86% | 94% | 97% | 98% | 99% |
| 27.0% | 19% | 34% | 46% | 56% | 64% | 71% | 76% | 80% | 84% | 87% | 95% | 97% | 98% | 99% |

PV=100%

Note: This table uses the mathematics of the Quantitative Marketability Discount Model as published in Mercer, Z. Christopher, *Quantifying Marketability Discounts* (Memphis, TN: Peabody Publishing, LP, 1997), as demonstrated in Chapter 9

H-1

THE QUANTITATIVE MARKETABILITY DISCOUNT MODEL (QMDM)
as presented in *Quantifying Marketability Discounts (QMD)*

## Sidney E. Smith, Jr. Family Limited Partnership
### December 31, 1997

| | |
|---|---|
| Base Value (Marketable Minority Interest) | $1.00 |
| Expected Growth Rate of Underlying Value | 3.00% |
| Expected Dividend Yield | 0.2191% |
| Expected Growth Rate of Dividend | 3.00% |

| | |
|---|---|
| Beginning Table Return | 18% |
| Increasing by | 1% |

| | |
|---|---|
| Average of 3-4 Year HP | 39% |
| Average of 5-7 Year HP | 63% |
| Average of 8-10 Year HP | 78% |
| Average of 10-20 Year HP | 89% |

| | |
|---|---|
| Average of 7-10 Year HP | 76% |

| | |
|---|---|
| **Concluded Marketability Discount** | **50%** |

### PRESENT VALUES OF DIVIDEND STREAM

Table 1

| Required Holding Period Return (%) | Assumed Holding Periods | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 15 | 20 | 25 | 30 |
| 18.0% | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.02 | $0.02 |
| 19.0% | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| 20.0% | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| 21.0% | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| 22.0% | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| 23.0% | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| 24.0% | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| 25.0% | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| 26.0% | $0.00 | $0.00 | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| 27.0% | $0.00 | $0.00 | $0.00 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |

### PRESENT VALUES OF TERMINAL VALUE

Table 2

| Required Holding Period Return (%) | Assumed Holding Periods | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 15 | 20 | 25 | 30 |
| 18.0% | $0.87 | $0.76 | $0.67 | $0.58 | $0.51 | $0.44 | $0.39 | $0.34 | $0.29 | $0.25 | $0.13 | $0.07 | $0.03 | $0.02 |
| 19.0% | $0.87 | $0.75 | $0.65 | $0.56 | $0.49 | $0.42 | $0.36 | $0.32 | $0.27 | $0.24 | $0.11 | $0.06 | $0.03 | $0.01 |
| 20.0% | $0.86 | $0.74 | $0.63 | $0.54 | $0.47 | $0.40 | $0.34 | $0.29 | $0.25 | $0.22 | $0.10 | $0.05 | $0.02 | $0.01 |
| 21.0% | $0.85 | $0.72 | $0.62 | $0.53 | $0.45 | $0.38 | $0.32 | $0.28 | $0.23 | $0.20 | $0.09 | $0.04 | $0.02 | $0.01 |
| 22.0% | $0.84 | $0.71 | $0.60 | $0.51 | $0.43 | $0.36 | $0.31 | $0.26 | $0.22 | $0.18 | $0.09 | $0.04 | $0.02 | $0.01 |
| 23.0% | $0.84 | $0.70 | $0.59 | $0.49 | $0.41 | $0.34 | $0.29 | $0.24 | $0.20 | $0.17 | $0.07 | $0.03 | $0.01 | $0.01 |
| 24.0% | $0.83 | $0.69 | $0.57 | $0.48 | $0.40 | $0.33 | $0.27 | $0.23 | $0.20 | $0.16 | $0.07 | $0.03 | $0.01 | $0.00 |
| 25.0% | $0.82 | $0.68 | $0.56 | $0.46 | $0.38 | $0.31 | $0.26 | $0.21 | $0.18 | $0.14 | $0.06 | $0.02 | $0.01 | $0.00 |
| 26.0% | $0.82 | $0.67 | $0.55 | $0.45 | $0.37 | $0.30 | $0.24 | $0.20 | $0.16 | $0.13 | $0.05 | $0.02 | $0.01 | $0.00 |
| 27.0% | $0.81 | $0.66 | $0.53 | $0.43 | $0.35 | $0.28 | $0.23 | $0.19 | $0.15 | $0.12 | $0.04 | $0.02 | $0.01 | $0.00 |

