IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


SIDNEY E. SMITH, III, et al.,
        Plaintiffs


    v.                      CIVIL ACTION NO. 02-264 ERIE


UNITED STATES OF AMERICA,
        Defendant



JURY TRIAL - DAY NO. 1



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers & Courtroom C,

U.S. Courthouse, Erie, Pennsylvania, on

Monday, September 26, 2005.



APPEARANCES:
        W. PATRICK DELANEY, Esquire, and SCOTT T.
        STROUPE, Esquire, appearing on behalf of
        the Plaintiffs.

IVAN C. DALE, Esquire, and LINDSEY W. COOPER, JR., Esquire, Tax Division, U.S. Department of Justice, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1                    I N D E X

2

3    WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE PLAINTIFFS:

5  James D. Cullen        47    66    89      --

6  Gregory F. Pashke      92    124    --      --

7

8              - - -

9

10    EXHIBITS:              IDENTIFIED

11  FOR THE PLAINTIFFS:

12  Plaintiff's Exhibit No. 1          56

13  Plaintiff's Exhibit No. 2          60

14  Plaintiff's Exhibit No. 3              63

15  Plaintiff's Exhibit No. 4              65

16  Plaintiff's Exhibit No. 5              69

17

18

19  FOR THE DEFENSE:

20  Defendant's Exhibit No. 4             83

21  Defendant's Exhibit No. 34          139

22  Defendant's Exhibit No. 36          166

23

24

25                      - - -


                                3


1            P R O C E E D I N G S

2

3            (Whereupon, the proceedings began at 8:40 a.m., on

4   Monday, September 26, 2005, in Judge's Chambers.)

5

6            THE COURT:  All right, we have a couple things to

7   take up.  First, there was a motion in limine to exclude the

8   testimony of Minnaugh?

9         MR. DELANEY:  He's not going to testify.

10        THE COURT:  That takes care of that one.  We have a

11   motion in limine to exclude certain theories of recovery not

12   raised in the claim for refund.  I will you tell, I read this

13   motion and response more than twice over the weekend and looked

14   at the cases.  I still am unclear as to what's going on here.

15   Would you, the ball's in your court, explain to me, see if you

16   can enlighten me as to what the basis for this is, what you

17   think they're trying to do that should be precluded under the

18   Variance Doctrine?

19        MR. DALE:  Here's what the plaintiffs did.  They

20   filed a claim for refund.  A claim for refund has a

21   jurisdictional prerequisite to anything we do here in court.

22   And their claim for refund said we want, we gave interest in

23   the Smith Family Limited Partnership.  The Smith Family Limited

24   Partnership has one asset.  That asset is worth $5.2 million.

25        THE COURT:  Let me stop you right there.  When your

4

1   expert testifies, are you going to stick to that valuation

2  figure, $5.2 million or is it going to be different?

3       MR. DELANEY:  He's going to explain the process

4  of -- no, he will likely say in my opinion the underlying asset

5  was worth $5.2 million.  But I don't want the jury to be bound

6  by that.  That's all I'm saying, it's a question of fact.

7  Ultimately, you don't limit the jury, don't limit the fact

8  finder.

9       THE COURT:  Let me ask you this.  When you were

10  first arguing your case before the IRS, I presume that part of

11  the theory was, what is no longer part of this case, and that

12  is did you argue the safe harbor you were entitled?

13       MR. DELANEY:  That wasn't even an issue.  Let me

14  just explore this with you a minute.  $5.2 million is not going

15  to the valuation except as a component, it's a factor.  Pashke

16  will tell you that look, I will look at all the business risks,

17  I will look at the income approach, I thought it was maybe $1.6

18  million there.  And I decided to go with the net asset value of

19  $5.2 million.

20       THE COURT:  The lower that $5.2 million goes, the

21  lesser the tax?

22       MR. DELANEY:  That's probably true.  But this isn't,

23  that isn't the valuation that is in question.  You move up to

24  the Family Limited Partnership --

25        THE COURT:  Let me ask you a question about that.


5


1  We're talking now really about, broadly speaking, marketability

2  discounts?

3        MR. DELANEY:  And a control discount.

4        THE COURT:  And a control discount.  There are

5  percentages attributed to both?

6        MR. DELANEY:  That's what experts do, yes.

7        THE COURT:  Is it your contention that what they

8  argued before the Commissioner on that point appears to be

9  inconsistent with what they might try to do in the trial here?

10        MR. DALE:  No.

11        THE COURT:  Is it really your concern that they may

12  try to wiggle on the value of the underlying assets, which is

13  $5.2 million?

14        MR. DALE:  Correct.  We took them at their word.

15        MR. DELANEY:  That's their responsibility.  They

16  should have done all of this.

17        MR. DALE:  Why would we do that if you're telling us

18    what the value is and we're willing to accept the value.  So

19    you're saying we should value each and every balance sheet --

20    even if we agree, we don't see any problem with the original

21    valuation filed with the claim of refund stating one value and

22    we accept it and then you can appeal the claim for refund,

23    arguing less than the value you assert, I don't think the court

24    has jurisdiction to do that.

25        THE COURT:  Hang on a second.  Now, isn't this

6

1    really what's going on here.  Your expert is going to testify

2    consistent with his expert report.  If he didn't, I would

3    preclude it because it would be surprise to the government.  He

4    says $5.2 million in his report.  And $5.2, he said it then,

5    he's going to say it now.  Your point is somewhat more of a

6    nuance point, isn't it, that this doesn't have anything to do

7    with your coming forward with a new theory, either a new theory

8    or new monetary value, it has everything to do with the

9    evidentiary principle that the jury can accept or reject the

10    testimony of any expert?

11        MR. DELANEY:  That's right.

12       THE COURT:  It's the government's position that the

13   jury is bound, you already heard his expert is going to testify

14   consistently with what he did before the Commissioner, how can

15   the jury possibly be bound by that figure given the charge I

16   give on all experts all the time?

17       MR. DALE:  I'm not saying that they're bound by the

18   figure, but I'm saying that on one hand you have two experts,

19   both stating this $5.2 million figure and assuming going into

20   the case the claim for refund they state is $5.2 million, the

21   value of this asset.  And the only issue is these discounts.

22   And we disputed the discounts.  So when you go to the jury, you

23   can't come back and find some other figure that would be

24   unsupported by the evidence, and I suppose that if you wanted

25   to argue if our expert came in and testified as to another

7

1   value, he said it was $3.8 or he said it was $6.5, at that

2   point in time there would be two opinions and the jury could

3   choose or they could split the difference or they --

4       THE COURT:  You're saying by all events if the

5   evidence comes in the way you think it will and the way he

6  indicates his expert is going to testify, there would be no

7  basis for the jury to come in with a figure lower than $5.2?

8      MR. DALE:  Correct.  Unless he wants to argue

9  something.

10      MR. DELANEY:  Here's the deal.  Pashke in his

11  deposition, in his report and in his deposition, he was

12  deposed, he said you know when I did my model, I came down to a

13  value of about $15,000 for one percent.  I'm a little

14  uncomfortable with that.  Subsequently, I moved it up to 24,

15  he's going to say 28, consistent with the judge's ruling, I

16  think he'll say the number's around $28,000.  There is some

17  evidence.  I'm going to bring in Sandy Smith, Sandy Smith is

18  going to talk about a situation that existed at the company

19  between 1993 and 1998.  And they can base, the jury can base

20  their opinion on the evidence they hear.  If you look at

21  Revenue Ruling 59-60, it talks about the components that the

22  finder of fact should consider.  The history of the company,

23  the performance of the company, dividend paying ability, all of

24  those things are within the purview of the fact finder.

25      MR. DALE:  That's an important distinction.  There's

1    a distinction between the Smith Family Limited Partnership and

2    the asset, Erie Navigation Company.  On the marketability

3    discount of the Smith Family Limited Partnership or the

4    financial status of the Smith Family Limited Partnership, you

5    are free to argue whatever you wish.

6         MR. DELANEY:  I'm free to argue whatever the

7    evidence is.

8         MR. DALE:  I said the marketability --

9         THE COURT:  If I could interrupt you for one second.

10   This is for the benefit of my court reporter, only one person

11   at a time, he can't get it down.  Go ahead, finish your point.

12        MR. DALE:  Just to finish my point briefly.  Is that

13   there's a distinction between the Smith Family Limited

14   Partnership and Erie Navigation.  If he wants to argue his

15   claim for refund was predicated that the Smith Family Limited

16   Partnership were subject to these discounts, then he's free to

17   do so.  I think what he's talking about with Pashke --

18        THE COURT:  If you come up with different discount

19   percentages, as I would fully expect, you can argue that to the

20   cows come home, that's not what we're talking about here.

21          MR. DALE:  We're talking about Erie Navigation

22   Company, he wants to talk about the financial condition of Erie

23   Navigation as to upturn his statement in the claim for refund,

24   that the Erie Navigation Company was worth $5.2 million.

25   That's the whole distinction.


                                    9


1          MR. DELANEY:  This whole business about discount

2   points is what people like Mr. Pashke and Mr. Burns like to do,

3   it's what they do.  It's up to the trier of fact to put a

4   number -- the trier of fact can't disregard completely

5   everything the experts say and make a decision based on what

6   they hear.  They can decide that Pashke is wrong, Pashke is

7   wrong about $5.2 million.  That the net asset value isn't

8   appropriate, that the income approach should be the way to go.

9   They don't even make that decision.  They just put a number on

10  it.

11          THE COURT:  Is he advancing different theories on

12  that asset, what was the other approach?

13          MR. DELANEY:  The income approach, he talked about

14  the income approach and what it did.  And he decided to select

15  the asset approach.  But they don't have to decide that.  They

16  just come up with a number.

17         MR. COOPER:  With regard to Sandy, he'll be my

18  witness.  That's the issue here.  They came to the value using

19  the net asset approach.  The expert took it.  What they argued

20  before the Commissioner was net asset.

21         THE COURT:  That's why I have a problem, as I read

22  the cases, whatever the cases may say about the amount of

23  money, I'll tell you what I think the law is -- hang on just

24  one second, if you would.  It says the court cannot consider

25  any action unless its grounds were reasonably encompassed by


                                10


1  the claim for refund.  In this circuit, meaning the Third, if

2  the refund claim sufficiently presents the facts and legal

3  claim so as to enable the Commissioner to make an intelligent

4  administrative review of the claim.  That's Fable at 222 F.2d

5  382.  That would be a different theory if they were now coming

6  with that.

7         MR. DELANEY:  When we had our claim, we submitted

8  Pashke's report, that's how we made our claim.  Pashke's report

9    talks about the income approach.  Pashke's report indicates his

10   model gave him a discount of 70 percent, put the value at

11   $15,000.  They chose to say we're not going to go to the

12   trouble to look at the underlying asset.  It's not my fault.  I

13   got testimony coming in that Sandy Smith will talk about what

14   the business of the Smith Family Limited Partnership, it was

15   the ownership of Erie Navigation Company, and what was that

16   business.  Here's what that business was.  Here's what it

17   looked like over the years.  Here's the ships we had, here's

18   what we did.

19         THE COURT:  Is that all by way of establishing the

20   foundational predicate for Pashke's testimony as to valuation?

21         MR. DELANEY:  It does that.

22         THE COURT:  Does it set you up to arguing to the

23   jury an alternative value theory that's going to be at cross

24   purposes for your own expert?

25         MR. DELANEY:  It's not.  It's not to set up a

11

1    different theory.  I'm going to ask Sandy Smith what do you

2    think the value is.  He's an owner, Rule 701 says that an owner

3  of an asset can state what the value is.  I'm going to ask him

4  what he thinks.

5       THE COURT:  What do you presume, taking a wild

6  guess, what do think he's going to say?

7       MR. DELANEY:  He'll be lower than Pashke.

8       MR. DALE:  Rule 701 states you can't give opinion

9  testimony, expert opinion testimony.

10       MR. DELANEY:  It's lay opinion testimony.

11       MR. COOPER:  702 is revised -- it was amended in

12  2001, that says that they tighten up on the rule, I would think

13  the valuation of a business would fall into --

14       MR. DELANEY:  The Third Circuit, like many other

15  circuits, quintessential 701 is an owner's opinion of the value

16  of his property.

17       MR. COOPER:  If we can back up real quick, though.

18  On a claim for refund, they took the net asset approach.  Under

19  penalties of perjury they said this is the amount.  The expert

20  rejected income.  How do you get the net asset approach.  You

21  look at the balance sheet, all the numbers, nothing is disputed

22  there.  Sandy is going to come in and talk about operating, how

23  good the business was, what was there, it's a different theory,

24  it's an income approach.  They never provided a report on that

25  to give a value.


12


1          MR. DELANEY:  We did provide a report on the income

2  approach, it's in Pashke's report.  I chose not to use it, it's

3  in the report, $1.6 million, it's in the report.  If you want

4  to talk about discounts, his report says 70 percent discount.

5          THE COURT:  In Pashke's report he utilized a net

6  assess approach en route to opining the asset was worth $5.2

7  million, is that correct?

8          MR. DELANEY:  He looked at both.

9          THE COURT:  Did he generate a figure under the

10  income approach in his report?

11          MR. DELANEY:  Yes.

12          THE COURT:  What was that figure?

13          MR. DELANEY:  $1.6 million.  Let me just follow that

14  through.  The math would be $1.6 million -- one percent share

15  would be worth $16,000.  And then discount it, once it's

16  discounted for marketability.

17          MR. DALE:  He didn't do that.

18          MR. DELANEY:  That's what his opinion wasn't.  He

19  said in my opinion I'd rather use the net asset value.  But he

20  goes through the process.

21      MR. DALE:  He doesn't discount, he doesn't include

22  the one percent interest, the $16,000, and then takes discounts

23  out of that.

24      THE COURT:  But the net asset approach rendered a

25  figure which was substantially higher, wasn't it, than the


13


1  income producing, it was there -- with the taxpayer paying more

2  money?

3      MR. DELANEY:  Right.  In his report he said look, if

4  I take the income approach, he'll testify to that, that the

5  value of the underlying asset was $1.6 million.  I looked at

6  the net asset, do these appraisals, it's $5.2 million, I chose

7  to take the $5.2 million.  Then I do the discounts.  Either way

8  the discounts are the same whether they use the income approach

9  or the net asset value approach.  Discounts have to do with

10  control and marketability.

11      THE COURT:  Let me tell you where I'm coming down on

12  this thing, I'm going to think about this.  This is what it

13  seems like to me.  It seems like to me if the income producing

14  approach was not pushed across the goal line with the

15  Commissioner, it was mentioned in the report, but the expert

16  says ultimately I'm not going that way, I think the better way

17  is this, that issue within the meaning of those cases was never

18  classically presented to the Commissioner so they could pass on

19  it, that's number one.  But number two, the question of the

20  extent to which a jury is bound by the testimony as to the

21  value.  There is no stipulation entered into here, it seems to

22  me, on what the value of that company was.  So that issue is in

23  play.  It seems to me no expert, both experts at least

24  implicitly are going to tell the jury that the value of the

25  company is as much art as it science.  There is no perfect way

14

1  to hit a bullseye.  It may well be that while the jury is not

2  bound by that $5.2 million figure insofar as it relates to

3  their opinion that it should be lower, I should warn you they

4  may also not be bound to that to the extent it may be higher.

5  If you want to get on that train, you can ride it, but there's

6  going to be risks going up there, risks going down.  That's not

7   my ruling.  In terms of opening statements here.  Because I

8   haven't ruled on this, I would suggest that no one say anything

9   that is going to require me to tell the jury --

10      MR. DELANEY:  I didn't plan on going into it.  There

11  is an offshoot of that -- that is how do we present this

12  question to the jury.

13      THE COURT:  Which question?

14      MR. DELANEY:  The ultimate question.  My view is

15  that the jury ought to answer the question, I'd like to speak

16  to them in my opening about it.  They ought to answer the

17  question of what is the value of the one percent interest in

18  the Smith Family Limited Partnership.  I think from the points

19  for charge, the verdict slip, the gather the government prefer

20  the jury to go through this business of naming discounts and

21  that sort of thing.

22      THE COURT:  I think that's a useful exercise in the

23  special interrogatory form because, and I have no fixed opinion

24  on this, except to say that, and this is with all respect to

25  the jurors, but this is a tough nut to crack, if we don't have

15

1  a road map on the special interrogatory form, they are going to

2  be at a complete loss.

3      MR. DELANEY:  Your Honor, just to make another

4  point.  Discounting is nothing more than the reverse of saying

5  here's what I think the value is, so my discount is this much.

6  You don't have to go through discounting to get to the value.

7  It's the way Mr. Burns and Mr. Pashke like to do it but

8  unnecessary, it's a step for the finder of fact.  I think it's

9  simpler if the jury is just told we're not going to think about

10  6.35 percent or 3.35 percent and multiply it all out, all the

11  math.  Just tell us what one percent interest is, we can all do

12  the math.  That's the way Pashke's report is written, it's just

13  a simpler way for people to understand it.  What's the value of

14  one percent of the Smith Family Limited Partnership on this

15  date and on this date.

16      THE COURT:  Here's a stupid question, but a one

17  percent interest necessarily subsumes some discount for

18  marketability and control?

19      MR. DELANEY:  That's right.

20      MR. COOPER:  That's why we did it as we wanted to

21  break it down in bite size chunks as evidence that the jury is

22   going to hear.  Say here's the starting point, here's the

23   discount, multiply.  Here's the next discount, multiply.  Add

24   them together.

25          THE COURT:  Even your expert opines on discount,


                                16


1   doesn't he?

2          MR. DELANEY:  He does.

3          THE COURT:  If a discount is a necessary

4   component --

5          MR. DELANEY:  It is not.

6          THE COURT:  Why not?

7          MR. DELANEY:  All the expert may say is look, there

8   is no control here, there is no marketability.  So instead of

9   one percent being the equivalent of one percent of the total

10   asset, I'm going to make it a number down here.  Instead of

11   $52,000 for a one percent interest, I'm going to make it 26.

12   Because I don't like the lack of marketability and lack of

13   control.  After the verdict comes back, we can figure out what

14   the discount is based upon the jury saying here's the number.

15          THE COURT:  All right.  Well, my present inclination

16  is to give the jury as much of a road map -- you're not

17  suggesting it's legally incorrect, would you prefer I don't as

18  a practical matter?

19      MR. DELANEY:  I think it's confusing, it's asking

20  them to become mathematicians, I don't think it's a smart way

21  to proceed with this group.  I want to place in front of the

22  jury, literally on the screen during my opening, here's the

23  your question, the judge will tell you what the question is,

24  but here's the question as I see it.  I would like to do that.

25  I'd also like to put in front of them just the definition of


                                17


1  what fair market value is taken from Rule 59-60.

2      MR. COOPER:  In that regard as well, I'm on the

3  easel probably going to write out the mathematics our expert's

4  going to do.

5      THE COURT:  Sure.

6      MR. DELANEY:  Your Honor, I have other questions.

7      MR. DALE:  Before we move on to a new topic, I

8  thought I might raise this.  You had mentioned you were going

9  to ask Mr. Smith, III, what he thought the value of the company

10  is because he was an owner.  As of the valuation date, he was

11  not an owner, he had a minority interest, he was the owner of a

12  minority interest on the valuation date.

13       MR. DELANEY:  On the valuation date he was an owner

14  of the limited partnership interest.

15       MR. DALE:  The whole predicate of that as a limited

16  partner, he doesn't have access to control the finances of the

17  underlying company, that is the whole predicate of discount for

18  lack of control.  How does he have enough control over the

19  finances of Erie Navigation Company to be able to do that.

20       MR. DELANEY:  He's a one percent general partner at

21  the time.  Also a limited partner at the time of both gifts.

22  Especially the December gift --

23       MR. DALE:  He wasn't a general partner at the time.

24  There is no foundation that he had the records to be able to

25  even know what it was worth on December 31, 1997.


18


1       MR. DELANEY:  He worked there for 12 years prior to

2  the gifts.  He was responsible and intimately involved in the

3  financials and operation of the company.

4          THE COURT:  It seems to me if there is case law out

5    there which says that an owner can value his or her own

6    company, there very may well be, I think there probably is,

7    your concern as to whether or not he even knew he was an owner,

8    may go more to the weight than anything else.

9          MR. DALE:  That will open the door to that line of

10   questioning.

11          THE COURT:  Absolutely.  Does the government dispute

12   that an owner can testify as to his or her company, as a legal

13   proposition?

14          MR. DALE:  I haven't researched it.

15          THE COURT:  Get me the cases, I'll look at it.  What

16   else do you want to tell me?

17          MR. DELANEY:  Summary judgment that was granted to

18   the government, if I read it correctly, knocks out Section

19   7.5(E), doesn't knock out right of first refusal, knocks out

20   the pricing and the terms of ROFR years.  All I'm asking is it

21   appropriate to ask the witness was there a restriction on

22   alienation without going into any terms.  Now, the case law, I

23   have the case True v. Commissioner, says even when you strike

24   out the price under 2703, the restriction on alienation still

25   is a relevant factor.  Let me just tell you when Pashke

19

1  testified he didn't consider any of that.  But it is a

2  consideration for the jury, it seems to me.

3      MR. DALE:  Our motion asks that the court --

4      THE COURT:  Tell the jury it's been struck, right?

5      MR. DALE:  Correct.  Our motion asks that the court

6  order that the value of the gifts at issue in this case be

7  determined without regard to the provisions contained in

8  Section 7.3 and 7.5 of the Limited Partnership Agreement.  That

9  granted Sidney E. Smith, Jr., Family Limited Partnership and

10  its partners a below market right of first refusal.  And the

11  court granted that motion.

12      MR. DELANEY:  Here's what I think, it's what the

13  Fifth Circuit said in True.  They said the case law does

14  generally indicate that the restrictive impact of a buy-sell

15  should be considered as a factor in valuing the interests for

16  the estate in gift tax purposes, even if specifically price

17  terms are held not to be controlling.  We agree the existence

18  of restrictive and bona fide business reasons supporting should

19  be acknowledged when determining fair market value.  That is

20  True v. Commissioner.

21      MR. DALE:  True v. Commissioner differs from a

22  number of different cases, including the ones relied upon by

23  the court in making its determination, True criticizes that

24  line of reasoning.  The line of reasoning has already been

25  adopted by the court in this case.  So he's arguing something

20

1  that should have been argued in the response to the motion for

2  summary judgment.

3      MR. DELANEY:  When I reread the magistrate's

4  recommendation, she referred to 7.5(E), I believe it is, that

5  just talks about price.

6      THE COURT:  I seems to me the Magistrate Judge's

7  R & R and my adoption of it says what it says.  You can't come

8  back in the back door and try to get in front of the jury one

9  of those issues that otherwise perhaps would have driven the

10  valuation lower.

11      MR. DELANEY:  I should not ask the witnesses to

12  explain the buy-sell without reference to price or terms for

13  installment payment, I should just keep away from that

14  completely?

15       THE COURT:  No, that isn't my point.  I have a

16  proposed charge which you're going to get tomorrow, we're going

17  to have a charge conference tomorrow.  But I think it's

18  necessary in the interest of the jury seeing this whole picture

19  that they understand what the buy-sell agreement or what the

20  partnership agreement said.  I'm going to tell the jury in my

21  charge that as a matter of law I have declared that certain

22  portions of that agreement may not be considered in determining

23  the valuation.  So as a factual matter, in terms of laying out

24  the landscape so the jury can see the whole picture, fine, you

25  can do that.  But I'm not going to let you argue to the jury

21

1  that any provision of that agreement which I have ruled

2  inoperative insofar as relates to valuation, they can't

3  consider on the issue of valuation.

4       MR. DELANEY:  I don't think I'm butting up against

5  the court's ruling or contesting the court's ruling.  In fact,

6  I didn't think it was necessary to say anything to them about

7  the court's ruling.  Because I don't believe they're going to

8  read this document.

9       THE COURT:  Here's the danger in that.  As a

10  practical matter, Pat, you may be absolutely right.  Let's go

11  off the record.

12       (Discussion held off the record.)

13       THE COURT:  Back on the record.  It's tough stuff.

14  What I don't want the jury doing, if they sit down and start

15  reading documents, is somebody on the jury, well, look at this

16  restriction here and this restriction there and on their own,

17  unbeknownst to us, cranking that in as an element of valuation.

18  I think it's important that they be told and I'm going to tell

19  them.  What else do you want to bring to my attention?

20       MR. DELANEY:  Just about the use of the podium, if I

21  can drag that small podium over in front of the jury.

22       THE COURT:  We can give you a hand.  Are you going

23  to use the overhead?

24       MR. DELANEY:  I will in the opening for those

25  questions that I had posed, I also have some photographs I


22


1  wanted to use.  There is a jury charge that suggests that the

2    government's position is there is a presumption.

3        THE COURT:  I was going to bring that up.

4        MR. DELANEY:  I don't think there is a presumption,

5    I think it's just stating what the burden of proof is.

6        THE COURT:  We'll talk about that at the charge

7    conference.  Just don't tell the jury there is a presumption in

8    your opening.  What else?

9        MR. DELANEY:  I did file a supplemental point for

10   charge electronically, you probably don't have it, maybe you do

11   have it.

12       THE COURT:  What does it say?

13       MR. DELANEY:  Just expanded on Rule 59-60, I thought

14   it was maybe instructive for the jury here on the elements.

15   When I read 59-60, it had a little bit of a road map about

16   valuation, I thought it was helpful, if it isn't, that's fine.

17       MR. COOPER:  Your Honor, I'm going to try to use my

18   computer to put things on the screens.  And the second thing,

19   the special interrogatories talks about charges, I

20   inadvertently left out a subtraction that has to be done --

21   there's actually another step in there.

22       THE COURT:  File a supplemental jury form.

23      MR. COOPER:  I can do that electronically, I can

24  give the disks to everyone.

25      THE COURT:  We can get it at some point filed so


23


1  it's of record.

2      MR. DALE:  Here's what we did.  We had in the

3  instructions to multiply by the discount rate, and that would

4  equal the value.  Well, in fact, that just equals the discount

5  to the value.