| Required Holding Period Return (Annual %) | Assumed Holding Periods in Years | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 15 | 20 | 25 | 30 |
| | Implied Marketability Discounts | | | | | | | | | | | | | |
| 18.0% | 13% | 23% | 33% | 41% | 49% | 55% | 60% | 65% | 69% | 73% | 86% | 92% | 95% | 97% |
| 19.0% | 13% | 25% | 35% | 43% | 51% | 57% | 63% | 67% | 72% | 75% | 87% | 93% | 96% | 97% |
| 20.0% | 14% | 26% | 36% | 45% | 53% | 59% | 65% | 70% | 74% | 77% | 89% | 94% | 96% | 98% |
| 21.0% | 15% | 27% | 38% | 47% | 55% | 61% | 67% | 71% | 75% | 79% | 90% | 95% | 97% | 98% |
| 22.0% | 15% | 28% | 39% | 49% | 56% | 63% | 69% | 73% | 77% | 81% | 91% | 95% | 97% | 98% |
| 23.0% | 16% | 30% | 41% | 50% | 58% | 65% | 70% | 75% | 79% | 82% | 92% | 96% | 98% | 98% |
| 24.0% | 17% | 31% | 42% | 52% | 60% | 66% | 72% | 76% | 80% | 83% | 93% | 96% | 98% | 98% |
| 25.0% | 17% | 32% | 44% | 53% | 61% | 68% | 73% | 78% | 82% | 85% | 93% | 97% | 98% | 99% |
| 26.0% | 18% | 33% | 45% | 55% | 63% | 69% | 75% | 79% | 83% | 86% | 94% | 97% | 98% | 99% |
| 27.0% | 19% | 34% | 46% | 56% | 64% | 71% | 76% | 80% | 84% | 87% | 95% | 97% | 98% | 99% |

PV=100%

Note: This table uses the mathematics of the Quantitative Marketability Discount Model as published in Mercer, Z. Christopher,
*Quantifying Marketability Discounts* (Memphis, TN: Peabody Publishing, LP, 1997), is demonstrated in Chapter 9.

Appraisal or Sidney E. Smith, Jr. Family Limited Partnership

## PRINCIPAL INFORMATION SOURCES AND REFERENCES RELIED UPON
## IN THIS VALUATION

* *Sidney E. Smith, Jr. Family Limited Partnership Agreement*
* *Revenue Rulings 59-60 & 68-609, and Appeals and Review Memorandum 34 (A.R.M. 34 )* U.S. Internal Revenue Service
* *Guide to Business Valuations*: Practitioners Publishing Company
* *Business Valuations: Fundamentals, Techniques & Theory*: National Association of Certified Valuation Analysts
* *Barrons*
* *Wall Street Journal*
* *Valuation Related Tax Cases*
* *Valuing A Business, Third Edition*  by Shannon P. Pratt, Robert F. Reilly, Robert P. Schweibs, Irwin Professional Publishing 1996
* *Valuing A Business, Third Edition*  by Shannon P. Pratt, Robert F. Reilly, Robert P. Schweibs, Irwin Professional Publishing 1996
* *Quantifying Marketability Discounts,* by Z. Christopher Mercer, ASA, CFA, Peabody Publishing, LP 1997
* *IRS Valuation Guide for Income, Estate & Gift Taxes*
* *Appraisal of Erie Navigation Company, Fair Market Value, Marketable, Controlling Ownership Interest in Common Stock,* Pashke Consulting, December 31, 1997
* Institute of Business Appraisers reference materials
* American Institute of Certified Public Accountants valuation reference materials
* Management interviews/questionnaires

# Appraisal Certification

We hereby certify the following statements regarding this appraisal:

1) We have personally inspected the assets, properties, or business interests encompassed by this appraisal.

2) We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3) We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4) Our compensation for making the appraisal is in no way contingent upon the value reported or upon any predetermined value.

5) To the best of our knowledge and belief, the statements of facts contained in this report, upon which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6) Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as promulgated by The Appraisal Foundation.

7) No persons other than the individuals whose qualifications are included herein have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

8) The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

9) The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in accordance with the Standards of Business Appraisal Practice, the Code of Ethics of the Institute of Business Appraisers, Inc., the Code of Ethics of the National Association of Certified Valuation Analysts, and the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Foundation.

10) Disclosure of the contents of this report is subject to the requirements of The Institute of Business Appraisers, the National Association of Certified Valuation Analysts, and the other professional organizations of which we are members related to review by their duly authorized representatives.