6      THE COURT:  All right, this will be part of the

7  charge conference.  Do you have anything else that you want to

8  bring to my attention?

9      MR. DALE:  We have objections to exhibits.

10      THE COURT:  We do.  There's no better time than now

11  to take them up, we're about to get rolling.

12      MR. DALE:  We have, there was some photographs that

13  Mr. Delaney delivered to us for the first time.

14      THE COURT:  Those aerial photographs?

15      MR. DALE:  Yes.

16      THE COURT:  What does that have to do with anything?

17          MR. DELANEY:  It shows the facilities.  One

18  interesting thing that the jury might actually hear.  It

19  describes --

20          THE COURT:  You weren't trying to show the hometown

21  jury a picture of the hometown plant by any chance, were you?

22          MR. DELANEY:  I hadn't thought of that, your Honor,

23  now that you bring that to my attention.  They're just

24  background.

25          THE COURT:  I don't see the relevance of it.


                          24


1          MR. DELANEY:  Of the photographs, your Honor?

2          THE COURT:  What is the relevance of them?

3          MR. DELANEY:  It provides Sandy Smith with an

4  opportunity to demonstrate to the jury --

5          THE COURT:  Opining on what, what is the

6  relevance -- I want to make sure what you're talking about, I

7  haven't seen any of this stuff?

8          MR. COOPER:  This goes back to Mr. Smith talking

9  about operating -- whether it's relevant on net asset, we

10  pulled a number of balance sheets, has nothing to do with those

11   numbers.

12        MR. DELANEY:  Certainly does.  Here's the

13   photographs we want to show to the jury.  This is one of the

14   ships the company owned.  This is a second ship the company

15   owned.  Same ship, dredging in the lake.  This is a third ship

16   the company owned.  Fourth ship the company owned.  This is the

17   Parade Street docks where they did business.  Here's this

18   Sandusky dock.  That's one of the ships.  This is the Erie

19   International terminal where they did work.  Where they just

20   unloaded one.  This will take 15 minutes to go through all

21   these.  It gives the jury some context.  Gives it some depth

22   and some background.

23        MR. DALE:  Strictly speaking, I haven't stated my

24   objections to the photographs.  You'll notice the photographs,

25   they're dated September 29, 2003.  So, apparently, the


                              25


1   plaintiffs have been in possession of these photographs for

2   nearly two years, they were furnished to us for the first time

3   on Thursday.

4        THE COURT:  Let me ask this to cut to the chase

5   here.  It may be completely benign, you put them up there, on

6   and off.  What probative point, how would you use those

7   photographs as a springboard to make an argument on valuation,

8   if at all?

9        MR. DELANEY:  They demonstrate what Pashke saw.

10  They demonstrate what Mr. Burns never saw when he undertook his

11  valuation.  They demonstrate to the jury what this business was

12  all about.

13       THE COURT:  Cutting to the chase, I'm going to let

14  you put them on the screen in the same sense in an automobile

15  accident, in an automobile accident case sometimes they come in

16  and talk a little bit about the person and whatnot and away it

17  goes.  But I will, because this goes hand in hand with my

18  ruling on valuation.  He will decide the extent to which you're

19  going to be able to use it.  But for present purposes you can

20  put it up.  The only dangling issue here, then -- was there

21  something else you wanted to call to my attention -- the only

22  issue is this question as to you don't think as an owner he can

23  come in now, and you essentially want me to preclude an owner

24  from testifying, is that right, on valuation?

25       MR. COOPER:  Because he takes a different method.

1  He's using an operating approach, talking about the line items

2  on a balance sheet, that is worth this and that is worth that,

3  not a net asset approach.  This is an operating approach, it's

4  a different methodology.  Yes, you should preclude him from

5  talking about it.

6        MR. DELANEY:  This is right out of the gate.  He

7  isn't the first witness, he's the third witness.

8        THE COURT:  To preclude it on the basis of the

9  variance doctrine, is that what it is?

10        MR. COOPER:  Yes, your Honor.

11        THE COURT:  You're not asking he be precluded on the

12  basis that he cannot express an opinion on value, it's that the

13  basis for his opinion on value is at odds with what they pushed

14  with the Commissioner, is that right; is that essence of the

15  objection?

16        MR. COOPER:  Yes.

17        THE COURT:  One more time and then I'll think about

18  this.  When you were before the Commissioner, when you argued

19  what the value should be, you laid out the various theories

20  that might be in play.  And you actually cranked out the

21  figures for both, the income producing and the net asset.

22  Would it be true, as a practical matter, when your expert

23  kicked out the $1.6 million for income producing, that the

24  figure was so low that he knew that it simply would never fly

25  with the IRS and opted for the figure that looked more

27

1  reasonable, that's really what happened, isn't it, when you get

2  right down to it?

3       MR. DELANEY:  I don't know what goes through their

4  minds.

5       THE COURT:  Would this be true.  The Commissioner,

6  in reaching his decision, never had to determine whether the

7  approach that your expert used under income producing was

8  appropriate, nor whether the value that he reached under income

9  producing was appropriate, would that be true?

10      MR. DELANEY:  They chose not to investigate whether

11  those were true.

12      THE COURT:  You're trying to abandon that approach

13  before the Commissioner?

14      MR. DELANEY:  The opinion that was expressed was the

15  $5.2, not the $1.6, although, they were both revealed.  That

16  isn't the theory, he just, and you're right, judge, these guys

17  have testified, Mr. Burns testified that valuation is 90

18  percent judgmental subjective.  This guy said yeah, he thinks

19  it's $5.2, here's the discounts.

20      THE COURT:  Did the Commissioner ever have an

21  opportunity to resolve this issue as that level based upon a

22  determination as to whether an income producing approach and

23  the value it produced was correct?

24      MR. DELANEY:  He had every opportunity.  There was a

25  three year lag before filing of a report the first time and our

28

1  request for refund with the report the second time.

2      THE COURT:  All right.

3      MR. COOPER:  He didn't pursue that theory.  It

4  wasn't important.

5      MR. DELANEY:  If I brought a different expert in

6  with a different view, the second expert --

7      THE COURT:  Hold your thought one second.  All

8  right.  You were saying?

9        MR. DELANEY:  I at one time in the case in an effort

10  to see where we were, I hired a different expert to do a

11  different analysis, to do a separate analysis.  He came up with

12  a slightly different figure.  I think I could have introduced

13  her here.  It's not a question of the method.  What we

14  approached the Commissioner with was your values are too high.

15  The other way to say that is your discounts are too low.  It's

16  the same thing.  That's what this case is all about.  It's not

17  that complicated, judge.  That's not a different theory, it's

18  not under a different section of the treasury regulations,

19  we're pursuing our refund.  That's what these cases talk about.

20  It's just a different value, that's all we're saying.

21        THE COURT:  All right.

22        MR. DALE:  If I could just make a brief response.

23  If this were true, obviously, any fact which would demonstrate

24  a lower value or any theory that would demonstrate a lower

25  value would be admissible.


29


1        THE COURT:  Let me ask one last question.  If you

2  had only, if Pashke had only discussed in the report a net

3   asset approach before the Commissioner, never even mentioned

4   the other, would you nevertheless contend you could raise an

5   income producing approach here?

6        MR. DELANEY:  Yes.

7        THE COURT:  You could still raise it?

8        MR. DELANEY:  Yes.

9        THE COURT:  Because your point is the overall

10  question is the appropriate value?

11       MR. DELANEY:  Right.  That's all we contested when

12  we filed with the Commissioner.

13       THE COURT:  All right, I have your point.

14       MR. DALE:  We do have some other objections to the

15  exhibits.  They want to introduce tax records, tax returns.

16       MR. DELANEY:  No, we didn't have tax returns.

17  Compiled financial statements of the company.  I wanted to put

18  in the Family Limited Partnership Agreement, I want to put in

19  the gift tax return.

20       MR. DALE:  That's a tax return, that's hearsay.

21       MR. DELANEY:  I wanted to put in the government's

22  declaration we owed more tax.  Our claim for refund.  I didn't

23  expect these things to go out with the jury.  Even the

24  agreement I didn't expect to be going out with the jury, it was

25  necessary to be made a part of the record that these things

30

1  were filed.

2          THE COURT:  I'm not sure what your objection runs

3  to?

4          MR. DALE:  If he wants to introduce the tax return

5  and claim for refund as evidence for the truth of the matter

6  asserted, then it's hearsay, it's inadmissible.

7          MR. DELANEY:  I'm not putting it in for the truth of

8  the matter asserted anymore than the government's notice of

9  what the deficiency was.  I'm trying to make a record that

10  these steps were all taken.

11          THE COURT:  It's not disputed that they were taken.

12  You can identify the exhibits and whatnot, the jury can hear

13  what the taxpayer claim was about.  It's going to be clear

14  enough it's all disputed.  What else?

15          MR. DALE:  I think that probably covers it from your

16  our end.

17          THE COURT:  Let's go out, we'll get set up and bring

18  the jury in.

19          (Whereupon, at 9:26 a.m., the proceedings recessed

20  in Judge's Chambers; and at 9:48 a.m. reconvened in

21  Courtroom C with the Jury present.)

22          THE COURT:  Members of the jury, it's nice to see

23  you again.  I'm glad everyone remembered after our several week

24  delay.  My recollection is that when you were last here, you

25  were all sworn in.  Then I'm not going to give you another oath

31

1  because it's unnecessary.  Are we ready to go?

2          MR. DELANEY:  The plaintiffs are ready, your Honor.

3          MR. DALE:  The defense is ready.

4          THE COURT:  Very good.

5          MR. DELANEY:  Good morning.  I was introduced to you

6  I guess it's almost a month ago, maybe even a little more than

7  a month.  But I'm sure you don't remember who I am.  My name is

8  Patrick Delaney.  The gentleman sitting with me at the table is

9  Scott Stroupe.  We are the lawyers here representing the estate

10  of Sidney Smith.  Mr. Smith died back in April of 2003, I

11  believe it was.  Mr. Smith's family is here.

12    You're going to hear testimony from his son, Sandy

13    Smith, who is sitting in the second row.  Next to Sandy is his

14    sister, Sid's daughter, Jill, who's also here.

15    This is a gift tax refund case.  That doesn't sound

16    very interesting.  It is interesting, though.  It's interesting

17    because of the nature of the gift that was given.  You're going

18    to hear some interesting things about a business that operated

19    here in Erie.  And how you value a business.

20    I need to take you back because the gifts that we're

21    talking about occurred back in 1998.  And that's the period of

22    time that we have to think about.

23    Let me take you back to 1997.  Sid Smith in 1997

24    operated a business that was headquartered here in Erie, it was

25    called Erie Navigation.  It was in the business of transporting

32

1    over the lake construction materials.  Things like sand,

2    gravel, stone, crushed limestone, that they might use in

3    cement, that type of business.  They also sold that kind of

4    material.

5    They maintained a dock, actually, a couple of

6  facilities, here in Erie on the bay.  They also maintained a

7  dock in Sandusky for a while.  That dock may have closed right

8  about the time of these gifts that we're going to be talking

9  about.

10       Sid Smith was the owner of that company.  And he had

11  owned it, I think he had purchased it I think in 1985.  As you

12  will hear, he was the man who ran it.  He made all the

13  decisions.  His son, Sandy, worked in the business.  Jill did

14  not.  His son, Sandy, worked in the business, though, since

15  about 1985 with Sid.  But Sid was the kind of guy, he was the

16  final word on matters.

17       In 1997 Sid Smith decided that he wanted to give

18  part of the business to his kids.  But it was a little bit

19  complicated.  Because Jill didn't work in the business, Sandy

20  did.  He hoped that some day Sandy would run the business.  He

21  knew that Jill would have no interest in that.  But he didn't

22  want to give that a different value, he wanted to sort of equal

23  out the value, but give Sandy pretty much control eventually.

24  But he wanted to keep control at that point.

25       When he was thinking about giving these gifts, he

33

1  was a man who was around 70, maybe in his early 70's, he still

2  felt he was valuable to the business, he wanted to maintain

3  some control.  He wanted to bring his family in.

4       He talked to his accountant about this, a gentleman

5  by the name of Dave Finnecy.  Mr. Finnecy has passed away.  And

6  you won't hear from him, obviously.  Mr. Finnecy and Sid Smith

7  came to see a lawyer by the name of Jim Cullen.  Jim Cullen is

8  in the courtroom, he's going to testify, probably right after

9  we finish the opening statements.  Jim Cullen is a lawyer who I

10  practice with, we're in the same firm.

11       So Mr. Finnecy and Sid Smith came to Jim Cullen and

12  explained what Sid wanted to do.  I'd like to transfer some

13  interest in the business to my children.  But, again, I need to

14  figure out how to even out the value, but I want Sandy to

15  eventually have control of the business, but I don't want to

16  deprive Jill of anything.  I also want to keep it in the

17  family, I want to try to keep it in the family.  And he said I

18  want right now, I want to maintain control myself.

19       Jim Cullen suggested to Mr. Smith and Mr. Finnecy

20  that they consider a family limited partnership.  That's a type

21  of entity.  If you think about corporations, partnerships, well

22  there's something called a limited partnership.  And he told

23  Mr. Smith this is the kind of structure that will allow you to

24  do what you want to do, to achieve your goals.  And what he

25  suggested is we'll put the business, Erie Navigation Company,

34

1  into this limited partnership.  And then you can start to make

2  gifts.

3           Why a family limited partnership, what is it about a

4  limited partnership.  You're going to hear about the

5  characteristics, about this sort of legal entity.  In a normal

6  partnership, the one that you might start to open a store or

7  run some other kind of business, in a normal partnership

8  everybody is equal.  If the nine of us formed a partnership, it

9  would typically be that we're all equal owners and we would

10  have an equal voice in how things worked.  If we were going to

11  make distributions of any profits, we would all have to decide.

12  The majority would decide whether we did one thing or the

13  other.  That's how a normal partnership works.

14           But you will hear that a limited partnership, these

15  things have been around for a long time, a limited partnership

16  has different classes of owners.  There's a person called a

17  general partner, and that person calls all the shots, they have

18  all the votes.  They have all the control.  They operate the

19  business, whatever the business of this limited partnership is,

20  on a day-to-day basis.  They decide what kind of business to

21  operate, they decide what to negotiate with banks.  They decide

22  all aspects of operation.  They even decide whether money gets

23  distributed out of the partnership.

24       Then there are limited partners.  And you'll hear

25  that limited partners have no voice in the operation.  The only

35

1  right they have is that the general partner decides to

2  distribute any money.  The limited partners get his share or

3  her share.

4       So Jim Cullen suggested this really is the way you

5  want to go, Mr. Smith.  Because we can gift limited partnership

6  interests to the children and that way you'll have continued

7  control.  You can make the decisions about how much you want to

8  give.  So that's what they did.  This fit Sid Smith's goal, his

9  purpose, and that's what they did.  They formed a family

10  limited partnership. You'll hear it called the Smith Family

11  Limited Partnership, in December of 1997. Then they put the

12  company inside of it. Smith Family Limited Partnership became

13  the owner of Erie Navigation Company.

14       Then in January of 1998, Sid made a gift to his

15  children, to each of his children, Sandy and Jill. He gave

16  them six percent of the limited partnership interest. Six

17  percent of the limited partner interest. Again, it fit his

18  goal. They are owners now, but there is no voice.

19       In December of 1997, I'm sorry, December of 1998,

20  Sid made a second gift to his children. He gave each of the

21  kids another about 13 percent limited partnership interest.

22  Those are the gifts that you'll hear about today.

23       You'll hear that the Internal Revenue Service

24  collects a tax from gifts. It's called a gift tax. It's a tax

25  on the value of a gift you give. We're not talking about

36

1  birthday gifts here, you have to have a gift of some

2  substantial size. In fact, I think you're allowed to give away

3  $10,000 a year, beyond that you have to report and pay a tax on

4  gifts.

5        The person who makes the gift has to pay the tax.

6  And you do that by filing a tax return.  It's a lot shorter

7  than your income tax return, but kind of the same sort of

8  thing.  You send a gift tax return into the IRS, there's a way

9  to calculate what the tax should be.

10        Well, how do you figure out what the value of a

11  six-percent limited partnership interest is in an operating

12  company.  Or a 13-percent interest in a limited partnership

13  that owns and operates a company.  How do you figure that out,

14  it's not easy.  The IRS requires that you file with your return

15  some sort of a report establishing what the value is.

16        So, Mr. Smith hired a gentleman who was trained with

17  regard to valuing a business, his name is Greg Pashke.  Mr.

18  Pashke was a CPA, he practiced here in Erie, now he lives in

19  Florida, and you'll hear his testimony in this case.  Mr.

20  Pashke looked at the operations of the company.  And he looked

21  at the limited partnership agreement, the document that created

22  the limited partnership agreement, because it outlined what

23  rights and responsibilities and how things worked.

24        And Mr. Pashke came up with a report.  And what he

25   reported was the value of a one-percent interest in the limited

37

1   partnership.  He just used that one-percent figure, he just

2   multiplied it out, if it's a six-percent gift, you multiply it

3   by six.  He came up with a report, then he calculated the tax.

4   Sid Smith swallowed hard and wrote a check in February of 1999

5   for $260,000 in tax for those gifts.  That's not income tax,

6   those were those gifts.

7          Now, the IRS has three years to examine a return, a

8   gift tax return.  And at about two years and 10 months, the IRS

9   wrote and said no, we don't agree, we think you owe more tax.

10  Why.  We think the value of the gifts is higher than what

11  you've indicated.  Okay, how much.  $360,000 more.  They

12  indicated that Mr. Smith needed to pay a total of, if you add

13  those two numbers, around $620,000 for the gifts he made in

14  1998.

15          You'll hear Mr. Smith was not at all happy about

16  that, completely disagreed with the value that the IRS had put

17  in.  But there's not a lot you can do, you got to pay the tax.

18  So, I think it's around the end of 2001, he paid an additional

19  $360,000 in tax and he asked for a refund.

20      And shortly thereafter, I think within a matter of

21  months, the IRS refused the refund and that's what brings us

22  here.  This lawsuit was instituted, that's the procedure you

23  can go through, you come into a district court.

24      And this lawsuit I think began, I think sometime in

25  2002.  September, 2002, I think.  That's what brings us here.


38


1  That's the question that ultimately will be presented to you at

2  the end of the case.  What was the value of the gifts that Sid

3  Smith gave in 1998.

4      Let me just -- I wrote it down, this is what you'll

5  hear from the judge.  You're going to hear this from a number

6  of witnesses, too.  What is the fair market value of the gifts

7  that were made by Mr. Smith in 1998.  I'm not sure exactly the

8  details of how we will present that to you.  You'll ultimately

9  have a question, a written question at the end of the case.  I

10  hope we ask you what's the value of a one-percent interest in

11  the Smith Family Limited Partnership.  But we may find that we

12  have to ask you the question some other way.  This is the

13  essential issue in the case.

14      You may think to yourselves who am I, I certainly

15  thought to myself, who am I to figure out what a value is.

16  Well, you're going to hear from some experts.  They will tell

17  you it's largely a subjective decision.  I mean, you hear the

18  facts, you hear about the information, you hear about the

19  business, you hear about the Smith Family Limited Partnership,

20  and you make a decision about fair market value.

21      Fair market value is defined -- it's defined by the

22  Internal Revenue Service, here's what it means.  Fair market

23  value is the price at which property, in this case we're

24  talking about an interest in a family limited partnership, the

25  price at which property would change hands between a willing


39


1  buyer and a willing seller.  I will tell you and you'll hear it

2  from witnesses, these are fictional people.  It's not the Smith

3  family.  We're talking about fictional people as you decide a

4  fair market value.  The price at which a willing buyer and

5  seller would exchange the property, would purchase or sell the

6  property.  With the buyer not being under no compulsion to buy.

7   In other words, there is no requirement that a buyer enter into

8   a transaction.  And the seller is not under any compulsion to

9   sell.  And, finally, that both the buyer and the seller have

10  all the reasonable knowledge that you would want.  They would

11  understand what the asset is or what the business is.  They

12  would understand what the restrictions on ownership might be.

13  Remember, this was a limited partner interest, somebody with no

14  voice in operations.  They would understand all of that.

15        They even understand alternative investments.  Do I

16  want to put my money here or do I take my money someplace else.

17  They would understand that as well.  But they are fictional

18  people, not the Smith family.

19        Those are the questions, that's the question and

20  that is the definition that you have to think about as we go

21  through this process.  And that's what brings us here.

22        This should be pretty quick.  This is not going to

23  be a long trial.  I would expect that from us you will hear

24  three witnesses.

25        We're going to put Mr. Cullen on the stand.  Mr.

40

1   Cullen is going to talk about his discussions with Sid Smith

2   and Mr. Finnecy.  He's going to talk about what a limited

3   partnership is and explain through questions and answers what

4   the rights of a limited partner might be.

5           You're going to hear from Greg Pashke, the man who

6   did the valuation for Sid Smith back in 1998.  And he'll talk

7   to you about an opinion that he has reached with regard to

8   value and how he formed that.

9           And then you're going to hear from Sid Smith, I'm

10  sorry, from Sandy Smith, Sid's son.  Sandy worked in the

11  business, as I indicated, for about 12 years, prior to these

12  gifts be given about 13 years, I think he started there in

13  about 1985.  He'll tell you he did most of the jobs.  I mean,

14  he drove the equipment, he worked in the office, he understood

15  the financials of the business.  He did the sales work.  He

16  talked to insurance companies and banks, all the things you

17  have to do in running a business.

18          As I said, I think it's going to be pretty quick, I

19  think the government only has one witness to put on.  I think

20  the IRS is only going to put one witness on, should be done

21  perhaps tomorrow.  At that point we'll ask you this question,

22  what is the value of the gifts that Mr. Smith gave in 1998.

23  What's the fair market value.

24       I think when you listen to the testimony, you'll

25  conclude, as we have, that the IRS has got it wrong.  And that


                                    41


1  the value is not as high as they are suggesting, and that a

2  refund is due.  Thank you.

3       THE COURT:  Mr. Cooper.

4       MR. COOPER:  May it please the court, ladies and

5  gentlemen and opposing counsel.  There is one word,

6  reliability, I want you to focus on that word.  As Mr. Delaney

7  told us, there is one issue, what is the value of the gifts.

8  And how do you get to that value.

9       The United States will provide you with a reliable

10  value as to the fair market value of the gifts on the day they

11  were given in 1998.  Our expert will demonstrate to you that

12  our valuation is reliable.  Because our expert used an

13  acceptable methodology.

14       His valuation is based in sound data.  And, more

15  importantly, his results are verified by independent studies.

16  And through that methodology, our expert will show to you that

17  the value of the four gifts that Mr. Smith, III, gave to his

18  children in 1998 were worth $1.6 million.  And that is what

19  we're here to determine.

20      You heard the history of Erie Sand and Gravel.  And

21  in forming that, Mr. Smith went and talked to his estate

22  planning attorney, Mr. Cullen, who is going to testify.  Mr.

23  Cullen as an estate planning attorney suggested this method of

24  a family limited partnership.  In which he would pass his

25  company he ran, Erie Sand and Gravel, to his children.


42


1       The two transactions that took place, the first one

2  happened January 5th of 1998; the second one occurred on

3  December 31st.  On each of these dates the two gifts were

4  given.  One gift was given to his son, Mr. Smith, III.  The

5  second gift was given to his daughter, Ms. Smith.  On that date

6  each received approximately a seven-percent interest.  On the

7  second date, two more gifts were given by Mr. Smith to his

8  children.  Again, each gift that were given to his children was

9  about 13.25 percent.

10      Now, where do we start the valuation.  What you'll

11  hear is at the time the gifts were given, Mr. Pashke, who is

12  the plaintiffs' expert, came up with a net asset value.  That's

13  the methodology he used, the net asset value.

14       What is net asset value.  It's assets minus

15  liabilities, which gives you net asset value.  His independent

16  valuation on January 5th -- I'm sorry, was $5.2 million.  So

17  without these discounts we're talking about, just assets minus

18  liabilities, this is how much the company was worth.

19       The same methodology was used again by our expert,

20  Mr. Francis Burns, who's sitting back there in the courtroom,

21  as well as Mr. Pashke in his supplemental expert report.  And

22  they both agree again that on December 31st, the net asset

23  value of ENC was $5.3 million.

24       Now, the first step of the calculation is easy.

25  What is the net asset value, what is the percentage of the

43

1  debt, and that will give you a pro rata value of a single gift

2  on those days.  And the proximate numbers, you'll find that the

3  pro rata value on this date is $364,000.

4       Going to December 31st, you use the same

5   methodology.  Because there's two days, you'll be taking the

6   same methodology and using it again.  But on the second date,

7   the value of the gift was $715,000.  And, again, that is for

8   one gift.

9          Now, we get to the point where we were talking about

10   discounts.  There are two discounts.  And both experts use the

11   same discount.  The first discount is called lack of control.

12   Mr. Delaney explained that to you.  The important thing I want

13   you to remember about lack of control.  Francis Burns went out

14   and relied on data called closed-end funds.  Mr. Pashke did the

15   same thing.  Mr. Burns came with a lack of control discount at

16   4.9 percent.  Mr. Pashke showed came in at five.  So the lack

17   of control discount between the two is almost exactly the same.

18          Again, on December 31st, they use the same

19   methodology again, looking at the same data.  And they both did

20   the same analysis.  And Mr. Burns on that date found that there

21   was a lack of control discount of 11.4 percent.  Mr. Burns is

22   our expert, that was his finding.  Mr. Pashke relied on the

23   same data, came to a lower discount, 10 percent.  So on those

24   two days the experts will tell you that basically there is no

25   dispute as to the amount of discount.

44

1          Now, how does that affect the pro rata share.  You

2    have to subtract it, make it lower, because it's a discount.

3    And a discount is like anything you see in a store, it's

4    usually a dollar, if it's on sale, it's a discount, it's

5    something less.  That's exactly what these discounts are.