*Gregory F. Pashke*

Gregory F. Pashke, CBA, CVA, CPA
Pashke Consulting

Certified Business Appraiser
(Institute of Business Appraisers)

Certified Valuation Analyst
(National Association of Certified Valuation Analysts)

Appraisa_ _f Sidney E. Smith, Jr. Family Limited __ nership

# APPRAISER'S QUALIFICATIONS

## Gregory F. Pashke

## Academic and Professional Credentials

Master of Business Administration (MBA) 1970
   University of Pittsburgh - Concentration in Accounting
Bachelor of Science Degree in Business Administration - 1969
   Gannon University - Concentration in Finance and Economics
Certified Business Appraiser (CBA) 1998
   Institute of Business Appraisers
Certified Valuation Analyst (CVA) 1997
   National Association of Certified Valuation Analysts
Certified Public Accountant (CPA) Pennsylvania 1972
Certified in Financial Management (CFM) 1997
   Institute of Management Accountants
Certified Management Accountant (CMA)1974
   Institute of Management Accountants
Certified Management Consultant (CMC) 1979
   Institute of Management Consultants
Certified Professional Consultant to Management (CPCM) 1994
   National Bureau of Certified Consultants
Certificate of Educational Achievement in Business Valuation
   American Institute of Certified Public Accountants

## Valuation Education Courses & Seminars

Certificate of Educational Achievement in Business Valuation
   American Institute of Certified Public Accountants
Institute of Business Appraisers Course on How to Value Mid-Size and Smaller Businesses
Institute of Business Appraisers Course on Using Transaction Data to Value Closely Held
   Businesses
American Society of Appraisers (Pittsburgh Chapter) Course on Quantifying Marketability
   Discounts
Institute of Business Appraisers Course on Valuation of Closely Held Business: Advanced
   Applications

## Professional Affiliations

National Association of Certified Valuation Analysts
Institute of Business Appraisers
American Institute of Certified Public Accountants
Pennsylvania Institute of Certified Public Accountants
   Past President of Erie Chapter
   Past Member of State Executive Committee
   Past Member of State Governing Council
   Past Chairman of State Nominations Committee
   Current Chairman of State Long Range Objectives Committee
Institute of Management Accountants
   Past Member of Board of Directors: Erie Chapter
Institute of Management Consultants
National Bureau of Certified Consultants

---

## APPRAISER'S QUALIFICATIONS

Gregory F. Pashke (continued)

### Position and Experience

Director, Pashke Consulting, 1997-current
Principle, Pashke Twargowski & Lee, Certified Public Accountants, 1974 - 1997
Vice President Finance, Keystone Aeronautics Corporation, 1973-74
Senior Accountant, Ernst & Ernst, 1971-73

### Publications

Authored thirteen articles on the managerial and informational aspects of an organization

Appraisal of Sidney E. Smith, Jr. Family Limited Partnership

## Statement of Contingent and Limiting Conditions

This appraisal is made subject to the following general contingent and limiting conditions:

1)  We assume no responsibility for the legal description or matters including legal or title considerations. Title to the subject assets, properties, or business interests is assumed to be good and marketable unless otherwise stated.

2)  The subject assets, properties, or business interests are appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3)  We assume responsible ownership and competent management with respect to the subject assets, properties, or business interests.

4)  The information furnished by others is believed to be reliable. However, we issue no warranty or other form of assurance regarding its accuracy.

5)  We assume no hidden or unapparent conditions regarding the subject assets, properties, or business interests.

6)  We assume that there is full compliance with all applicable federal, state, and local regulations and laws unless the lack of compliance is stated, defined, and considered in the appraisal report.

7)  We assume that all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state, or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in this report is based.

8)  Unless otherwise stated in this report, we did not observe, and we have no knowledge of, the existence of hazardous materials with regard to the subject assets, properties, or business interests. However, we are not qualified to detect such substances. We assume no responsibility for such conditions or for any expertise required to discover them.

9)  Possession of this report does not carry with it the right of publication. It may not be used for any purpose by any person other than the client to whom it is addressed without our written consent and, in any event, only with proper written qualifications and only in its entirety.

10)  We, by reason of this opinion, are not required to furnish a complete valuation report, or to give testimony, or be in attendance in court with reference to the assets, properties, or business interests in question unless arrangements have been previously made.

11)  Neither all nor any part of the contents of this report shall be disseminated to the public through advertising, public relations, news, sales, or other media without our prior written consent and approval.

12)  The analyses, opinions, and conclusions presented in this report apply to this engagement only and may not be used out of the context presented herein. This report is valid only for the effective date(s) specified herein and only for the purpose(s) specified herein.

13)  Pashke Consulting does not purport to be a guarantor of value. Valuation of closely held entities is an imprecise science, with value being a question of fact, and reasonable people can differ in their estimates of value. Pashke Consulting has, however, performed conceptually sound and commonly accepted methods and procedures of valuation in determining the estimate of value included in this report.