6          So when you add in the lack of control discount,

7    through this gift, the lack of control discount is

8    approximately $18,000.  The second lack of control discount is

9    $82,000.  When you subtract that from the pro rata share and

10   you find that on January 5th, after the lack of control

11   discount, a single gift was worth $346,000.  And on December

12   31st a single gift, remember there were two, a single gift was

13   worth $633,500 a pop.

14          Now, we go to the second discount, which is lack of

15   marketability.  And you provide this discount because the

16   interest in a family limited partnerships are not something

17   that are readily marketable.  And what do I mean by that.

18   There's not a mechanism where you can take that interest and

19   sell it into the market.  So if you think the marketability of

20  stock in Microsoft, there's a vehicle, the NASDAQ, you could

21  easily sell it.  With these partnership interests, they're not

22  easily sellable, there is no mechanism for selling them.  So

23  there is a discount for this lack of marketability.

24        Our expert went out there and relied on specific

25  data.  And these are reports that were done by several groups,

45

1  including the Securities and Exchange Commission, from the

2  1960's to the late 1990's.  Many, many years of reports.  And

3  after analyzing this data and making adjustments for lack of

4  diversification, he came in at a discount for lack of

5  marketability at 17.5 percent.  This number will also be

6  verified by independent academic research.

7        Now, what you do is you do the same methodology.

8  After you determine what the lack of marketability discount is,

9  you go through the same math.  You multiply it times fair

10  market value after a discount to get the amount of discount.

11  So on this date the discount would have been $61,000 for the

12  one gift.  On the second day, it would have been $100,011.

13  Then, again, you subtract this number from that number.  So the

14  fair market value of a single gift was $285,000.  And on the

15  second date, the fair market value of a single gift was

16  $522,000.

17         Remember that's a single gift, there were two

18  children, Mr. Smith, III and Ms. Smith.  Multiply that times

19  two, the value of the gifts were approximately $570,000, both

20  of them.  Over here, over a million.  So the value of the two

21  gifts on that date is $570,000 and a million dollars.  And

22  together the two gifts were worth $1,614,000.

23         Using the methodology the United States would

24  provide for you, that is the appropriate value of all four

25  gifts made in 1998.  Because Mr. Burns' analysis, one, net

46

1  asset value, pro rata value, lack of marketability, control

2  discount, both experts agree.  Lack of marketability discount

3  based upon tens of years of studies and it's verified by

4  independent research, leads you to $1.6 million.

5         The United States will provide you with reliable

6  valuation because these are accepted methods of valuation.  And

7  its based on hard data, it comes to a specific result.

8        This is not a tax case, this is a case about the

9    value of a business, 40-percent interest possibly.  Mr. Smith,

10   III, and Ms. Smith at the close of 1998, they owned 40-percent

11   of the partnership, that owned 100 percent of Erie Navigation

12   Company and its other companies.  Which included Erie Sand and

13   Gravel and Erie Sand and Steamship.  They were 40-percent

14   owners of that stuff.  And you're valuing that stuff for gift

15   tax purposes.

16       May I remind you all gifts are not taxable.  In 1998

17   when the gifts were made, gifts were only taxable if they were

18   in excess of $625,000.  So this tax only affects certain

19   people, not every person.

20       When you break down this into small bits, small

21   analysis, it isn't complicated, it's easy.  If you take it part

22   by part.  In the whole it may seem complicated, but in small

23   parts it's easy and justifiable if you follow the United

24   States' methodology.

25       The only thing that may be complicated in this case


47


1    is you trying to decipher my southern accent.  I will try to

2   alleviate that concern as much as possible.  I'm Lindsay

3   Cooper, I'm an attorney for the Justice Department.  My

4   co-counsel over there is Ivan Dale, he is also an attorney for

5   the Justice Department.

6         As you heard, this case may go two days.  And the

7   way that it works is Mr. Delaney has an opportunity to go

8   first.  But I want to make a deal with you, keep your mind open

9   when you listen to the testimony.  Because our expert may have

10  to come up on the second day and provide you with his

11  methodology.  So keep an open mind on that first day and allow

12  us to put forth our case, because the way it works is we have

13  to go second.  Thank you for your time.

14         THE COURT:  All right, Mr. Delaney, call your first

15  witness.

16         MR. DELANEY:  Thank you, your Honor.  We would call

17  Jim Cullen to the stand.

18         THE COURT:  Mr. Cullen, come up here, give your full

19  name to my court reporter, please?

20         THE WITNESS:  James D. Cullen, C-u-l-l-e-n.

21         JAMES D. CULLEN, PLAINTIFFS' WITNESS, SWORN

22                DIRECT EXAMINATION

23  BY MR. DELANEY:

24  Q.   Mr. Cullen, would you state your full name, please?

25  A.   James D. Cullen.


                                48


1  Q.   We know one another, don't we?

2  A.   Yes, sir.

3  Q.   We practice law together?

4  A.   Yes.

5  Q.   What is your business address and your occupation,

6  please?

7  A.   I'm an attorney with MacDonald, Illig, Jones and Britton,

8  we're located at 100 State Street, here in Erie.  I'm an

9  attorney in the estates and trust group.

10  Q.   Would you tell us just a little bit about your education,

11  start with college; when did you graduate, and then law school?

12  A.   I went to John Carroll University in Cleveland, I

13  graduated with a degree in accounting in 1969.  In 1972 I

14  graduated from the University of Pittsburgh School of Law.

15  Q.   Have you practiced law in Erie since that date?

16  A.   Yes, sir.

17  Q.   When were you licensed to practice in Pennsylvania?

18  A.   May of 1973.

19  Q.   All right.  In the course of your law practice, did you

20  have occasion to provide any services to the late Sid Smith,

21  Jr.?

22  A.   Yes, sir.  Our firm represented Mr. Smith and his company

23  and I personally did estate planning work for he and his wife.

24  Jim Spoden, my partner, did the corporate work for Mr. Smith.

25  And we also knew Sandy and Jill.


49


1  Q.   You were aware that Mr. Smith had two children?

2  A.   Yes.

3  Q.   In your work with Mr. Smith, did you have anything to do

4  with the creation of a family limited partnership?

5  A.   Yes, I did.

6  Q.   Do you remember when Mr. Smith approached you about that

7  or how were you approached?

8  A.   It was the spring of 1997, and I was approached by Mr.

9  Dave Finnecy, who was Mr. Smith's friend and accountant.  And

10  Dave Finnecy and I had a meeting where Dave outlined to me some

11  of the issues that he and Mr. Smith had been talking about with

12  regard to the company and trying to bring in as shareholders or

13  owners Jill and Sandy.

14  Q.   At that time were Mr. Smith's two children adults?

15  A.   Yes, they were both adults.

16  Q.   Were they both located in Erie, if you know?

17  A.   Sandy was, Sandy was working at the business.  He had

18  started in the mid '80s.  Jill was not working in the business,

19  she was not in Erie, she was in, I believe, Phoenix or

20  someplace warm in Arizona.

21  Q.   All right.  Did Mr. Smith express to you what it was he

22  was trying to accomplish, why he was coming to you and what he

23  wanted to do?

24  A.   Yes, he did.

25       MR. COOPER:  Objection.


                                50


1        THE COURT:  Is it a hearsay objection?

2        MR. COOPER:  Yes, sir.

3        THE COURT:  What's your response?

4        MR. DELANEY:  Your Honor, it isn't hearsay, it's an

5   expression of the intent, which, if you'll give me a moment,

6  I'll cite Rule 801, I believe --

7      THE COURT:  Let me see you at side bar.

8      (At side bar on the record.)

9      MR. COOPER:  Your Honor, it's double hearsay, we

10  haven't established Mr. Smith told the witness anything.

11      MR. DALE:  Mr. Smith told Mr. Finnecy who told Mr.

12  Cullen.  Mr. Finnecy and Mr. Smith are not here today to

13  testify as to Mr. Smith's reported intent, which I'm not sure

14  is relevant to this case anyway.

15      THE COURT:  First of all, is Mr. Cullen going to

16  testify as to what he heard directly from Mr. Smith and,

17  secondly, how is Mr. Smith's intention as to this document

18  relevant as to this case, how it shakes itself out?

19      MR. DELANEY:  First of all, the objection, as I

20  understand it, is to hearsay.  It's an 803 exception, saying

21  then existing mental, emotional or physical conditions are

22  admissible.  I think it's relevant to this background to

23  explain why Mr. Smith was right to place the business in a

24  family limited partnership.  What was his idea.  It was the

25  fact there was the interest in his maintaining control.  Mr.

1   Cullen is also going to provide through questions and answers,

2   explain what a limited partnership is.  This is the best

3   evidence the jury is going to hear on this issue.

4           THE COURT:  Cullen is going to testify as what he

5   did in response to this?

6           MR. DELANEY:  Yes.

7           THE COURT:  It's overruled.

8           (End of discussion at side bar.)

9   BY MR. DELANEY:

10  Q.   I think the question was what did Mr. Smith indicate to

11  you was his intent or goal, what did he want to do?

12  A.   Mrs. Smith, his wife, had passed away in 1993.  This was

13  in the spring of 1997, and his goal was to involve Sandy, his

14  son, and Jill, as owners of the business.  Sandy worked in the

15  business, that was natural, Jill did not.  He was looking for a

16  mechanism where he could treat them on an economical basis

17  equally, have them both work in the business, but ultimately

18  end up with Sandy being able to manage the business like he

19  was.

20  Q.   Like he, Sid was?

21  A.   Like he, Sid was.  Sid's goal was to ultimately work in

22  that direction.  But for the time being he was very much

23  involved in the management of the business and wanted to

24  continue to be the person who ran the business.  He was also

25  concerned about -- we used to call them domestic disorders.  He


                                52


1  had seen a lot of companies where the children got married and

2  then got divorced and the family business interests owned by

3  those children became issues in divorce proceedings.  He wanted

4  to make sure that that didn't occur, that the company stayed

5  within the family and somehow it took care of those issues,

6  too.

7  Q.   As a result of that conversation, what advice did you

8  provide to Mr. Smith?

9  A.   It was my advice that this concept of a family limited

10  partnership would meet the goals and objectives that he was

11  trying to accomplish at that time.

12  Q.   Had he ever heard of a limited partnership, as best you

13  can recall from the conversation?

14  A.   As best as I recall, no, he hadn't.

15  Q.    Now, why not just say to Mr. Smith, look, give shares in

16  Erie Navigation Company to the kids, why not do it that way,

17  would that not accomplish his goals?

18  A.    That was the same question that he asked, wouldn't it be

19  simpler.  The answer is no, because when you give the shares of

20  Erie Navigation Company to the children, the children are free

21  to pass them any way that they want.  They're still subject to

22  the claims of domestic disorders.  And, also, he was concerned

23  about the operation of the company as far as Jill was

24  concerned.  He wanted to make sure that even though some day

25  Sandy would manage it, he wanted her to have an interest in it,


53


1  but didn't want her being liable for anything in connection

2  with the business.

3  Q.    Okay.  Let's talk about limited partnerships, hopefully

4  you can help us understand what the distinction is or what the

5  characteristics of a limited partnership are.  How do you

6  start, how do create a limited partnership?

7  A.    First, you decide on a name.  In this case we decided

8  very simply the Sidney E. Smith, Jr. Family Limited

9  Partnership.  You register that name with the Commonwealth of

10  Pennsylvania.  You go to the Internal Revenue Service and ask

11  them to assign this new entity, this limited partnership, a tax

12  identification number, like our Social Security number.  And

13  then you prepare a partnership agreement to be signed by the

14  people who are going to be the partners.

15        MR. COOPER:  Your Honor, we would object on the

16  grounds he's giving expert testimony.

17        THE COURT:  Overruled.  Go ahead.

18  BY MR. DELANEY:

19  Q.    The agreement itself, the limited partnership agreement,

20  is it a standard form, is every limited partnership agreement

21  exactly the same no matter what company it is?

22  A.    No, sir.

23  Q.    Who drafts the limited partnership agreement?

24  A.    The lawyer does.

25  Q.    Who signs the limited partnership agreement?

54

1  A.    The people who are the partners.

2  Q.    And what is the purpose of the agreement, just very

3   generally what's in this type of agreement?

4   A.    The agreement sets forth the duties and responsibilities

5   of the partners.  And in a limited partnership agreement you

6   have two kinds of partners.  You have a general partner and a

7   limited partner.  And when this partnership was formed, Mr.

8   Smith was the general partner that was in control.  He also

9   owned a limited partnership interest, and Jill and Sandy owned

10  limited partnership interest.  So this agreement set forth

11  exactly who had what responsibilities.  It said that the

12  general partner, Mr. Smith, is the person who controls and

13  manages all of the partnership affairs, runs the business,

14  borrowing, and things like that.  It also sets forth what the

15  limited partners can and cannot do and what happens if they

16  have a domestic disorder or they want to sell their interests,

17  issues like that.

18  Q.    All right.  Now, I have a series of questions for you so

19  we can understand the distinction between a general partner and

20  a limited partner, I have a series of questions.  Are they both

21  considered owners?

22  A.    Yes.

23  Q.    Typically, if you take all of their interests, the

24  general partnership interests and the limited partnership

25  interests, does it total a 100 percent, is that how it works?

55

1  A.   Yes, sir.

2  Q.   Does a limited partner -- a person is a limited partner,

3  has a limited partnership interest, do they have a right to be

4  employed by the business?

5  A.   No, they do not.

6  Q.   Do they have a right to be an officer of the business,

7  like a president or secretary?

8  A.   No.

9  Q.   Can they select or remove the people who are general

10  partners?

11  A.   No.

12  Q.   Can a limited partner transact any business for the

13  limited partnership, can they sign contracts or make contracts?

14  A.   No, sir.

15  Q.   Can the limited partner -- a person holding a limited

16  partnership interest, hire or fire anybody in the business?

17  A.   No, absolutely not.

18  Q.   Does the limited partner have any right to dictate what

19  business the partnership engages in?

20  A.   No.

21  Q.   Does it have any right to incur debt for the business?

22  A.   No.

23  Q.   Does the limited partner have any right to dictate when

24  money comes out of the partnership to the partners?

25  A.   No.

56

1  Q.   Who has all those rights?

2  A.   The general partner does.

3  Q.   Does the limited partner have any input into how the

4  business is managed?

5  A.   No, that's for the general partner.

6  Q.   And one last question, just the reverse of that, can a

7  person who holds a limited partnership interest veto what the

8  general partner decides or wants to do?

9  A.   No, sir.

10  Q.   This is a little bit confusing.  Can one individual own

11  both a general partnership interest and a limited partnership

12  interest in the same organization?

13  A.   Yes, sir, under Pennsylvania law that's required, too.

14  Q.   When Sid Smith formed this family limited partnership, in

15  fact, he had both interests, didn't he?

16  A.   Correct, he did.

17  Q.   Let's go back and talk to you about Mr. Smith himself.

18  Let me show you a document that we've marked as Plaintiff's

19  Exhibit No. 1.  It's about a 30-page document, I believe.

20  Do you recognize that document?

21  A.   Yes, sir.

22  Q.   Would you tell us what that document is?

23  A.   This is the limited partnership agreement that I drafted

24  for the Sidney Smith Family Limited Partnership.

25  Q.   All right.  How long is it?


57


1  A.   The agreement itself, without the schedules, is 29 pages.

2  Q.   This is what sets forth the ground rules, is that

3  correct?

4  A.   Yes, sir.

5  Q.   Is it signed on page 28 and 29?

6  A.   Yes, sir.

file:///A|/SMITHDY1.TXT

7   Q.   All right.  It is signed by Sidney Smith, Sandy Smith and

8   Jill Smith?

9   A.   Correct.

10   Q.   Thank you.  When the partnership started at the very

11   beginning, now the jury knows we're talking about gifts in

12   1998, but before we get to 1998, when you started the limited

13   partnership for the Smith family, how much of the total hundred

14   percent was dedicated to the general partner's interest?

15   A.   Three percent.

16   Q.   And how much was dedicated to the limited partner's

17   interests?

18   A.   Ninety-seven.

19   Q.   Now, after you get this -- by the way, did you say the

20   date, did I ask you the date of this agreement?

21   A.   I don't believe you did.  But the agreement was executed

22   on December 29, 1997.

23   Q.   Does that mean it was signed about that date?

24   A.   Yes, sir.

25   Q.   Or made effective that date?

58

1  A.   Correct.

2  Q.   Do you know when or if Mr. Smith made a gift of the

3  limited partner's interest to Jill and Sandy?

4  A.   Yes.

5  Q.   Do you know when that first gift occurred?

6  A.   January of 1998.

7  Q.   You don't have to say exactly, but do you know

8  approximately what amount he gave to each of the children?

9  A.   In terms of a percentage, approximately, six-percent

10  each.  Little more than that, 6.5.

11  Q.   Was it a general partnership interest he was giving or a

12  limited partnership interest?

13  A.   Limited.

14  Q.   Do you know if there were any subsequent gifts that were

15  made to Sandy and Jill by Sid Smith?

16  A.   In December of 1998, he made additional gifts of limited

17  partnership interests to each of them.

18  Q.   And about what percentage to each?

19  A.   About 13 percent.

20  Q.   So, at the end of 1998, Jill and Sandy each had about 20,

21  maybe a little bit more than 20-percent limited partner's

22  interest?

23  A.    Yes, sir, 21 and a half percent each.

24  Q.    Who was in control of the business at that point?

25  A.    Mr. Smith was.


59


1  Q.    Sid Smith?

2  A.    Correct.

3  Q.    You say that with a smile?

4  A.    That was important to him.

5  Q.    Okay.  Let's talk about gift tax.  On a gift such as

6  this, was it necessary to pay some gift tax?

7  A.    Yes, sir.

8  Q.    And a gift tax, is it a state tax or a federal tax?

9  A.    It's a federal tax.

10  Q.    How does a taxpayer -- well, let me back up.  Who pays

11  the tax, the recipient of the gift or the person who makes the

12  gift?

13  A.    The person who makes the gift pays the tax.

14  Q.    How does that person report or what is that person do to

15  report that there is some tax due?

16  A.    He files a United States gift tax return with the

17  Internal Revenue Service, reporting the details of the gift,

18  the dates, exactly what was given and the value of the gifts

19  that were given.

20  Q.    I understand there are some thresholds, it's not every

21  gift that you might give a child that has to be taxed?

22  A.    Correct.

23  Q.    Can you tell us generally how those thresholds are met?

24  A.    Back in 1998, they're different from what they are today,

25  but back in 1998, we could give $10,000 per person per calendar

                                    60

1  year without any gift tax reporting requirement.  When you

2  exceeded that $10,000 annual exclusion amount, then you started

3  to eat into a lifetime exclusion amount that the government

4  gives you for gifts.  And that lifetime exclusion amount in

5  1998 was $625,000.

6  Q.    Do we find all of this in some law?

7  A.    Yes, sir.

8  Q.    The Internal Revenue Code?

9  A.    Yes, sir.

10  Q.    Now, as a result of these gifts, do you know if Mr. Smith

11  filed a gift tax return with the federal government?

12  A.    He did.

13  Q.    And do you know about when that return would have been

14  filed?

15  A.    February of 1999.

16  Q.    I'm going to show you a document that's marked as

17  Plaintiff's Exhibit No. 2, and ask if that is a document you're

18  familiar with?

19  A.    Yes, sir.

20  Q.    And what is that document?

21  A.    This is the gift tax return that Mr. Smith filed on

22  February 12th of 1999, to report the gifts that he made in

23  1998.

24  Q.    Did he indicate or is it indicated on this form the

25  amount of tax that was calculated?

61

1  A.    Yes, sir.

2         MR. COOPER:  Objection, there's no relevance.

3         THE COURT:  Overruled.

4   BY MR. DELANEY:

5   Q.   What amount of tax was reported on this tax return?

6   A.   $262,243.

7   Q.   Now, that gift tax, is it -- how do you calculate the

8   gift tax, is it on the value or is it on some other measure of

9   the gift?

10  A.   The gift tax is calculated on the value of the gifts that

11  are given.

12  Q.   Is it a flat tax, is it like a flat 10 percent no matter

13  what the value is?

14  A.   No, sir.

15  Q.   What is it?

16  A.   The greater the gift, the more gift taxes you're going to

17  pay.

18  Q.   So the higher the percentage, the greater the value?

19  A.   Right.  The rates at that time ran from -- taxable gifts,

20  they started at 37 percent, in 1998 ran all the way up to big

21  gifts of 60 percent.

22  Q.   You had to pay that percentage of the value of the gift?

23  A.   Yes, sir.

24  Q.   Now, I don't presume that you can just declare a number

25  for the federal government on your gift tax return; do you have

62

1  to justify the value you've placed on your gift?

2  A.    If it's cash that you're giving, you can obviously

3  declare the number.  But for Mr. Smith, when he was giving

4  limited partnership interests, I couldn't value it, he couldn't

5  value it.  So that's where you hire a valuation expert to tell

6  you what the value of the gifts are.

7  Q.    And, Jim, I forgot to ask you this question.  After you

8  formed the Smith Family Limited Partnership, those are the

9  gifts we're talking about, interests in that partnership, what

10  assets, what property did the Smith Family Limited Partnership

11  own?

12  A.    The shares of stock in Erie Navigation Company, I think

13  it was 105 shares.

14  Q.    Did it own anything else?

15  A.    No, sir.

16  Q.    That was it, no cash, no securities, just the stock in

17  that company?

18  A.    Correct.

19  Q.    Okay.  Can you tell us what the procedure is when you

20  file this, do you have to send a check in with the tax return?

21  A.   Yes, sir.

22  Q.   Did Mr. Smith do that?

23  A.   Yes, sir, he did.

24  Q.   How long does the IRS have to examine this type of a tax

25  return or back in '98 how long did they have?


63


1  A.   Three years from the due date of the return.

2  Q.   And did there come a time when the IRS contested the tax

3  return?

4  A.   Yes, sir.  We got a notice in December of 2001, not quite

5  three years after we filed a gift tax return, that the Internal

6  Revenue Service did not agree with the values that we put on

7  the gifts that were made.

8  Q.   Let me show you what's been marked as Plaintiff's Exhibit

9  No. 3, and are you familiar with that?

10  A.   Yes, sir.

11  Q.   What is that document?

12  A.   This is the notice that we received from the estate tax

13  attorney out of Pittsburgh, his name was Frank Habineck.

14  Q.  Who did he work for?

15  A.  He worked for the Internal Revenue Service.  This is the

16  notice that he sent indicating that the government was looking

17  for another $360,803 in gift taxes.

18  Q.  Do you know what the basis -- I mean in most general

19  terms, what was the government saying, you had miscalculated

20  the tax when you filed the tax return?

21  A.  No, they didn't agree with the value that Greg Pashke had

22  put on the limited partnership interests.

23  Q.  Well, you caused me to recall -- on Exhibit No. 2, the

24  tax return, when you calculated the tax, you must have come up

25  with a value for the gift, is that correct?

64

1  A.  Yes, sir, we did.

2  Q.  How did you do that?

3  A.  Well, we had hired Greg Pashke to tell us what the value

4  of the gift of the limited partnership was.  We then attached

5  his report to this gift tax return.

6  Q.  So the government has the benefit of not only the tax

7  return, but Mr. Pashke's report?

file:///A|/SMITHDY1.TXT

8   A.   Yes, sir.

9   Q.   And then the IRS in 2001, they write to you?

10  A.   Yes.

11  Q.   And they say we want this additional amount of tax?

12  A.   Yes, sir.

13  Q.   Okay.  Did they attach any kind of a report, does the

14  government attach any kind of report saying how they're

15  justifying the increased tax?

16  A.   No, sir.

17  Q.   What did Mr. Smith do in response to the notice from the

18  government?

19  A.   He was not happy.

20  Q.   Okay.

21  A.   He was a little -- was quite shocked as a matter of fact.

22  He had thought when he wrote the check for the gift tax return,

23  that that was a lot of money, he was thinking then that the

24  gifts weren't worth what he was paying gift taxes on.  But when

25  they came back with $360,000 in additional tax, he was very

65

1   upset and wanted to know what his options were.

2   Q.   And as a result, did he write a check?

3   A.   Yes, sir, he did.

4   Q.   When you write that check for the additional amount of

5   gift tax -- do you have the original?

6   A.   Yes.

7   Q.   I've put in front of you Plaintiff's Exhibit 4, do you

8   see that?

9   A.   Yes, sir.

10   Q.   What is that document?

11   A.   This is the claim for refund that was filed.  When you

12   pay the tax, that stops the running of the interest.  And then

13   what you do is you then ask the government, you file a form,

14   which Mr. Habineck had sent to me, with the bill for the

15   $360,000, you file a form with the IRS saying look, how about

16   looking at this again, reviewing it, we're requesting a refund.

17   And, again, the reason you pay the tax is to stop the running

18   of the interest.  So we filed this Form 843, which is a claim

19   for refund, with the Internal Revenue Service.

20   Q.   Did the government allow any sort of refund?

21   A.   No, sir, they didn't.  And the law says that either you

22   hear from them within a six-month period or if you don't, then

23  your alternative as the taxpayer is to come to court to seek

24  the refund.

25  Q.    Do you know when the lawsuit was filed, when we filed

66

1  this lawsuit?

2  A.    September, roughly, of 2002.

3  Q.    When did Mr. Smith pass away?

4  A.    In April of 2003.

5          MR. DELANEY:  That's all the questions I have for

6  this gentleman.

7          THE COURT:  All right.  Yes, sir.

8                  CROSS-EXAMINATION

9  BY MR. COOPER:

10  Q.    Mr. Cullen, you work for the law firm of MacDonald,

11  Illig, Jones and Britton, correct?

12  A.    Yes, sir.

13  Q.    That law firm is also representing the plaintiffs here

14  today?

15  A.    Yes, sir.

16  Q.    During this proceeding has your name appeared on the

17  pleadings as an advocate for the plaintiffs?

18  A.   It did initially.

19  Q.   It did, didn't it?

20  A.   Yes, sir.

21  Q.   And as counsel for plaintiffs, are you supposed to be an

22  advocate of their positions?

23  A.   Sure.

24  Q.   And you're testifying today as an attorney for the

25  plaintiffs, correct?


                                67


1  A.   Yes, sir.

2  Q.   I believe you testified today that you wrote the family

3  limited partnership on behalf of Mr. Smith?

4  A.   Yes, sir.

5  Q.   Did you learn about family limited partnerships at a

6  conference?

7  A.   Yes, sir.

8  Q.   Was the speaker at the conference, I believe, a fellow by

9  the name of Mr. Eastland?

10  A.   Yes, sir.

11  Q.   You are an estate planning attorney?

12  A.   Yes, sir.

13  Q.   And you attended that conference as an estate planning

14  attorney?

15  A.   Yes, sir.

16  Q.   And during the conference before Mr. Eastland, he

17  discussed these family limited partnerships as an estate

18  planning tool, correct?

19  A.   Yes, sir.

20  Q.   Actually, the first time that you had the opportunity to

21  write a family limited partnership, you called Mr. Eastland?

22  A.   Yes, sir.

23  Q.   And Mr. Eastland provided you with the first family

24  limited partnership he used?

25  A.   He prepared it.


68


1  Q.   He prepared it for you, correct?

2  A.   Yes, sir.

3  Q.   And then you used it?

4  A.   No, sir.

5    Q.   You used some form of it?

6    A.   No, sir.

7    Q.   You didn't revise his partnership agreement in any way?

8    A.   No, sir.

9    Q.   Did you use it as a model?

10   A.   No, sir.  His was drafted under Texas law.

11   Q.   Since you're in Pennsylvania, you had to modify it to

12   conform with Pennsylvania law?

13   A.   I didn't even use it as a basis, Pennsylvania law is so

14   much different from Texas, I started fresh.

15   Q.   And just to back up, you drafted the family limited

16   partnership, correct?

17   A.   Yes, sir.

18   Q.   Then the issue before this jury is the value of the

19   partnership interests that you drafted?

20   A.   Yes, sir.

21   Q.   And, approximately, I believe you told me during your

22   deposition that 30 percent of your practice is estate planning?

23   A.   Yes, sir.

24   Q.   And the majority of the rest of your practice concerns

25   estate administration?

69

1    A.    Yes, sir.

2    Q.    In your capacity as the estate planning attorney for Mr.

3    Smith, had you drafted his wills?

4    A.    Yes, sir.

5    Q.    I want to show Mr. Cullen what's previously been marked

6    as Exhibit No. 5.  And, Mr. Cullen, is this or one of the wills

7    that you drafted for Sidney Smith?

8    A.    Yes, sir.

9    Q.    And if we turn to page 13 at the very back, is that your

10   signature there, sir?

11   A.    Correct, it is.

12   Q.    And I believe when you were talking to Mr. Delaney

13   earlier, you said that one of the benefits of not gifting the

14   stock was that the children -- is that the children could do

15   anything with the stock that they'd like, meaning there weren't

16   any restrictions on transferability, is that correct?

17   A.    Yes, sir.

18   Q.    One of the reasons for putting it into the partnership

19   was to put the restrictions on the stock of ENC, correct?

20   A.    Correct, to make sure that it stayed within the family.

21  Q.    Right.  Prior to the formation of Smith FLP, was there

22  any restrictions on the stock of ENC?

23  A.    No, not to my knowledge.

24  Q.    Were there any restrictions on the stock of ENC in the

25  event that Mr. Smith died and passed it on to his children?

70

1  A.    No, not to my knowledge.

2  Q.    If I could turn your attention to page five of the will

3  that you drafted?

4  A.    Yes, sir.

5  Q.    Doesn't paragraph five say that the shares go to the

6  children and if the children, such as Mr. Smith, III, wanted to

7  sell the shares, didn't he first have to offer the shares to

8  the company?

9  A.    Can you wait one second and let me read it?

10  Q.    Yes, sir.

11  A.    What was your question again, I'm sorry.

12  Q.    After reading paragraph five, didn't the will require

13  that in the event of his death and the shares passed to one of

14  his children, then the children attempted to sell it, that they

15  would first have to sell it back to the company, Erie

16  Navigation Company?

17  A.    Yes, sir, that's exactly what it provides.

18  Q.    And there was a second restriction as well, if the

19  company didn't want the stock, the children would have to give

20  the other child an opportunity to buy the stock?

21  A.    Yes, sir.

22  Q.    And weren't these same type of restrictions contained

23  within the Smith Family Limited Partnership?

24  A.    Yes, sir.

25          THE COURT:  We're going to take a five-minute

71

1  recess.

2          (Proceedings recessed in Courtroom C at 11:01 a.m.;

3  and at 11:07 reconvened in Judge's Chambers as follows.)

4          THE COURT:  For present purposes you need some

5  direction as to the other issue, as to whether Mr. Smith can

6  come in and testify to valuation based upon a different method.

7  I've looked at the cases, I've concluded he cannot.  Let me put

8  this on the record as to why.  For instance, I'm looking at

file:///A|/SMITHDY1.TXT

9   Hempt_Brothers,_Inc.,_v._United_States, 354 F.Supp. 1172.

_____ _____ _____ __ _____ _____

10  Broadly speaking, this case involved a change in the accounting

11  method, that produced an error in an inventory calculation.  It

12  appeared that corporate entity had made and then abandoned a

13  particular approach.  And the court said, and this is apropos

14  to the question of variance or waiver, "the Commissioner is

15  required to examine only those points to which his attention is

16  necessarily directed, and this is essentially apposite here

17  because the corporation's amended claim sets forth specific

18  reasons in support of its inventory argument the natural effect

19  of which is to induce the Commissioner to pursue quite a

20  different line of inquiry than is relevant to the theory upon

21  which the plaintiff seeks to rely.  Similarly, it is immaterial

22  to the facts which might support recovery pursuant to the

23  tax-benefit theory were before the Commissioner when he

24  reviewed the corporation's claim.  The mere availability of

25  information is not equivalent to notice that a specific claim

72

1   based thereon is being made because the Internal Revenue

2   Service cannot be expected to discover every claim which a

3   taxpayer might conceivably assert." Citing cases. In Scott

_____

4   Paper_v._United_States, 943 F.Supp. 49, the court discussed the
_____ __ _____ _____

5   policy reason or purpose behind its variance rule. It said the

6   court -- the principles that the court lacks jurisdiction of

7   action to recover taxes except upon grounds reasonably

8   encompassed by the claim for refusing as originally filed or

9   properly amended. The purpose of this rule is to facilitate an

10  administrative determination of claims and to limitation of

11  issues which the Commissioner has considered and prepared to

12  defend. Citing the Hempt decision. The court went on to say,

_____

13  "to the contrary, the Commissioner is required to examine only

14  those points to which his intention is necessarily directed,

15  and this is especially apposite here because of the

16  corporation's amended claim sets forth specific reasons in

17  support of its inventory argument the natural effect of which

18  is to induce the Commissioner to pursue quite a different line

19  of inquiry than is relevant to the theory upon the plaintiff

20  presently seeks to rely." In this case -- my view of it is

21  this. Two different valuation methods were proposed in the

22  plaintiff's report.  However, only one was actively pursued

23  before the Commissioner.  The other was effectively abandoned

24  and the Commissioner had no reason to pass upon it.  And so for

25  that reason, I am going to preclude the testimony of Mr. Smith.


73


1       MR. DELANEY:  Your Honor, is my understanding then

2  that a taxpayer, when a taxpayer files a request for refund, he

3  should ask for every dime of the tax back.  Because if he

4  doesn't then and should not state any theory for it, then he

5  has an opportunity to allow the fact finder to give an amount

6  less than the refund claim.

7       THE COURT:  Fortunately, right here I don't have to

8  predict what the ramification of this ruling would be.  It is

9  sufficient for me to say I view the method of valuation, the

10  method of determining what the appropriate tax could be,

11  tantamount to the theory or the claim.  And if for whatever

12  reason, tactical or otherwise, a taxpayer chooses to pursue

13  theory of recovery A, to the exclusion of theory of recovery B,

14  he or she does it at its own risk.  So that's my ruling.

15       MR. DELANEY:  Let me think that through, does that

16    mean the government can't use any other method -- should the

17    government then be bound by the same method?

18          THE COURT:  I don't understand the upshot of your

19    question.  Let me answer it this way now that you asked it.

20    This case was presented to the Commissioner on a net asset

21    basis of computation.

22          MR. DELANEY:  Okay.

23          THE COURT:  The government is defending this case on

24    a net asset basis of computation, is that correct?

25          MR. COOPER:  Yes.


                            74


1          THE COURT:  If your question is can the government

2    now come in by way of defense and suggest an alternative

3    computation theory that might be more disadvantageous, is that

4    the concern?

5          MR. DELANEY:  Once you establish net asset value,

6    you work out discounts.  Mr. Pashke used a method called QMDM

7    to first do that.  It suggested that a discount of 70 percent.

8    The government uses a different method.  So their valuation

9    method is different than mine.  They didn't rely on my

10  valuation method to establish the amount of the tax.  What they

11  did is rely on the fact that Greg Pashke said you know there

12  are four ships out there.  And those four ships are worth $5.2

13  million.  They didn't.  That isn't -- I understand you're not

14  going to change, I need to understand what the ramifications

15  are.  I mean, we used the QMDM method, they didn't.

16          THE COURT:  That's right.

17          MR. DELANEY:  They're allowed to do that?

18          THE COURT:  That's right.  You had the burden before

19  the Commissioner.  And -- well, go ahead.

20          MR. DELANEY:  The next point is, Pashke will testify

21  to that 70 percent discount.  Is the jury allowed to go

22  through --

23          THE COURT:  To a 70 percent discount relative to

24  what gift?

25          MR. DELANEY:  Relative to the value of one percent


75


1  of the family limited partnership interest.  Then you calculate

2  out the gifts.

3          THE COURT:  Seventy-percent discount, was that a

4  figure Pashke urged before the Commissioner?

5      MR. DELANEY:  He wrote a report that put everybody

6  on notice that when you use that model, it's 70 percent.

7      MR. DALE:  Pashke urged 50 percent.

8      THE COURT:  Refresh my recollection, what does

9  Pashke, what does he urge as an appropriate discount in his

10  expert report?

11      MR. DELANEY:  About -- 50 percent, you're right.

12  $28,000 number, it's about 48 percent discount.

13      THE COURT:  I apologize, I didn't understand the

14  upshot, where did the 70 percent come from?

15      MR. DELANEY:  He said he considered this, then

16  subjectively considered the decision to move this up.

17      THE COURT:  Let me take one more swing at it to make

18  this clear.  If I haven't, I will accept the probability the

19  problem is mine, rather than anybody elses.  My ruling has

20  nothing to do with the sub battlefield of discounts.  That is a

21  whole different world.  And you guys are free to go, that's

22  where the real slug fest is in this case.  You can do anything

23  you want there.  My ruling is what my ruling was on the

24  underlying valuation.

25      MR. DELANEY:  May I have Sandy Smith then say well,

76

1   I think this discount of 70 percent is appropriate?

2         THE COURT:  No, because that's beyond his expertise.

3         MR. DELANEY:  But the discount is just the reverse

4   of saying the value.  Discount is just a backhanded way of

5   saying here's what I believe the value is, well, that would be

6   40 percent discount or 50 percent discount or 60 percent

7   discount.  That has no magic to it, it's just another way to

8   express value.

9         THE COURT:  Let me ask you this.  When Mr. Smith was

10  originally prepared to testify on value, what was the method he

11  was going to use to reach his conclusion as to what the value

12  of it was?

13         MR. DELANEY:  He would say I understand what you

14  mean by fair market value.  I understand that you have to limit

15  what we know to 1998, the date of the gifts.  I have all the

16  information available concerning financial condition,

17  operations and the business outlook and the industry outlook.

18  All the things that are listed in 5960.  Here is my suggestion

19  of value.

20          THE COURT:  All right.  And did that calculous on

21  his part require a discount?

22          MR. DELANEY:  No.  It is a discount.

23          THE COURT:  What does the government say about that?

24          MR. COOPER:  They use net asset value.  The fact is

25  Sandy Smith will not give an opinion as to net asset value,


77


1  it's not going to be the same value as Pashke and Burns.

2  Whatever he's doing is something different.  It's a different

3  methodology than what your ruling was, you should strike it.

4          MR. DELANEY:  He wouldn't say net asset value is

5  wrong.  He won't say that.

6          THE COURT:  I misapprehended Mr. Delaney's point.

7  I precluded him from weighing in on net asset value.  Mr.

8  Delaney now says alternatively he won't.  Why can't Mr. Smith

9  weigh in on this, on the sub issue of discount insofar as it

10  informs the decision of the jury on the ultimate question?

11          MR. DALE:  Is that question posed to the government?

12          THE COURT:  It is.

13          MR. DALE:  Mr. Smith is not an expert capable of

14  opining as to appropriate discounts or lack of marketability,

15  when the exclusive issue in this case is determining value.  I

16  think that Mr. Cullen got on the stand just moments ago and

17  said the following.  Mr. Smith can't testify as to, can't

18  determine the value.  I can't determine the value.  Therefore,

19  we have to hire a valuation expert.  And that's exactly why Mr.

20  Smith, III, likewise can't testify as to the appropriate

21  discount for lack of marketability, which is what Mr. Delaney

22  would have him do.  It's so inherently unreliable, it would

23  just be erroneous for the jury to hear that.

24       MR. DELANEY:  The question is whether it's

25  admissible, not whether it's unreliable.  He can go in and say

78

1  I agree that the net asset value is $5.2 million.  I'm going to

2  tell you what the one percent in the limited partnership is

3  worth, and it's worth this amount.

4       MR. DALE:  I don't see that allowing Mr. Smith to

5  testify as to appropriate discounts for lack of marketability

6  is any different from me calling Mr. Cooper to the stand and

7  him saying I think this thing is worth $38 million.

file:///A|/SMITHDY1.TXT

8        MR. DELANEY:  Frank Burns said in deposition --

9   valuation is 90 percent subjective, 90 percent judgmental.

10  That's what he said in his deposition.  And it's right, all

11  this business about discounts.  There is no special study one

12  has to have for discounts.  Discount is the reverse of saying

13  here's what the value is -- oh, by the way, it's this much less

14  than the proportionate share.  That's all the discount is.

15        THE COURT:  I got your point, I'll reflect on it.

16        (Proceedings recessed at 11:21 a.m., in Judge's

17  Chambers; and reconvened at 11:23 a.m., in Courtroom C.)

18        THE COURT:  Members of the jury, it was my intention

19  to give you some very preliminary instructions before we

20  commenced this.  Perhaps given the time delay between the time

21  you were selected and the time you showed up, to be quite

22  frank, it slipped my mind.  This is something that I normally

23  do.  So if you can bear we me for one second.  Would you like

24  to step down for one second.

25        THE WITNESS:  Yes, sir.


                              79


1        THE COURT:  All right.  This is an example of where

file:///A|/SMITHDY1.TXT

2  the horse has gotten halfway out of the barn because we've

3  already had a witness up there but so be it. Let me tell you

4  this as a preliminary matter.

5        In this case it is going to be your duty to find

6  from the evidence what the facts are. And you and you alone

7  will be the judges of the facts. You will then have to apply

8  to those facts the law as I will give it to you. You must

9  follow that law, whether you agree with it or not. Nothing

10  that I may say or do during the course of this trial is

11  intended to indicate or should be taken by you as indicating

12  what your verdict in this case should be.

13        Now, the evidence from which you will find the facts

14  consists of the testimony of witnesses, documents and other

15  things received into the record as exhibits. And any facts

16  that the lawyers agree to or stipulate to or that I may

17  instruct you to find.

18        Certain things are not evidence and must not be

19  considered by you, and I'm going to tell you what those are

20  right now. Statements, arguments and questions by lawyers are

21  not evidence. Objections to the questions are not evidence.

22  Lawyers have an obligation to their clients to make objections

23  when they believe that evidence is being offered for an

24  improper purpose under the rules of evidence.  You should not

25  be influenced by the objection or by my ruling on it.  If the

80

1  objection is sustained, then you ignore the question.  If it's

2  overruled, then treat the answer like you would any other.  If

3  you are instructed that some other item of evidence is received

4  for a limited purpose only, you must follow that instruction.

5  Testimony that the court has excluded or told you to disregard

6  is not evidence.  Anything you may have seen or heard outside

7  the courtroom is not evidence and must be disregarded.  You are

8  to decide this case only on the evidence presented here in this

9  courtroom.

10      Now, there are two types of evidence which you are

11  entitled to consider, direct and circumstantial.  Direct

12  evidence is direct proof of a fact, such as the testimony of an

13  eyewitness.  Circumstantial evidence is proof of facts from

14  which you may infer or you may conclude that other facts exist.

15  And I will give you further instructions on these, as well as

16  other matters, at the conclusion of this case.  But for present

17  purposes, simply bear in mind that you may consider both types

18  of evidence.  Now, it's going to be up to you to decide in this

19  case which witnesses to believe, which witnesses not to

20  believe, and how much of any witness's testimony to accept or

21  reject.  I will also give you further instructions on this at

22  the end of the case.

23      Now, as you already know, based upon our preliminary

24  get-together, this is a civil case.  The plaintiff has the

25  burden of proving his case by what is called the preponderance

81

1  of the evidence.  That means the plaintiff has to produce

2  evidence which considered in light of all the facts, leads you

3  to believe that the plaintiffs' claims are more likely true

4  than not.  To put it differently, if one were to put the

5  plaintiffs and the defendant's evidence on opposite sides of

6  the scales, the plaintiff would have to make the scales tip

7  somewhat on his side.  If the plaintiff fails to meet this

8  burden, the verdict must be for the defendant.  Now, those of

9  you who may have sat on a criminal case in the past will have

10  heard the term proof beyond a reasonable doubt.  That

11  requirement does not apply in a civil case, so you should put

12  it out of your mind.

13        A few brief final words about your conduct as

14  jurors.  First, I instruct you that during the course of this

15  trial you are not to discuss the case with anyone or permit

16  anyone to discuss it with you.  Until you retire to the jury

17  room at the end of the case to deliberate on your verdict, you

18  simply are not allowed to talk about the case.

19        Second, do not read or listen to anything touching

20  on this case in any way.  If anyone should try to talk to you

21  about it, bring it to the court's attention promptly.

22        Third, do not try to do any research or make any

23  independent investigation about the case on your own.

24        Finally, do not form, and importantly, do not form

25  any opinion until after the evidence is in.  That is to say it


                                  82


1  is important that you keep an open mind until you start your

2  deliberations at the end of the case.

3        Now, my law clerk tells me that you've been given

4  pads and pens.  Well, then, to state the obvious, I wouldn't

5   have given them to you unless you're entitled to you use them,

6   And you are.  So you can take notes as you see fit.

7           The trial, of course, has already begun, and you've

8   heard the opening statements.  Let me just point out to you

9   that the opening statements were neither evidence, nor were

10  they argument, it was simply an outline of what each party

11  intends to present to you.  As you see, the plaintiff puts on

12  his witnesses first, the defendant may cross-examine them.

13  After that, the defendant will present his witnesses and the

14  plaintiff will have the opportunity to cross-examine those.

15  After that the attorneys will make what is called closing

16  arguments to summarize and interpret the evidence for you.

17  And, thereafter, I will give you my instructions on the law, at

18  which point you will retire to begin to deliberate on your

19  verdict.  All right, Mr. Cullen, you can resume the stand now.

20          (Continued - CROSS-EXAMINATION)

21  BY MR. COOPER:

22  Q.   Mr. Cullen, before we took the break, I believe we were

23  looking at what's been marked as Defendant's Exhibit No. 5.

24  And this document is dated April 26, 1994; if you could look at

25  page 13 of the document?

1  A.   Yes, sir.

2  Q.   And that was before the formation of Smith Family Limited

3  Partnership?

4  A.   Yes, sir.

5       MR. COOPER:  At this time may I move this into

6  evidence?

7       THE COURT:  You may, it's admitted.  Just for future

8  reference, when a party moves, if I hear nothing, I will

9  presume there is no objection.  Go ahead.

10  BY MR. COOPER:

11  Q.   Mr. Cullen, I'm going to hand you what's been previously

12  marked as Defendant's Exhibit No. 4, and the document says

13  "Last Will and Testament of Sidney E. Smith, Jr."  Mr. Cullen,

14  have you seen this document before?

15  A.   Yes, sir.

16  Q.   In fact, this is another will that you drafted?

17  A.   Yes, sir.

18  Q.   And on the back page is that your signature on page

19  three?

20  A.   Yes, sir.

21  Q.    The date of this document is February 9, 1999?

22  A.    Yes, sir.

23  Q.    And this was drafted after the formation of the family

24  limited partnership?

25  A.    Yes, sir.


84


1  Q.    In this document are there any restrictions on

2  transferability of ENC stock?

3  A.    No, sir.

4  Q.    And when I say restrictions on transferability, that's

5  what we discussed before the break, where the previous will had

6  a restriction that if one of the children wanted to sell it,

7  they had to first sell it to the company, correct?

8  A.    Yes, sir.

9          MR. COOPER:  At this time I would like to move

10  Exhibit No. 4 into evidence.

11          THE COURT:  It's admitted.

12  BY MR. COOPER:

13  Q.    As well as being a lawyer listed on the pleadings in this

14  case, are you as well a lawyer acting on behalf of the estate

15  of Mr. Smith?

16  A.    Yes, sir.

17  Q.    And you've done certain activities on behalf of the

18  estate, such as help him with estate and federal tax returns?

19  A.    Yes, sir.

20  Q.    And the estate is paying your fees through the estate?

21  A.    Yes, sir.

22  Q.    And if the plaintiffs were to get a refund back, a refund

23  of tax, the money would go to the estate?

24  A.    Yes, sir.

25  Q.    All right.  So that money could be used to pay your fees?


85


1  A.    I think our fees have already been all paid in the

2  estate.

3  Q.    You don't know, sir?

4  A.    No, sir.

5  Q.    Also, your law firm, MacDonald, Illig and Jones, is that

6  correct?

7  A.    MacDonald, Illig, Jones and Britton, yes, sir.

8  Q.    You are also employed on behalf of the family limited

file:///A|/SMITHDY1.TXT

9   partnership at the time, weren't you?

10   A.   Our firm, yes, sir.

11   Q.   So in total your firm has been employed by either Mr.

12   Smith, his estate, or the family limited partnership, is that

13   correct?

14   A.   Yes, sir.

15   Q.   And we talked at your deposition, wasn't Mr. Smith a

16   significant client of your law firm?

17   A.   Yes, sir, he and his company, yes, sir.

18   Q.   He was significant?

19   A.   Yes, sir.

20   Q.   Besides the family limited partnership at issue in this

21   litigation, have you drafted other family limited partnerships?

22   A.   Yes, sir.

23   Q.   For other clients?

24   A.   Yes, sir.

25   Q.   And do those family limited partnerships, much like the

86

1   Smith Family Limited Partnership, do they contain similar

2   terms?

3  A.  Yes, sir.

4  Q.  Is it possible that how this litigation outcome and

5  rulings during the litigation, could that have a possible

6  impact on those other partnership agreements?

7  A.  It could.

8  Q.  It's possible?

9  A.  Yes, sir.

10  Q.  And besides your professional relationship with Mr.

11  Smith, the father, did you have a personal relationship with

12  him as well?

13  A.  I considered him my friend, too.

14  Q.  And you would all go out and have lunch occasionally?

15  A.  Yes, sir.

16  Q.  I believe he also called you with family problems because

17  of that, I understand you're one of several children?

18  A.  Yes, sir.

19  Q.  So you would talk about his family affairs?

20  A.  Yes, sir.

21  Q.  So you're also a friend, you consider yourself a friend

22  of Mr. Smith?

23  A.  Yes.

24  Q.   You're here testifying as once a friend of Mr. Smith?

25  A.   Yes.


87


1  Q.   For family limited partnerships, Mr. Cullen, in your

2  experience do people use family limited partnerships as a

3  mechanism to pass property to their children or other

4  decedents?

5  A.   Yes, sir.

6  Q.   And in order for a family limited partnership to be

7  useful -- let me ask this.  Are there certain efficiencies for

8  passing property to your decedents through a family limited

9  partnership?

10  A.   Yes, sir.

11  Q.   And one of the efficiencies is that there is a discount

12  associated with it, is that correct?

13  A.   Yes, sir.

14  Q.   So the discount lowers the value of the property,

15  correct?

16  A.   Correct.

17  Q.   Because the property value is lowered by the partnership,

18   the fair market value of the property is also lowered, correct?

19   A.   Yes, sir.

20   Q.   And because the fair market value of the property is

21   lower, the person that passes the family limited partnership

22   pays less gift tax, correct?

23   A.   Yes, sir.

24   Q.   In family limited partnerships, there is not a mechanism

25   for every gift here in the universe?

88

1   A.   No, sir.

2   Q.   They're mostly effective with high net worth property,

3   correct?

4   A.   Not necessarily just high net worth property.  It's the

5   type of asset they want to put in it.

6   Q.   Well, let me state there has to be a certain value in the

7   family limited partnership to make it effective?

8   A.   Yes, sir.

9   Q.   And that's because if there's not a lot of value in the

10   partnership, things like filing tax returns, ongoing reporting

11   costs, those costs are too high to reach a tax efficiency?

12  A.   Yes, sir.

13  Q.   I believe you were testifying earlier that had to do with

14  a tax return, on the back of the tax return you acknowledged

15  there was a valuation?

16  A.   Yes, sir.

17  Q.   And, Mr. Cullen, in connection with the gifts, did you

18  provide a valuation as to the gift at interest?

19  A.   No, sir.

20  Q.   Did Mr. Smith, the giftor, did he himself actually

21  provide a valuation as to the value of the gifts he gave his

22  children?

23  A.   Just his opinion that he was surprised at what the values

24  were.

25  Q.   No, I said did he provide a valuation of the gifts he

89

1  gave to his children?

2  A.   A written one, like a report?

3  Q.   Yes, sir.

4  A.   No, sir.

5  Q.   I believe you testified earlier in order to give that

6   valuation, you didn't do it because it requires some level of

7   expertise required?

8   A.   Correct.

9   Q.   And that is why Mr. Smith had to hire an expert to

10   provide that valuation, correct?

11   A.   Yes, sir.

12          MR. COOPER:  Thank you, no further questions.

13          THE COURT:  Anything further of Mr. Cullen?

14          MR. DELANEY:  I do, your Honor.

15                REDIRECT EXAMINATION

16   BY MR. DELANEY:

17   Q.   If Sid Smith could have put a letter on that tax return

18   saying what his opinion was of the gift, would the IRS have

19   simply accepted that?

20          MR. COOPER:  Objection, lack of foundation.

21          THE COURT:  Overruled.

22   BY MR. DELANEY:

23   Q.   Would they?

24   A.   No, sir.

25   Q.   But Sid Smith had an opinion?

90

1   A.   Yes, sir.

2   Q.   I don't know why we're talking about wills -- do you have

3   the two wills that Mr. Cooper handed to you?

4   A.   I do.

5   Q.   One is 1994 and one is 1999, is that right?

6   A.   Correct.

7   Q.   They're both for Sid Smith?

8   A.   Yes, sir.

9   Q.   Mr. Cooper asked you whether the 1994 had some discussion

10   about restrictions on Erie Navigation stock?

11   A.   Yes, sir.

12   Q.   And then he asked you whether in the 1999 it said

13   anything?

14   A.   Yes.

15   Q.   In 1999 did Mr. Smith own Erie Navigation Company?

16   A.   No.

17   Q.   Who owned it?

18   A.   The partnership owned it in 1999.

19   Q.   The limited partnership?

20   A.   Yes, sir.

21   Q.   So is it necessary to put something in the will at that

22    time?

23    A.    About Erie Navigation Company, no.

24    Q.    Now, I don't know where he's going with this, so I got to

25    ask you these questions.  The fact that there was some

91

1    reference to restriction in the 1994 will, did that satisfy Sid

2    Smith's desire or goal in 1997?

3          MR. COOPER:  Objection, I'm going to ask that he

4    stop leading his witness.

5          THE COURT:  Well, I don't think it's leading, but

6    for future reference, also, before you ask a question, don't

7    editorialize, it doesn't matter where he's going, you just ask

8    the questions as you see fit to ask them.

9    BY MR. DELANEY:

10    Q.    Did the restrictions contained in the 1994 will fulfill

11    Mr. Sid Smith's goals that he was trying to achieve in '97?

12    A.    No, sir.

13    Q.    And why not?

14    A.    Well, in 1997 he wanted to make lifetime gifts to Sandy

15    and Jill and start to give them an ownership interest in the

16   business, among other things.  And this 1994 will that I had

17   drafted for him after his wife passed away, simply gave them

18   outright the company under certain restrictions then.  But that

19   would be at his death.

20   Q.    Finally, Mr. Cooper asked you if the jury comes to a

21   value that the judge determines triggers a refund, where does

22   the money go?

23   A.    Into the estate.

24   Q.    Is there any additional tax then?

25   A.    Yes, sir.


                                92


1   Q.    What happens?

2   A.    Well, that's then an asset that's brought back into Mr.

3   Smith's estate and we'll have to pay estate tax on that asset,

4   like we did other assets that he owned at the time of his

5   death.

6   Q.    How much, what percentage?

7   A.    I don't remember what the top end rate is, but it's

8   roughly 45 percent.

9         MR. DELANEY:  Thank you.

10          THE COURT:  Anything further of this witness?

11          MR. COOPER:  No, your Honor.

12          THE COURT:  All right, Mr. Cullen, thank you, you're

13   excused.  Call your next witness.

14          MR. DELANEY:  Your Honor, we would call Greg Pashke

15   to the stand.

16          THE COURT:  Give your full name to my court reporter

17   and spell it for him, please?

18          THE WITNESS:  Gregory, G-r-e-g-o-r-y, F., last name

19   is Pashke, P-a-s-h-k-e.

20          GREGORY F. PASHKE, PLAINTIFFS' WITNESS, SWORN

21               DIRECT EXAMINATION

22   BY MR. DELANEY:

23   Q.   Mr. Pashke, would you tell us, please, your full name?

24   A.   Gregory F. Pashke.

25   Q.   And what is your address?


                              93


1   A.   1547 Southwest Mockingbird Circle, Port St. Lucie,

2   Florida.

3   Q.   Did you ever live in Erie?

4   A.   Yes, I did.

5   Q.   When?

6   A.   From 1974 through July of 2002.

7   Q.   And then you moved to Florida?

8   A.   That's correct.

9   Q.   What is your education, let's start with your education

10   beginning with college?

11   A.   I graduated from Gannon University in 1969.

12   Q.   And any training after that, any formal academic

13   training?

14   A.   Yes, I went to the University of Pittsburgh for --

15        THE COURT:  Mr. Pashke, you're going to have to keep

16   your voice up a little bit, sir.

17        THE WITNESS:  I went to the University of

18   Pittsburgh, I have a masters in business administration from

19   there.

20   BY MR. DELANEY:

21   Q.   What year did you get that degree?

22   A.   That was in 1970.

23   Q.   And are you at all trained in accounting?

24   A.   Yes.

25   Q.    And do you have any certifications with regard to

94

1   accounting?

2   A.    Yes, I'm a certified public accountant.

3   Q.    Let's talk about your work history just very briefly.

4   When you left school, where did you go to work?

5   A.    I went to work for one of the large accounting firms at

6   the time, it was Ernst & Ernst in Pittsburgh.

7   Q.    How long did you stay with them?

8   A.    A little over two years.

9   Q.    And where did you go from there?

10   A.    Then I went to work as the chief financial officer of a

11   company called Keystone Aeronautics.

12   Q.    Where were they located?

13   A.    They were located also in Pittsburgh.

14   Q.    How long did you stay with Keystone Aeronautics?

15   A.    About a year and a half.

16   Q.    After that what did you do?

17   A.    Then we relocated to Erie, Pennsylvania.

18   Q.    Had you grown up in Erie?

19  A.    Somewhat.  My father was in real estate, excuse me, the

20  retail business, so we moved around a lot as kids.  But Erie

21  was more home than anywhere else.

22  Q.    When you came back to Erie after working for Keystone

23  Aeronautics, what did you do in the way of work?

24  A.    Well, I started for a few months to work for another

25  local CPA firm.  But after about a five-month period, I

95

1  combined with three other gentlemen and started our own CPA

2  firm.

3  Q.    What was the name of that firm?

4  A.    Bartolo, Pashke and Twargowski.

5  Q.    How long did you stay with that CPA firm?

6  A.    With that firm and variations of that firm through 1996.

7  So, roughly, 22 years.

8  Q.    And what did you do after leaving that firm?

9  A.    I've been a sole management consultant since that time.

10  Q.    Is there any particular type of training that one has to

11  go through in order to conduct business valuations?

12  A.    Yes, there are several options available.

13  Q.   Did you undertake any of that training?

14  A.   Yes, I hold three of those designations.

15  Q.   And where did you take the training, Greg?

16  A.   The training for those I took in various seminars in

17  Pennsylvania.

18  Q.   And what designations or certifications do you hold, what

19  are the names of the organizations?

20  A.   Well, the one organization is called the National

21  Association of Certified Valuation Analysts.  Their designation

22  is the CVA, which is the certified valuation analyst.  One of

23  the other organizations is called Institute of Business

24  Appraisers.  And I'm a certified business appraiser from that

25  organization.  And then the last is a program of the American

96

1  Institute of Certified Public Accountants.  And I'm accredited

2  in business valuation.

3  Q.   Now, you indicated you are a CPA, a certified public

4  accountant; do you practice accountancy today?

5  A.   I'm licensed in the Commonwealth of Pennsylvania, but I

6  don't typically do things a typical CPA would, I don't do any

7   audits.

8   Q.   You mentioned you have a management consulting business?

9   A.   Yes, that's correct.

10  Q.   What type of work do you do in that business?

11  A.   Well, I do some business appraisals.  I also do some

12  general management consulting, which is strategic business

13  planning, generally helping put together different kinds of

14  advisory boards for companies.  And then financial consulting,

15  which is cost accounting, budgeting, forecasting, things along

16  those lines.

17  Q.   How many business valuations do you think you've done in

18  your career?

19  A.   Somewhere around 30 to 35.

20  Q.   Mr. Cullen mentioned that it's necessary to get some sort

21  of appraisal when you file a gift tax return.  Have you done

22  appraisals of businesses for gift tax returns?

23  A.   Yes.

24  Q.   And in this particular case, did you do the gift tax --

25  I'm sorry, the appraisal for the gift tax return for Sidney E.

97

1   Smith, Jr., Family Limited Partnership?

2   A.   Yes.

3        MR. DELANEY:  Your Honor, at this time I move for

4   the admission of Mr. Pashke's testimony as an expert in

5   business valuation and accountancy.

6        THE COURT:  Do you have any voir dire on

7   qualifications?

8        MR. DALE:  I will reserve those until the

9   cross-examination.

10        THE COURT:  All right, then I'll reserve ruling

11   until you've had a chance to do that.  Go ahead.

12   BY MR. DELANEY:

13   Q.   Are there other reasons you do business valuations, other

14   than gift tax returns?

15   A.   Yes, they're needed in divorce proceedings.  If someone's

16   buying or selling a business, that might be another time that

17   they're done.  If there's a dispute amongst shareholders,

18   that's another time they might be done.

19   Q.   All right.  When you perform an appraisal for gift tax

20   purposes, what's the standard of value that you're using?

21   A.   It's referred to as fair market value.

22   Q.   All right.  Has that been defined someplace?

23  A.   Yes, Revenue Ruling 59-60 defines fair market value.

24  Q.   I'm going to show you what I showed the jury in the

25  opening statement.  And I want to make sure that I represented


98


1  this accurately to the jury the definition of fair market

2  value.  Will you take a moment and look at that, please.

3        MR. DALE:  Might it be a matter that the judge is

4  going to instruct the jury on the definition of fair market

5  value.

6        THE COURT:  Is there any objection to the content of

7  the document as it appears on the screen?

8        MR. DALE:  I don't believe I have an objection to

9  the content itself.

10        THE COURT:  It's overruled.

11  BY MR. DELANEY:

12  Q.   Mr. Pashke, is this your understanding of the definition

13  of fair market value?

14  A.   Yes, it is.

15  Q.   Do you know where it comes from, where this definition

16  comes from?

17  A.    Revenue Ruling 59-60 has those.

18  Q.    Is that something that is published by a government

19  agency?

20  A.    Yes, it's part of the Internal Revenue Code.

21  Q.    So if in an appraisal you're going to work with fair

22  market value, essentially, you're looking for a price between a

23  willing buyer and a willing seller, is that correct?

24  A.    Yes, they're hypothetical buyers and sellers.

25  Q.    That was going to be my question.  If you're valuing a

99

1   Smith Family Limited Partnership, do you think of this buyer

2   and seller as being Smith family members?

3   A.    No, you do not.

4   Q.    In fact, specifically do you disregard the Smith family

5   members?

6   A.    Yes, you do.

7   Q.    In terms of compulsion, what is your understanding of

8   what it means that a buyer and seller have no compulsion, what

9   does that mean?

10  A.    That they're not under any stress or duress to sell or to

11  buy.

12  Q.    When it indicates that a buyer and seller have reasonable

13  knowledge of facts, what facts?

14  A.    Well, all the circumstances relating to what they're

15  contemplating buying and selling.

16  Q.    Would that include the nature of the business?

17  A.    Yes.

18  Q.    Would it include the limitations on the ownership?

19  A.    Yes.

20  Q.    Would it include restrictions on the ability to buy or

21  sell once you own this property?

22  A.    Yes.

23  Q.    And would it include alternative investments that a buyer

24  might be able to make as opposed to buying this property?

25  A.    Yes.


100


1  Q.    Thank you.  Do you remember how you were contacted or by

2  whom you were contacted with regard to the Smith Family Limited

3  Partnership?

4  A.    Yes.

5   Q.   Tell us about that?

6   A.   It was Mr. David Finnecy, who was the certified public

7   accountant for Erie Navigation Company.

8   Q.   He came to you?

9   A.   Yes, he did.

10  Q.   And what did he request that you do?

11  A.   David asked me, he had told me he had a client who had

12  made certain gifts, and he wondered if I would be interested in

13  doing an appraisal of those gifts.

14  Q.   All right.  Now, did you actually go through just one

15  appraisal or do you go through stages of appraisal in coming up

16  with a conclusion about these particular gifts?

17  A.   I ended up doing three separate appraisals.

18  Q.   What did you appraise then in these three stages?

19  A.   Initially, I appraised a hundred percent of the stock of

20  Erie Navigation Company.

21  Q.   Without regard to any limited partnership?

22  A.   That's correct.

23  Q.   All right.

24  A.   So, I basically appraised the overall company by itself.

25  And, secondly, there were gifts of a few shares of the common

101

1   stock to the children.

2   Q.    Before the limited partnership agreement?

3   A.    Yes.  And I valued those.  And then I valued a gift of

4   the limited partnership interest from the family limited

5   partnership.

6   Q.    Did you do this work in separate distinct stages or are

7   you really gathering information all at once?

8   A.    Well, basically, I'm doing all three at the same time.

9   Q.    Now, in talking about the Erie Navigation Company in

10  doing this first step that you're referring to, how do you go

11  about your investigation; you mentioned Finnecy, did Mr.

12  Finnecy provide you with any data or information?

13  A.    Yes, Mr. Finnecy was able to provide me with lots of the

14  financial information related to the company.  And that's prior

15  financial statements, which I used five years of information.

16  Copies of prior tax returns.  There was a lot of financial

17  information that I got from Mr. Finnecy.

18  Q.    When are you doing this work by the way?

19  A.    This would have been during the summer, fall of 1998.

20  Q.   So at that point in time, the January gifts had been made

21  by Mr. Sid Smith to his children?

22  A.   Yes, as well as the '97 gifts of stock to the children.

23  Q.   Okay.  But that's not the subject of this discussion.

24  But the December gifts had not yet been made, is that correct,

25  when you're doing your work?

102

1  A.   In terms of the filing of the tax return?

2  Q.   That's right.

3  A.   Yes.

4  Q.   Now, after speaking with Mr. Finnecy, you said you went

5  back how far?

6  A.   I asked Mr. Finnecy for information from the preceding

7  five years.

8  Q.   Back to '93?

9  A.   That's correct.

10  Q.   Did you have occasion to visit the company's places of

11  business?

12  A.   Yes, I did.

13  Q.   Where did you find those places of business?

14  A.   Well, I toured the operational facilities here in Erie.

15  And I also toured the facilities in Sandusky.

16  Q.   Do you remember which facilities in Erie you went to?

17  A.   Just the ones down at the foot of the dock entrance.

18  Q.   Did you go to the office, also, of the company?

19  A.   Yes.

20  Q.   Did you meet with Mr. Smith?

21  A.   During my tour I did meet with Mr. Smith.

22  Q.   We're talking about Sid Smith?

23  A.   That's correct.

24  Q.   Tell us about the assets of Erie Navigation Company as

25  you found them in your investigation, what were those assets

103

1  generally, what were those assets?

2  A.   Well, like most operating companies, they have cash

3  receivables and inventories.  The biggest valued assets in Erie

4  Navigation were the shipping vessels that the company had.

5  Q.   Was it necessary to put a value on any of the assets?

6  A.   Well, it did, as I started to go through the valuation

7  process.

8  Q.   And were you able to put a value on the ships in that

9  Erie Navigation Company used?

10  A.   Yes.  I had requested that management obtain appraisals

11  of those vessels because that was the most significant assets

12  that the company had.  And when I used the other methodologies,

13  I was coming up with a value that I could not use those other

14  approaches, I needed to look at the assets.

15  Q.   Do you remember who the person was, was it a ship

16  appraiser that went out and got numbers on the ships?

17  A.   Yes, but I had received those reports from the company.

18  Q.   Then you used those numbers in coming up with your own

19  opinion?

20  A.   That's correct.

21  Q.   Did you study the industry itself?

22  A.   Yes, sir, I did.

23  Q.   And we should talk about what was your, from your

24  perspective, in doing this investigation, what was the business

25  of Erie Navigation Company?


104


1  A.   Well, they sold construction aggregates, which is again,

2   basically, sand and gravel or limestone, primarily to the

3   construction industry.  And they also did sand dredging

4   operations on the Great Lakes.  They also provided, did

5   shipping on the Great Lakes.

6   Q.   When you looked at the industry, did you look at the

7   construction materials industry and try to get background on

8   that industry?

9   A.   Yes.

10   Q.   And did you also look at the shipping industry as it

11   pertains to the Great Lakes?

12   A.   Yes.  I requested and had an independent research firm

13   give me information on that.

14   Q.   Did you bring your report with you, by the way?

15   A.   Yes, I did.

16   Q.   Did you bring your report concerning Erie Navigation

17   Company with you?

18   A.   Yes.

19   Q.   Can you tell us, if you need to you can look at that

20   report, can you tell us generally what kind of business risks

21   or what kind of factors drove value for a company like Erie

22   Navigation Company, what characteristics of it you took into

23   consideration as you did your work?

24  A.   Well, as I did my research and analysis, after I had

25  conversations with management, I came up with what I thought


105


1  were the significant risk factors associated with Erie

2  Navigation as an operating company.

3  Q.   And what were those risk factors?

4  A.   Well, one of the bigger ones was that the company was a

5  small player in an industry dominated by four major players --

6  which meant four firms controlled approximately 20 percent each

7  of that market.  And that Erie Navigation was a smaller layer

8  in the market.

9  Q.   Do you know how much bigger the other companies were?

10  A.   My guess would be -- my recollection would be probably 6

11  to 10 times, something along those lines.

12  Q.   What other aspects or risks did you find?

13  A.   Well, the company also had one major customer, that

14  approximated 31 percent of their annual sales.  So it was like

15  having a lot of eggs in one particular basket.  So that implied

16  some risk when you have that dominant of a customer.

17  Q.   When you were talking about that customer, examining that

18  concentration of business, was that just for that one year that

19  you were looking or was it for a longer period of time?

20  A.    Well, I looked at it over a five-year period.  But for

21  that most recent year it was around 31 percent.

22  Q.    Was else did you find in your investigation?

23  A.    Well, the other is something that's referred to as a

24  limited management depth.  Being a smaller company, typically,

25  you don't have a lot of managerial talent, you have several

106

1  employees and some very good players.  But you don't have the

2  depth that you might have with a larger company.  So if

3  something happens to one of those key people, you have

4  significant risks.

5  Q.    Did you find that there was a concentration of management

6  in one or two people?

7  A.    Yes.

8  Q.    Who?

9  A.    That would be Sid and then his son.

10  Q.    Anything else?

11  A.    The seasonal nature of the Great Lakes shipping is

12  another factor.  Obviously, when the lakes froze, you can't

13  ship.  Then the construction business has a cyclical cycle.

14  Interest rates are typically high, there is less construction

15  going on.

16  Q.    All right.  When you put these factors together, what

17  impression did you have as you're doing your analysis, what

18  impression did you have about the element of risk for this

19  particular company if someone was going to invest directly in

20  this company?

21  A.    Well, that there were considerable risks associated with

22  it because of its size, which it was in the industry.

23  Q.    Now, you say that you looked at five years of financial

24  statements?

25  A.    That's correct?


                                    107


1  Q.    Did the financial statements tell you the level of sales

2  each year for the company?

3  A.    Yes.

4  Q.    What did you find with regard to the level of sales?

5  A.    Well, that the sales from year to year were relatively

file:///A|/SMITHDY1.TXT

6   flat, it was not a growing company.  It had pretty much a flat

7   sales stream through that period of time.

8         THE COURT:  Mr. Delaney, we're going to take our

9   lunch break now.  Members of the jury, it's about 12:05 -- I'm

10   going to ask that you be back here at 1:15.

11         (Luncheon recess from 12:05 p.m.; until 1:16 p.m.)

12         (In Judge's Chambers at 1:16 p.m.)

13         THE COURT:  I want to clear up this one last loose

14   end on Mr. Smith.  So the record is clear and will be clear in

15   the event this case ever goes up higher and those folks are

16   looking at this, I precluded him from coming in and weighing in

17   on $5.2 million because that issue, essentially, was not

18   contested.  It was in a sense admitted.  So the Commissioner

19   never had any reason to challenge it one way or the other.

20   Alternatively, you want him to come in and I suppose try to

21   skin the fair market cat from the other end, which you want him

22   to come in and express his opinion on owner discount,

23   essentially, is it?

24         MR. DELANEY:  As the owner of Smith Limited Family

25   Partnership.

1      THE COURT:  Over the lunch hour we took a look at

2   this.  Here's the bottom line.  This is Robinson_v._Watts
     ————————— —— —————

3   Detective_Agency, 685 F.2d 729, (1st Cir. 1982).  And the court
     —————————— ——————

4   says:

5      "An owner of a business is competent to give his

6   opinion as to the value of his property."  Citing cases.

7   Whether or not his opinion is accurate goes to the weight of

8   the testimony and not its admissibility.  Just as an aside,

9   that principle as to the owner's ability to testify is under

10   701.  It is widespread among the circuits, including this

11   circuit, as in the case that was mentioned earlier, 57 F.3d

12   1190, which merely acknowledges the principle that an owner can

13   testify as to his or her value.  So, as I view it, the question

14   as to the appropriate amount of discount ad the whole issue of

15   discount was hotly contested before the Commissioner.  In the

16   sense that ball was in play.  So given the fact that a owner

17   can testify as to value, given the fact that it runs to weight,

18   and given the fact that issue was before the Commissioner, I

19   don't see the policy implications that drive the variance rule

20  implicated, I'm going to let him express an opinion on that,

21  subject to whatever cross-examination that the government would

22  choose to utilize.  All right.

23       MR. DALE:  These cases that you were referring to,

24  they've been adopted in light of the amendment to Rule 701,

25  which excludes lay opinion testimony, that requires certain


109


1  scientific, specialized --

2       THE COURT:  That's my ruling.  All right, let's go.

3       (Proceedings recessed at 1:19 p.m., in Judge's

4  Chambers; and reconvened at 1:24 p.m., in Courtroom C.)

5       THE COURT:  Mr. Delaney, are you ready to go?

6       MR. DELANEY:  Yes, your Honor.

7  BY MR. DELANEY:

8  Q.   Mr. Pashke, I think when we broke, we had finished

9  talking about the various risks, and also you had explained to

10  us that you looked at the financial statements for the five

11  years prior?

12  A.   That's correct.

13  Q.   I'm not sure whether I asked you this, what did that show

14    in terms of the sales of Erie Navigation Company?

15    A.    Yes, the sales had been flat during that period of time.

16    Q.    All right.  In the process of trying to come up with a

17    value for that company, I realize we're not yet to that step

18    where we're at the limited partnership.  In valuing that

19    company, did you assign any kind of growth rate to it --

20    growing in value?

21    A.    Yes.

22    Q.    Growth in value or growth in --

23    A.    Yes, I used a three percent.

24    Q.    Per year?

25    A.    Yes.


110


1    Q.    Now, how would you rate this particular company in terms

2    of its business risks relative to the three percent in the

3    term?

4    A.    Three percent is the growth rate I anticipated.  The

5    company had not been very profitable.  Even the size of the

6    company, it was not a very profitable organization.

7    Q.    And in terms of risk, how would you rate it?

8  A.   Relatively on the higher side.

9  Q.   When you have high risk and low return or low

10  profitability, what is that telling you as an appraiser?

11  A.   That it has lower value.

12  Q.   Are there different methods that you as an appraiser can

13  use to try to come to a number for this entire company, for the

14  whole 100 percent?

15  A.   Yes.

16  Q.   And what are those different methods?

17  A.   Well, one method is market method.  You can relate that

18  to your house.  If you wanted to get an idea from an appraiser

19  what your house would sell for, there's a ready market for the

20  housing market.  So an appraiser can look at a lot of

21  comparable sales, have a pretty good idea about what your house

22  might be worth because there's a relative market for it.  For

23  Erie Navigation Company, due to its size primarily, there were

24  really no comparable companies that I could find that were

25  comparable enough for me to be able to use that method to that

111

1  company.

2  Q.    When you say due to its size, because it was too big or

3  too little?

4  A.    Too little.

5  Q.    What other methods are there?

6  A.    There's the income method --

7        MR. DALE:  Objection, your Honor, this is precisely

8  the subject of your Honor's ruling.  Mr. Pashke is attempting

9  to testify as to --

10        THE COURT:  Let me see you at side bar for a minute.

11  Members of the jury, we will have these side bar conferences

12  occasionally.  Pure questions of law are being discussed over

13  there.  Remember, you're the finders of fact.  We try to keep

14  these to a minimum because they do slow things down, but they

15  are a necessary evil.

16        (At side bar on the record.)

17        THE COURT:  All right, what was the question?

18        MR. DELANEY:  I was asking Mr. Pashke what other

19  methods he considered or what method is it possible to use, I

20  believe he would say the income approach is a possible

21  approach.  I intend to ask him what did the income approach

22  then tell you.  He would report 1.6.

23        THE COURT:  Sustained.

24          MR. DELANEY:  May I ask him the approach without a

25   number -- and then say I didn't use it?


                                112


1          THE COURT:  What does the approach get you, here's

2   my view of it.  If you ask him about the income approach, what

3   it produced, it's then in the jury's mind that there was this

4   lower value.  You can't get it out.  I've already ruled that he

5   can't testify to that.  Number one, I'm not going to let you do

6   that.  Number two, whether he used a different approach without

7   any result, I don't see its probative value.  Sustained.

8          (End of discussion at side bar.)

9   BY MR. DELANEY:

10   Q.    What approach did you use in coming to an opinion about

11   the value of Erie Navigation Company, the whole company?

12   A.    The one that I finally settled on?

13   Q.    Yes.

14   A.    I ended up using the net asset value method.

15   Q.    Could you tell the jury what the net asset value method

16   is?

17   A.    Well, one of the options you have is to look at the asset

file:///A|/SMITHDY1.TXT

18  value of the company.  And you look at the assets the way

19  they're recorded, then you look to see if there are others, if

20  some of the assets might have a higher value than they're

21  recorded on the books.  Now, what I did, then I asked the

22  owners of the company to get appraisals on the shipping vessels

23  that the company had.  Since those were the major assets that

24  the company had.  So using those appraisals, I had adjusted the

25  asset value of the books to come up with an estimated value of

113

1  the company using the net asset value method.

2  Q.    Would it be correct in the net asset value, you deduct

3  the company's debt from the value of the assets?

4  A.    That's correct.

5  Q.    All right.  And what did you reach in the way of an

6  opinion with regard to the net asset value of the entirety of

7  Erie Navigation Company?

8  A.    Using the net asset value method, I arrived at a value of

9  $5.2 million.

10  Q.    Now, after you had or I guess you're doing this all at

11  once, but is there then an opinion you reached about just one

12    share of Erie Navigation Company, not the limited partnership,

13    just one share of that company?

14    A.    Yes, I did an analysis to appraise a single share of the

15    company stock, one of 105 shares.

16    Q.    All right.  What is the difference, is that simply one

17    percent of the $5.2 million?

18    A.    No.

19    Q.    Why?

20    A.    Well, being a one share, one share of, excuse me,

21    compared to 105 shares for the total company, it's a minority

22    nonmarketable interest.

23    Q.    What do you mean by minority?

24    A.    Minority means, basically, the person holding that one

25    share of stock or roughly one percent of the company, is not in

114

1    a position to make any of the decisions that impact the

2    company.  They can't elect officers, they can't have salaries

3    themselves.  They can't determine what business lines the

4    company will operate in.

5    Q.    This sounds like a limited partner, you're not talking

file:///A|/SMITHDY1.TXT

6  about a limited partner, just the one-percent shareholder, is

7  that right?

8  A.    Yes, many of the limitations that control marketability

9  are very, very similar to a one-percent shareholder in the

10  common stock of the company.

11  Q.    How many shares do you need to have control?

12  A.    Fifty-one percent of the shares will give you control in

13  the company.

14  Q.    All right.  Now, beyond the issue of control, was there

15  any other reason that one share of stock was not the equivalent

16  of one percent of $5.2 million?

17  A.    Yes, it relates to the marketability of those shares.

18  Q.    What do you mean by marketability?

19  A.    Well, there's not a ready market for the shares of Erie

20  Navigation Company.  If you own, let's say a hundred shares of

21  Hershey Foods and you decided this afternoon you'd like to sell

22  them, you can call your broker, sell them and in three days

23  your sale will be liquidated in cash.  So there's a ready

24  market for that.  When you have roughly one-percent share in

25  common stock of a closely-held company, it's just very, very

1  difficult to market that interest.  There's not a ready market

2  to be able to sell it.

3  Q.    So what do we call these adjustments you would make

4  because of lack of control or lack of salability, what do you

5  call them?

6  A.    For the lack of control, we call that the minority

7  discount.  And for the lack of marketability and liquidity,

8  we refer to that as lack of marketability discount.

9  Q.    Did you go through the process to try to determine then

10  what the fair market value would be of one share of Erie

11  Navigation stock?

12  A.    Yes, I did.

13  Q.    Or one percent of Erie Navigation stock?

14  A.    Yes.

15  Q.    What number did you come up with for one share?

16        MR. DALE:  Objection, your Honor, relevance.  It's

17  seeking testimony about a matter which is not the subject of

18  this case.  He's seeking an appraisal of an interest that is

19  not the subject of this case, wasn't part of the claim for

20  refund.

21          THE COURT:  What's the question again, Mr. Delaney,

22  if you would?

23          MR. DELANEY:  What is the fair market value of one

24  percent of Erie Navigation stock, not the limited partnership,

25  but the stock.  It has relevance, judge, because it


                              116


1  demonstrates the reasonableness of his ultimate decision with

2  regard to one percent of the Smith Family Limited Partnership.

3          THE COURT:  Well, it wasn't directly part of the

4  claim for refund, it's overruled.

5  BY MR. DELANEY:

6  Q.    What number did you come up with for -- let me strike

7  that and start that sentence over.  Are you looking for fair

8  market value?

9  A.    Yes.

10  Q.    So you're looking for a price that a fictional buyer and

11  seller would put on a one-percent interest in Erie Navigation

12  Company?

13  A.    That's correct.

14  Q.    And what number did you come up with?

15  A.    I came up with a value of $29,120.

16  Q.    That's of course different, lower than a mere one-percent

17  of the total company, isn't it?

18  A.    That's correct.

19  Q.    One percent of the value of the total company would be?

20  A.    $52,000.

21  Q.    So the difference between $52,000, and your opinion of

22  $29,120, is that representing the discount?

23  A.    Yes, I had a combined discount to represent both the lack

24  of marketability and the minority discount, those totaled 44

25  percent.


117


1  Q.    All right.  Now, did you then in your process try to

2  value an interest of the limited partner interest in the Smith

3  Family Limited Partnership?

4  A.    Yes, I did.

5  Q.    Once again, are you trying to establish a fair market

6  value?

7  A.    Yes.

8  Q.    And what percentage did you use, did you one percent or

9    10 percent, what did you use?

10   A.   I used one percent for my analysis.

11   Q.   Once the Erie Navigation Company is put inside Smith

12   Family Limited Partnership, does that make the underlying asset

13   more attractive to our fictional buyer or less attractive?

14   A.   It would make it less attractive.

15   Q.   Does that lower the fair market value?

16   A.   Yes.

17   Q.   Let's talk about then what you do.  You've already told

18   us about examining the company, talking to Mr. Smith, talking

19   to Mr. Finnecy -- what do you do when you're trying to figure

20   out the fair market value of the limited partner interest?

21   A.   Well, you start by looking at the rights and heirs with

22   the limited partnership itself.

23   Q.   You were here for Mr. Cullen's testimony, were you not?

24   A.   Yes, I was.

25   Q.   Did you hear the explanation, the litany of questions I


118


1    asked him about what limited partners can do and what they

2    can't do?

3  A.   Yes.

4  Q.   Were those the types of things you investigated?

5  A.   Yes.

6  Q.   Did you disagree with any of those things?

7  A.   No.

8  Q.   Did you look at the limited partnership agreement for the

9  Smith Family Limited Partnership, which I think is Exhibit 1,

10  it might even be up there?

11  A.   Yes, I did.

12  Q.   Did you examine what the terms of that agreement were?

13  A.   Yes, I did.

14  Q.   Did that have any impact on your ultimate opinion?

15  A.   Yes, it did.

16  Q.   What method did you use then, are there different methods

17  by which you can look at the Smith Family Limited Partnership

18  interest, different methods that you as an appraiser can use?

19  A.   Yes, there are different methods.

20  Q.   Which method did you use?

21  A.   For the limited partnership interest?

22  Q.   Yes.

23  A.   I looked at two aspects.  One, to estimate the minority

24  discount.  I looked to the closed-end funds at the end of the

25  year for a holding company.  And came up with a discount of

119

1  five percent for January of '98; and 10 percent for December of

2  '98.  But I did that methodology in combination with the

3  approach I took to determine the lack of marketability.

4  Q.    Which approach was that?

5  A.    I ended up using a model that was called the Quantitative

6  Marketability Discount Model.

7  Q.    That's a mouthful.

8  A.    It is a mouthful.  What it really does, it tries to

9  address the specific attributes of the investment that the

10  limited partnership holds.  It looks at those particular

11  characteristics of the holding that it has of Erie Navigation

12  Company and the types of things that impact value from the

13  perspective of a willing buyer and a willing seller.

14  Q.    Does the model that you used or the method that you used

15  for the one percent of the family limited partnership, one

16  limited partnership percent -- what did the model tell you in

17  terms of a discount or the value --

18  A.    Well, the inputs into the model, one, it basically asks

19  the question how fast will my investment grow.  The underlying

20  investments, Erie Navigation Company, which was an under

21  performing asset, that was not growing rapidly at all.  Then

22  the second thing the model addresses, well, how many cash can I

23  expect to get while I'm holding the investment.  Using the

24  analogy of I own shares of Hershey Foods, Hershey stock

25  hopefully goes up overtime.  But every quarter you get a

120

1  dividend check.  There were dividends that Erie Navigation

2  Company had that went into the limited partnership.  But those

3  were very, very nominal in nature.  So there were not very many

4  income streams coming from the dividends.  One of the other

5  factors you look at is how long is my expected holding period

6  of this investment.  When is it likely I can get my money out.

7  One of the provisions of the limited partnership agreement says

8  that, well, there are a couple of provisions, but one addresses

9  that a limited partner has no right to get out of it.  And the

10  terms of the limited partnership actually went to 2050.  Now,

11  that would be a very, very long time.  I thought that that was

12  probably unrealistic because things do change.  But I thought

13  it very unlikely that it would be, a hypothetical buyer and a

14  hypothetical seller would realize that if you had this limited

15  partnership interest, that you could get out of and in your

16  term.  You would probably expect a holding period similar to

17  what you had if you had OCL stock in a family limited company.

18  Typically, you're going to hold that for a while.  Then the

19  other thing the model looks at is what is the relative risk

20  associated with this investment, compared to the other

21  investments that I have alternatives that I can invest in.  And

22  it addresses those risk characteristics.

23  Q.   When you plug that model in or plug that information or

24  assumptions into the model, what number did you come up with,

25  either as a value or a discount?


121


1  A.   Well, the model suggested a price range for the

2  one-percent limited partnership interest in the $15,000 to

3  $16,000 dollar range.

4  Q.   That would have been how much of a discount?

5  A.   Roughly, in the 70-percent range.

6  Q.   Did you just accept that or did you do something else?

7  A.    No, I went back.  I came up with earlier when I valued

8  the one-percent share of common stock, okay.  That I realized I

9  had that as a benchmark.  And I used different methodology to

10  derive that.  I came up with a different way of approaching the

11  lack of control and different methodology for coming up with a

12  lack of marketability.  So I had that as kind of a benchmark or

13  a baseline that I was comparing it to.  So I knew that once the

14  asset was inside this family limited partnership, I'm one step

15  removed, it's worse.  I don't own a one-percent share in the

16  stock anymore, the stocks all in this other thing.  That is

17  more restrictive than even the one-percent share of common

18  stock.  So I have more restrictions on me.  So I know it has to

19  be less value.  But even the situation with the common stock is

20  not all that attractive.  So I tried to weigh those and balance

21  those out.

22  Q.    What opinion did you reach, then, with regard to the fair

23  market value of a one-percent interest or one-percent limited

24  partner interest in the Smith Family Limited Partnership?

25  A.    For the January gift, $28,300.  And for the December

122

1  gift, $27,600.

2  Q.  You mentioned that for fair market value our hypothetical

3  buyer and seller would be aware of alternative investments?

4  A.  That's correct.

5  Q.  And I think you may have indicated that in your

6  investigation you looked at alternative investments?

7  A.  Yes, I did.

8  Q.  Back in 1998 what was a safe alternative investment,

9  low-risk alternative investments would our hypothetical buyer

10  have had?

11  A.  Well, the safest would be investing in U.S. government

12  securities, those are the safest.

13  Q.  Are those treasury bills?

14  A.  Yes.

15  Q.  And can individuals buy them?

16  A.  Yes.

17  Q.  Are they for different periods of time, do they have a

18  different maturity date?

19  A.  Yes, they do.

20  Q.  Tell us what the return our hypothetical buyer would have

21  on treasury bills if purchased back in 1998?

22  A.    It would have been in that five to six percent range.

23  Q.    Any risk?

24  A.    Relatively as risk free as you're going to get.  Those

25  are the safest returns that you can have.  You risk virtually

123

1  none of your principal and you're pretty assured of an income

2  stream you're going to have from that.  That's the safest.

3  Q.    Any other alternative investments?

4  A.    Other ones that are relatively safe, money markets that

5  you might go to the bank, you can have access to your cash any

6  time that you want.  Those are a little less, but in that same

7  relative range.  You can go to the bank and get certificate of

8  deposits, where you have to give them your money for six months

9  or a year.  And those rates were all also in that five to six

10  percent range.  Those are the really, really safe kinds of

11  investments that would have been available as alternatives.

12  Q.    Did you ever establish any anticipated return that the

13  hypothetical buyer in our fair market value analysis, that a

14  hypothetical buyer would have if he or she decided to invest in

15  a family limited partner?

16  A.    Yes, because of the underlying asset and the growth rate

17  attributable to that, I felt that was three percent.  So that

18  was growing less than what the interest rates would have been

19  on alternative investments.

20  Q.    Yet there would be risks with that investment?

21  A.    That's correct.

22        MR. DELANEY:  That's all the questions I have, thank

23  you.

24        THE COURT:  All right, Mr. Dale.

25        MR. DALE:  Thank you, your Honor.


124


1             CROSS-EXAMINATION

2  BY MR. DALE:

3  Q.    Mr. Pashke, can any average Joe off the street provide a

4  valuation of a limited partnership interest in a family limited

5  partnership?

6  A.    I would think not.

7  Q.    At least not one that's got any reliability; in other

8  words, if I just picked a number out of thin air, if I said I

9  thought, you know, it was worth X, my opinion probably wouldn't

10  be very reliable?

11         THE COURT:  There's a question there?

12  BY MR. DALE:

13  Q.    You have to have certain qualifications to be a business

14  appraiser, isn't that right?

15  A.    That's correct.

16  Q.    Because the task that you're being asked to perform is

17  one which requires a certain specialized knowledge?

18  A.    Yes.

19  Q.    It requires training?

20  A.    Yes.

21  Q.    It requires the ability to work with certain technical

22  aspects of business?

23  A.    Yes.

24  Q.    Now, Mr. Pashke, you're what's called a certified

25  valuation analyst, that's one of your certifications that you


125


1  need to be able to value a business or that you should have?

2  A.    Yes, that's one of the ones that I possess.

3  Q.    That's called CVA for short sometimes?

4   A.   Yes.

5   Q.   And that's a certification you have as a business

6   appraiser?

7   A.   Yes.

8   Q.   As an accountant, let's say if an accounted wanted to

9   become a CVA, they take a week long training course, is that

10  right?

11  A.   At that particular time, that's correct.

12  Q.   And then there is a take-home exam?

13  A.   There was at that particular time.

14  Q.   When you say that particular time, that's the time you

15  became a certified valuation appraiser?

16  A.   That's correct.

17  Q.   That was in 1997, is that right?

18  A.   Sounds correct.

19  Q.   All right.  So you took that week long training in 1997?

20  A.   Yes.

21  Q.   And your take-home exam was in 1997?

22  A.   Yes.

23  Q.   All right.  And you're also what's called a certified

24  business appraiser?

25  A.   That's correct.

126

1  Q.   All right.  And that's sometimes called CBA, for short?

2  A.   That's correct.

3  Q.   And for a CBA, you have to submit two reports for peer

4  review, isn't that right?

5  A.   That's correct.

6  Q.   And you did that in February of 1998?

7  A.   That's correct.

8  Q.   And as of the date that you prepared the expert report in

9  this case, I think you mentioned that you started working on it

10  in the summer of 1998?

11  A.   That's correct.

12  Q.   Those were your only two business appraisal

13  certifications?

14  A.   That's correct.

15  Q.   Now, as of the time you prepared the report, you had

16  valued about four or five family limited partnerships, isn't

17  that right?

18  A.   That's about right.

19  Q.   And those were all for gift and estate planning purposes?

20  A.   Well -- my recollection is they were for gifts.

21  Q.   For gifts for tax planning purposes?

22  A.   Yes.  Well, information that they needed to file for gift

23  tax returns.

24  Q.   Don't you pay less gift tax on a gift of lesser value

25  than you would on a gift of higher value?

127

1  A.   Yes.

2  Q.   And the donor pays the gift tax, right?

3  A.   Yes.

4  Q.   So if you're the donor and you're planning for gift tax

5  purposes, it's better for you if what you're giving has a lower

6  value, as opposed to a higher value, is that right?

7  A.   Well --

8  Q.   Financially?

9  A.   You're asking me to put my shoes in the owner of that

10  particular thing, I'm not quite sure what you mean.

11  Q.   Well, do you --

12  A.   If you're asking me --

13       THE COURT:  Slow down, and you slow down, you're

14  talking over each other, try it again.

15  BY MR. DALE:

16  Q.   I'm just saying if you're a business person engaged in

17  gift tax planning, all right, you engage a valuation expert for

18  gift tax planning purposes, you have to pay more tax on a

19  higher valued gift?

20  A.   Yes.

21  Q.   So if you're looking to lower your gift tax, then you

22  want the value of the gift to be lower?

23  A.   Yes.

24  Q.   Mr. Pashke, have you ever done a valuation for the United

25  States government for tax purposes?


                                  128


1  A.   I have not.

2  Q.   Have you ever been retained as an expert witness to do a

3  valuation for a state taxing authority?

4  A.   No, I have not.

5  Q.   Now, in 1998, I think you testified a guy named Dave

6  Finnecy contacted you about valuing Smith Family Limited

7  Partner interests?

8   A.    Yes, Mr. Finnecy was the CPA for Erie Navigation.

9   Q.    Okay.  He was also the accountant for Mr. Smith, isn't

10  that right, the elder Mr. Smith?

11  A.    I believe he did Mr. Smith's personal tax returns, too.

12  Q.    And this was the first job you did for Mr. Finnecy?

13  A.    That's correct.

14  Q.    After your valuation, Mr. Finnecy gave you a couple of

15  other closely held gift valuations, isn't that right?

16  A.    Mr. Finnecy asked me to do one more for a company he had

17  in Ohio that was in a similar business.  Actually, I take it

18  that was not a limited partnership, that was a situation where

19  he had a client that was just gifting the stock, not through a

20  family limited partnership, they were just going to gift the

21  shares of stock.

22  Q.    But that was a valuation for tax purposes?

23  A.    Correct.

24  Q.    I want to go through and see if I can narrow maybe any

25  areas of disagreement we may have with the plaintiffs in this


129


1   case, maybe we can shorten some of this testimony.

file:///A|/SMITHDY1.TXT

2          THE COURT:  Mr. Dale, are you moving from

3  qualifications now to substance?

4          MR. DALE:  As to?

5          THE COURT:  As to the request by the plaintiff that

6  he be recognized as an expert in the fields previously

7  described?

8          MR. DALE:  I would like to withhold for a little

9  while longer --

10          THE COURT:  Do you have anymore voir dire?

11          MR. DALE:  I don't have anymore voir dire.

12          THE COURT:  Then now is the time, do you object or

13  not?

14          MR. DALE:  I do not object.

15          THE COURT:  I recognize him as an expert in the

16  fields described by the plaintiff.  Go ahead.

17  BY MR. DALE:

18  Q.    You valued an interest in Smith Family Limited

19  Partnership, is that right?

20  A.    That's correct.

21  Q.    And Smith Family Limited Partnership has one asset, is

22  that right?

23  A.   That's correct.

24  Q.   Has a stock certificate that represent 105 shares in Erie

25  Navigation Company?


130


1  A.   Yes, its sole asset was all the shares of Erie

2  Navigation.

3  Q.   And if there's 105 shares, those are all the shares --

4  A.   That's correct, it's a hundred percent of the ownership

5  of the company that is owned by the limited partnership.

6  Q.   Now, if you've got control, let's me say this -- would

7  this Smith Family Limited Partnership then have control over

8  Erie Navigation Company at that point?

9  A.   Yes.

10  Q.   And if you've got control over a company, you can cause

11  it to be liquidated at that point in time, can you not?

12  A.   Yes, if the general partners decided to try to do that,

13  they could explore the opportunity.

14  Q.   Right, if Smith Family Limited Partnership decides,

15  whatever corporate method is required for Smith Family Limited

16  Partnership to make that decision, if that decision is made,

17  then they then control the disposition of Erie Navigation

18  Company, is that right?

19  A.   Could you rephrase that for me.

20  Q.   Well, I guess we're thinking of Smith Family Limited

21  Partnership -- let's say instead of Smith Family Limited

22  Partnership, let's say I owned a hundred percent of the shares

23  of Erie Navigation Company, all right?

24  A.   Okay.

25  Q.   At that point in time, I could do whatever I want with

131

1  those shares, is that right?

2  A.   That's correct.

3  Q.   I could liquidate them?

4  A.   If you can find a buyer, yes.

5  Q.   If I can find a buyer, I could liquidate them.  I can

6  make a sale of substantially all of the assets of Erie

7  Navigation Company?

8  A.   Yes, but you have might have some tax consequences on

9  that.

10  Q.   There is different tax consequences, depending on

11   whatever the basis was of the assets?

12   A.   That's correct.

13   Q.   Okay.  But, I guess I'm saying if I owned all those

14   assets or if Smith Family Limited Partnership owns all those

15   assets or owns Erie Navigation Company, and Erie Navigation

16   Company is somehow a risky endeavor because it's only making

17   three-percent profits over time -- at the end of the day if

18   they don't want to continue on and hang on to it and get these

19   measly profits, they could break it down and sell it off?

20   A.   That's certainly an option for them.

21   Q.   Nothing prevents them from doing that?

22   A.   No, but they have other considerations they might think

23   about.

24   Q.   Depending on what basis?

25   A.   Keeping the business in the family, which is one of the


                                    132


1   things that they apparently wanted to do.

2   Q.   Okay.  But I think that may be the intention, but let's

3   say your a hypothetical buyer, does the hypothetical buyer want

4   to keep the business in the family?

5   A.   The hypothetical buyer of the limited partnership

6   interest?

7   Q.   The hypothetical buyer -- does hypothetical buyer in any

8   piece of property ever consider, well, what if I want to keep

9   it in the family?

10   A.   Well, the hypothetical buyer and the hypothetical seller

11   are still governed by the nature of what they're buying and

12   selling.

13   Q.   I guess what I'm getting at is this.  Doesn't the

14   hypothetical buyer want to make the highest and best use of

15   their property?

16   A.   After they buy it, they can control it, yes.

17   Q.   So if you control it, you want to make the highest and

18   best use of that property?

19   A.   Typically, yes.

20        THE COURT:  Keep your voice up, sir.

21   BY MR. DALE:

22   Q.   You said typically, are there sometimes under the fair

23   market value that you don't want to make the highest and best

24   use of your property?

25   A.   No, you're correct.

1  Q.   Under the fair market value standard, you always want to

2  make the highest and best use of the property?

3  A.   (Witness nods head.)

4  Q.   So if you owned, under the hypothetical buyer-seller

5  standard, if you owned a hundred percent of the shares of Erie

6  Navigation Company and you want to make the highest and best

7  use of that property, you have a couple of choices.  You can

8  sell it down, sell its assets, sell its stock or, on the other

9  hand, you can hang onto it and see if it generates enough

10  returns?

11  A.   Yes, those would seem to be your options.

12  Q.   If you want the highest and best use of that property,

13  you're going to choose the better of those two options, is that

14  right?

15  A.   Well, depends on their assessment method, that's correct.

16  Q.   I'm talking about the hypothetical's buyer's assessment,

17  the one who wants to make the highest and best use of the

18  property?

19     MR. DELANEY:  I need to object on the basis that

20  this is incredibly misleading because we are not in this case

21  valuing an interest that is controlling.  All of these

22  questions have to do with controlling.  The buyer in our

23  formula doesn't have any control.

24      MR. DALE:  I can respond to that.

25      THE COURT:  You needn't have to.  You're going to

134

1  have an opportunity to take him on redirect, if you think

2  something needs clearing up, you can clear it up, it's

3  overruled.

4  BY MR. DALE:

5  Q.    You valued an interest in Erie Navigation Company, right?

6  A.    That's correct.

7  Q.    A one-hundred percent interest in Erie Navigation?

8  A.    I valued the company as a whole, that's correct.

9  Q.    That's not this kind of an interest where you don't have

10  control, if you own one-hundred percent, you got control?

11  A.    That's correct.

12  Q.    When you're valuing that interest, you're using the

13  standard of value of a hypothetical buyer and seller?

14  A.    That's correct.

15  Q.    And they're making the highest and best use of the

16  property?

17  A.    Yes.

18  Q.    In making the highest and best use of the property, they

19  have a choice between selling the assets or keeping it, they're

20  going to choose the better of those two options?

21  A.    Under their assessment of that, that's correct.

22  Q.    I'm talking about the hypothetical buyer?

23  A.    Well, the hypothetical buyer and hypothetical seller, I

24  mean they're mirror images of each other to some degree.

25  Well -- rephrase your question.


135


1  Q.    I guess I'm trying to -- didn't you say that the net

2  asset value was the appropriate method of valuing Erie

3  Navigation Company?

4  A.    Well, that's the method that I had settled on because the

5  other two approaches didn't work.

6  Q.    In settling on that methodology instead of using one that

7  didn't work -- what is the net asset value method, does that

8  mean you take all the assets and then you subtract all the

9   liabilities and then what you got left is the net asset value?

10   A.   Yeah, that's essentially it.

11   Q.   So, theoretically, if I own a house that's worth

12   $100,000, I got an $80,000 mortgage, my house has a net asset

13   value of $20,000?

14   A.   In that example, yes.

15   Q.   All right.  So if I own that house, that sort of

16   represents what I can turn into cash.  I mean, there may be

17   transactional costs along the way but, theoretically, I can

18   sell my house and convert it into some amount of cash at that

19   point?

20   A.   Yes, if there's a market for your house, you can

21   liquidate that and have cash and you have no tax consequences,

22   that's correct.

23   Q.   And, in your opinion, didn't you say that net asset value

24   is sort of a baseline for valuation?

25   A.   It's a comparison you look at when the other


136


1   methodologies don't work.  When the income approach doesn't

2   work, the market approach doesn't work, because there's either

3  no value or low value, you look at the net asset value, that's

4  correct.

5  Q.   I'm sorry, what was correct?

6  A.   That you're using net asset value method.

7  Q.   You used that as the baseline for your valuation?

8  A.   To say yes, there's an indication of value using the net

9  asset value method.  I looked at that indication of value, that

10  was the $5.2 million.

11  Q.   And then that $5.2 million, that was as of a particular

12  date, right?

13  A.   That's correct.

14  Q.   And what was that date, do you recall?

15  A.   That was 12/31/97.

16  Q.   12/31/97 --

17      THE COURT:  Excuse me, slow down a little bit, don't

18  talk over him.

19      MR. DALE:  I'm sorry, your Honor.

20      THE WITNESS:  I believe that value used for the

21  January 5th of '98 gifts.

22  BY MR. DALE:

23  Q.   That's all I was going to ask.  And then that was -- so

24  January 5th was the date of the first gifts?

25  A.   That's my understanding, yes.


                          137


1  Q.   And you valued the net asset value of Erie Navigation

2  Company on January 5th of $5.2 million?

3  A.   I was asked to appraise it as of 12/31/97, which I did.

4  They use that as a proxy for what it was worth five days later.

5  Q.   Because typically businesses don't dramatically change in

6  value within five days?

7  A.   That's correct.

8  Q.   I don't know if this is working, I just wanted to see if

9  I could get down what you just mentioned here.  All right, so

10  on January 5, 1998, Erie Navigation Company had a net asset

11  value of $5.2 million.  I don't know if the jury can see --

12        THE COURT:  You folks can see that on your screen,

13  can't you?

14        (Jurors nod heads.)

15        THE WITNESS:  Yes, I can see it fine.

16  BY MR. DALE:

17  Q.   All right.  And, likewise, because Smith Family Limited

18  Partnership owns 100 percent of the stock of Erie Navigation

19  Company, you also determined or can determine that Smith Family

20  Limited Partnership on January 5, 1998, has a net asset value

21  of $5.2 million, is that right?

22  A.   Yes.

23  Q.   And that's your opinion that you're expressing today?

24  A.   Yes, that the overall asset value is $5.2 million.

25  Q.   The asset value?


138


1  A.   Sure.

2  Q.   So that is the net asset value of Smith Family Limited

3  Partnership?

4  A.   Yes.

5  Q.   Smith Family Limited Partnership net asset value.  How

6  did you come up with the net asset value -- you looked at the

7  financial statements of Erie Navigation Company, is that right?

8  A.   Yes.

9  Q.   You looked at the assets that they owned?

10  A.   Yes.

11  Q.   They owned some vessels, some boats?

12  A.   Yes.

13  Q.   And they owned some equipment?

14  A.   Yes.

15  Q.   And land?

16  A.   Yes.

17  Q.   And buildings?

18  A.   Yes.

19  Q.   And some of that land or some of those boats you made

20  adjustments to from what they were listed on the books, is that

21  right?

22  A.   I believe there were four vessels that the company

23  obtained appraisals for me.

24  Q.   I'm sorry, I have just have to ask my co-counsel a

25  question.  I'm sorry, I have a lot of paperwork.  I'm going to


139


1  show you what's been pre-marked as Defendant's Exhibit 34 --

2  well, can you identify Defendant's Exhibit 34?

3  A.   Well, just looking at the front page, it's a claim for

4  refund and request for abatement.

5  Q.   Okay.  Can you tell who submitted that claim for refund

6    and request for abatement from looking at it?

7    A.    Well, the form says that Sidney E. Smith, Jr. is the

8    claimant.

9    Q.    And that's the elder Sidney E. Smith, Jr.?

10   A.    Yes.

11   Q.    Can you tell with that claim for refund if Mr. Smith

12   submitted any of your reports?

13   A.    Yes, it appears that two of my reports are attached.

14   Q.    And those two reports are the Smith Family Limited

15   Partnership valuation report?

16   A.    Yes.

17   Q.    And the Erie Navigation Company valuation report?

18   A.    Yes.

19   Q.    I'd like you to, if you wouldn't mind, turn to the Erie

20   Navigation Company valuation report.

21   A.    (Witness complies.)

22   Q.    Sir, are you there?

23   A.    Yes, I am.

24   Q.    Would you turn to page one of that report?

25   A.    Yes.

140

1  Q.   Can you identify what is listed as Exhibit G, as page G-1

2  to your Erie Navigation report?

3  A.   Yes, that's the net asset value calculation that I

4  performed.

5  Q.   Okay.

6       MR. DALE:  Your Honor, permission to publish this to

7  the jury?

8       THE COURT:  Sure, you needn't ask for permission,

9  just publish away.

10  BY MR. DALE:

11  Q.   This is a little small, so I will try to blow it up the

12  best I can.  So here we have the net asset value method, it

13  looks like at the beginning you discuss the assets, I think we

14  talked earlier that net asset value is simply assets minus

15  liabilities, is that right?

16  A.   That's correct.

17  Q.   And you valued some of these or you list the value of

18  these assets.  Now, where did you get -- where its says

19  unadjusted book value, where did you get the unadjusted book

20  value of assets of Erie Navigation Company?

21  A.   That would have been from the company's financial

22  statements, the balance sheet of December 31st of 1997.

23  Q.   How did you go back getting the company's financial

24  statements?

25  A.   Mr. Finnecy, who was the CPA for the company, had


141


1  provided the last five years financial statements for me.

2  Q.   Did he provide them to you when you were engaged to value

3  the company?

4  A.   That's correct.

5  Q.   Okay.  And on here there are various fixed assets, is

6  that right?

7  A.   Yes.

8  Q.   And included under fixed assets are some of the things we

9  talked about earlier, land, buildings, vessels, equipment,

10  vehicles, is that right?

11  A.   Yes.

12  Q.   So if I'm right, the numbers over here next to land,

13  buildings, vessels, equipment and vehicles, those are the book

14  value as listed in the books provided to you by ENC's

15  accountant, is that right?

16  A.  Provided to me by their CPA, yes.

17  Q.  Okay.  What does book value mean?

18  A.  Well, book value is just at any one point in time the

19  residue of what you earlier mentioned, the assets as are

20  reflected on the books, less all the liabilities the company

21  has, the remaining portion is equity.

22  Q.  That's what book value is?

23  A.  Yes.

24  Q.  So what is the book value of a particular asset, like a

25  building?

142

1  A.  Well, typically, a building, if you were going to just

2  look at it by itself, you would look at what the building

3  typically was purchased for, less if there's been some

4  depreciation recorded on that building.  It's anticipated when

5  you buy a building, it's not going to last forever.  And some

6  of the building is depreciated over time.  So let's say you

7  start with a building that cost $100,000, and you decide to

8  write it off over say 40 years.  So it would be $2,500 a year.

9  After four years you depreciate it $10,000.  So the original

10    cost of 100, less the 10, would tell you that the book value of

11    that asset would be roughly $90,000 after four years.

12    Q.    So is it original cost minus depreciation?

13    A.    That's what book value typically is, yes.

14    Q.    So then there's a simple formula that would be what you

15    paid for it minus all the depreciation you take?

16    A.    Yes, in that example, yes.

17    Q.    How about the book value of a vessel, is it about the

18    same, is it calculated the same?

19    A.    In a similar fashion, and with the vessels that Erie

20    Navigation had, they were older vehicles, excuse me, older

21    ships.

22    Q.    Okay.  Meaning that they were probably purchased a long

23    time ago?

24    A.    Yes.

25    Q.    So what you paid for it part, was what you paid for it a

143

1    long time ago?

2    A.    Whenever they made the acquisition, yes.

3    Q.    And they probably took a lot of depreciation over time on

4    that, is that right?

5    A.    Yes.

6    Q.    Since they owned it a while?

7    A.    I don't know the precise numbers right now, they would

8    depreciate them as long as they held them, yes.

9    Q.    Did they do that with equipment?

10    A.    Yes.

11    Q.    And did they do that with buildings?

12    A.    Yes.

13    Q.    Vehicles?

14    A.    Yes.

15    Q.    But not land, you don't do it with land, do you?

16    A.    No.

17    Q.    Now, it says here on the books -- what's this pro forma

18    book adjustments --let my try to pan out so maybe the jury can

19    see it?

20    A.    Those are some reclassifications I made to the balance

21    sheet as it was to get to my adjusted book value.

22    Q.    But what did you do?

23    A.    Well, there are several things.  There were some assets

24    that you referred to as non-operating.  It is not necessary to

25  have those to run the business.  One of the things when you're

144

1  looking at, for instance, when I used the net income -- excuse

2  me, the income approach to value, I couldn't end up using it

3  because it didn't give me, you know, it was nowhere near close

4  to what this approach was.  One of the things you do is you go

5  ahead and you look at the non-operating assets.  So if I had a

6  company that, on an income approach, was worth let's say $2

7  million, and I had some non-operating assets, in this case it

8  was cash surrender value of an insurance policy, which you

9  don't need to run the company.  And they also had an idle

10  vessel, one of the ships they weren't using.  So if I was using

11  an income approach and I came up and said well the income

12  stream tells me this asset is worth $2 million, but I got

13  another $130,000 worth of assets that are operating assets, I

14  would have taken this 136 and added to what I had for the

15  operating value.  So all I'm doing here is just trying to

16  reflect that there are some assets and I'm calling them idle

17  assets, they're not being used in the ongoing operation of the

18  company.  That's what's going on at that point.

19   Q.    So these are adjustments made because some items are not

20   being used, that's probably all I'm going to be able to process

21   here.  Now, after you made these adjustments, you got the

22   adjusted book value of land, buildings, vessels, equipment and

23   vehicles, is that right, am I pointing those out right?

24   A.    Yes.

25   Q.    This column here?


145


1   A.    Yes.

2   Q.    Now, some of those book values were a little lower than

3   fair market value, right, in terms of the individual assets?

4   A.    Well, I did this thing in two stages.  In the one column

5   that we're looking at, pro forma book adjustments, are just

6   trying to do some reclassifications, they don't change the

7   underlying net asset value.  You have to go over to the far

8   column where I adjusted for the appraisal increases.

9   Q.    Is book value the same as fair market value?

10   A.    No, not necessarily.  Book value is an accounting term,

11   it's used any time you're looking at a company's balance sheet,

12   okay.  If you said what's the company's book value, it's going

13    to be the assets, less the liabilities, and that's going to be

14    the book value of the company.  That could be at any time.

15    Fair market value, like we mentioned, is a different concept.

16    Q.    So if you're going to determine the fair market value of

17    an asset, you might have to make an adjustment to the book

18    value or you might have to go out and make an appraisal of

19    something to determine what the fair market value of that asset

20    is?

21    A.    Yes, which is precisely what I did with the biggest

22    assets they had, the vessels.

23    Q.    Okay.  Because they have -- can you tell from looking at

24    that what their book value of vessels was?

25    A.    Yes, towards the bottom, if you scroll down to the


                                146


1    bottom, I think it has a summary that's pretty good.  Keep

2    going down.

3    Q.    About here?

4    A.    Right there, just go over a little bit.

5    Q.    All right.

6    A.    So, basically, that's showing that the market value of

7  the vessels when they were appraised, the four ships that the

8  company had, the appraisals said they were worth $2,245,000.

9  The book value of those assets, I mean that's the net amount

10  that they had on the books for those assets, was only $303,000.

11  So I increased the book value -- excuse me, the net asset value

12  of the company from $3,250,000 roughly, to $5,191,000.  So down

13  here is where it shows how I increased the value by $1,941,800,

14  to reflect the additional appraised value above what the assets

15  that were recorded on the books.  Those are appraised values,

16  those are not if the company actually sold those assets at that

17  price, the company would have to pay a tax on that gain.  So

18  that $1,941,000 was the appraised amount.  Using that analogy

19  with your house.  If your house was worth -- you paid $100,000

20  when you bought the house, all of a sudden the house is worth

21  $200,000.  If you sell it for $200,000, let's say, it was an

22  investment property, not your house, you'd have to pay a tax on

23  that.  What I did here was just booked the additional appraised

24  value increase.  I didn't reflect the potential income tax

25  effect that would happen.  If that would have been the case,

147

1    there's a potential tax liability of maybe $800,000 if the

2    company in fact sold the ships.  They would have to pay a tax,

3    the corporation would have to pay a tax for that.

4    Q.    That's a little bit beyond I guess what I asked.

5    A.    I'm sorry, I just thought I had to explain that.

6    Q.    I think I get it.  It's listed on the books at -- the

7    vessels were listed at $303,200?

8    A.    Yes.

9    Q.    And you adjusted them up?

10   A.    Almost $2 million.

11   Q.    Almost $2 million.  That is based on the appraisals that

12   you asked Mr. Smith to get, is that right?

13   A.    That's correct.

14   Q.    And these are appended to your report, is that right?

15   A.    Yes.

16   Q.    Can you talk about this adjustment -- well, I guess this.

17   There were some other items on here that are listed of book

18   value -- the equipment, the vehicles and the buildings, they

19   are listed at book value, did you go out an have those items

20   appraised?

21   A.    No, I did not.

22        THE COURT:  Mr. Dale, I have to take a conference

file:///A|/SMITHDY1.TXT

23  call at 2:30, it's about 2:28.  Members of the jury, if you

24  could mosey back into the jury room, we'll get you back in just

25  a few minutes and we'll continue.  I want to get something on

148

1  the record here after you go back in.  Go back to your room,

2  we'll get you as promptly as possible.

3         (Whereupon, the Jury was excused from Courtroom C

4  at 2:29 p.m.)

5         THE COURT:  This is just a further clarification of

6  the record, this is by way of a follow-up to our discussion in

7  chambers about lay testimony, in the wake of lay testimony as

8  to value or owner testimony as to value in the wake of the

9  amendments to Rule 701.  Let the record reflect that the

10  Advisory Committee Notes 2002 amendments provide in part, for

11  example, "most courts have permitted the owner or officer of a

12  business to testify to the value or projected profits of the

13  business, without the necessity of qualifying the witness as an

14  accountant, appraiser, or similar expert."  Citing Lightning
                        _____

15  Lube_v._Witco, Third Circuit case.  "Such opinion testimony is
    ____ __ _____

16   admitted not because of experience, training, or specialized

17   knowledge within the realm of an expert, but because of the

18   particularized knowledge that the witness has by virtue of his

19   or her position in the business.  The amendment does not

20   purport to change this analysis.  See also to that same effect

21   International_Rental_and_Leasing_Corp._v._McClean, 303

22   F.Supp.2d 573.  Just as a timing matter, I just want to get a

23   sense as to how we're going here, how much longer do you think

24   you're going to have him on cross, I'm not trying to shorten it

25   at all, I'm just trying to get a sense?

149

1        MR. DALE:  Well, I never know how to estimate this

2   properly because I'm sort of in between prepared questions, but

3   I would guess probably about an hour longer.

4        THE COURT:  All right.

5        MR. DALE:  I guess just as a follow-up on the

6   judge's ruling, would it be correct that they would still have

7   to lay the foundation that Mr. Smith had the predicate

8   knowledge by virtue of his position as an owner or officer as

9    of the valuation?

10        THE COURT:  I think in order for any person to

11   testify to anything, a foundation has to be laid, so the answer

12   to that would be yes.  And insofar as the line of questioning

13   we're on right now, just so I'm clear, we're on the net asset

14   sheet, if you will, of the corporate entity itself?

15        MR. DALE:  Correct.

16        THE COURT:  We're spending time on that, that's

17   fine.  I was of the opinion that there really wasn't much

18   dispute about that before the Commissioner, as to its value?

19        MR. DALE:  That's correct.

20        THE COURT:  All right.

21        MR. DALE:  I think we're probably demonstrating

22   methodologies.  I think there's been some insinuating talk

23   about it on the direct, about all the risks of the company.

24        THE COURT:  All right.

25        (Recess from 2:32 p.m.; until 2:50 p.m.)


                              150


1         THE COURT:  All right, Mr. Dale, fire away.

2    BY MR. DALE:

3   Q.   All right, I think we were talking before the break, you

4   mentioned that the book value of an asset is what you paid for

5   it minus depreciation?

6   A.   Yes, in the case of buildings or ships, that's right.

7   Q.   The book value is not the same thing as fair market

8   value, is it?

9   A.   Typically not, no.

10   Q.   All right.  Now, you went out and had -- I think we

11   talked about that Erie Navigation Company had various types of

12   fixed assets, is that right?

13   A.   Yes.

14   Q.   Vessels, equipment, vehicles, buildings and land, all

15   right?

16   A.   Yes.

17   Q.   Is that a comprehensive list of the fixed assets of Erie

18   Navigation Company?

19   A.   Yes.

20   Q.   You mentioned some of these kinds of assets are

21   depreciated -- and that's vessels?

22   A.   Yes.

23   Q.   Equipment?

24   A.   Yes.

25  Q.   Vehicles?

151

1   A.   Yes.

2   Q.   Buildings?

3   A.   Yes.

4   Q.   But not land?

5   A.   No.

6   Q.   Okay.  And I think there was some testimony earlier, in

7   terms of when these things were acquired, they were acquired,

8   many of them, by Sidney Smith back in 1985, does that sound

9   right?

10  A.   I believe the testimony mentioned that he bought the

11  business about that time.

12  Q.   And would it be fair to say that the older an asset is or

13  if you paid for it a long time ago, its book value, the further

14  away its book value is from fair market value?

15  A.   It can be and it cannot be, depending upon the

16  circumstance.  If you have an asset that is depreciating in

17  realtime by the way it's being depreciated on the books, they

18  may be pretty close.  The vehicles would be an example.

19  Q.    Well, you mentioned that the boats that Erie Navigation

20  had were pretty old, so you needed to go out and have them

21  appraised, is that right?

22  A.    They were the biggest assets the company had, that's

23  correct, that's why I asked for that.

24  Q.    In the end that appraisal came back about six times what

25  it was listed at on the books, isn't that right?


                                152


1  A.    That was approximately correct, yes.

2  Q.    For example, this is one of the boats, isn't it?

3         THE COURT:  That would be a ship.

4         THE WITNESS:  Looks like the Richard Reiss, I

5  believe.

6  BY MR. DALE:

7  Q.    You went out there and you saw some of these things?

8  A.    Yes.

9  Q.    I believe this is one of the ships that was appraised,

10  isn't that right?

11  A.    Yes, this was the most valuable ship that the company

12  had.

13  Q.  It's sort of hard to tell from this scale -- this boat is

14  620 feet long, isn't it?

15  A.  It's two football fields, yes.

16  Q.  This thing is appraised at $2 million just by itself,

17  isn't that right?

18  A.  I don't recollect, but if you'd let me look.

19  Q.  Sure.

20  A.  Yes, that's correct.

21  Q.  All right.  Now, you did obtain an appraisal of the

22  vessels -- but you didn't obtain a separate appraisal of the

23  equipment, did you?

24  A.  I did not.

25  Q.  You didn't obtain a separate appraisal of the vehicles,

153

1  did you?

2  A.  Did not.

3  Q.  You didn't obtain a separate appraisal of the buildings,

4  did you?

5  A.  Did not.

6  Q.  You didn't obtain a separate appraisal of the land, did

file:///A|/SMITHDY1.TXT

7  you?

8  A.   Did not.

9  Q.   And you mentioned, also, that you went out there and

10  visited the site of Erie Navigation Company -- they own some

11  property out on the bayfront, is that right?

12  A.   Yes.

13  Q.   Out on Bayfront Road?

14  A.   That sounds correct.

15  Q.   You went down to the marina, turned right, went up a few

16  blocks, it would be on your left?

17       MR. DELANEY:  I'm going to object, your Honor, there

18  is no evidence they own property there, they don't, they lease.

19       THE COURT:  All right.  Well, that wasn't so much an

20  objection as it was a statement.  Go ahead.

21  BY MR. DALE:

22  Q.   Is this a photograph of some of Erie Navigation's

23  facilities down there on the bayfront?

24  A.   It appears to be, yes.

25  Q.   And they run some operations in Sandusky, isn't that

154

1  right?

2  A.   That's correct.

3  Q.   You mentioned you went out there and visited the Sandusky

4  operations?

5  A.   Yes.

6  Q.   Does that look like a photo of their Sandusky operation?

7  A.   I assume so, it's been eight years since I've been there.

8  Q.   All right.  Well, I will try to move on then.  I think at

9  the end of the day, though, all of your totals came out to --

10  you added up vessels, equipment, your calculations of the

11  vessels, equipment and all of that, you came up with the net

12  asset value of Erie Navigation Company of $5.2 million?

13  A.   That's correct.

14  Q.   And then there was a separate gift date, is that right?

15  A.   I'm sorry, what?

16  Q.   There are two gifts that are the subject of this case,

17  isn't that right?

18  A.   Yes.

19  Q.   Gifts on two separate dates?

20  A.   Yes.

21  Q.   So your first valuation, which was December 31, 1997,

22  which we assume is going to be the same on January 5, 1997?

23  A.   '98.

24  Q.   Or '98.  And then didn't you do an update, update your

25  valuation for the second gift date?


                                155


1  A.   Yes.

2  Q.   Do you recall what you came to on that particular date?

3  A.   It was $5.3 million.

4  Q.   $5.3 million, that's because the net assets of Erie

5  Navigation Company had increased, is that right?

6  A.   Yes.

7  Q.   As a result the Smith Family Limited Partnership also had

8  a net asset value of $5.3 million, isn't that right?

9  A.   That's correct.

10  Q.   Have you reviewed the reports of the United States'

11  expert in this matter?

12  A.   Yes, I'm generally familiar with them.

13  Q.   Mr. Fran Burns, his reports?

14  A.   Yes.

15  Q.   Do you recall whether he used the same figures that you

16   used in calculating the net asset value?

17   A.   Yes.

18   Q.   I guess -- strike that.  He relied on your valuation of

19   Erie Navigation Company, isn't that right, at least for January

20   5, 1998?

21   A.   Yes.

22   Q.   And he also relied on your valuation of Smith Family

23   Limited Partnership as of January 5, 1998, is that right?

24   A.   Yes.

25   Q.   And then he made an adjustment based on your first

156

1   valuation for December 31, 1998?

2   A.   That's correct.

3   Q.   And he adjusted it using also the net asset value

4   approach -- he came up with a net asset value of Erie

5   Navigation Company also of $5.3 million, is that right?

6   A.   Yes.

7   Q.   Assuming your first 5.2 was correct, he adjusted for one

8   year later to 5.3?

9   A.   Yes.

10   Q.    Likewise, Mr. Burns, his adjustment showed that Smith

11   Family Limited Partnership on December 31, 1998 was also 5.3?

12   A.    Yes.

13   Q.    Okay.  So you guys essentially are in agreement on all of

14   this?

15   A.    Yes.

16   Q.    There is no dispute between you and the United States'

17   expert?

18   A.    Yes.

19   Q.    All right.  Now, from net asset value, then you are

20   required to make certain adjustments for lack of marketability

21   and lack of control, is that right?

22   A.    That's correct.

23   Q.    And can anyone just come up with a discount for lack of

24   control or lack of marketability; in other words, if I said

25   lack of marketability of two percent, does that add any


157


1   reliability to it?

2   A.    Lack of marketability of two percent, is that what you

3   said?

4   Q.   Right, I'm saying I think Smith Family Limited

5   Partnership should be discounted by two percent as to

6   marketability, just based on my general experience, is that a

7   very reliable statement?

8   A.   Probably not.

9   Q.   You need a methodology to come to an appropriate discount

10  for lack of marketability, isn't that right?

11  A.   Yes.

12  Q.   You need training, you need expertise in the area?

13  A.   Yes, as much information as you can look at.

14  Q.   I guess we'll start with the discount for lack of

15  control.  I think you mentioned that you used closed-end fund

16  data to come up with a discount for lack of control, is that

17  right?

18  A.   I used that method when I valued the FLP interests, but I

19  used a different methodology when I valued the common stock.

20  Q.   Okay.  But for the FLP interests, which is what we're

21  talking about in this case?

22  A.   Yes.

23  Q.   You looked to closed-end fund data.  And a closed-end

24  fund, you're talking about a mutual fund, is that right?

25  A.   Yes.

158

1  Q.    There's two types of funds, an open-end fund and a

2  closed-end fund, is that right?

3  A.    Yes.

4  Q.    With the open-end fund, you can essentially transact with

5  the manager or the investment company that runs the fund, is

6  that right?

7  A.    Essentially, they're like mutual funds.  If you want to

8  sell them, if you own a mutual fund and you want to sell it,

9  you're selling it back to the mutual fund itself.

10  Q.    But if you have a closed-end fund, you can't do that?

11  A.    You cannot.

12  Q.    You can't control whatever, you're on your own, is that

13  right?

14  A.    With a closed-end fund, you can only sell it, you can't

15  sell it back to the fund itself, you have to find another buyer

16  for it.

17  Q.    Theoretically, that's sort of a proxy for -- well, I

18  guess open-end funds don't sell at a discount to net asset

19  value, do they?

20   A.   Typically, mutual funds, you'll always get whatever the

21   net asset value of the fund is if you sell it.

22   Q.   But the closed-end funds, those do sell at discount to

23   the net asset value, is that right?

24   A.   Yes, they do.

25   Q.   Sometimes, they don't always, but frequently they do, is

159

1   that right?

2   A.   Yes.

3   Q.   And on average?

4   A.   Yes.

5   Q.   And so I guess the theory is that this closed-end fund

6   data is sort of a proxy for calculating the discount for lack

7   of control, is that right?

8   A.   That's one of the methods you can use, correct.

9   Q.   So what you looked at was the Herzfeld closed-fund

10   average?

11   A.   Yes.

12   Q.   That's a published average of closed-end funds, is that

13   right?

14    A.    Yes.

15    Q.    And don't Barron's and the Wall Street Journal, they also

16    publish this kind of data?

17    A.    Yes.

18    Q.    All right.  And you came up with, based on that data, you

19    came up with a discount for lack of control of five percent on

20    January 5, 1998, is that right?

21    A.    That's correct.

22    Q.    And I think you mentioned that you reviewed Mr. Burns,

23    the United States' expert, his report, he looked at closed-end

24    fund averages, is that right?

25    A.    Yes.

160

1    Q.    And maybe not the Herzfeld closed-end fund, maybe he

2    looked at Barron's, some other publications that quoted the

3    averages, I can't recall, can you?

4    A.    I don't recall, either.

5    Q.    But you know he used closed-end fund data?

6    A.    Yes.

7    Q.    He came to a discount of 4.9 percent as of January 5,

8   1998, is that right?

9   A.   That's correct.

10   Q.   So we're pretty close?

11   A.   Yes, using that methodology that we both employed, that's

12   correct.

13   Q.   Did you come up with 4.9 and just round it off?

14   A.   I looked at the approximate and rounded it to five.

15   Q.   Now, then on December 31, 1998, there is different data.

16   Different closed-end fund data as of that time, is that right?

17   A.   That's true, yes.

18   Q.   You always want to value something as of the valuation

19   date?

20   A.   Or as close to it as you can get, yes.

21   Q.   And you looked at the data then as of December 31, 1998?

22   A.   Yes.

23   Q.   The closed-end fund data?

24   A.   Yes.

25   Q.   And you came up with a discount for lack of control of 10

161

1   percent, is that right?

2   A.   That's correct.

3   Q.   Okay.  And do you recall what Mr. Burns came up with?

4   A.   I don't recollect.

5   Q.   Would 11 percent sound about right?

6   A.   It sounds about right, I don't know the precise number.

7   Q.   It was something pretty close to what you came up with,

8   right?

9   A.   Yes, it was similar.

10  Q.   So, in essence, you guys are pretty close to each other

11  on discount for lack of control?

12  A.   Using that approach, we came up with very similar

13  numbers.

14  Q.   The only other thing to do, then, if you were going to

15  calculate then the value of Smith Family Limited Partnership,

16  adjust it for lack of control, you would just multiply whatever

17  the interest was times 4.9 percent?

18  A.   Yes, on a purely mechanical standpoint.  But I do want to

19  mention that I used a different methodology when I valued the

20  common stock.  And you come up with a different number.

21  Because I look at the relationships of both lack of control and

22  lack of marketability.  Because those things bleed over a

23   little bit.

24   Q.   I see.  But I mean, I just want to stick with the asset

25   that we're talking about in this case?


162


1   A.   Yes.

2   Q.   That was gifted in this case.

3   A.   Okay.

4   Q.   All right.  I guess what I'm saying, there's another

5   discount in there, it's a discount for lack of marketability?

6   A.   That's correct.

7   Q.   Lack of marketability.  And these discounts are

8   multiplicative, is that right?

9   A.   Yes.

10   Q.   Meaning that you don't just -- you don't just say, if

11   you're trying to figure out combined discount, you just don't

12   add your discount for lack of marketability to your discount

13   for lack of control and that's your total discount, is that

14   right?

15   A.   No.

16   Q.   You multiply one first, and then you multiply the second

17  discount to the first discounted number, is that right?

18  A.    That's correct.

19  Q.    Do you recall whether you came up with the same discount

20  for lack of marketability on both the January 5th and the

21  December 31st valuation dates?

22  A.    Yes, I did.

23  Q.    And do you recall whether Mr. Burns, the United States'

24  expert, came up with the same number on the January 5th and

25  December 31st valuation dates?

163

1  A.    I don't recollect that for sure.

2  Q.    Do you recall what Mr. Burns' discount for lack of

3  marketability was?

4  A.    I don't remember the precise number, no.

5        THE COURT:  Let me see counsel at side bar for a

6  second.

7        (At side bar on the record.)

8        THE COURT:  My function here is not to tell anybody

9  how to try their case, but I do have the responsibility to move

10  the case along.  You can get these numbers laid out a heck of a

11    lot quicker, cut to the chase on that.

12         (End of discussion at side bar.)

13    BY MR. DALE:

14    Q.    Mr. Pashke, isn't the last thing that we have to do on

15    this chart is to calculate the value, after we determine the

16    discount for lack of marketability, then we just multiply by

17    whatever percentage interests we're valuing?

18    A.    That's correct.

19    Q.    In other words, if it's a 13-percent interest, at this

20    point in time you just multiply by .13 and you at that point in

21    time you could determine the value of that 13-percent interest?

22    A.    Yeah, that's one of ways you can get to it.

23    Q.    So, if you were going to calculate the value, you would

24    start with $5.2 million -- you would multiply by, I guess .049

25    if you were going to accept Mr. Burns' discount or point .05 if


164


1    you were going to accept your discount, is that right?

2    A.    Yes, that would give you that particular discount.

3    Q.    Okay.  And then the same with the discount for lack of

4    marketability, whatever that percentage interest is, you would

5  multiply that, and then you would multiply by the percentage

6  interest that was owned and that's your fair market value of a

7  partial interest?

8  A.   Well, that would be of the whole company.

9  Q.   I guess I'm saying here assume you would have a

10  13-percent interest?

11  A.   Okay.

12  Q.   If you multiplied the 13 percent here, multiply by .13,

13  wouldn't you reach the fair market value of 13-percent

14  interest?

15  A.   Yes, assuming we're talking about the minority interest,

16  yes.

17  Q.   All right.  And the minority interest being valued here

18  were a 13.73 percent interest, weren't they?

19  A.   (No audible response.)

20  Q.   If you don't recall, that's fine.  All right.  But at the

21  end of the day our real dispute is here?

22  A.   That's correct.

23  Q.   Isn't it, a dispute between the United States' expert and

24  you, really it's all about the discount for lack of

25  marketability?

1  A.    Yes.

2  Q.    That's where 99 percent of the difference in our values

3  is coming from at this point?

4  A.    That's correct.

5  Q.    Now, you used what is referred to as a Quantitative

6  Marketability Discount Model, is that right?

7  A.    That's correct.

8  Q.    Do you have Exhibit 34 in front of you right now?

9  A.    I can get it.  I have that.

10  Q.    Now, is there a page in that exhibit where you spell out

11  the application of the Quantitative Marketability Discount

12  Model?

13  A.    There's a portion in my report that I talk about the

14  model.

15  Q.    Okay.  The way it works is that you plug in certain

16  numbers and you come up with a chart, is that right?

17  A.    Yes.

18  Q.    And some of the numbers that you plugged in are based on,

19  are directly out of the company's financial statements?

20  A.    Well, they're dealing with the underlying asset.  The

21  thing that the limited partnership owns.  By implication if I

22  own a portion of the limited partnership interest, how that

23  asset behaves is going to impact my particular investment.  For

24  instance, it's different if the limited partnership owned $5.2

25  million worth of cash.  That's pretty easy, there wouldn't be

166

1  any, there might be a small discount because of that.  Because

2  of the nature of the underlying asset, you have a company that

3  is not doing all that well, not paying that many dividends, has

4  a lot more inherent risk, those are some of the factors that go

5  into that model.

6  Q.    You mentioned the company wasn't doing very well?

7  A.    That's correct.

8  Q.    I'd like to show you a chart, if you wouldn't mind?

9  A.    Okay.

10  Q.    Can you tell me if you can compare that chart with the

11  figures that you have in front of you?

12        MR. DELANEY:  Can we identify that chart, your

13  Honor.

14        THE COURT:  Sure, what is it?

15          MR. DALE:  This chart will be identified as Exhibit

16  36.

17          THE COURT:  All right.  By way of substantive

18  description, what is it, can you identify what you're looking

19  at?

20          THE WITNESS:  It looks like it's information off the

21  five-years income statement from 1993 through 1997.

22          THE COURT:  All right.

23          MR. DELANEY:  Your Honor, I'd like to see you at

24  side bar before they publish this.

25          THE COURT:  All right.  Do you intend to publish it?


                              167


1           MR. DALE:  I do.

2           THE COURT:  Let me see you at side bar.

3           (At side bar on the record.)

4           THE COURT:  Let me see a copy of it.  Tell me what

5   this is again?

6           MR. DALE:  This is information from the financial

7   statements on Erie Navigation, statements from 1993 to 1997.

8           THE COURT:  Just a summary compilation of what's

9    there.  Tell me what is the relevance?

10         MR. DALE:  Mr. Pashke says that dividends are

11   paid -- you pay it out of salaries.  I want to use them to

12   demonstrate there is a lot of money left over.

13         THE COURT:  In my view the financial condition of

14   the company, to the extent it's relevant, is opened by virtue

15   of the discussion with your expert about risk.

16         (End of discussion at side bar.)

17   BY MR. DALE:

18   Q.   I'll trade with you this chart, that one has actually

19   been marked as Exhibit 36.  I think you identified this as the

20   financial information from Erie Navigation Company for the

21   years 1993 to 1997?

22   A.   Yes, appears to be information of different sections in

23   my report.

24   Q.   As far as Erie Navigation Company goes, they have net

25   sales in excess of $13 million in each of the years between

168

1    1993 and 1997, is that right?

2    A.   Yes, 15 million, 13 million -- roughly 14, 15 and 15.

3   Q.   They had an operating profit in excess of at least

4   $150,000 a year for each of those five years, is that right?

5   A.   That's correct.

6   Q.   And they had net earnings that vary anywhere from between

7   $94,000 and $219,000, is that right?

8   A.   Yes, that's correct.

9   Q.   Now, at the same time the company was being owned -- it

10  was owned by Sidney Smith, Jr., is that right?

11  A.   That's correct.

12  Q.   The elder Mr. Smith?

13  A.   That's correct.

14  Q.   He was the one in charge?

15  A.   That's correct.

16  Q.   He received a salary for the years 1993 through 1997?

17  A.   That's correct.

18  Q.   And that varied depending on the year.  In 1994 looks

19  like it was down $150,000.  But in 1993 he was paid himself a

20  salary of over $600,000, is that right?

21  A.   That's correct.

22  Q.   Now, maybe you can tell me if this is correct.

23  Oftentimes in a closely-held company if one person is in

24   control, that company doesn't often pay dividends to the owner,

25   right?


169


1   A.   That could be the case sometimes.  Sometimes they do and

2   sometimes they don't.

3   Q.   In other words, if the company is generating a profit and

4   he wants to draw down from that profit as the sole owner, the

5   guy in charge, sometimes he can do that, maybe for tax

6   consequences sometimes it's better to do that by way of drawing

7   a salary, isn't that right?

8   A.   That can be the case, yes.

9   Q.   The company can deduct the salary at that point in time?

10   A.    The company can deduct the salary, that's correct.  It's

11   taxable income to the officer, but it's tax deductible by the

12   corporation.

13   Q.    Okay.  Now, you reviewed Erie Navigation Company's

14   information and you concluded that the officer's salary issued

15   to Mr. Smith in many of the years was in excess of typical

16   executive compensation?

17   A.    What I looked at was using the income method, which I

18   ended up using at the end because it only had an indicated

19   value of about a million six.  I readjusted the books --

20   Q.    Mr. Pashke --

21        THE COURT:  Hang on a second, let him finish his

22   answer.

23        THE WITNESS:  I readjusted the books, I took the

24   financial information that's reflected in the income statements

25   from '93, '94, '95, '96 and '97, and what I did, one of the


170


1   things I looked at was the officer's salaries.  And they

2   bounced around quite a bit.  So what I did is I went out and I

3   looked at information that was available in the marketplace

4   that might give me an indication about what a replacement

5   salary might be for someone to run an operation of this size.

6   So I made an adjustment in each of the years, to add back or in

7   some cases in that second year, actually subtract salary

8   adjustments.  And then I also made some other adjustments.

9   I adjusted the depreciation, we talked about how the ships were

10   not --

11        MR. DALE:  Your Honor, if I may.

12       THE COURT:  I think so now.  Listen to his question

13   and respond to that.  Go ahead.

14   BY MR. DALE:

15   Q.    My only question was -- Mr. Smith's salary in these five

16   years was different than the salary that would be required, as

17   you mentioned, for a replacement person to come in and do his

18   job, is that right?

19   A.    That's was my estimation, yes.

20   Q.    Okay.  Now, in the QMDM you mentioned you plug in some

21   numbers based on the value of Erie Navigation Company, the

22   financial condition of Erie Navigation Company and you come up

23   with a chart, is that right?

24   A.    Yes.

25   Q.    And you mentioned because this company is not doing well


171


1   in your estimation, that that impacted the numbers that you

2   used to put into your chart, is that right?

3   A.    That's correct.

4   Q.    And notwithstanding the fact the company hasn't sustained

5   a loss in any of the last five years?

6    A.    That's correct.

7    Q.    Once you arrive at your chart, then, can you tell me

8    where in the appraisal you have in front of you, that is

9    Exhibit 34, where that chart is that you came up with using the

10   QMDM model?

11   A.    I believe that's Exhibit H-1.

12   Q.    Exhibit H-1.  And based on that chart, you have a range

13   of implied marketability discounts, is that right?

14   A.    That's correct.

15   Q.    And there is two variables that go into determining the

16   final marketability discount under the QMDM model, is that

17   right?

18   A.    Well, there's four variables actually.

19   Q.    Once you reach this point in the chart, are we down to

20   two variables?

21   A.    Yes.

22   Q.    In other words, the other two variables you've heard

23   established once you get down to the chart?

24   A.    That's correct.

25   Q.    Those other two variables, those relate to the financial

172

1  condition of the underlying company --

2  A.    As part of the dividend yield and the anticipated growth

3  in that, anticipated growth in the investment at large, those

4  are actually three things that happened before we get to this

5  point.

6  Q.    So you put in your anticipated growth rate, anticipated

7  dividends, things of that nature, you come up with the numbers

8  in this chart, is that right?

9  A.    That's correct.

10  Q.    Once you get the chart, there's two variables in this

11  chart, correct?

12  A.    That's correct.

13  Q.    There's a required holding period return?

14  A.    That's correct.

15  Q.    And there's an assumed holding period in years?

16  A.    Yes.

17  Q.    And just from the looks of this chart you came up with,

18  assuming all your other factors that you put in are correct, is

19  it fair to say that if you -- this factor says assumed holding

20  period in years?

21  A.    Yes.

22  Q.   All right.  And this chart ranges from 1 to 30 years, is

23  that correct?

24  A.   That's correct.

25          THE COURT:  Mr. Dale, by way of helping the jury

173

1  since you're talking about this document, is it possible to

2  flip that on to the screen, would that be useful.  You don't

3  have to, just by way of suggestion.

4          MR. DALE:  I'd rather not because it's actually a

5  limited partial of a larger chart.

6          THE COURT:  All right, that's no problem at all.

7  BY MR. DALE:

8  Q.   Is it fair to say that based on all other determinations

9  with regard to Smith Family Limited Partnership being equal,

10  your determination of the assumed holding period in years would

11  result in a marketability discount of anywhere between 15

12  percent and 98 percent under the QMDM model, is that right?

13  A.   That's correct.

14  Q.   That one variable, the determination of that one variable

15  changes the marketability discount from 15 percent to 98

16  percent, is that right?

17  A.    Yes.  And one example, you're selling the investment,

18  essentially, real soon.  In the other case you're going to hold

19  on to it, have to hold on to it for 30 years.

20  Q.    Whatever you determine in that regard, that dramatically

21  impacts the range of marketability discounts that you come up

22  with under the model, is that right?

23  A.    Yes.

24  Q.    And, for example, if you came out of this one end with a

25  98 percent discount for lack of marketability, wouldn't that

174

1  effectively reduce your determination of fair market value to

2  two percent of net asset value?

3  A.    Under those assumptions, that's correct.

4  Q.    And on the other end, if you determined that there was a

5  one-year assumed holding period, and we'll get into what an

6  assumed holding period is in a little bit, but if you

7  determined there was a one-year assumed holding period, you

8  would come up with a 15-percent discount for lack of

9  marketability, is that right?

10  A.    In that range, yes.

11  Q.    In other words, a company with a 15 percent or business

12  interests with a 15-percent implied marketability discount,

13  would trade at 85 percent of its net asset value, is that

14  right?

15  A.    In this example, yes.

16  Q.    So all other determinations that you made with respect to

17  Smith Family Limited Partnership, the characteristics of the

18  Smith Family Limited Partnership, the financial debt,

19  everything else being equal, we assume that to be true, then

20  your determination of the assumed holding period can change the

21  result from between two percent of net asset value to 85

22  percent of net asset value, is that right?

23  A.    Using that 30-year parameter, that's correct.

24  Q.    That's a pretty important assumption, then, that you're

25  going to be making?


175


1  A.    Well, sure.

2  Q.    Let's say if I were -- well, I guess ultimately you did

3  come up with an assumed holding period in years, is that right?

4  A.    Yes, I assumed a holding period of between 7 to 15 years.

5  Like I mentioned, the limited partnership agreement goes on to

6  the year 2050.  And the limited partner has no way of getting

7  out him or herself.  But I didn't use 50 because I thought that

8  was unlikely that something would happen before then.

9  Q.    You're doing the assuming here, is that right?

10  A.    That's correct.

11  Q.    And, ultimately, you assumed a 7 to 15 percent, 7 to 15

12  year holding period?

13  A.    Given the nature of this investment, that's correct.

14  Q.    You assumed that the hypothetical buyer would have it for

15  7 to 15 years, is that right?

16  A.    A hypothetical buyer can anticipate likely he would have

17  it that long, yes.

18  Q.    And based on that assumed holding period that you came up

19  with, you came up with an implied discount of anywhere between

20  67 and 93 percent?

21  A.    That's correct.

22  Q.    On net asset value, is that right?

23  A.    That's correct.  That's what the QMDM model indicated.

24  Q.    So if you had a net asset value of $100,000, or let's say

25  of a million dollars, let's say you had a net asset value of a

176

1  million dollars, and using this model you came up with a

2  discount of 67 percent to 93 percent, then, ultimately, the

3  range that you're looking at there is anywhere between $70,000

4  and $330,000, is that right?

5  A.    Well, I'm not sure of the math, what you're doing there.

6  Q.    Let's assume you've calculated a percentage interest in

7  the company?

8  A.    Yes.

9  Q.    And you calculated that the percentage interest in that

10  company, adjusted the discount for lack of control, that value

11  equals one million dollars?

12  A.    Okay.

13  Q.    Okay.  Now, you want to apply the marketability discount

14  to that, and at the end you get your final value?

15  A.    Yes.

16  Q.    All right.  You come up with a range from between 67 and

17  93 percent.  You would just take the 67 to 93 percent, multiply

18  it by one million --

19  A.    That would be the discount.

20  Q.    So the discounted value, then, would be anywhere between

21  $70,000 and $330,000, is that right?

22  A.    No, it's actually -- yes, exactly.  You're right 70,000

23  to 330,000, that sounds right.

24  Q.    I mean that's a pretty broad range, isn't it?

25  A.    Yes.


177


1  Q.    I mean if I were going to sell my house, if I were going

2  to a real estate appraiser and they came back to me and they

3  said I've used the model for appraising your house, I've come

4  up with an answer, your house is anywhere between $70,000 and

5  $330,000.  Is that sufficient, in your mind, if you were

6  wishing to sell your house to justify that appraisal?

7  A.    Well, we're looking at entirely different assets, that's

8  precisely the situation here.  It's a housing market, there is

9  an established market, it's pretty subtle.  What we have here,

10  which is the real difficulty with this thing, is that we have a

11  real slow growing asset, that typically the required rate of

12  return is going to be pretty high.  So the longer you hold this

13  asset, typically, the less it's going to be worth.  It's

14  different than a house.

15  Q.    So the longer you hold the asset, the less it's going to

16  be worth?

17  A.    With the assumptions that I have here, that's correct.

18  Q.    Is there anything in the Smith Family Limited Partnership

19  agreement that requires a hypothetical buyer to hold an asset

20  for any particular period of time?

21  A.    No.  He just can't get out of the agreement for 50 years

22  or plus.

23  Q.    There's nothing that says he can't turn around and sell

24  his interest?

25  A.    If he could find a willing buyer, that's correct.


                                    178


1  Q.    As long as he can find a willing buyer -- and under the

2  fair market standard, you assume a willing buyer, is that

3  right?

4  A.    That's correct.

5  Q.    So there is no required holding period under the Smith

6  Family Limited Partnership agreement, is there?

7    A.    Other than the person can, they could attempt to sell the

8    interest whenever they would wish.

9    Q.    What if you knew as a hypothetical buyer, what if you

10   knew that the management intended, the management of Smith

11   Family Limited Partnership, intended to liquidate and

12   distribute to the partners within one year; if you knew that to

13   be true, you would have an assumed holding period of one year,

14   is that right?

15   A.    That would be correct.

16   Q.    So if that were true, you would have a marketability

17   discount of 15 percent?

18   A.    If I knew for sure that would happen in one year, that's

19   exactly right.

20   Q.    Did you interview Mr. Smith, Jr., in connection with this

21   valuation to determine whether they had any intent to dispose

22   of the underlying asset?

23   A.    I did not talk to him per se.  I had conversations with

24   Mr. Finnecy, who was pretty close --

25   Q.    You didn't talk to Mr. Smith about whether there was any

179

1  intent to sell the asset, is that right?

2  A.   I did not.

3  Q.   You didn't talk with Mr. Smith, III, about whether there

4  was any intent to sell the asset, did you?

5  A.   I did not, but I asked that question, but not of them.

6  Q.   And did you ask that question of someone who would have

7  the ability to liquidate the Smith Family Limited Partnership,

8  somebody who had the authority to do that?

9  A.   No, because that would have only been the two people you

10  already mentioned.

11  Q.   Who came up with this model, do you know?

12  A.   Yes, the gentleman's name is Christopher Mercer.

13  Q.   Christopher Mercer.  Do you recall when you first learned

14  about this particular model?

15  A.   Yes, it would have been earlier in 1998 is when I got

16  exposed to this particular approach.

17  Q.   So the same year that you valued this family limited

18  partnership interests, that was the first time you learned

19  about this QMDM model?

20  A.   Yes, I learned about it earlier that year.

21  Q.   The model is something that's a creation of a gentleman

22  by the name of Christopher Mercer?

23  A.   Yes.  One of the reasons why he tried to develop that was

24  that prior to that -- should I go into that or not?

25  Q.   That's not really my question, I just wanted to see if

180

1  Christopher Mercer did the model, I think you've answered that?

2  A.   Yes.

3  Q.   And does Christopher Mercer run -- does he have a

4  valuation company?

5  A.   Yes, he does.

6  Q.   Is it called Mercer Capital?

7  A.   I believe that's the case, yes.

8  Q.   And do they publish articles at Mercer Capital from time

9  to time?

10  A.   Yes.

11  Q.   I'd like to you show you an article from Mercer Capital,

12  if I could, Mr. Pashke, have you seen that article before?

13  A.   No, I haven't.

14  Q.   That's an article by Mercer Capital, isn't it?

15  A.   That's what it seems to say.

16  Q.   Do you want to take a moment and read that article?

17        THE COURT:  How long is it?

18        THE WITNESS:  I would need more than a moment.

19        THE COURT:  How many pages is it?

20        MR. DALE:  It's seven pages landscaped size, it's

21  long.

22        THE COURT:  I'm not going to have him sit here and

23  have him read it for 10 minutes in front of the jury.  I'm

24  trying to get a sense of time.  Can you direct him to the

25  portions you think are relevant?


                              181


1        MR. DALE:  I can probably direct him to the portions

2  I think are relevant.

3        MR. DELANEY:  Your Honor, I've never seen, I don't

4  know what the point of it is.  It's nothing that has been

5  authored by anybody in this courtroom.  I haven't had time to

6  look at it.

7        THE COURT:  Look it -- we have one more witness

8  after Mr. Pashke, is that right?

9        MR. DELANEY:  I do, your Honor, yes.

10        THE COURT:  And the government has its expert and

11  then that's it, correct?

12      MR. DALE:  Correct.

13      THE COURT:  I suspect it will be 10 minutes by the

14  time we get back here and he's had a chance to read this.  That

15  is going to take us up to 4 o'clock.  What I'm inclined to do,

16  I have some other business with the lawyers, I'm inclined to

17  let you go on the theory we're not losing that much time

18  because we're going to finish this thing up tomorrow almost

19  assuredly anyways.  I don't want to waste your time while

20  they're sitting around reading this, which is necessary to do.

21      Let me just remind you what I think I told you in

22  connection with my original instructions.  Don't talk about the

23  case, in the most unlikely event there would be anything in the

24  news, avoid all sources of outside information on it.

25      I'm going to stay on the bench here, so you folks

182

1  are free to go, have a pleasant evening.  Please be back and

2  ready to go, we're going to start at 9:15 tomorrow morning.

3      (Whereupon, at 3:44 p.m., the Jury was excused for

4  the day.)

5          THE COURT:  Okay.  Just a couple quick housekeeping

6    matters.  When you're done, poke your head into chambers and my

7    law clerk will give each of you a proposed jury charge.  Which

8    I want both of you to take home and to review tonight just in

9    the interest of time.  My standard procedure, if you have any

10   requests for additions, deletions or refinements, you will see

11   in large measure, you don't know my standard charge, but you'll

12   see in large measure is a compilation of the standard

13   instructions I give in every case, most of which you had asked

14   for, both of you, in one form or fashion.  As well as the

15   addition of various points of each of your charges.  And the

16   charge is in three different font.  My standard charge, and

17   then in a different font for the government's, and a different

18   font for the plaintiff.  So it will make it somewhat easier as

19   you follow along to see what was added or deleted.  Jumping

20   ahead, if you know, how long do you figure your closing is

21   going to be in this case?

22          MR. DELANEY:  Thirty minutes, 35 minutes, pushing to

23   40.

24          THE COURT:  Pushing closer to 30, but in that range.

25   The same thing for the government -- you're going to be the

183

1    closer for the government?

2            MR. COOPER:  Yes, your Honor.

3            THE COURT:  If we don't get finished tomorrow, I

4    think the jury was anticipating Wednesday anyways, but we'll do

5    the best we can.  All right, we're adjourned.

6

7            (Whereupon, at 3:45 p.m., the proceedings were

8    adjourned for the day.)

9

10                   - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

184

1          C E R T I F I C A T E

2

3

4          I, Ronald J. Bench, certify that the foregoing is a

5   correct transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11   _____

12   Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25