IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SIDNEY E. SMITH, III, et al.,
     Plaintiffs

v.           CIVIL ACTION NO. 02-264 ERIE

UNITED STATES OF AMERICA,
     Defendant


JURY TRIAL - DAY NO. 2


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, September 27, 2005.


APPEARANCES:
     W. PATRICK DELANEY, Esquire, and SCOTT T.
     STROUPE, Esquire, appearing on behalf of
     the Plaintiffs.

IVAN C. DALE, Esquire, and LINDSEY W. COOPER, JR., Esquire, Tax Division, U.S. Department of Justice, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

| 1 | I N D E X |
|---|---|

2

| 3 | WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|---|
| 4 | FOR THE PLAINTIFFS: | | | | |
| 5 | Gregory F. Pashke | -- | 24 | 48 | 58 |
| 6 | Sidney E. Smith, III | 63 | 102 | 126 | -- |
| 7 | | | | | |
| 8 | FOR THE DEFENSE: | | | | |
| 9 | Francis X. Burns | 134 | 160 | 179 | 182 |
| 10 | | | | | |

11                    - - -

| 12 | EXHIBITS: | IDENTIFIED |
|---|---|---|
| | FOR THE PLAINTIFFS: | |
| 13 | Plaintiff's Exhibit No. 1 | 96 |
| | Plaintiff's Exhibit No. 3 | 102 |

14   Plaintiff's Exhibit No. 5          126
     Plaintiff's Exhibit No. 6          126
15   Plaintiff's Exhibit No. 7           57
     Plaintiff's Exhibit No. 8           71
16   Plaintiff's Exhibit No. 9           73
     Plaintiff's Exhibit No. 10          74
17   Plaintiff's Exhibit No. 11          75
     Plaintiff's Exhibit No. 12          77
18   Plaintiff's Exhibit No. 13          80
     Plaintiff's Exhibit No. 14          78
19   Plaintiff's Exhibit No. 15          82
     Plaintiff's Exhibit No. 16          84
20   Plaintiff's Exhibit No. 17          84
     Plaintiff's Exhibit No. 18          83
21   Plaintiff's Exhibit No. 34          54


22   FOR THE DEFENSE:
     Defendant's Exhibit No. 10         151
23   Defendant's Exhibit No. 11         149
     Defendant's Exhibit No. 14         147
24   Defendant's Exhibit No. 31         181

25                    - - -



                                    3



1            P R O C E E D I N G S

2

3            (Whereupon, the proceedings began at 8:44 a.m., on

4   Tuesday, September 27, 2005, in Judge's Chambers.)

5

6            THE COURT:  Let's start with the plaintiff here.

7   Have you had a chance to go through the proposed jury charge?

8            MR. DELANEY:  Yes, I have.  Page 3 under substantive

9    principles --

10            THE COURT:  Page 3.

11            MR. DELANEY:  Page 3 under substantive principles

12    the two paragraphs at the bottom I think are both unnecessarily

13    confusing.  There is no issue about whether a tax applies to

14    this gift or not.  Why do we need to confuse the jury with

15    issues about the $625,000 tax credit, that lifetime exemption.

16    May have been the $30,000 of this gift was taxable to Mr.

17    Smith.

18            THE COURT:  In other words, it's correct as a matter

19    of academic background, but the jury doesn't need to know it?

20            MR. DELANEY:  No.

21            THE COURT:  Why does the jury need to know it as a

22    practical matter?

23            MR. DALE:  I think it corrects any potential

24    prejudice that may result from the assumption somehow the gift

25    tax is so onerous -- in fact we had to strike one juror for

4

1    that very ground, maybe to give somebody a birthday present.

2   This just prevents that kind of thing from happening.  I even

3   think there were some insinuations in Cullen's direct

4   examination that somehow the process of complying with the gift

5   tax laws is onerous.

6            THE COURT:  Put it this way.  The portion under

7   substantive principles you're talking about is a correct

8   statement of the law, isn't it?

9            MR. DELANEY:  I don't believe it is.  I guess it is

10  if the total value of the gifts exceeds $625,000 in a lifetime.

11  This is nothing more than an attempt to pump up the numbers

12  here for these people.  You could accomplish this same thing by

13  simply saying I'm telling you this gift tax applies to this

14  type of gift, it doesn't apply to all types of gifts.  I said

15  that to them in the opening, I'll say it to them in the

16  closing.

17           THE COURT:  Put it this way, they already know what

18  the amount of the gifts are.  As long as it's substantively

19  correct, it's not misleading, I'm going to give it.  What else?

20           MR. DELANEY:  Page 4, under the italicized portion

21  on page 4 you have included, I think this is my suggestion,

22  that the question for them, the sole issue is to value the one

23  percent limited partnership interest.  That's in the first

24  italicized paragraph.  Is that the way we will go?

25      THE COURT:  No.  Depends on what you mean.  In other

5

1  words, are we going to use the breakdown of the government in

2  their special interrogatories?

3      MR. DELANEY:  Yes.

4      THE COURT:  Do you have your jury interrogatory form

5  handy.

6      (Discussion held off the record.)

7      THE COURT:  Let me ask you this question.  In the

8  interest of expediting this and making it easier for the jury,

9  maybe even us -- if once the jury determines what the value of

10  a one percent limited partner interest is, why can't I do the

11  rest of the work and mold the verdict -- because it becomes a

12  question of pure mathematics after that, do you agree -- it

13  would be the consensus of everybody we make sure we get the

14  numbers right.  Once that piece of the puzzle comes in, the

15  rest of the pieces of the puzzle inextricably fall without any

16  discretion at all.

17      MR. COOPER:  I don't disagree it's mathematics at

18  that point.  The issue in the case is what was the value of the

19  gifts.  And gifts isn't one percent, gifts are 6.85 and other

20  percents.

21        THE COURT:  I quite agree with you on that.  There's

22  no dispute on that.  But once we know what the one percent

23  interest is and if we can all agree on the total amount of the

24  gift is 6.8, whatever else it is, it becomes for us a matter of

25  multiplication, rather than for the jury to go through a purely

6

1  mechanical exercise.  So my question, again, is what are we

2  losing by taking that burden off the jury and just doing it

3  ourselves?

4        MR. COOPER:  We provided in a special interrogatory

5  a specific methodology on how to get there.  I would agree with

6  you that we could put in another step that says divide it, just

7  the converse of what you're suggesting, to get to the one

8  percent interest.  As you indicated, it's helpful to have the

9  methodology on how to get there because experts use a specific

10  way how to get to a value.  We're trying to lay out both

11  expert's methodology how to get there.

file:///A|/SMITHDY2.TXT

12          THE COURT:  What was the change in your verdict

13  form, if I may inquire?

14          MR. COOPER:  It was after you calculated lack of

15  control discount, that gives you the dollar value you have to

16  reduce by that instance.  You come up with the fair market

17  value after the lack of control.  Then you calculate the lack

18  of marketability discount, which is a reduction.  Then you have

19  to subtract the dollar reduction from the fair market value

20  after the lack of control.  Because, as Mr. Pashke already

21  testified, it's a cumulative calculation.

22          MR. DALE:  We actually had the most recent one.  The

23  change we made was just we had accidentally said you multiply

24  the value by the discounts to get the answer.  Actually, you

25  multiply the value by that which was not discounted.


                                    7


1           MR. DELANEY:  All of which is purely mathematics, if

2   you know the value of one percent.  I would even suggest,

3   judge, if there's any hint that somebody might think one

4   percent less than six times -- six times that number, we could

5   caution them.  Look, when you tell us one percent, it's going

file:///A|/SMITHDY2.TXT

6    to be the same, we're just going to do the math for you.  It

7    doesn't matter.

8           THE COURT:  In reaching one percent, they are still

9    having to crank in this percentage -- they are still going to

10   have to do the reduction for lack of control and marketability

11   discounts.  But we'll never see that.

12          MR. DELANEY:  Right.  All you're going to be able to

13   do is analyze what that is by your math, you can calculate what

14   the discount was after they give you the number.

15          THE COURT:  All right, here's my final point.  That

16   is all well and good, the jury is going to have to know how to

17   do that.  They're going to forget unless it's clearly spelled

18   out in the charge, which I intend to give them, by the way, to

19   help them follow along.  How can I insure that they're going to

20   know what the proper steps are?

21          MR. DELANEY:  I don't know there are proper steps.

22   They are to come up with a value.  That's all.  There is no law

23   that says the finder of fact must follow this particular method

24   in coming to a number.  In fact, Revenue Ruling 59-60 says

25   there is no formula for establishing the value of a gift.  This

1   is the type of work that Mr. Pashke does, there's no question

2   Mr. Burns does it.  But it doesn't necessarily have to have the

3   work of the fact finder.  The fact finder listens to the

4   circumstances, says here's the value of that gift.

5          THE COURT:  Look at it from a macro sense listening

6   to the experts.

7          MR. DELANEY:  Yes.

8          THE COURT:  I tend to agree with that.  I'm going to

9   simplify this thing for the jury.  We'll get to the verdict

10   form, but it's going to be a shorter form, we'll do the work.

11          MR. DALE:  How do we protect against mathematical

12   error which may occur.  All the evidence we're going to have

13   indicates this is the process you go through.  Now, if the jury

14   is back there -- literally coming up with an incorrect verdict

15   simply because there was a mathematical error --

16          THE COURT:  That's true of any jury deliberations.

17   It is not essential for us to know the manner or method by with

18   the jury reaches its verdict in this or any other case.  It's

19   only essential they listen to the expert testimony and they

20   come in with a verdict.  We're going to mold the verdict.  What

21  else?

22      MR. DELANEY:  Go to page 5, your Honor.  Page 5 and

23  page 6 -- take a look at page 5, one, two, three and the top of

24  page 6, the next paragraph, those are -- I'm sorry I'm getting

25  way ahead of myself.  On page 5, the first two paragraphs in

9

1  bold, I think go to this issue of asking them to do math.  You

2  perhaps already addressed that.  At the bottom of page 5 there

3  begins a discussion of your rulings with regard to Sections 7.3

4  and 7.5.  I would suggest leaving that out.  I'm not going to

5  argue anything about restrictions on alienability.  I'm not

6  going to argue that there's any impact of Section 7.3.  I'm not

7  asking that you send the Family Limited Partnership out for the

8  jury to examine.  So they might be confused.  Leave it out to

9  make it simple.  Our people haven't talked about 7.3,

10  installment notes on RFR or anything of that sort, why

11  introduce that information in this charge.  Again, unless you

12  want them to examine the Family Limited Partnership Agreement.

13      THE COURT:  Do you want it to go out with the jury?

14      MR. DALE:  I intend to ask the expert that up on the

15  stand right now about the Limited Partnership Agreement and

16  perhaps as part of that we submit it to the jury.

17      MR. DELANEY:  Instead of all of this nonsense, not

18  nonsense, all of this business --

19      THE COURT:  Freudian slip.

20      MR. DELANEY:  Yes, it was.  By telling them the

21  court's rulings, let's redact the information and just tell

22  them there are certain things we had to take out, we all agreed

23  to take them out.  If it's going out with the jury, then to

24  caution them not to worry about those things.

25      MR. DALE:  The problem is your expert did two


                                10


1  valuations, one including right of first refusal provisions,

2  then he gives an opinion as to what if these restrictions are

3  not included.  And you don't really have --

4      THE COURT:  I'm not going to let his expert testify

5  to that other point, that's out of the case.

6      MR. DELANEY:  He never said what his other value was

7  of the Smith Limited Partnership.

8      MR. COOPER:  Goes directly to methodology for

9    reducing.  If that includes analysis.

10    MR. DALE:  In fact, the methodology he used, he came

11    out with the numbers that Mr. Delaney was talking about, wants

12    to talk to the jury, he was relying on that methodology, on the

13    language of the partnership agreement, that included these

14    restrictions.  I have to demonstrate now that's what he did.

15    Those don't count anymore.

16    MR. DELANEY:  You open that door, I think the door

17    is open with regard to restrictions.

18    THE COURT:  Hang on a second.  When the taxpayer

19    through Pashke made its pitch to the IRS, was the figure that

20    he was proposing to the Commissioner, did it include a

21    reduction based upon those factors which I have now ruled don't

22    apply?

23    MR. DELANEY:  Yes.  And then he prepared an amended

24    report after he heard about the 2703 and all that business.

25    THE COURT:  Which he considered it without those


11


1    factors, is that right?

2    MR. DELANEY:  Yes.  What he testified to here was

3    that he did the calculation without consideration of a

4    buy-sell.  In fact to my disadvantage, not just the price

5    issues of buy-sell, he took all the buy-sell out.  And that's

6    what his testimony has been.  Here's the number.

7         MR. DALE:  QMDM model in his report, that says I

8    considered these restrictions.  Then comes out with a number.

9    You put him up on the stand and he testified to the number.  I

10   have to demonstrate that part of that was relying on

11   restrictions that he's not supposed to rely on.  At least they

12   were in the report.

13        THE COURT:  Do you mean the 70 percent discount?

14        MR. DALE:  Yes.

15        MR. DELANEY:  Okay.

16        THE COURT:  We're going to leave that in.

17        MR. DELANEY:  I would still suggest to you certain

18   things that can be taken out, that you don't need to get into

19   all of this about the court's rulings, we can redact it.  And

20   the judge could say to them, look, if you have to look at the

21   agreement, I'm still not sure they have to look at, even if you

22   want to cross him on that, you have to look at the agreement,

23   if you see things that are redacted, don't worry about it,

24   everybody agrees those are irrelevant issues that should not be

25  considered.


                                12


1        THE COURT:  Is anybody going to move to have this go

2  out with the jury?  If nobody is going to have this go out with

3  the jury, that's what I need to know.

4        MR. DALE:  I am going to elicit testimony as to the

5  nature of these restrictions.  I'm going to say these

6  restrictions were included in the valuation that Mr. Pashke

7  came up with and I'm going to somehow say -- I want him to say

8  if you take out these restrictions --

9        THE COURT:  I'm giving the charge.  If you're going

10  to offer that, then it seems to me this charge eliminates any

11  possibility, based upon what the jurors hear out there, that

12  they may in any way rely on that language, that's already been

13  removed.  But now as the first part.  The method of

14  calculation.  What is really wrong with that --

15        MR. DELANEY:  Here's my point.  Two questions, first

16  you determine the net asset value of the Smith Family Limited

17  Partnership.  So the issue of the 5.2 is up in the air.  It's

18  an issue for them to decide, right?

19          MR. COOPER:  Yes.

20          MR. DELANEY:  I thought we weren't allowing anything

21  other than 5.2 for net asset value.  So if Sandy Smith gets on

22  and says it ain't 5.2, it's something a lot less than that,

23  these ships weren't worth that much, can he say that?

24          MR. COOPER:  I think the court ruled he can say

25  whatever he wants is the issue here, but it was an expert in


                                13


1  his methodology, he couldn't shift off of that.

2          MR. DALE:  Except that wasn't submitted to the

3  Commissioner.

4          MR. COOPER:  We still object to your ruling,

5  don't get me wrong.

6          THE COURT:  I won't get you wrong.

7          MR. COOPER:  That's the ruling.  I'd like to bring

8  up another issue, too, about that testimony?

9          THE COURT:  You can bring it up when I switch over

10  to you.

11          MR. DELANEY:  You have to be careful, judge, are you

12  ready to decide how you're going to set up your verdict slip.

13        THE COURT:  Is Sandy Smith going to testify, if I

14  let him, that the net asset value of his business was less than

15  $5.2 million?

16        MR. DELANEY:  I didn't intend to have him testify to

17  that.  I intended to have him testify to what the value of the

18  one percent interest in the Smith Family Limited Partnership.

19        MR. COOPER:  How does he do that?

20        MR. DELANEY:  He's an owner, ask him.

21        THE COURT:  Here's my ruling, maybe this is going to

22  clear this up.  The ruling is that insofar, I would not let the

23  expert, your expert come in and utilize a different method of

24  calculation insofar as the net asset issue is concerned.

25  That's number one.  You then yesterday said, well, I did that


                                    14


1  under the Variance Doctrine, because the Commissioner never had

2  a chance to challenge it.  You then said let my guy come in and

3  testify to value as the owner.  I said he can testify on

4  discount because that was in play before the Commissioner.

5  Frankly, this is where I likely see this coming out.  I'm not

6  going to let you, through your guy or anybody else, attack the

7  net asset value of the company because that issue was -- that

8  issue was for all practical purposes conceded before the

9  Commissioner.  But I am going to let you weigh in on discount.

10  Now, here's a nuance point, here is the other point.  That

11  having been said, the question is is a jury bound by what they

12  hear on the $5.2 million, that's an entirely separate issue.

13        MR. DELANEY:  I don't think they are.

14        THE COURT:  Do you think they are, does the

15  government?

16        MR. DALE:  Probably not.

17        THE COURT:  Probably not.  I think for me to charge

18  this jury or for that matter any jury on the issue, that would

19  be like me jumping right into the jury box, I don't think I'm

20  supposed to do that.  I think the jury charge, the way it's set

21  up is right, at least on that point.  What did you want to say?

22        MR. COOPER:  I would like to raise a point as to lay

23  person opinion.  The cases he raises talk about the business,

24  talk about lay person because of his experience within the

25  business, the working entity, he could give a lay opinion as to

15

1  value of the business.  Now, how does that translate into him

2  being able to give a discount.  There's two separate issues,

3  what is value and what is discount, how does that lay

4  background give the reliability to translate into him being

5  able to give an opinion about a discount on marketability or

6  whatever the discount may be.

7        MR. DELANEY:  There's a misunderstanding of

8  discount.  Discount merely means what the value is as compared

9  to proportionate share from the value of a hundred percent.

10  That's all discount means.  They're assigning such importance

11  to discount that it's somehow sacred.  Is it not.  It is the

12  value.

13        THE COURT:  My view of it is this.  An owner can

14  weigh in on the value of a simple company, the owner can weigh

15  in on the value of a more complex company, whose value arguably

16  is more difficult to determine.  His opinion in either case is

17  entitled to more or less weight, depending on what he's dealing

18  with.  Implicitly you're asking me to revisit my ruling, I'm

19  not going to do it.

20        MR. DALE:  We did talk about a foundational issue I

21  want to raise.  There likely will be another objection to this

22  point on foundation.  You have to value an interest on a given

23  date.  January 5th and December 31st.  So presumably the lay

24  opinion exception to testifying as to value would require that

25  that person be an owner or officer as of the date of valuation.


16


1  They would be testifying as to their knowledge at that time.

2  Anything that happens afterwards --

3        THE COURT:  As triggering requirement for the rule?

4        MR. DELANEY:  He needs to be an owner, he needs to

5  know in the courtroom today he was an owner.  He doesn't need

6  to know back then he was an owner.  I question the point

7  they're trying to raise is Sandy didn't know the gift was made

8  until after the January gift occurred, his dad said to him I

9  gave you a little piece of the company.  So can he today,

10  knowing he's an owner in January, opine today what the value

11  was back on January 5th, I would say of course he can.

12        MR. DALE:  I would say he cannot.

13        THE COURT:  I'll rule on it right now, he can.

14        MR. DELANEY:  If you go to --

15        THE COURT:  Hang on one second.  Back on page 5.

16  The method for calculation.  I'm going to give that charge, I

17  don't see there's anything wrong with it, it's correct.  Okay.

18  Keep going.

19      MR. DELANEY:  I'm all the way up to 10, your Honor.

20  This is a pretty standard charge on circumstantial evidence.

21  I'm not sure that's applicable here.

22      THE COURT:  Let me think about it.  I can't think of

23  anything, can you fellows?  I have no strong feeling on this

24  one way or the other, it's just a standard charge, we threw it

25  in.  I don't think this is a circumstantial case.  But if


                                17


1  anybody wants it in and there's a good reason, I'll be happy to

2  keep it in.

3      MR. DALE:  I think there is circumstantial evidence.

4  When we're talking about what the experts rely on, they rely on

5  things that aren't directly applicable to the value of the

6  Smith Limited Partnership interest.  It's by analogy.

7      MR. DELANEY:  The example which you use about

8  circumstantial evidence and the raincoat, I'm just trying to

9  shorten this.

10          THE COURT:  I don't think it applies, I'm going to

11   take it out, it's just confusing to the jury.  This is a tax

12   case.  What else?

13          MR. DELANEY:  That's it for me, judge.

14          THE COURT:  How about the government?

15          MR. DALE:  I only had two things.  One is we sort of

16   talked about the one percent versus value of the actual gift

17   that was made.  I assume that the court has already informed

18   the jury that we'll decide accordingly.

19          THE COURT:  What we will do is we'll get the one

20   percent value and then we will do the math.

21          MR. DALE:  The only thing about that, there is a

22   factual assumption that's made.  A factual assumption that the

23   one percent interest or the gift of six percent, for example,

24   is equal to a one percent interest times six.  Now, I think

25   from my knowledge that is true, but --


                                18


1          THE COURT:  You should be darn sure it's true.

2          MR. DALE:  I haven't stipulated to it, I would like

3   to talk about it.

4          MR. DELANEY:  I would suggest that the court can

5   even say something to them.  We know this wasn't a one percent

6   gift, we're saving you the math.  If you tell us what one

7   percent is, we'll calculate out what the six percent gift

8   should be.

9          THE COURT:  So your concern is it's going to confuse

10   the jury if they've been hearing about 6.8, what the percentage

11   of the gift is, we would simply ask what one percent is without

12   telling them we're going to relieve them of the burden of doing

13   the math.  Or is the concern more fundamental than that?

14          MR. DALE:  Something a little more than that,

15   something related to that that the instructions that will be

16   the math that we'll be doing imbued with a certain factual

17   determination.  I don't know if it's, for example, for a lack

18   of control discount, that if you have a 49 percent interest

19   that you can exert the same amount of control as the one

20   percent interest.  So, therefore, you just multiply by 49.  I

21   think that's true from, I think that's the way that experts

22   were working.  But I don't know as a matter of fact that that's

23   certain.  There is something intuitive to me that doesn't make

24   sense about that.

25          THE COURT:  Wasn't the way that was set up in the

file:///A|/SMITHDY2.TXT

19

1   proposed special interrogatories, wouldn't the jury ultimately

2   have to perform that multiplicative step?

3        MR. DALE:  The way it was set out in the special

4   interrogatories was you reduce the asset value down to the

5   percentage of asset value that represents the gifts.  And then

6   you take your discounts from that.  The expert is opining as to

7   the discount to be applied to the gifts.  So I feel comfortable

8   saying we can discount that gift by five percent for lack of

9   control or 20 percent for marketability.

10       MR. COOPER:  Let me pose this question.  Because the

11   experts are actually in agreement on certain marketability, how

12   do they actually, if we just come up with a number, break out

13   in their deliberations the way the evidence is, okay, they'd

14   agree here -- this is where they fight, let's talk about it.

15   It gives them a fundamental way to look at how they come up

16   with a number.  That's the way this case has been presented,

17   they either agree or don't agree here, how does that affect the

18   analysis.  They need to have some kind of methodology to be

19   able to consider that evidence.

20      THE COURT:  I tell them in my charge, I'm sure I

21   tell them, this is in my charge, it's part of my standard

22   insofar as expert testimony is concerned, they may accept it or

23   they may reject it, just as they may the testimony of any other

24   lay witness.  And the testimony of an expert witness for them

25   need only be as good as the factual predicates upon which they


20


1   find the expert relied.  The fact that it happens to be a tax

2   as opposed to an Internet sex case, it might be a little

3   tougher for the jury, the same approach is taken, that doesn't

4   concern me.  Getting back to your point how do you want to

5   resolve this, he raises and it's not an unfair point, I want to

6   make darn sure we're right on this.

7      MR. DELANEY:  I think, for example, I know that

8   Pashke, who wrote his report as of one percent, I didn't hear

9   any criticism from Mr. Burns in that regard.  I think that it

10   is simple multiplication.  There are scenarios in which it can

11   get complex when you get near a percent, there is a variety of

12   other players, control issues, we're at 6 percent and 13

13   percent.  And I would suggest that the court simply say look,

14  don't assume just because its one percent, it's going to be

15  different than one times six, we'll do the math.  You tell us

16  one percent, we're going to multiply it out for the gifts.

17       THE COURT:  You guys talk about it and then if you

18  can agree on something, fine.  I tend to think that's the best

19  way to go.  What else, do you have anything on the charge, is

20  that it?

21       MR. DALE:  The only other thing that I had was

22  regarding -- regarding the verdict for the plaintiff.  I don't

23  have a specific suggestion, it's on page nine, first two

24  sentences of that are correct.  I'm sorry, the first two

25  sentences in the third paragraph in italics is correct.  Then

21

1  the third sentence is "therefore, if after considering all of

2  the evidence, you feel persuaded that it is more probable than

3  not that the fair market value of the limited partnership

4  interest is less than the Commissioner's valuation, your

5  verdict must be for the plaintiff."  that also is true.  But I

6  don't know if -- I hope that at that point in time they don't

7  go, okay, well what are the plaintiffs saying -- I think maybe

8  the next step is to calculate the amount of damages to be

9  awarded.

10         THE COURT:  With all respect, I guess I'm missing

11  your point.  As a matter of fact, whose charge is this?

12         MR. DELANEY:  It's mine.  This is just the burden of

13  proof.

14         THE COURT:  I think it's an accurate statement, I

15  can't see possibly how they're going to get confused by that.

16  So, this is where we are.  Absent some earth shattering

17  revelation, my present inclination is to give the interrogatory

18  as submitted by the plaintiff to the jury and we will do that

19  one percent math.  If I am not sufficiently convinced that the

20  multiplication which we're going to be doing is going to

21  produce a correct result, in other words, if I become convinced

22  that your concern is legitimate, we're going to have to go back

23  to the drawing board, I'm not going to go through this whole

24  trial only to have this thing be bounced on an issue like that.

25  Why don't you ask Mr. Burns what he thinks.


                                22


1          MR. DALE:  I think Mr. Burns would agree.  I think

file:///A|/SMITHDY2.TXT

2  in the expert community this is how they traditionally in this

3  circumstance, I think that there would be agreement in the

4  expert community.  In the same way you were arguing before, the

5  jury can disregard when an expert opines, I think this is the

6  same thing, the jury could disregard and say I don't think that

7  you can just multiply it by six.

8        THE COURT:  If it's true, then the jury could say

9  the earth is flat.  There's just certain things -- ask your

10  guy.  Based upon what you've told me, I think it's likely he's

11  going to say yeah, that works.  In which case we're off that

12  rock and a hard place.  So who's on the stand, I've lost track

13  here?

14        MR. DELANEY:  Pashke on cross.

15        THE COURT:  Are you winding down with him, getting

16  close?

17        MR. DALE:  I'm probably going to be 10 to 15 minutes

18  away from completing Mr. Pashke.

19        THE COURT:  Then who do we have?

20        MR. DELANEY:  Sandy Smith.

21        THE COURT:  Will he be an hour on direct?

22        MR. DELANEY:  I don't think he's an hour.  I'll move

23  very fast.

24      THE COURT:  How about your expert, how long do you

25  figure?


                              23


1       MR. COOPER:  On direct I think we'll do him in 35

2  minutes.

3       THE COURT:  So we're getting pretty close to

4  cleaning the deck here.

5       MR. COOPER:  May I raise an issue on Sandy Smith.  I

6  think there's another basis, I'm troubled about him coming in

7  here in the last minute and talking about it.  That's one of

8  the reasons we proposed written discovery to them.  We asked

9  them how did the value, that controlling value in ENC stock

10  change from December '97 to '98.  They tell us the controlling

11  interest is what is set forth in Pashke's report, in response

12  to Interrogatory five and six.  They say it's the same on the

13  next dates.  Sidney Smith verifies this.  So he's now going to

14  be able to implicitly say, well, the discount is something

15  less, shouldn't they have told us that the net asset value is

16  not that because Sidney Smith has got this discount.  We don't

17  know how he's coming to a discount valuation.  Under Rule 37

18  they should have disclosed this to us, that he was going to

19  give an valuation or the testimony --

20      THE COURT:  You're basically claiming surprise or

21  prejudice?

22      MR. COOPER:  Under Rule 37 it wasn't disclosed.

23      MR. DELANEY:  What's the question, we were never

24  asked, Sandy Smith was deposed, you never asked if he had any

25  opinion about this.  He was described in the initial


24


1  disclosures as having information on the financial, the assets

2  of the operation, the conditions of the underlying asset.  And

3  that he was a limited partner and general partner in the

4  limited partnership, nobody ever asked him do you have an

5  opinion about what this value is.  That question doesn't ask

6  about opinion, does anybody hold an opinion.  I went back and

7  looked at all this.

8      THE COURT:  I don't see any prejudice.  You had a

9  crack at him at deposition, I just don't see any prejudice

10  here.  The question could have been asked.  All right, let's

11  get out there and get going.

12          (Whereupon, at 9:27 a.m., the proceedings recessed

13  in Judge's Chambers; and at 9:32 a.m., reconvened in

14  Courtroom C.)

15          THE COURT:  All right, sir, you can resume the

16  stand.

17          (Continued - CROSS-EXAMINATION)

18  BY MR. DALE:

19  Q.    Mr. Pashke, we had been talking yesterday about the value

20  of a minority interest in the Smith Family Limited Partnership,

21  is that right?

22  A.    That's correct.

23  Q.    I think I put up a chart -- absent the item I just

24  crossed off.  I think we agreed that the United States' expert

25  was not asked to re-examine your net asset, your $5.2 million


25


1  net asset value, is that right?

2  A.    That's my understanding, yes.

3  Q.    If that figure is correct, then you and the United

4  States' expert then are in agreement on the adjustments to

5   December 31, 1998, is that right?

6   A.   That's my understanding.

7   Q.   We agree that once you obtain a net asset value, then you

8   calculate a lack of control discount?

9   A.   That's correct.

10  Q.   And both you and the United States' expert agree that the

11  best way to do that is to look at closed-end fund averages?

12  A.   That's the approach that we chose, yes.

13  Q.   And you and the United States' expert came up with

14  control discounts that were pretty close to one another, is

15  that right?

16  A.   That's correct.

17  Q.   So the real difference between you and the United States'

18  expert relates to the appropriate discount for lack of

19  marketability on each of the valuation cases, is that right?

20  A.   That's correct.

21  Q.   And for calculating the appropriate discount for lack of

22  marketability, you used a model called QMDM?

23  A.   I looked at the QMDM -- and utilized it, that was not my

24  final decision.

25  Q.   We'll get to that.  This QMDM, that is something that you

1   learned about three months or so before -- for the first time,

2   at least before undertaking this assignment?

3   A.   Around six, but in that same area.

4   Q.   In the same year, about the same month?

5   A.   That's correct.

6   Q.   Do you recall the month in which you took the seminar

7   where you learned about the QMDM?

8   A.   I'm pretty sure it was in March of that year.

9   Q.   Do you recall when you were first engaged to determine

10  this?

11  A.   It would have been in the fall, late summer, early fall

12  of '98.

13  Q.   Under the QMDM, you make various calculations and

14  assumptions to come up with the chart that we talked about?

15  A.   That's correct.

16  Q.   At the end, even assuming all the calculations and

17  assumptions that go into the chart are correct, you do have to

18  assume a holding period, is that right?

19  A.   That's correct.

20  Q.   And depending on what you assume for the holding period,

21  everything else is equal, the QMDM chart that you prepared

22  shows a marketability discount that reduces your value from

23  anywhere from 2 to 85 percent of net asset value?

24  A.    That was the range on that particular sheet of paper,

25  yes.


27

1  Q.    And that's a discount from the net asset value of 5.2 or

2  5.3 that we're talking about, less the control discount?

3  A.    That's correct.

4  Q.    And you assumed a 7 to 15-year holding period, is that

5  right?

6  A.    That's correct.

7  Q.    But there was nothing in the family limited partnership

8  agreement that imposes a required holding period, was there?

9  A.    Depends on how you view that.  For me, for my judgment,

10  the fact that a limited partner could not terminate the

11  agreement and the partnership agreement had a life of 50 years,

12  that has holding period implications.

13  Q.    But I mean if a hypothetical buyer of the Smith Family

14  Limited Partnership interest wanted to turn around and sell it

15  the next day, assuming he could find a buyer, he could, right?

16  A.    Theoretically, he could, yes.

17  Q.    There's nothing in the partnership agreement that said

18  you can't turn around and sell it?

19  A.    No, there's nothing that would prohibit that.

20  Q.    And I think before we left I handed you an article from

21  Mercer Capital, is that right?

22  A.    That's correct.

23  Q.    That's Christopher Mercer's firm, the guy who came up

24  with QMDM?

25  A.    That's correct.


                                    28


1  Q.    That article at some point discusses the application of

2  the QMDM to a hypothetical family limited partnership, is that

3  right?

4  A.    That's correct.

5  Q.    And, ironically, the name of that family limited

6  partnership was the Smith Family Limited Partnership?

7  A.    That's correct.  Which is not the Smith Family Limited

8  Partnership we're talking about in this proceeding.

9   Q.   We shouldn't assume that it refers to this Smith Family

10  Limited Partnership or any family limited partnership, it's

11  purely hypothetical, is that right?

12  A.   That's correct.

13  Q.   Now, I don't want to ask you whether that article is

14  correct or incorrect because I don't know that it's important,

15  but something struck me that I wanted to ask you about.  On

16  pages three and four, Mercer Capital came up with this QMDM,

17  they're relating the QMDM to the Smith Family Limited

18  Partnership.  And they say family dynamics indicates some

19  pressure for liquidity in about five years, is that right?

20  A.   I know they commented on that, let me see if I can find

21  that here -- it's on page three you said or page four?

22  Q.   I thought it was towards the end of page three, beginning

23  of page four?

24  A.   Yes, it's on the top of page four, the article comments

25  on that.


29


1   Q.   And they say family dynamics indicates some pressure for

2   liquidity in about five years, right?

3   A.   Yes, in this hypothetical partnership that's what the

4   article is saying.

5   Q.   And as a result of those family dynamics, they assume a

6   holding period of between three and seven years, is that right?

7   A.   That's correct, in this article.

8   Q.   Now, let me ask you this.  Did you interview Mr. Smith to

9   determine what the family dynamics were that might cause some

10  pressure for liquidity within one, two, three, four, five

11  years?

12  A.   I did not.

13  Q.   Did you interview Mr. Smith, III, to determine what the

14  family dynamics were that might cause some pressure for

15  liquidity within one, two, three, four, five years?

16  A.   I did not.

17  Q.   Did you interview Jill Smith to determine what the family

18  dynamics were, to see whether there would be some pressure for

19  liquidity within one, two, three, four, five years?

20  A.   I did not.

21  Q.   And under fair market value standards, don't we assume

22  that Mr. Smith in fact is not the hypothetical buyer; in other

23  words, we assume that the hypothetical buyer doesn't have the

24  characteristics of Mr. Smith, III, particularly, or Jill Smith

25  particularly, do we?


30


1  A.    That's correct, we're assuming hypothetical parties that

2  aren't the specific parties in this case.

3  Q.    I see.  But the model, at least in part, according to

4  Mercer Capital, requires you to look a little bit to the

5  specific family dynamics of the parties to the family limited

6  partnership?

7  A.    This particular article uses that as an example, yes.

8  Q.    Now, when you prepared your valuation, you had mentioned

9  this earlier, so I want to come back to it.  You eventually

10  came up with a range of discounts supplied by the model,

11  between 67 and 93 percent, right?

12  A.    Sixty-three and something, could I pull it out?

13  Q.    Absolutely.

14  A.    Yes, that's correct.

15  Q.    So it's correct the model that you prepared to determine

16  the range is between 67 and 93 percent?

17  A.    Yes, assuming that 7 to 15-year range of anticipated

18  holding period.

19  Q.    And, ultimately, you didn't select a value within the

20  range suggested by your model, did you?

21  A.    No, I did not.

22  Q.    You selected a value of 50 percent, is that right?

23  A.    Actually, it ended up being closer to 43 percent.

24  Q.    It ended up being closer to 43 percent?

25  A.    That's correct.


                                31


1  Q.    That's because?

2  A.    The combined discounts -- well, ended up being 43 percent

3  in the final analysis.

4  Q.    And that was taking out certain portions of the --

5  A.    That's correct.

6  Q.    Partnership agreement, that aren't pertinent to this

7  valuation?

8  A.    That's correct.

9  Q.    So at the end of the day you came up, is it fair to say,

10  then, your discount for lack of marketability is 43 percent?

11  A.    Yes.

12   Q.   On both dates?

13   A.   Yes.

14   Q.   And the only -- you would also agree that the 43 percent

15   would be the same on both dates?

16   A.   Yes.

17   Q.   And, typically, the discount for lack of marketability,

18   it doesn't vary with the valuation date, if the company is the

19   same, is that right?

20   A.   Well, again, it's a matter of judgment.

21   Q.   Okay.  And I want to do this then, if you were to

22   calculate a one-percent interest in the Smith Family Limited

23   Partnership using your numbers, how would you go about doing

24   that, would you take the one-percent first?

25   A.   That's the way I did it.


32


1   Q.   Okay.  But you could take the one-percent at the end if

2   you wanted?

3   A.   Sure.

4   Q.   So first you would take the net asset value and multiply

5   it about five percent, is that right?

6   A.   Yes.

7   Q.   The way you would do that is multiply it by .05?

8   A.   Yes.

9   Q.   All right.  Using your numbers, and then you come up with

10  a sort of an intermediate result?

11  A.   The residue, I guess, you have a calculated amount.

12  Q.   And I'm not going to do the math right now to see how we

13  would do that.  And then you would multiply that intermediate

14  amount by your discount for lack of marketability, if we assume

15  your discount is accurate, which is the 4.43?

16  A.   It's a little less than 4.43, but for illustration

17  purposes that's fine.

18  Q.   Okay, how much less?

19  A.   It's in between each periods.  It's in between 42 and 43

20  percent because of a multiplicity kind of a thing, it doesn't

21  come out perfect.  So it's somewhere between 42 and 43 percent.

22  But 43 percent for illustrative purposes is fine.  I can tell

23  you the number that I came up with for the final result.  You

24  can compare it.

25  Q.   But I think you told Mr. Delaney the final number you

33

1   came up with?

2   A.   That's correct, I said that, that's on the record.

3   Q.   I want to find out how you came up with that number, all

4   right.  And you're saying you can't multiply it by the number

5   here?

6   A.   Well, it's because of the way I addressed some of those

7   issues that the court addressed us to ignore in the partnership

8   agreement.  It's how I adjusted my original number which causes

9   this to happen.

10  Q.   How did you adjust your original number then?

11  A.   I basically adjusted my original number down seven

12  percent.  Combined discount by seven percent to both periods.

13  Q.   All right.  How did you come up with that seven percent

14  number?

15  A.   That was my assessment of the implications of the things

16  that we're not supposed to consider.

17  Q.   I think I can talk about what we weren't supposed to

18  consider, I think the jury will be aware that they're not

19  supposed to consider this.  I just want to see how you

20  calculated your adjustment if that's all right.

21       THE COURT:  Let me see you at side bar.

22        (At side bar on the record.)

23        THE COURT:  For my own benefit, his original

24  marketability was 50 percent based upon those factors, seven

25  percent on those factors no longer in play, is that right?


34


1        MR. DALE:  Right.

2        THE COURT:  You simply want to find out the reason

3  or the methodology of him moving from 50 to 43, is that right?

4        MR. DALE:  Correct.  That is largely dependent on

5  the nature of the restrictions, that was his analysis.

6        MR. DELANEY:  This is, I can't say necessarily

7  prejudicial, it's just a waste of time.  He's come up with a

8  number.

9        THE COURT:  You know what the 43 is.  Seven

10  percent -- it's not in play, why tilt at a windmill that's not

11  standing -- it's 43 percent, that's what we're here about right

12  now.

13        MR. DALE:  I can't figure out how he came up with

14  that number.

15        THE COURT:  Ask him how did come up with the 43

16  percent number.

17          MR. DALE:  Maybe I'll do that.

18          THE COURT:  Look it, every now and then I rethink

19  something I just did.  I think you are entitled to this

20  witness's methodology from just every angle.  On further

21  reflection, you can ask him why the seven-percent slide, rather

22  than 10 percent or 12 percent, because it goes to his

23  methodology.

24          MR. DALE:  Thank you, your Honor.

25          (End of discussion at side bar.)


                            35


1  BY MR. DALE:

2  Q.   I think before we had our little side bar there, I

3  apologize for the interruption, we were talking about you had

4  come down to 43 percent, between 42 and 43 percent somewhere,

5  instead of a 50-percent discount?

6  A.   Well, what I'm actually doing is trying to back into

7  this.  It's why I made my adjustment, I had my combined

8  discount, which I calculated there originally.  I reduced that

9  by seven percent to both periods.  So trying to do what you're

10  asking me to do here, I have to kind of reverse the math in

11  order to get back into that.

12  Q.   And I guess, well, what we're talking about here is that

13  originally you had valued the family limited partnership

14  agreement subject to certain restrictions on transfer that the

15  parties had negotiated, is that right?

16  A.   Well, certain restrictions that were part of the family

17  limited partnership agreement, yes.

18  Q.   In this case sometimes those restrictions are called

19  rights of first refusal, is that right?

20  A.   That's my understanding, yes.

21  Q.   And in this case when we're valuing this for gift tax

22  purposes, we're not supposed to consider those rights of first

23  refusal, are we?

24  A.   That's what I was asked to do, was to ignore those

25  provisions.

36

1  Q.   Now, the provisions required a limited partner, if he

2  wished to sell the interest -- before I even get into that,

3  was there a particular methodology that you used to come to the

4   seven percent?

5   A.   Well, I used, again, going back to my original

6   calculation for the common stock interest, I came up with a

7   combined discount of 44 percent.  When I looked at the limited

8   partnership interest, it appears to be less attractive to me

9   than even a one-percent share in the common stock.  Because

10  I've got a company now inside another entity with still some

11  conditional restrictions that even a minority interest holder

12  in common stock does not have.  So I looked at 44 and a half,

13  excuse me, 44, combined that with the methodology, I used a

14  different approach on -- excuse me, on the minority discount

15  and lack of control discount.  But I had a combination of 44

16  using it that way.  So I knew it should be higher.  What I

17  ended up doing is ended up coming up with 45 and a half percent

18  to that relationship in January of '98, and 48 percent at the

19  combined discount in December of '98.

20  Q.   So, you just adjusted the number back to somewhere close

21  to what your valuation of a one-percent interest in Erie

22  Navigation was?

23  A.   Yes, I had that as a benchmark for me.

24  Q.   You assumed your first one must have been right, we'll

25  adjust it back?

37

1  A.    Well, we had a relatively unattractive asset, even if it

2  had not been put in the family limited partnership, so I had

3  that as my base of reference.  So if all the gifts would have

4  been family stock, it would have been in that 44 percent range.

5  Q.    All right.  Now, if the right of first refusal then were

6  to impact the value by more than seven percent, maybe your

7  first valuation could have been wrong?

8  A.    Well, again, this is, I think, a judgment call, an

9  assessment of those.  There's lots of restrictions, lots of

10  implications.  I think it's impossible to isolate every

11  particular one and put a final number on it.

12  Q.    Okay.  Well, you did review these restrictions, didn't

13  you?

14  A.    Yes.

15  Q.    And the restrictions said that if a limited partner, if

16  they wanted to sell their interest, they had to first offer it

17  to the partnership, is that right?

18  A.    That's correct.

19  Q.   And then to the other partners, is that right?

20  A.   That's correct.

21  Q.   And I'll call that provision the right of first refusal,

22  if that's okay?

23  A.   That's fine.

24  Q.   So if the partnership or he other partners, then, didn't

25  exercise their right of first refusal, meaning that they didn't


38


1   choose to buy the partnership interest from the partner who

2   wanted to sell, then that partner who wanted to sell could go

3   ahead and sell it to somebody else, to a third party, is that

4   right?

5   A.   That's correct.

6   Q.   But even then the other partners who stay or the

7   partnership, they get another opportunity, they get another

8   opportunity to buy the interest back from the third party, is

9   that right?

10  A.   That's correct.

11  Q.   And these provisions are contained in Section 7.3 and 7.5

12  of the partnership agreement, is that right?

13    A.    Well, I don't have that in front of me, but that sounds

14    right.  I have no reason to doubt that.

15    Q.    Okay.  You quoted these right of first refusal provisions

16    at length in your original valuation, correct?

17    A.    Yes, I went through, basically, a lot of the partnership

18    agreement talking about the implications of different elements

19    of the partnership agreement.  The right of first refusal

20    section was a portion of that, yes.

21    Q.    Now, the right of first refusal provisions state that if

22    they so elect, the partnership or the partners can buy the

23    interests back from the guy who wants to sell by giving him a

24    promissory note, is that right?

25    A.    That's correct.


39


1    Q.    And what is a promissory note?

2    A.    Well, it's basically an obligation to pay.  If I bought

3    your house and I would say I don't have all the cash so I'm

4    going to give you a note for $150,000 I owe, I pay you

5    overtime.  It's a way, essentially, the seller didn't get to

6    liquidate his interests right away, he would have gotten to

7  sell it.  But he would have had to wait over a period of years

8  in order to receive the cash for the sale of his interests.

9  Q.    All right.  So a promissory note -- this is really lay

10  person's talk, it's kind of like an IOU?

11  A.    That's a reasonable way to say it.

12  Q.    So if I owe you a $1,000, I might give you a note that

13  says I promise to pay you the sum of $1,000?

14  A.    Yes.

15  Q.    And probably the repayment terms would be written into

16  the note?

17  A.    Yes.

18  Q.    Maybe they'll say I'll pay you every month or every year

19  for 15 years, for example?

20  A.    Yes.

21  Q.    And sometimes there's an interest rate to be paid on the

22  note, is that right?

23  A.    That's correct.

24  Q.    Maybe a thousand dollars at six-percent interest, for

25  example?

40

1  A.   That's an example, yes.

2  Q.   For 10 percent?

3  A.   Yes.

4  Q.   Now, if I'm giving you a $1,000 note and at six-percent

5  interest over 15 years, I'm going to end up paying you more

6  than $1,000, is that right, assuming I only make the minimum

7  payment required?

8  A.   Yes.

9  Q.   And if I'm giving you a thousand dollar note at

10  10-percent interest over 20 years, if I make the minimum

11  payment, I'm going to end up paying you more than on the

12  six-percent note, is that right?

13  A.   That's correct.

14  Q.   So, conversely, if you got two notes, one required to pay

15  you a six-percent interest and one required to pay you a

16  10-percent interest, all other things being equal, you're going

17  to receive more money on the 10-percent note than on the

18  six-percent note?

19  A.   That's correct.

20  Q.   So if you're going to lend somebody money, then, you

21  would rather get a 10-percent note of return than a six-percent

22  note?

23  A.   Yes.

24  Q.   The 10-percent note is worth more, it has greater present

25  value, is that right?

                                    41

1  A.   Yes.

2  Q.   Is there a way to calculate the difference in present

3  value between a 10-percent note and a six-percent note, let's

4  assume that the 10-percent is market rate, is there a way to

5  calculate the difference between the present value of a

6  six-percent note and a 10-percent note?

7  A.   Yes.

8  Q.   In the family limited partnership agreement, these

9  restrictions, this right of first refusal, they say that you

10  have to pay out -- they say that the partners who are

11  exercising their right of first refusal, can give the departing

12  partner a note, correct?

13  A.   That's correct.

14  Q.   And it specifies the repayment terms of that note?

15  A.   That's my understanding, yes.

16  Q.   If the party elects; in other words, if the partner who

17  is exercising the right of first refusal elects, they can pay

18  it out over 15 years?

19  A.   I believe that was the period, yes.

20  Q.   This would be true if they were buying it back even from

21  a third party, is that right?

22  A.   I don't recollect that.

23  Q.   Well, do you recollect if there was an interest rate

24  specified?

25  A.   Yes.


42


1  Q.   For the note?

2  A.   Yes.

3  Q.   And that interest rate was the applicable federal rate

4  for long-term debt instruments, is that right?

5  A.   Yes.

6  Q.   And that applicable federal rate, we'll call it the AFR

7  for short, that's the interest rate to be paid on this loan, is

8  that right?

9  A.   That's my recollection, yes.

10  Q.   And the interest rate that the federal government pays on

11  IOUs, I mean that's what it is, that's what the federal

12  government pays on its IOUs, it's similar notes that it issues

13  when it borrows money, is that right?

14  A.   That's my understanding, I know they're published rates.

15  Q.   All right.  But a rate where the federal government is

16  the borrower, that's a relatively risk-free note, isn't it?

17  A.   Yes.

18  Q.   And it's risk free because it's backed by the full faith

19  and credit of the United States government, is that right?

20  A.   That's my understanding, yes.

21  Q.   And contrary to perhaps the reports of the media, the

22  government is likely to be able to repay its notes for the

23  coming future?

24  A.   If not, we're all in trouble.

25  Q.   Right.  And an interest rate on that note is related to


43


1  risk, is that right, the interest rate is related to risk?

2  A.   Typically, yes.

3  Q.   The riskier the note, the higher interest rate that would

4  be negotiated by a hypothetical lender and borrower?

5   A.   Typically.

6   Q.   And in December of 1998, the applicable federal rate was

7   6.13 percent, is that right?

8   A.   I don't recollect that.

9   Q.   Do you recollect what Erie Navigation Company was

10   borrowing at in December of 1998?

11   A.   I do not.

12   Q.   Do you think that would be located within your report

13   anywhere?

14   A.   I would have to look back probably at the financial

15   statements to see what the current borrowing rate was.  But I

16   do not have those with me.

17   Q.   Let me give you a couple interest rates that we're going

18   to assume, all right?

19   A.   Yes.

20   Q.   Because I think you mentioned you could calculate the

21   present value if you had two interest rates, you could

22   calculate the present value, the difference in present value of

23   two notes, all other things being equal?

24   A.   Yes, that's possible.

25   Q.   I'd like you to assume a couple of interest rates.  All

44

1  right, let's assume that one note has an interest rate of 8.5

2  percent, and another note with the same terms over 15 years has

3  an interest rate of 6.13 percent?

4  A.   Okay.

5  Q.   And if the principal amount of the note is a thousand

6  dollars, are these calculations correct?

7  A.   Well, I have no way of knowing that.  I assume these are

8  fine.

9  Q.   You would have to use the amortization tables --

10  A.   Yes, I have no reason to dispute what you have here.

11  Q.   You're just eyeballing it, does it look okay?

12  A.   Well, yes, the eight-and-a-half one and they're higher,

13  so that looks okay.

14  Q.   Without regard to numbers, this methodology is correct.

15  You calculate the total payments received over 15 years, is

16  that right, you reduce that back to present value?

17  A.   Yes, that's what you're doing, yes.

18  Q.   Then you can come up with an implied discount between the

19  two notes?

20  A.   Yes, that's fine.

21  Q.   But these provisions that set the interest rate of the

22  note to be paid upon exercising the right of first refusal, if

23  you took those out of the partnership agreement, you determine

24  that that represents a seven-percent discount for lack of

25  marketability, isn't that right?


                                    45


1  A.   That's correct.  I made that judgment based upon all the

2  factors within the limited partnership agreement.  Again,

3  compared it to my analysis for the common stock.  And I also

4  had another basis of comparison to make that assessment.

5  Q.   Okay.  I just have a couple more things and I'll sit

6  down.  You were here from the beginning of the trial, weren't

7  you?

8  A.   Yes, I was here yesterday morning.

9  Q.   And you were here when Mr. Delaney got up and made his

10  opening statement and put the words fair market value up here?

11  A.   Yes.

12  Q.   And you're a person who I think is qualified to determine

13  fair market value of an business, is that right?

14  A.   Yes.

15  Q.   And so I want to talk to you about some of the things you

16  would rely upon in determining fair market value.  Now, I

17  notice -- were you here for Mr. Cullen's testimony?

18  A.   Yes, I was here since early yesterday morning up to the

19  time I testified.

20  Q.   I think Mr. Cullen was talking about some of the

21  processes you have to go through to submit a gift tax return

22  and all of that.  That doesn't impact the value of a business

23  interest being given, does it?

24  A.   I'm not sure I understand your question.

25  Q.   Well, when you value a business interest, that's of a

46

1  particular date, is that right?

2  A.   Yes.

3  Q.   On December -- in this case on January 5, 1998?

4  A.   I did my appraisal as of December 31st.

5  Q.   And then one as of December 31, 1998?

6  A.   Yes.

7  Q.   And if after that you knew that the whole business burned

8   down, it doesn't impact the valuation at that point in time,

9   does it?

10  A.   Typically, under fair market value you try to assess it

11  at that particular point in time, yes.

12  Q.   So you wouldn't consider that, hey, someone set fire to

13  the Smith Family Limited Partnership in 2000, to determine your

14  value in 1998?

15  A.   I wouldn't consider it, but there are other parties,

16  there have been court proceedings in which they have in fact

17  considered things that have happened post event.  For me, I

18  would only look at it as of the date that I was asked to do

19  that.

20  Q.   Let me ask you how does the thing burning down in 2000

21  impact the value in 1998?

22  A.   Well, if someone knew that and wanted to make an

23  assessment, if it was an ongoing business entity.  Just using

24  the example as you mentioned, I wouldn't use it, someone else

25  looking at that overall situation, the implication is that you

47

1   no longer have an ongoing business.  Let's say, I live in

2   Florida, I lived through two hurricanes last year in my area.

3   There were a lot of businesses that theoretically were worth a

4   reasonable amount of money, let's say, Labor Day of last year.

5   And four weeks later it would have been worth considerably

6   less.  But it was not an anticipated event.

7   Q.    You need an anticipated event, is that right?

8   A.    Yes, if you knew something was reasonable and likely, you

9   would consider it.

10  Q.    So you're looking at something at that point in time,

11  you're also forward looking at that point in time, where is

12  this business going?

13  A.    Well, sure, based upon the dynamics that are knowable at

14  the time, yes.

15  Q.    You don't know where it's going?

16  A.    No, to do that I would be a very wealthy man.

17  Q.    Let me ask you this.  Does it matter for the purpose of

18  the valuation of December 31, 1998, what the ultimate tax is

19  going to be paid on the gift of those shares?

20  A.    It wouldn't impact what I would do, no.

21  Q.    It wouldn't impact the value?

22  A.    No, because the company is not paying a gift tax anyways.

23  Q.    That's something that happens after?

24  A.   Exactly.

25  Q.   And if the donor that made the gift, it was somehow


48


1   difficult for him to deal with the IRS, that's got nothing to

2   do with the value of the gift?

3   A.   No, it has nothing to do at all.

4   Q.   Whatever, even if the rate of taxes was onerous or it's

5   not onerous, that has nothing to do with the value of the gift,

6   does it, that's something that happens after the fact, is that

7   right?

8   A.   That's correct.

9        MR. DALE:  If you could hold on for one minute, I

10  just have a question to ask my opposing counsel.  I have no

11  further questions.

12       THE COURT:  All right, Mr. Delaney.

13       MR. DELANEY:  Thank you, your Honor.

14            REDIRECT EXAMINATION

15  BY MR. DELANEY:

16  Q.   Mr. Pashke, yesterday and perhaps even today, Mr. Dale

17  suggested to you that or asked questions that seem to

18  insinuate, well, maybe there would be a sale of the company at

19  some point after our hypothetical buyer acquired a one-percent

20  interest in the Smith Family Limited Partnership, that's the

21  framework I want to talk about right now.  If you have a sale

22  that occurs a year, two years, three years, he even mentioned

23  five years, is there a distinction between fair market value --

24  I'm sorry, between net asset value because that's how you value

25  the underlying company, and the liquidation value?

49

1  A.    Yes.

2  Q.    Could you tell us what liquidation value means?

3  A.    Well, in general it's a different premise of value.  Fair

4  market value assumes the business would be ongoing.

5  Liquidation value means you would try to do a calculation to

6  say what would happen if we liquidated the company, how much

7  could we sell and realize from selling all the assets of the

8  organization.

9  Q.    And is liquidation value, how does it compare to net

10  asset value, is it higher or is it lower?

11  A.    Well, it would depend upon the result.  If you had net

12  asset value at a particular point in time.  With liquidation

13  value, you're trying to say how much of my inventory could I

14  sell, would I be able to sell what I paid for it, will I get

15  more for it or less for it, how long a period of time do I

16  think it would take me to sell it.  You look at specific

17  assets, the vehicles, the vessels, and when you think you could

18  sell those things, how long, if there were any closing costs

19  involved.  It's a whole different approach.  You typically

20  would need to probably bring in other experts that know about

21  liquidation values of certain kinds of assets.

22  Q.   Do you have to deduct from value the expenses of

23  liquidation?

24  A.   Yes.

25  Q.   For example, the commissions paid to people, brokers or

50

1  auctioneers who sell the assets?

2  A.   Yes, you would try to estimate what those commissions

3  would be and to deduct those.

4  Q.   Do you deduct the taxes that the company would have to

5  pay in turning its assets into cash?

6   A.   If you knew what all the assets were sold for and you

7   would know what the book value was, if there was a taxable

8   income as a result of that, yes, the corporation would have had

9   to have paid tax on that income.

10  Q.   Now, for Erie Navigation Company, when you looked at its

11  financial statements, was it a situation where they had lots of

12  new equipment or was the equipment old?

13  A.   I don't know that offhand here.  It's assumed they had a

14  mixture of both, but I don't recollect the details.

15  Q.   What about the ships, what do you remember about the age

16  of the ships?

17  A.   Well, I know that the ships themselves were older.

18  Q.   Do you know how much the ships had been depreciated?

19  A.   Well, I did that have that one exhibit I looked at

20  yesterday.

21  Q.   Do you remember what amount of tax you assumed would have

22  to be paid if the company were liquidated?

23  A.   Well, I've done a calculation of that.  I didn't use that

24  in my analysis.  But it would have been around $800,000.  It

25  would have -- I wrote the ships up by about two million, the

51

1    combined tax rate would have been approximately 40 percent, so

2    it would have been about $800,000.

3    Q.    Now, you've explained to us that when you looked at the

4    underlying asset, Erie Navigation Company, the whole company,

5    that you used net asset value?

6    A.    That's correct.

7    Q.    If I'm the hypothetical buyer of a one-percent interest

8    in the limited partnership, do I assume that net asset value

9    will always be the same as we move into the future?

10    A.    No, you would anticipate it would change somewhat.

11    Q.    If the assets, the underlying assets, the assets of Erie

12    Navigation are ones that are depreciating in value, what will

13    that do to the net asset value in the future for me, the

14    hypothetical buyer?

15    A.    Well, there's a combination of things there.  To the

16    degree that the assets are depreciating, the net asset value

17    would go down.  But the company, if they have some earnings,

18    those earnings would add to the net asset value.

19    Q.    What about debt, what does debt do to net asset value,

20    debt of Erie Navigation Company?

21  A.    Well, again, in the calculation of net asset value, you

22  start with all the assets that the company has.  And you reduce

23  that by the amount of debt or the liabilities that the company

24  has.

25  Q.    So what did that do to net asset value?


52


1  A.    It reduces it.

2  Q.    If the debt goes up, what happens, assuming that the

3  assets stay the same?

4  A.    The net asset value would go down.

5  Q.    Now, if I'm a hypothetical buyer in 1998 of a one-percent

6  family limited partnership and I'm an intelligent person, I

7  presume, yes?

8  A.    Well, that's the assumption with a hypothetical buyer and

9  seller.

10  Q.    Thank you, we now have on the record that I'm an

11  intelligent person.

12        THE COURT:  That's the hypothetical person.

13  BY MR. DELANEY:

14  Q.    If I'm aware that net asset value can fluctuate and that

15  debt can cause net asset value to go down, would I be inclined

16  to investigate what the cash flows were for Erie Navigation

17  Company to try and figure out, well, is this net asset value

18  going to stay the same, go up, go down?

19  A.    Well, cash flow is something you might want to take a

20  look at, yes.

21  Q.    Now, we've heard about earnings and, in fact, there was a

22  chart put on the screen that talked about earnings in each year

23  for the Erie Navigation Company, do you remember that?

24  A.    Yes, I do.

25  Q.    Are earnings the same as cash flow?


53


1  A.    No, they're different.

2  Q.    How are they different, what is cash flow really?

3  A.    Well, earnings are counting, is calculating typically

4  what we call accrual base accounting.  If I sell something, you

5  have a receivable, you don't have the cash yet, but you would

6  still calculate for purposes of the financial statements that

7  you've made a gain on that.  If you sold something and you sold

8  it for more than you paid for it, you would recognize the gain,

9   even though you hadn't collected the cash.

10   Q.   You're losing me, Mr. Pashke.  Let me ask a question.  If

11   I sell a product today, but I haven't gotten the purchase

12   price, I won't get it for another 30 days, when do I book the

13   sale, do I put it on today or do I wait until I get the cash

14   under the accrual method?

15   A.   Under the accrual method you would recognize it today.

16   Q.   Even if I didn't collect it until later on?

17   A.   That's correct.

18   Q.   Now, with cash flow, what does accounting do with cash

19   flow?

20   A.   Well, the cash flow statement, basically, go through the

21   methodology of dealing with all the changes that happened in

22   the cash from one period to the next.  The analogy might be

23   your checkbook.  If you go through all the changes that happen

24   with your checkbook over a period of time.

25   Q.   Am I correct that cash flow is the amount of money that


54


1   goes out and the amount of money that comes in?

2   A.   That's a good way of expressing it, yes.

3   Q.   In doing your analysis of Erie Navigation Company, did

4   you look at cash flow?

5   A.   Yes, I did.

6   Q.   Take a look, I think Mr. Dale put Exhibit 34 in front of

7   you, which is your analysis of Erie Navigation Company, do you

8   have that?

9   A.   I can get my copy, the exhibits aren't up here.

10   Q.   I'll show you first before I put it on the screen, what I

11   will represent to you is page C-5 from Exhibit 34, your

12   analysis of Erie Navigation Company, does that look familiar?

13   A.   Yes, it does.

14   Q.   All right.  What is it?

15   A.   It's the summary of the statements of cash flows for the

16   company for a five-year period.

17   Q.   If I could have it back, I'll put it on the screen.  Now,

18   am I correct that across the top you have different years for

19   Erie Navigation Company?

20   A.   That's correct.

21   Q.   Then you broke, as we go down and look all the way to the

22   left, you have the various categories or line items described,

23   is that correct?

24   A.   That's correct.

25  Q.   And then at the bottom you have cash at the beginning of

55

1  the year, cash at the end of the year, is that right?

2  A.   Yes.

3  Q.   And this tells us, am I correct, all of the expenses and

4  all of the payments that the company has to make during the

5  course of a year, is that right?

6  A.   It reflects not only the earnings to the company, but the

7  changes from all the other balance sheet items.  If it has to

8  borrow money or if it paid debt off or if it bought new ships,

9  new equipment, that's all reflected in cash flow.

10  Q.   So even if it goes to the bank and borrows money and

11  money comes in, that's reflected in the cash flow?

12  A.   Yes.

13  Q.   Let me see if I can zoom in a bit.  That first column

14  that reflects an amount where it says beginning of year and end

15  of year, see that first column, $1,219,000?

16  A.   Yes.

17  Q.   At the beginning of year -- the end of year, $140,000?

18  A.   Yes.

19    Q.    Does that reflect negative cash flow for that particular

20    year?

21    A.    Yes.  If you look at the number above that where it says

22    total cash flow.

23    Q.    If we could go to just the one line, that tells us money

24    in and money out.  When you use parenthesis, does that mean a

25    negative number?

56

1    A.    Yes.

2    Q.    So in 1993 Erie Navigation Company had what kind of cash

3    flow, money in, money out?

4    A.    They had a $1,078,000 negative cash flow.

5    Q.    Okay.  In 1994, which is the second figure, second

6    column, what kind of cash flow did the company have?

7    A.    They have a positive cash flow of $168,000.

8    Q.    Now, go up, you see the dark line that says "financing"?

9    A.    Yes.

10    Q.    Is there an indication of some transaction regarding

11    debt?

12    A.    Yes.

Q. What does that tell us?
A. Well, it tells us that the short-term bank debt increased by $450,000, which means they borrowed $450,000. They have a long-term borrowings of an additional $750,000.
Q. So in 1994 had there been no short-term borrowing of $450,000, what would the cash flow had been that year?
A. It would have been negative.
Q. Okay. Let me quickly take you across here -- I'm sorry, I can't use this screen because the page won't show up for the whole thing. I'm going to take this off the screen and hand it to you. We've talked about '93 being a negative cash flow. We talked about '94 being a positive cash flow, but that includes a bank loan; what about '95?

57

A. '95 has a negative cash flow of $46,690.
Q. What about '96?
A. '96 has a negative cash flow of $185,043.
Q. What about '97?
A. '97 has a positive cash flow of $335,465.
Q. Is there any new debt in '97?

7   A.   In '97 there was a new debt of $450,000, but payments of

8   $362,000.

9   Q.   All right.  And 1998 isn't on that chart, is it?

10   A.   No.

11   Q.   I'm going to show you what has previously been marked as

12   Plaintiff's Exhibit No. 7, I can tell you that we'll have Mr.

13   Smith authenticate that.  But could you tell us that that

14   purports to be?

15   A.   This is the financial statements for Erie Navigation

16   Company for the period 1997, 1998.

17   Q.   I want you go to the cash flow page for that period of

18   time?

19   A.   I have that.

20   Q.   What does it show in 1998 for cash flow?

21   A.   Negative cash flow of $6,042.

22   Q.   And here I am the hypothetical buyer in 1998, and I'm

23   thinking about investing some money in a one-percent limited

24   partnership interest and I know that the limited partnership

25   owns Erie Navigation Company.  If I investigate what the cash

58

1  flows have been, I know the net asset value seems to be $5.2

2  million, but I know what the cash flows are, what am I

3  thinking, what kind of impression would that hypothetical buyer

4  have do you think?

5  A.   Well, he or she would be concerned about the number of

6  periods where cash flow was negative.  And how that might

7  impact the future returns of the business.

8  Q.   The net asset value?

9  A.   Well, eventually that might get shown in there.  But the

10  cash flows would be something, the negative cash flows would be

11  something that typically would concern somebody.

12  Q.   Companies that have more money going out than coming in

13  in order to survive, what do they do?

14  A.   They got to borrow.

15  Q.   And borrowing drives down net asset value if the assets

16  are otherwise staying the same value?

17  A.   Yes.  But in that example, if you borrow $500,000, you

18  have cash of $500,000, then it's a debt.  They would have a

19  tendency to balance out.

20       MR. DELANEY:  Thank you.

21       THE COURT:  Do you have anything further, Mr. Dale?

22          MR. DALE:  I have just brief recross on that chart.

23                    RECROSS-EXAMINATION

24  BY MR. DALE:

25  Q.    This last thing we talked about, you mentioned that there


                              59


1  was a $6,000 negative cash flow in 1998, is that right?

2  A.    Yes, that's my recollection.

3  Q.    When would you know that total, when would you know for

4  certain the total of that?

5  A.    You would know that December 31st of 1998.

6  Q.    You wouldn't know it on January 5th?

7  A.    No.

8  Q.    If you were going to increase your cash reserves to cover

9  that cash flow shortage, you might have to borrow if you didn't

10  have enough money?

11  A.    Yes.

12  Q.    So in order to bring yourself back, you might have to

13  borrow $6,000, is that right?

14  A.    To get back to zero, yes.

15  Q.    That borrowing that $6,000 debt, might reduce your $5.2

16    million net by $6,000, is that right?

17    A.    I'm not sure I understand your question.

18    Q.    I think there was a suggestion that borrowing reduces net

19    asset value, is that right -- because net asset value is an

20    asset minus debt, right?

21    A.    Yes.

22    Q.    So if you increase debt, net asset value is decreased?

23    A.    All other things being equal.  Typically, like I just

24    explained to Mr. Delaney, if you borrowed $500,000, the cash

25    would go up and the liabilities would go up, so the net asset

60

1    value, using that example, would not change.

2    Q.    If you lend money, how does that show up on a cash flow

3    chart?

4    A.    Well, it would be pretty much as a note receivable.

5    Q.    On this chart would that be included under accounts

6    receivable?

7    A.    Well, that could be one of the areas where you would

8    reflect it, yes.

9    Q.    What would be another area where you would reflect it?

10  A.   You might have a note receivable.

11  Q.   But this chart doesn't have note receivables, correct?

12  A.   No, it does not.

13  Q.   And based on this chart, is it correct that from 1993 to

14  1997, the company had positive cash flow in two of the years,

15  is that right?

16  A.   Yes, it had a positive cash flow in 1994 and in 1997.

17  Q.   And negative cash flow in '93, '95 and '96, is that

18  right?

19  A.   That's correct.

20  Q.   Now, can you tell whether the company had positive cash

21  flows for the entire period between 1994 and 1997?

22  A.   Well, yeah, I did a calculation for all five years.

23  Q.   But I want to exclude one year here?

24  A.   Okay.

25  Q.   I want to exclude 1993.  Do you think you had a positive


61


1  cash flow between 1994 and 1997?

2  A.   Yes.

3  Q.   But in 1993 you got this big million dollar negative cash

4   flow, is that right?

5   A.   Yes.

6   Q.   You also have a million dollar, million point three

7   accounts receivable, is that right?

8   A.   Yes.

9   Q.   And you mentioned that if there was borrowing taking

10  place in 1993, it would be reflected in that -- I'm sorry, if

11  they were lending to other people, it would be reflected in the

12  accounts receivable, is that right?

13  A.   Yes, if they were lending money, what would happen is

14  that if they lent money, cash would go down by the amount that

15  they had lent, and the receivable would go up by the amount

16  that they had lent.

17  Q.   I see.  Let me ask you this.  Do you know whether in 1993

18  the company was engaging in any transactions with affiliated

19  companies?

20  A.   Yes.

21  Q.   By affiliated companies, do you mean companies that were

22  owned by members of the Smith family, is that right?

23  A.   That were related to the affiliated companies, yes.

24  Q.   By members of the Smith family, we're specifically

25  talking about Mr. Smith, III, and Ms. Smith, is that right?

62

1  A.   I don't know, I don't recollect offhand the components of

2  it, I know they had affiliated companies at that time.

3  Q.    Some of those were Serve-all Concrete --

4  A.   That sounds correct.

5  Q.   S & J Trucking, is that one of them?

6  A.   That sounds like one.

7  Q.   And didn't Erie Navigation Company lend some money to

8  S & J Trucking or some of these affiliated entities?

9  A.   I don't recollect that, but it's certainly possible.

10  Q.    Did you make an adjustment in your valuation for

11  transactions with affiliated companies?

12  A.   I did not, I talked with Mr. Finnecy about that.

13  Q.   I don't want you to tell me what Mr. Finnecy said, but

14  you can tell me what you did?

15  A.   I didn't do anything, I assumed that the transactions

16  were arms-length under normal business conditions.

17      MR. DALE:  I have no further questions.

18      THE COURT:  Thank you, sir, you're excused.  Members

19  of the jury, we're going to take about a five or 10 minute

20  break and we'll come back and resume with another witness.

21       (Recess from 10:35 a.m.; until 10:54 a.m.)

22       THE COURT:  All right, call your next witness.

23       MR. DELANEY:  Thank you, your Honor.  We'd call

24  Sandy Smith to the stand, please.

25       THE COURT:  Come on up here, I'll swear you in.


63


1       SIDNEY E. SMITH, III, PLAINTIFF HEREIN, SWORN

2            DIRECT EXAMINATION

3  BY MR. DELANEY:

4  Q.   Mr. Smith, could you tell us your full name, please?

5  A.   Sidney E. Smith, III.

6  Q.   And do you commonly go by Sandy Smith?

7  A.   I do.

8  Q.   What is your current address?

9  A.   3792 West Houseland Court, Eagle, Idaho.

10  Q.   How long have you been out there?

11  A.   Just over a year.

12  Q.   What is your occupation?

13  A.   I do residential excavation.

14        THE COURT:  I sorry, what do you do?

15        THE WITNESS:  Residential excavation.

16   BY MR. DELANEY:

17   Q.    What is your education, just start with college, if you

18   would?

19   A.    I went to the Rochester Institute of Technology.  I got a

20   four-year degree in business administration.  After college I

21   went to work for the Burlington Northern Railroad, went through

22   their management training program.

23        THE COURT:  Mr. Smith, see this guy here, see the

24   smoke coming off his fingers.  He can't go that fast, all

25   right, slow down.  Go ahead.


64


1   BY MR. DELANEY:

2   Q.    After college you worked for whom?

3   A.    The Burlington Northern Railroad in St. Paul, Minnesota.

4   I went through their management training program.

5   Q.    How long did you work for the railroad?

6   A.    I worked for them for just over three years.

7   Q.    And after the railroad, where did you go?

8   A.   I came to work for Erie Sand and Gravel.

9   Q.   Now, we've heard the name Erie Sand and Gravel, we've

10  heard the name Erie Navigation Company.  We'd like you to kind

11  of put that in context for us.  Who owned Erie Sand and Gravel?

12  A.   Erie Sand was a wholly-owned subsidiary of Erie

13  Navigation Company.

14  Q.   And we understand and we're going to talk about some of

15  the ships that worked the Great Lakes.  Was there another

16  company as well, in addition to Erie Navigation, Erie Sand and

17  Gravel, was there a third company?

18  A.   Correct.  Erie Sand Steamship was a wholly-owned

19  subsidiary of Erie Sand and Gravel.  So we had Erie Navigation,

20  Erie Sand and Gravel, Erie Sand Steamship Company.

21  Q.   So in this case it's all of those operations we will

22  collectively refer to as Erie Navigation, is that all right?

23  A.   That's fine.

24  Q.   Okay.  I want to clarify something as well.  Were there

25  other businesses that your family operated other than Erie

65

1   Navigation, in 1997 and 1998?

2    A.    Correct.  There was Serve-all Concrete Company, which was

3    started in 1994, which was ready mix concrete.  There was a

4    trucking company called S & J Trucking, which was started in

5    1994, that hauled the concrete.  Then we had the Mountfort

6    terminal, which was a stevedoring company that would handle

7    products for other people.  We handled locomotives for General

8    Electric, loading those on ships.  Handled some bore and some

9    drywall, gypsum.

10   Q    Stevedore is the dock work, isn't it?

11   A.    Correct.

12   Q.    Now, Those three companies, are they part of this lawsuit

13   at all?

14   A.    No, they're not.

15   Q.    They weren't owned by Erie Navigation?

16   A.    Not at all.

17   Q.    They weren't owned by Erie Sand and Gravel?

18   A.    No.

19   Q.    And not owned by Erie Steamship?

20   A.    Correct.

21   Q.    Now, let's go back to your history.  You say that you

22   began working for Erie Navigation in 1985?

23  A.   Correct.  I came home for Labor Day weekend, and I was

24  working nights in North Dakota, my mother made me an offer I

25  couldn't refuse.  She said your dad's bought this thing, this

66

1  one fellow had a stroke, another fellow was leaving the

2  company, she's like you really should think about coming home.

3  So I did.

4  Q.   When you started out, what kind of work did you do?

5  A.   I did everything.  I ran equipment, ran the scales,

6  checked the trucks in and out to the scales.  Did a lot of

7  sales work initially because the fellow that I was directly

8  replacing was the salesman for Erie Sand and Gravel.  So I

9  called on the road building customers, home builders, that sort

10  of thing.

11  Q.   In the period 1993 to 1998, could you generally describe

12  what your duties and responsibilities were at that point in

13  time?

14  A.   Well, things had changed quite a bit by then.  I was

15  promoted to vice president, which made me responsible for a lot

16  more things.  The daily operation of the St. John, our sand

17   dredge.  I was now dealing with insurance companies and banks,

18   and doing a lot more administrative things.

19   Q.   In the period 1993 through 1998, would you have been

20   familiar with the financial performance of Erie Navigation

21   Company?

22   A.   Yes.

23   Q.   All right.  I guess we really never have described what

24   the business of Erie Navigation Company was.  Can we deal with

25   that, tell us generally what lines of business Erie Navigation

67

1   Company was in?

2   A.   Well, I'll start at kind of the bottom rather than at the

3   top.  The steamship company, its sole asset was the motor

4   vessel Richard Reiss, which was built in 1943.  We purchased it

5   used in 1988.  It was kind of on its last legs.  What we

6   typically did, we'd buy older ships, put a lot of sweat into

7   them and then operate them.  She handled, would haul crushed

8   stone, gypsum, coal, road salt, from points on the Great Lakes.

9   It would be loaded by shore side equipment and then unloaded by

10   ships unloading here.

11  Q.    Now, we're going to look at a picture of the Reiss, then

12  I'll have some more questions about that.  What other

13  operations did the company have?

14  A.    Next up the list would be Erie Sand and Gravel, which was

15  a primary operation here in Erie.  And we handled, we would

16  bring in limestone by ship.  We would dredge sand in Lake Erie

17  for distribution.  And put in the ready-mix concrete.  We also

18  had an operation in Sandusky, Ohio, that handled road salt and

19  some other products, as well as sand, dredged sand in Lake

20  Erie.  And then above that is where we had Erie Navigation.

21  Erie Navigation had two vessels known as the Day Peckinpaugh,

22  which is a self-propelled dry bulk cement carrier, which ran up

23  and down the barge canal.  And then the John Emery, which was a

24  sand vessel that operated for the Sandusky operations.

25  Q.    Is that a fair description of the operations, the

68

1  businesses that Erie Navigation was in in the period 1993 to

2  1998?

3  A.    Yes.

4  Q.    Now, you talked about what your responsibility was, how

5   about your dad's?

6   A.   My dad was the vessel dispatcher for Richard Reiss.  She

7   ran basically 24 hours a day, seven days a week, from the first

8   week of April until the middle of December.  It was his job to

9   dispatch the boat, figure out where it's going to load, where

10  it's going to unload, where it's going to get fuel.  Where the

11  groceries are going on, when the crew was going to get on, when

12  the crew is going to get off.  So he had a pretty full job.  I

13  think that's why I was kind of pressed into these other things

14  that he didn't like to do.

15  Q.   Did he have a title?

16  A.   He was president, chief executive officer, chairman of

17  the board, yes.

18  Q.   Was he the last word?

19  A.   First and only, yes.

20  Q.   Beside yourself, what other management was there, other

21  than your father from that period, 1993 to 1998?

22  A.   We had a vice president of finance, if you will, he was

23  our secretary, treasurer, by the name of Bob Boorum.  We also

24  had a vice president of the Sandusky operation.

25  Q.   So there were just three vice presidents and your father?

69

1  A.   Correct.

2  Q.   Did your sister, Jill, ever work in the business?

3  A.   No, she did not.

4  Q.   In 1993 to 1998 was she living in Erie, if you know?

5  A.   1998, I don't think so.

6  Q.   Now, just to get a flavor of the business, how many

7  employees -- I guess let's try to deal with it closer to '97,

8  '98, since that's where our focus is.  How many employees are

9  working for Erie Navigation Company?

10  A.   Total, it would probably be about 75, I would say.

11  Q.   What type of trades are there?

12  A.   A big portion our are shipboard personnel, deckhands,

13  engineers, mates, wheels man, that of thing.  The Richard Reiss

14  carried a crew of 28.  We also had a crew of eight on the J.S.

15  St. John.  A crew on the Emery of four guys.  We had equipment

16  operators, which were operating engineers, both in Ohio and in

17  Pennsylvania.  I know we had our maintenance forces, which were

18  welders, fitters and mechanics, that sort of thing, laborers.

19  And then we had I think eight or nine people in the office.

20  Q.   Was the work seasonable?

21  A.  Yes.

22  Q.  In what way?

23  A.  Well, we can't operate certainly in the wintertime on the

24  lakes because of the ice and wind conditions.  And, also, the

25  construction industry both in northern Ohio and western

70

1  Pennsylvania pretty much draws to a halt around Christmas time

2  until the weather breaks in the spring.

3  Q.  You actually described for me -- when it comes to that

4  aspect of the business involving the sale of materials, such as

5  limestone and sand, construction materials, how big was your

6  geographic market from the dock?

7  A.  Well, from Erie we would go roughly 20 to 25 miles.

8  There was a similar dock operation in Conneaut, they handled

9  the same products we did.

10  Q.  You mean a competitor?

11  A.  A competitor, correct.  And then to the south there was a

12  quarry about 60 miles south of here.  There is a quarry in

13  western New York, it's about 75 miles away.

14  Q.  Would these be competitors, also?

15  A.   Yes, they would all be competitors.  Then we also

16  competed with the local sand and gravel pits as well.

17  Q.   Why would it be so limited, why the 20, 25 miles from the

18  dock?

19  A.   Our source of materials came about 300 miles away, it was

20  floated by ship, which was fairly expensive.  To put it on the

21  dock and then reload it into trucks.  Where somebody who had a

22  limestone quarry and would just put it in the truck once and be

23  able to deliver it.  So that's why our market was not very big,

24  it was pretty much confined to Erie County.

25  Q.   I want to show you some photographs that actually you

71

1  supplied these to us, didn't you?

2  A.   I did.

3  Q.   This is something I think the jury has already seen, I've

4  marked it as Plaintiff's Exhibit No. 8.  First of all, are you

5  familiar with that picture?

6  A.   Yes, I am.

7  Q.   Can you tell us what that picture demonstrates or

8  depicts?

9  A.    That's the motor vessel Richard Reiss coming into the

10  foot of the Parade Street dock here in Erie.  She's in a loaded

11  condition, I'd say it's either late spring or late fall, one of

12  the two.

13  Q.    Now, would this picture accurately depict the condition

14  of the Reiss back in 1998?

15  A.    It would.

16  Q.    By the way, Reiss is not R-i-c-e, is it?

17  A.    No, it's a German spelling, the people we bought the ship

18  from, their family name was R-e-i-s-s, but they pronounced it

19  Rice.

20  Q.    How long is this ship?

21  A.    620-feet long.

22  Q.    What does she carry?

23  A.    She will carry anything in bulk that doesn't have to be

24  kept dry.  Road salt, which can be kept semi-dry, but primarily

25  limestone, rock gypsum and coal.


72


1  Q.    Is this the most valuable asset that Erie Navigation

2  owned?

3    A.    Yes, it was.

4    Q.    How old was it?

5    A.    She was built in '43 in River Rouge, Detroit.  We leased

6    it in '86, '87 and '88, and then purchased it outright in -- I

7    think it would have been very late in 1998, December.

8    Q.    How big is its crew?

9    A.    Twenty-eight guys.

10   Q.    And is this a ship that is bringing material to your

11   docks in Erie?

12   A.    Typically not.  Because we could utilize larger ships to

13   come to Erie, we had a pretty good dock lease with the Port

14   Authority, as far as length and depth of water.  So the Reiss

15   would trade in some of the smaller ports around the Great

16   Lakes.

17   Q.    Just to get a sense, first of all, when you say we could

18   take larger ships in Erie, our ships, Erie Navigation's ships?

19   A.    No, they would be competitor's ships.

20   Q.    So the Reiss would do what?

21   A.    Well, she would work for primarily two big companies

22   hauling material for them from their quarry to others

23   customers' docks in Cleveland and Fairport, Ohio and Detroit,

24  Michigan.

25  Q.    This season that you talked about, April through mid


73


1  December, how much of the season is the Reiss out?

2  A.    Twenty-four hours a day seven days a week from the time

3  she leaves the dock until lay up time.

4  Q.    Do you make it a point to keep her constantly moving?

5  A.    Constantly moving.  It costs us a thousand-dollars an

6  hour roughly to operate her.

7  Q.    Let me show you another picture.  That we've marked as

8  Plaintiff's Exhibit No. 9.  Is that familiar to you?

9  A.    Yes, it is.

10  Q.    And what is that?

11  A.    That's the motor vessel J.S. St. John.  Which is our

12  principal sand dredge, works out of Erie almost exclusively.

13  She's arriving with the first load of sand for the beach

14  nourishment project.  We would end up using the sand in '04,

15  but that's in the fall of '03.

16  Q.    Does that picture accurately depict the condition of the

17  St. John in 1998?

18   A.   It does.

19   Q.   Now, the St. John is what type of vessel?

20   A.   The official terminology is a trailing suction hopper

21   dredge.

22   Q.   What does it do?

23   A.   It will go out in the lake about 18 miles, there's a big

24   long siphon hose on the starboard side that you can't see, it's

25   lowered down, it's connected to a diesel-driven pump, the pump

74

1   drags water and sand up, goes across an incline screen, and

2   screens out the large material.  The fines settle out in the

3   cargo hold of the vessel.  We bring it back in and unload it

4   with an excavator.

5   Q.   Let me show you another picture that we've marked as

6   Plaintiff's Exhibit 10.  Is this another picture of the St.

7   John?

8   A.   Yes, it is.

9   Q.   What's it doing?

10   A.   She's out on the pump grounds dredging the material.  You

11   can see the overflow of the sand around the water.

12  Q.   I thought it was sinking.

13  A.   I know you did.

14  Q.   How often would she go out per day?

15  A.   It would sink twice a day according to you.

16  Q.   And where do you go, can you just go outside the bay and

17  get sand?

18  A.   No, we had a permitted area out in the middle of the lake

19  called the terminal moraine.

20  Q.   Who provides the permit?

21  A.   We get the permit through the Corps of Engineers, the

22  Pennsylvania DER and the Coastal Zone Management.

23  Q.   Okay.  And how far is it?

24  A.   About 18 miles off of -- I'd say Fairview.

25  Q.   How about the crew on this vessel?


75


1  A.   Four guys.  They had a captain, a pump man, an engineer

2  and a deckhand.  We carried two sets, we had a day shift and an

3  evening shift.

4  Q.   And besides four seamen all together, I'm sorry, eight

5  seamen all together?

6   A.   Eight seamen, four on each shift.

7   Q.   If she went out twice a day, how many days a week?

8   A.   Typically we made, it would operate seven days a week,

9   but we make 13 trips a week, just because we'd shift from days

10  to nights, guys that had days one week and then nights the next

11  week.  It was tough to go a full 14 shifts.

12  Q.   Is this ship working for other customers or is it

13  bringing its material back to Erie?

14  A.   Everything primarily came back to Erie.

15  Q.   Essentially, it's just sand?

16  A.   (Witness nods head.)

17  Q.   How old is this vessel?

18  A.   It was built in 1944.

19  Q.   So she would have been 54-years-old in 1998?

20  A.   Correct.

21  Q.   It was not the only sand dredge you had at Erie

22  Navigation?

23  A.   No, it was not.

24  Q.   We'll get to that.  Let me show you what I've listed as

25  Plaintiff's Exhibit No. 11, is that familiar to you?

1  A.   Yes, it is.

2  Q.   What does that picture show?

3  A.   That's the motor vessel Day Peckinpaugh.

4  Q.   You better spell that?

5  A.   P-e-c-k-i-n-p-a-u-g-h.

6  Q.   What type of vessel was the Day Peckinpaugh?

7  A.   She was a self-propelled dry bulk carrier.

8  Q.   Is that like the Reiss?

9  A.   No, it's different.  She would handle things like cement

10  principally.  She could handle flour, sugar.  Anything that has

11  to be dry in its powder state.

12  Q.   This vessel is shown where?

13  A.   It's sitting at the foot of Parade Street dock here in

14  Erie.  It's tied up, kind of dormant.

15  Q.   Did it work in 1998?

16  A.   It did not.

17  Q.   When was the last time the Day Peckinpaugh was on the

18  lake?

19  A.   The last time she operated I think was mid September,

20  1994.

21  Q.   All right.  Where is she today, do you know?

22  A.   It was recently donated to a museum in New York.

23  Q.   How old was the Day Peckinpaugh?

24  A.   It was originally built in 1921.

25  Q.   So the Day Peckinpaugh would have been 67-years-old in

77

1  1998?

2  A.   That's correct.

3  Q.   Here is a photograph, Exhibit 12, Plaintiff's Exhibit 12,

4  can you tell us what this depicts?

5  A.   That's the motor vessel John R. Emery departing Erie

6  empty.

7  Q.   And what type of vessel is this?

8  A.   Trailing suction hopper dredge.

9  Q.   The same as the St. John?

10  A.   Correct.

11  Q.   What was the age of this vessel?

12  A.   She was built in 1903.

13  Q.   So she would have been about 95-years-old in 1998?

14  A.   That would be correct.

15  Q.   Did this vessel dredge sand at the same location out on

16   the lake as the St. John?

17   A.   Well, she worked at Sandusky, we had pump grounds there

18   were permitted through the Ohio DNR, the Corps of Engineers.

19   After we sold the Sandusky dock, we brought it to Erie to

20   supplement with what the St. John was doing.

21   Q.   And what about her crew?

22   A.   Similar crew.  Captain, engineer, pump man and deckhand.

23   Q.   Did the Emery go out everyday?

24   A.   Typically, once a day, we didn't have a night crew for

25   her.

78

1   Q.   And, again, it's just sand that will ultimately be sold

2   by Erie Navigation Company?

3   A.   By Erie Sand and Gravel, correct.

4   Q.   And she is not working for other customers?

5   A.   No, she's not.

6   Q.   Now, how many facilities in 1997 and 1998, how many

7   locations did Erie Navigation work from?

8   A.   Just two.  The Erie docks and the Sandusky dock.

9   Q.   And tell us about Sandusky.  How many employees at

10   Sandusky?

11   A.   There were five employees on the dock there.  Two loader

12   operators, a mechanic, a vice president and a gal that worked

13   in the office.

14   Q.   I'm going to take this out of order, but I'm going to

15   show you what's been marked as Plaintiff's Exhibit No. 14; can

16   you tell us what that photograph depicts?

17   A.   That's an aerial picture of the dock in Sandusky.

18   Q.   Is that an accurate depiction as the facility appeared in

19   1997?

20   A.   It is.

21   Q.   Does the dock actually include this entire yard, all the

22   way over to where it appears the ship is docked?

23   A.   Yes.

24   Q.   So these slips in between were part of Erie Navigation's

25   operation?

79

1   A.   Correct.

2   Q.   Now, was this facility owned or leased by Erie

3   Navigation?

file:///A|/SMITHDY2.TXT

4   A.   That was the only real estate that we owned.

5   Q.   And do you know when it was purchased?

6   A.   I'm going to say probably early 1900s.

7   Q.   So before your father owned the company?

8   A.   Yes.

9   Q.   In the period of time -- I'm sorry, what type of business

10  was operated off of this facility?

11  A.   That was primarily sand and road salt.  The big piles in

12  the foreground are road salt.  There was a number of limestone

13  quarries within a mile of the docks, that's why we didn't

14  handle any limestone there.  It was primarily road salt and

15  sand.

16  Q.   In the period '94 through '97, were the operations at

17  Sandusky profitable for Erie Navigation Company?

18  A.   No, we lost money every year.

19  Q.   In terms of the disposition of that property, was it

20  ultimately disposed of in some way?

21          MR. COOPER:  Objection, your Honor, what happened

22  and how it was disposed has no effect on the value.

23          THE COURT:  Overruled, go ahead.

24          THE WITNESS:  We sold it to a gentleman that had a

25   dock construction company.


80


1   BY MR. DELANEY:

2   Q.   Do you remember approximately when you sold it?

3   A.   I think it was '97 or '98.

4   Q.   After that facility was sold, did you lease it back?

5   A.   No, we did not.  He took it over, based his operation

6   there, we brought the Emery to Erie.

7   Q.   Let me show you what we previously marked as Plaintiff's

8   Exhibit 13 and ask you if that is a picture that's familiar to

9   you?

10   A.   Yes, it is.

11   Q.   What does that depict?

12   A.   It's an aerial view of the foot of the Parade Street dock

13   here in Erie.

14   Q.   Was that a facility that Erie Navigation operated?

15   A.   Yes, it was.

16   Q.   Do you know how long it operated that facility?

17   A.   We started leasing that in 1968 from the Penn-Central

18   Railroad.

19  Q.   I was going to ask you, did you ever own that piece of

20  property?

21  A.   No, we didn't.

22  Q.   In 1997 and 1998 was this facility still operating?

23  A.   Yes, it was.

24  Q.   I noticed there does not appear to be any bayfront

25  highway on this photograph, do you know how old this photograph

81

1  is?

2  A.   It's fairly old, I'm going to venture a guess, it's

3  probably in the early '90s.

4  Q.   But other than that lack of a highway that's there today,

5  is it the same sort of facility as existed in 1998?

6  A.   Yes.

7  Q.   And what did you do off of this particular dock?

8  A.   It was purely limestone that would come in by ship, be

9  unloaded by the ships themselves, and then we'd load trucks,

10  weigh them and send them on there way.  We also handled some

11  sand there as well.

12  Q.   In 1997 and 1998 did you have any other facilities on the

13   Erie bay, other than this Parade Street facility?

14   A.   We had the general offices were located over at the Erie

15   International Marine terminal.

16   Q.   Did Erie Navigation Company own that terminal, that

17   facility, that dock?

18   A.   No, we did not, we leased that from the Port Authority.

19   Q.   What was the type of work done at that dock by Erie

20   Navigation Company; by that I mean the dock at the Erie

21   International terminal?

22   A.   We would lease space, again, handle almost the same

23   commodities.  Different grades of stone maybe over there than

24   we had at Parade Street.  It was just an overflow area for the

25   Parade Street dock.


82


1   Q.   Let me show you some other photographs.  What we

2   previously marked as Plaintiff's Exhibit 15, do you know where

3   that location is?

4   A.   Yes, I do.

5   Q.   Where is that?

6   A.   That happens to be at the marine terminal.

7   Q.   What activity is going on at that point?

8   A.   The loader looks like he's transferring materials

9   somewhere, he's going to load a truck.  There is a ship off

10  loading stone there.

11  Q.   What kind of stone, do you have any sense what that is?

12  A.   Looks like calcite 57s.

13  Q.   Thank you.  What is the ship -- is that the Reiss?

14  A.   No, it's not, it's the Earl W. Ogleby.  Owned by Ogleby

15  out of Cleveland, Ohio.

16       THE COURT:  Keep your voice up a little bit, Mr.

17  Smith, you're slow enough but you're too low.

18  BY MR. DELANEY:

19  Q.   Were they a competitor?

20  A.   Yes, they were.

21  Q.   Do you have any idea when this photo was taken?

22  A.   Fairly recently actually.  I'm going to say probably

23  2003.

24  Q.   Depicting the kind of activities that were going on at

25  that terminal facility that was leased by Erie Navigation?

83

1  A.   Yes.

2  Q.   Let me show you what's been marked as Exhibit 18.  What's

3  depicted there?

4  A.   We're loading customer's dump trucks with limestone.

5  Q.   This loader that we see, is this a piece of equipment

6  that would have been owned or leased by Erie Navigation

7  Company?

8  A.   It is.

9  Q.   How about the trucks, did Erie Navigation Company

10  maintain its own dump trucks?

11  A.   No.  We had two small residential delivery trucks, five

12  tons.

13  Q.   Do you know how many of the front loaders you would had?

14  A.   In 1997, '98?

15  Q.   Yes.

16  A.   I'd say we probably had five.

17  Q.   All at this one facility or is that between Parade Street

18  and the Erie terminal?

19  A.   Typically, we had two at Parade Street and two at the

20  terminal, and then one as a backup.

21  Q.   All right.  Does this accurately depict the kind of

22  activities that were occurring in 1997 and 1998?

file:///A|/SMITHDY2.TXT

23   A.   It does.

24   Q.   Here is a very similar photograph; what location would

25   this be?


84


1   A.   That's at the foot of the Parade Street dock.

2   Q.   That is simply again another loader filling up a

3   customer's truck, is that right?

4   A.   Correct.

5   Q.   Is the truck ours, Erie Navigation's?

6   A.   No, it wasn't, it was a fellow who bought a truck, he

7   worked for us almost exclusively so he put our logo on the

8   door.

9   Q.   Does it accurately depict the kind of activities that

10   Erie Navigation was involved in?

11   A.   Yes.

12   Q.   Just a couple more.  Exhibit 17, what is this occurring?

13   A.   We're unloading dredged sand from the J.S. St. John with

14   kind of a modified excavator.

15   Q.   So that claw is actually going into the hold of the St.

16   John?

17  A.    Correct, it's going in, getting a bucket full of sand,

18  swiveling away from the ship and putting it on the dock.

19  Q.    This is the type of thing that would occur twice a day, I

20  gather?

21  A.    Yes, sir.

22  Q.    All right.  And, finally, Exhibit 16, a little bit out of

23  order, what is this picture depicting?

24  A.    That's at the north pier of the Peninsula.  That's

25  delivering the first load of sand out there.

85

1  Q.    You delivered sand to the Peninsula?

2  A.    Correct.

3  Q.    Why was that?

4  A.    It was incredibly inconvenient for us, as well as the

5  citizens of Erie, to have all these trucks trundling through

6  town with sand for the Peninsula after we brought it into the

7  downtown area, essentially.  So we decided to see if we could,

8  with the Corps of Engineers help, deliver the sand directly to

9  the Peninsula for distribution out there.  It would cut down on

10  trucks through town, it would cut down on the cost of the sand

11   as well.

12   Q.   So this is beach replenishment?

13   A.   Beach re-nourishment they call it, yes.

14   Q.   You explained to us that all of this activity was

15   essentially seasonable, between the beginning of April to mid

16   December.  What would be done during those other months, from

17   mid December until the beginning of April, what kind of work

18   did Erie Sand and Gravel or Erie Navigation Company involve

19   itself in?

20   A.   Well, we would completely shift gears, all the equipment

21   would basically be gone through, if it needed anything, engines

22   pumps.  The ships, the Reiss, typically we had 14 or 15 guys

23   working on her.  Renewing steel plates in the cargo hold, doing

24   main engineer work, generator work on her.  Pumps, circuits.

25   Renew the radar, all that sort of thing.


86


1   Q.   All right.  Was most of that work done in-house or did

2   you outsource it?

3   A.   We did about 90 percent in-house.

4   Q.   When the season ended, when the shipping season ended,

5   did your workforce get smaller?

6   A.   A little bit because the seamen would be laid off and

7   then we would actually hire some local guys out of the

8   construction business to help do the welding and refit.

9   Q.   You mentioned that there were a crew of 28 on the Reiss.

10  What was their pattern of work, what kind of vacation would

11  they have -- what's the cycle is what I'm asking?

12  A.   They work, under the union contract they worked 60 days

13  on, 30 days off.  For every two days worked, they got a day of

14  paid vacation.  Most of the guys would work a full 60, they'd

15  get off or something in advance of that.  While they're on

16  board they work four-hour shifts twice a day.  So if you were

17  on the 8 to 12 shift, you worked 8 to 12 a.m., and then 8 to 12

18  p.m. around the clock.

19  Q.   How about the logistics of maintaining a community of 28

20  people around the clock, what about food and supplies; who took

21  care of all those logistics?

22  A.   My dad essentially took care of most of it.  We had a

23  purchasing agent, but making sure that the grocery guy met the

24  boat at the right time, because we'd today delayed from wind

25  and weather and so forth, it was a full-time job.

87

1  Q.   You described for me once that the Reiss was a tramp

2  steamer, what do you mean by that phrase?

3  A.   Well, she didn't have any set patterns of trade.  We'd be

4  in Fairport today, back in Marblehead tonight.  Go over to

5  Cleveland, go back to Marblehead.  Maybe we'd go up north to

6  Sarnia, Ontario, unload there.  Go to Alabaster, Michigan, to

7  Grand Haven, there was no pattern.  There was no load that was

8  duplicated.  We were in and out of a port on the average of

9  every 16 hours.

10  Q.   Okay.  One of the things that Mr. Pashke mentioned in his

11  testimony was when he took a look at Erie Navigation Company,

12  one of the things he noticed was that there was a significant

13  customer, there was a concentration of business with regard to

14  one customer, I think he may have said 30 percent.  Who was

15  that customer?

16  A.   Originally, the company was Marblehead Lime Corporation.

17  They sold to a big multi-international during the timeframe of

18  this court case, in 1993 I believe they sold it to Standard

19  Lafarge Corporation, which is a French multinational company,

20  they have sales in excess of $10 billion.

21  Q.    Now, did Lafarge become one of your customers then, or

22  one of the customers of Erie Navigation?

23  A.    They became a customer of Erie Navigation.

24  Q.    What was the business of Lafarge in Marblehead, Ohio?

25  A.    They operated the limestone quarry there.


88


1  Q.    Did they sell that product to others then?

2  A.    Yes, they did.

3  Q.    You say it was a French company?

4  A.    Yes.

5  Q.    Were they permitted to own their own ships?

6  A.    No, they're not.

7  Q.    Why?

8  A.    I believe they're prevented from operating, any

9  foreign-owned company cannot operate vehicles of commerce

10  within the borders of the United States.  The same way that Liv

11  Thompson can't fly from Chicago to Detroit.  They could not

12  bring a ship between Cleveland and Marblehead, Ohio.

13  Q.    Where is Marblehead, by the way?

14  A.    It's near Sandusky, Ohio, it's a little west of there.

15  Q.    Now, did they come to your Sandusky dock in order to have

16  the Reiss loaded with their material or where would the Reiss

17  go to get material that Lafarge was quarried?

18  A.    We'd go right to their dock.  They had a loading facility

19  right there in Marblehead, Ohio.

20  Q.    And you say this is limestone?

21  A.    Right, crushed limestone.

22  Q.    It's used in what line of product?

23  A.    Concrete block, asphalt pavement, concrete pavements.

24  Q.    Were any of your competitors doing work for Lafarge?

25  A.    In 1993, no.


89


1  Q.    Why?

2  A.    Well, the dock was short, it was pretty antiquated, it

3  was built in the '20s, the loading facility was short, didn't

4  go out in the water very far.  Therefore, the water was

5  shallow, so we would actually kind of beach the ship there and

6  we'd have to load from the stern forward, so it was kind of a

7  tricky operation, there was some weather issues in there.

8  Q.   Your competitors, did they have ships the size of the

9  Reiss?

10  A.   No, they did not.

11  Q.   Were their ships bigger or smaller?

12  A.   Much larger.

13  Q.   What prevented them from getting the Lafarge business

14  then?

15  A.   Well, the dock was too short.  We had a niche there.

16  They couldn't get in and they weren't going to try.

17  Q.   Did that relationship change in the period 1997 to '98,

18  that is the relationship between Erie Navigation and Lafarge?

19  A.   Yes, it did.

20  Q.   What happened?

21  A.   They essentially shut the quarry down for about a year in

22  1997 with some limited shipping, but they extended the dock

23  about 600 feet, and then dredged almost a million cubic yards

24  of bottom sediment so they could load larger, deeper vessels.

25  Q.   When this is happening, what are you thinking?


90


1  A.   It was kind of a tenuous time.  It's kind of like sitting

2  at a traffic light and you hear brakes and tires squealing on

3  the pavement, you knew you were going to get hit but it was a

4  matter of when.

5  Q.    With Lafarge's larger dock and deeper slip, what did that

6  mean to your competitors?

7  A.    They would be able to get in there.  Where we had only

8  been able to get in before.

9  Q.    How often, prior to 1997, how often was the Richard

10  Reiss, that big vessel we saw, going into the Lafarge dock to

11  pick up material?

12  A.    Somewhere between 100 and 125 times a year.

13  Q.    In that season?

14  A.    In the season, correct.

15  Q.    After Lafarge extended its dock and deepened its slip --

16  let me back up.  How do you charge a customer like Lafarge for

17  hauling their material to their customers?

18  A.    It's pretty much by the ton.  It's $2.20 to Cleveland.

19  It's $2.40 to Detroit, that sort of thing.

20  Q.    How many tons did the Richard Reiss hold?

21  A.    Full load, it was about 16,500 tons.

22  Q.    When Lafarge increased its dock and made its slip deeper,

23  what happened to your business with Lefarge?

24  A.    The other larger shipping companies all came in, they had

25  a more efficient vessel, could carry more with the same amount

91

1  of crew, same amount of fuel.  And they started, basically,

2  started to pick away at our market there.

3  Q.    The price per ton, was it effected in any way by that

4  competition?

5  A.    The first year it dropped about 30 percent.

6  Q.    What would that do to your profits?

7  A.    Our profits eroded rapidly.

8  Q.    And by the end of '98, was there a full compliment of

9  competitors working the Lafarge slip?

10  A.    Yes, there were.

11       MR. COOPER:  Objection, could we discuss something

12  at side bar.

13       THE COURT:  Sure.

14       (On the record at side bar.)

15       MR. COOPER:  This is what happened after the

16  valuation date.  There's a case in the Western District of

17  Pennsylvania called Estate of Newcomer.  It says evidence of

18    events subsequent to the date of decedent's death is irrelevant

19    to the valuation of the decedent's property at the time of

20    death.  Now, as you pointed out -- if we were doing a valuation

21    for tax purposes, same line of reasoning, would subsequent

22    events have any impact on the value of the gift.

23         THE COURT:  More broadly speaking, first of all,

24    what does this have to do with what we're about.  Secondly,

25    address his point as it relates to the western district case?


92


1         MR. DELANEY:  If I may go in reverse.  All of this

2    occurred in '97, '98.  The last gift is December 31, 1998.  So

3    I'm not sure why this in any way is a subsequent event.

4    Secondly, we've had testimony now about how cash flow can have

5    an impact on net asset value.  By placing at risk what those

6    assets, the net asset value is.  It's not a static number.  I

7    think it just demonstrates what a reasonable informed buyer,

8    hypothetical buyer partnership might be interested in a

9    relevant piece of information.  They have, it seems to me, the

10    jury has the right to consider what a limited partner insofar

11    as to what a hypothetical party or buyer would look at.

12          THE COURT:  Like from the time before, if the

13   timeframe we're talking about here is before the December 31st

14   valuation date, then what's the problem?

15          MR. COOPER:  I don't have a problem with that.  I

16   believe if you look at the final revenues shown, they're

17   increasing --

18          THE COURT:  All right, it's overruled.

19          (End of discussion at side bar.)

20   BY MR. DELANEY:

21   Q.   Sandy, we talked about your competitors and actually Mr.

22   Pashke also mentioned that he reviewed that issue when he was

23   investigating Erie Navigation.  How many competitors would you

24   have had in this business that Erie Navigation was involved in?

25   A.   There were roughly four other larger, much larger firms


93


1   that did shipping on the Great Lakes.  The first one was

2   American Steamship out of Buffalo, New York.  They were owned

3   by GATX in Chicago.  There was Ogleby Norton, which they had 14

4   hulls based in Cleveland, Ohio, a publicly-traded corporation.

5   There was U.S. Steel Corporation, which had ships on the Great

6    Lakes.  They had approximately eight ships, they were

7    transacting the same business.  There was Interlake Steel

8    Company, they were our competitors, too.  They had at the time,

9    I believe, seven hulls.

10   Q.    In terms of size, how did these competitors compare to

11   Erie Navigation Company?

12   A.    Well, they were vastly huge.  By number of ships, they

13   had us outnumbered by 10 times.  By capacity, it was more than

14   that.  Some of the ships could carry 60,000 tons at a time.

15   Most of them were capable of carrying 40 to 30,000 tons, so we

16   would have to make two trips for one of their trips.

17   Q.    In 1997, 1998, the only ship that Erie Navigation had to

18   compete with those four companies was which one of the ships?

19   A.    The Richard Reiss.

20   Q.    Now, talk about the dock based business as well.  That's

21   the sale of construction equipment or construction materials?

22   A.    Correct.

23   Q.    I think we've touched on this a little bit, but who were

24   your competitors in that business?

25   A.    We had, in the limestone, we competed with U.S. Steel,

94

1   which had an operation in Conneaut, Ohio.  We competed with

2   Buffalo Crushed Stone to the east.  And then to the south, we

3   competed with some of the big companies down there.

4   Q.    Do they actually quarry limestone in this region?

5   A.    Not in Erie or Crawford County, but there was a quarry

6   outside of Grove City.  There's some others down near New

7   Castle.

8   Q.    Is that what keeps, the land-based quarries, is that what

9   keeps your geographical area smaller?

10  A.    Correct.

11  Q.    In terms of regulation, you mentioned this permitting

12  business, the permitting out on the lake.  Was the business of

13  Erie Navigation Company highly regulated?

14  A.    Yes, it was.

15  Q.    Give us an idea from the standpoint of your employees,

16  how much in the way of man hours was spent just on the

17  regulation of your business?

18  A.    We had one gentleman that did primarily all the

19  regulations required for operating ships on the Great Lakes.

20  He was a retired captain from the U.S. Coast Guard.  It was his

21  full-time job to handle all the regulatory agencies that we

22  came in contact with.  About 2,200 hours a year, I guess.

23  Q.   In 1997 and 1998 did Erie Navigation Company have any

24  litigation, any lawsuits involving itself?

25  A.   Yes, we did.


95


1  Q.   What type of lawsuits involved Erie Navigation Company in

2  those years?

3  A.   In those years we were presented with lawsuits, roughly

4  100 asbestosis cases.  They were seamen that were -- injured or

5  exposed to asbestos that were on ships that Erie Sand had back

6  in the late '60s and early '70s.

7  Q.   This is before your family ever owned the business?

8  A.   That's correct.

9  Q.   Did you have any lawsuits with plaintiffs or injured

10  people with these 100 suits, where they were your employee,

11  that is when the Smith family owned Erie Navigation or Erie

12  Sand and Gravel?

13  A.   No.

14  Q.   So these are older suits?

15  A.    Correct.

16  Q.    Was there insurance coverage for those types of suits --

17  well, let me ask you this.  Was there an insurance company in

18  existence that could pick up the defense on those suits?

19  A.    At the time of those suits or at the time that those

20  people were exposed to asbestos, we were owned by Koppers

21  Corporation out of Pittsburgh, Erie Sand was.  So we didn't

22  have the insurance records.  So we had to go alone on the

23  defense costs.

24  Q.    Ultimately, was there any insurance that was identified

25  that would pick up either the defense or indemnity on those

96

1  claims?

2  A.    No.

3  Q.    We've heard that your father made a gift of a certain

4  portion of the Family Limited Partnership.   Well, let me back

5  up and ask this.  Mr. Cullen was here and testified, were you

6  here?

7  A.    Yes, I was.

8  Q.    You heard how your father visited with Mr. Cullen and

9  they talked about an arrangement for a Family Limited

10  Partnership?

11  A.   Correct.

12  Q.   Were you aware that those conversations were going on?

13  A.   No, I was not.

14  Q.   In January of 1998, we've heard on January 5, 1998, your

15  father executed some documents to transfer a portion of the

16  Smith Family Limited Partnership to you?

17  A.   Correct.

18  Q.   Let me just show you what is Exhibit 1, the Smith Family

19  Limited Partnership Agreement, and have you take a look at page

20  28 and 29 of that agreement; is that your signature?

21  A.   Yes, it is.

22  Q.   Is that your father's signature?

23  A.   Yes, it is.

24  Q.   Is your sister's signature contained on page 29?

25  A.   Yes, it is.


97


1  Q.   All right, thank you.  You've heard us talk about fair

2  market value, Sandy, have you not?

3  A.   Yes, I have.

4  Q.   Do you understand that fair market value talks about a

5  hypothetical buyer and a hypothetical seller?

6  A.   Yes.

7  Q.   And it's not Smith family members, do you understand

8  that?

9  A.   Correct.

10  Q.   And do you understand that the fair market value involves

11  or is the price at which a hypothetical buyer and seller would

12  transact business -- neither being required to buy or sell and

13  both having full knowledge of the transaction events and even

14  alternative investments they could make, do you understand

15  that?

16  A.   Yes, I do.

17  Q.   Do you have an opinion about the fair market value of

18  what one percent of the Family Limited Partnership would be,

19  the Smith Family Limited Partnership would be, which owned Erie

20  Navigation Company as of January 5th and December 31, 1998?

21        MR. COOPER:  Objection, lack of foundation.

22        THE COURT:  Lay a little foundation.

23  BY MR. DELANEY:

24  Q.   Were you an owner of a limited partnership interest in

25  1998?


98


1   A.   Yes, I was.

2   Q.   Do you remember how much your father had gifted to you in

3   January of 1998?

4   A.   Yes.

5   Q.   What percentage, if you can recall?

6   A.   I think it was five or six percent.

7   Q.   Do you know what amount he gifted to you in December of

8   1998?

9   A.   It was 10 or 12 percent, maybe more.

10  Q.   Now, had you been involved continuously in the business

11  of the underlying asset of Erie Navigation Company between 1985

12  and 1998?

13  A.   Yes, I had.

14  Q.   Today are you familiar with the terms that are contained

15  generally in the Family Limited Partnership Agreement?

16  A.   Yes, I am.

17  Q.   Now, I would ask whether you have such an opinion?

18      MR. COOPER:  Objection, foundation.

19      THE COURT:  I apologize, I didn't hear the

20  objection, what was the basis for the foundational objection?

21      MR. COOPER:  How does he arrive at a discount.

22      THE COURT:  Well, that's not a foundational

23  objection, he's about to tell you, overruled.  Go ahead.

24  BY MR. DELANEY:

25  Q.    Sandy, what is your opinion about the fair market value

99

1  of one percent of the Family Limited Partnership in 1998?

2  A.    Well, I think it was -- I don't know, somewhere between,

3  I don't know, $10,000 to $12,000 per share.  I could make a

4  case for one share.  I could make a case for 7,000, I could

5  make a case for 15.  But in the middle I'd say $10,000 to

6  $12,000.  Just do some simple mathematics and say okay, it was

7  $5.2 million and there's how many shareholders, that's where I

8  ended up.  And we had significant bank debt.

9  Q.    Okay.  Did you take into consideration in forming your

10  opinion what a hypothetical buyer could do with their money

11  elsewhere?

12  A.    Yeah, I suppose.  I have since then, yes.

13   Q.   Have you taken into consideration in forming your opinion

14   what dividends the limited partnership would have received from

15   the underlying company?

16   A.   They were pretty nonexistent.  We paid dividends up from

17   Erie Navigation to the partnership to basically pay Mr. Pashke,

18   Mr. Finnecy and MacDonald, Illig.  There were no distributions

19   that came from the partnerships.

20   Q.   Did you take into consideration in forming your opinion

21   the management of the company, the management of Erie

22   Navigation Company?

23   A.   Yeah, my dad was in charge and that's all the further it

24   was going.  If we had a dispute, it was too bad if he didn't

25   agree with you.


100


1   Q.   And did you take into consideration the net asset value

2   and cash flows of Erie Navigation Company?

3   A.   Yeah, I mean, we had a couple of tough years.

4   Q.   I want to show you a document that we've all previously

5   looked at.  I know that the print is a little bit small, can

6   you read that?

7          THE COURT:  To me it's not legible, you're going to

8   have to zoom it, maybe it's just my eyes.

9   BY MR. DELANEY:

10  Q.    Just to begin with, this is C-5 from Mr. Pashke's review

11  of Erie Navigation Company.  I want to zoom in on the year

12  1994.

13  A.    Okay.

14  Q.    Do you see a line -- first of all, under financing, under

15  that line financing, short term bank debt charge?

16  A.    Yes.

17  Q.    I'm going to take it down, I'm sorry about that -- do you

18  see in 1994 the numbers $450,000?

19  A.    Yes, I do.

20  Q.    Mr. Pashke indicated that was new debt, do you know what

21  that debt was?

22  A.    Yes, I do.

23  Q.    What was it?

24  A.    It was a loan that my father made back to the company in

25  early January.  He had been given, taken I should say, a rather

101

1   sizable bonus at the end of 93.  And turned around and lent it

2   back to the company because we had a significant outstanding

3   bill from the port with dry docks on the Richard Reiss of

4   $800,000.

5   Q.    Now, I'm going to go across the page to 1997.  If this is

6   1994, '95, '96, to '97, do you see another financing situation

7   of another $450,000?

8   A.    Correct.

9   Q.    Are you familiar with what that transaction was?

10   A.    Yes, I am.

11   Q.    What was that?

12   A.    That was a note or a loan from my father and myself this

13   time, my dad had lent $350,000, I had lent $100,000.

14   Q.    To the company?

15   A.    To the company.

16   Q.    Any particular purpose or operating money?

17   A.    No, it was, we did not have a particularly good year.

18   But I can remember that we had also gone through a five-year

19   inspection again with the Richard Reiss.  Fortunately, this

20   time the rudder stock wasn't bent.  But it was still an

21   expensive repair.

22          MR. DELANEY:  That's all the questions I have,

23  Sandy, thank you.

24          THE COURT:  It occurs to me you're about to start

25  your cross-examination, there's not much point with you


                              102


1  starting it and then me calling lunch break in about seven

2  minutes.  So we're going to take our lunch break right now.

3  Members of the jury, I'm going to ask you to be back -- let's

4  be back and ready to go by 10 after one, you can begin your

5  cross at that time.

6          (Luncheon recess taken from 11:54 a.m.; until

7  1:15 p.m.)

8          THE COURT:  All right, Mr. Cooper, let's go.

9                  CROSS-EXAMINATION

10  BY MR. COOPER:

11  Q.    Good afternoon, Mr. Smith.

12  A.    Good afternoon.

13  Q.    Mr. Smith, I believe earlier that Mr. Delaney may have

14  handed you what's been previously marked as Exhibit No. 3, do

15  you have that in front of you?

16  A.   No, I do not.

17  Q.   I believe you previously identified this document as

18  being the consolidated financial statements and accountants'

19  compilation report for Erie Navigation Company and its

20  subsidiaries?

21  A.   I don't think I identified it before, but that's what it

22  is.

23  Q.   This is for the years 1997 and 1996?

24  A.   Yes.

25  Q.   And have you seen this document in your position as being

103

1  the vice president of Erie Navigation Company?

2  A.   Probably.

3  Q.   Would you have reviewed the document?

4  A.   Yes.

5       MR. COOPER:  Your Honor, at this time I'd like to

6  move Exhibit No. 3 into evidence.

7       THE COURT:  Any objection?

8       MR. DELANEY:  I have no objection.

9       THE COURT:  It's admitted.

10   BY MR. COOPER:

11   Q.    And this financial report, it was put together by I

12   believe what they call independent auditors, is that correct?

13   A.    Yeah, it was put together by our outside CPA firm.

14   Q.    They're independent auditors, right?

15   A.    Yeah, it wasn't an audit, though, it was a compilation

16   report.

17   Q.    An accountants' compilation report?

18   A.    Correct.

19   Q.    And the firm there was Root, Spitznas and Smiley?

20   A.    Correct.

21   Q.    And this document, would it have accurately reflected the

22   financial condition of Erie Navigation in 1996 and 1997?

23   A.    I would assume so.

24   Q.    And was this document provided to your expert as part of

25   his analysis as to the value of Erie Navigation Company?


104


1   A.    I couldn't tell you for sure one way or the other, I

2   would imagine he got it, but I didn't provide it to him, no.

3   Q.    Have you had reviewed your expert's report -- Mr. Pashke,

4  I guess I should be more clearer, because you had two experts,

5  Ms. Carrier and Mr. Pashke?

6  A.   Correct.

7  Q.   Mr. Pashke is the only one who has testified, right?

8  A.   Right.  But I wasn't sure if you were talking about Jim

9  Cullen or Greg or who you were talking about.

10  Q.   I didn't realize Mr. Cullen was an expert.  Did you

11  provide financial statements to Mr. Pashke in coming to his

12  evaluation?

13  A.   I would assume that they did, Mr. Finnecy was very

14  thorough.

15  Q.   Mr. Finnecy?

16  A.   Well, Mr. Finnecy was our outside CPA who is listed here

17  on the letterhead, he would have provided these statements to

18  Mr. Pashke.

19  Q.   And Mr. Pashke in coming to his -- do you understand what

20  net asset value is?

21  A.   I think I do.

22  Q.   Would that understanding be that it is assets minus

23  liabilities?

24  A.   Yes.

25  Q.   And did your expert, Mr. Pashke, use the net asset value

105

1   for the valuation of this FLP?

2   A.   I believe he did.

3   Q.   After reviewing the financials, he came to the

4   determination that the value of the ENC stock as of December,

5   1997 was $5.2 million, correct?

6   A.   Yes, I believe he did.

7   Q.   And as well -- I'm going to show, do you have Exhibit 34

8   in front of you?

9   A.   There's nothing else up here, sir.

10  Q.    Do you see what's been previously marked as Defendant's

11  Exhibit No. 34?

12  A.   Yes, I do.

13  Q.    And this is a Form 843 which is a claim for refund and

14  request for abatement, correct?

15  A.   Yes, it is.

16      THE COURT:  Mr. Cooper, do me a favor, when you

17  examine the witness, don't walk away from him and talk that

18  way, it's hard for the reporter, it's hard for him and it's

19  hard for me.

file:///A|/SMITHDY2.TXT

20      MR. COOPER:  Yes, sir.

21      THE COURT:  You can walk around all you want but

22  direct your questions that way.

23      MR. COOPER:  Thank you.

24  BY MR. COOPER:

25  Q.   And at the bottom of the page can you identify that

106

1  signature?

2  A.   Yes, it looks like my father's signature.

3  Q.   And attached to the claim for refund back in the back is

4  the report of Mr. Pashke?

5  A.   Okay.

6  Q.   You know that?

7  A.   No.

8  Q.   Is Exhibit D to the report, Mr. Pashke's --

9  A.   Do you want me to look at it now?

10  Q.   No, I'm just saying Mr. Pashke's report is attached?

11  A.   Okay.

12  Q.   By attaching that report to this document, your father,

13  under penalty of perjury, declared that he examined this

14  request for refund and that he declared that everything in it

15  was true and correct to best of his knowledge.  Do you have an

16  understanding if your father agreed with Mr. Pashke that the

17  value of ENC stock as of December 31st was $5.2 million?

18  A.   I couldn't tell you if he did or didn't.  I don't think

19  he ever thought it was worth that much money.  But that's just,

20  I really don't know, it's not something that we discussed.

21  Q.   Well, if he didn't think it was worth $5.2 million, would

22  he have made a misrepresentation to the Internal Revenue

23  Service?

24       MR. DELANEY:  I'm going to object to that, your

25  Honor, he's asked this witness the state of mind of a person

107

1  who's deceased.

2       THE COURT:  Sustained.

3       MR. DELANEY:  Thank you.

4  BY MR. COOPER:

5  Q.   Let me try it a different way.  Do you have an

6  understanding of whether or not your father contended the net

7  asset value of ENC's stock was $5.2 million?

8   A.   Did he agree or disagree?

9   Q.   Agree?

10  A.   That he agreed, again, I don't really know.  It's not

11  something, my father never thought he was -- as well to do as

12  he was.  I mean, he just never lived very high and, you know,

13  when he saw these numbers, I don't think he ever believed it.

14  But he was a pretty willing guy and if his accountant said, you

15  know, here Sid sign this, we're going to send it in, I think he

16  would have done it.

17  Q.   Would you agree with me that he did submit this to the

18  Internal Revenue Service?

19  A.   I'm sure he did, that's why we're here today I think.

20  Q.   Now, Mr. Smith, I believe when you testified earlier, you

21  also stated that the net asset value of ENC stock was worth

22  $5.2 million?

23  A.   That's what Mr. Pashke's calculations yielded, right.

24  Q.   I'm asking you, I mean when you testified, did you agree

25  that the net asset value of the ENC stock was worth $5.2


108


1   million?

2   A.   If you're asking my opinion as to the value of it in

3   1998, would I have paid $5 million for that, no.

4   Q.   Well, I'm asking whether or not you agree that the net

5   asset value on December 31, 1997 was $5.2 million?

6   A.   In Mr. Pashke's report he said $5.2 million.  But if

7   you're asking me -- I guess I don't know what you're asking.

8   His report he said $5.2 million.  If you're asking me what

9   would you pay for it, I'm not going to pay you $5.2 million for

10  it.

11  Q.   So you're contending that the net asset is not $5.2

12  million?

13  A.   Yeah, I'm saying it's not $5.2 million, not in my mind.

14  Q.   So the net asset value is something less in your mind?

15  A.   Yes.

16       MR. COOPER:  Your Honor, I'd like to strike the

17  witness --

18       THE COURT:  You opened the door.

19       MR. COOPER:  May we have a side bar?

20       THE COURT:  Sure.

21       (On the record at side bar.)

22       MR. COOPER:  In your ruling -- the net asset value

23  is not discounted to the value he could put to get the

24  discount.  And as you ruled very clearly, the net asset value

25  is $5.2 million.


109


1       THE COURT:  Hold your thought for one second.  Mr.

2  Cooper, I've got a feeling this issue is going to take a little

3  bit of time, it's an important one.  I'm going to let the jury

4  go out and bring my law clerk in and we'll chat about this.

5  What is your initial response to this?

6       MR. DELANEY:  He never said in direct testimony that

7  he was basing his opinion upon something other than the $5.2

8  million net asset value.  He never said that.  I'm talking

9  about Mr. Smith.  In their cross, it's incredible to me that

10  they have asked him what his opinion is.

11       THE COURT:  That's what struck me, but I want to

12  hear from them.

13       (End of discussion at side bar.)

14       THE COURT:  Members of the jury, we've hit one of

15  those legal bumps in the road, it's going to take a little

16  longer, it wouldn't be convenient for you to sit there.  So I'm

17  going to ask you to go back to your jury deliberation room.

18  I'm have a little argument here with counsel, both counsel, and

19  then we'll bring you right back.

20          (The Jury was excused from Courtroom C at 1:32 p.m.)

21          THE COURT:  All right, let's re-tee this thing.  Go

22  ahead.

23          MR. COOPER:  This is the basis of my motion at this

24  point.  We've gone through --

25          THE COURT:  So the Clerk is clear, the motion is to


110


1   strike the response of Mr. Smith, who responded to a question

2   from you, in essence, do you agree with Mr. Pashke's valuation

3   of $5.2 million.  To which he responded, and I'm paraphrasing,

4   but the upshot was no, I don't agree with it, I wouldn't have

5   paid that much for it.  And you me want to strike that

6   testimony, is that right?

7           MR. COOPER:  Well, I want to understand -- should we

8   do this in front of the witness?

9           THE COURT:  In front of who?

10          MR. COOPER:  The witness.

11          THE COURT:  I would like Mr. Smith, that's a good

12   point, I appreciate that, Mr. Cooper.  Mr. Smith, step out,

13   please.  All right, go ahead.

14          MR. COOPER:  I think the implications are broader,

15   we have been fighting over this, as in the claim of refund, the

16   net asset value and the methodology of net asset value is $5.2

17   million.  The question is you allowed him to give a lay opinion

18   as to one percent interest as to the discount.  So how did he

19   get there.  And, obviously, implicit in his testimony is if

20   we're stuck at $5.2, he testified to the condition of the

21   business, the operations of the business.  So, obviously, that

22   is what makes up the reduction in value.  But, clearly, that's

23   not how he did it.  I mean what he did is he doesn't start at

24   $5.2 and go through the methodology.  His methodology is the

25   net asset value isn't $5.2.  And that's what he said.  I don't


                              111


 1   believe it was worth $5.2.  And that is why I think this is --

 2   is the essence of this kind of back dooring in a lower net

 3   asset value by letting him talk.  Because as he said, your

 4   Honor, no, I don't think it's the net asset value is $5.2.  And

5   it's against your ruling.  And, apparently, he didn't use the

6   methodology where he was going to opine to a value with

7   implicitly meant discounts, as Mr. Delaney pointed out.  His

8   discounts starts with a lower net asset value to begin with.

9   So this has been our contention from the beginning.  And I

10  believe the witness has talked about that.  If that's the

11  methodology that he used, actually, in my mind, being the

12  advocate for the government, his testimony as to the value,

13  because he used the methodology that is against your ruling, it

14  should be stricken.

15       THE COURT:  All right, what do you say about this,

16  Mr. Delaney?

17       MR. DELANEY:  This interrogation hasn't even

18  explored those issues.  First of all, this witness was asked

19  the question on direct testimony, what is your opinion of the

20  value of a one percent limited partnership interest.  He

21  expressed that opinion in a dollar amount.  We stayed away from

22  the underlying, we understood what the underlying asset was, we

23  didn't explore anything about value.  On cross-examination, he

24  isn't asked about his methodology, he's asked what do you think

25  a hundred percent of the stock of Erie Navigation would be

112

1  worth, $5.2 million.  Well, he says that's what Pashke said.

2  Do you agree with that, he presses on.  No, I wouldn't pay

3  that.  He hasn't even connected that with the methodology.  But

4  even if he did, the horse is out of the barn now, judge.  This

5  man has opened the door, and I think that the jury heard it,

6  they shouldn't be cautioned about it, there should be no other

7  instruction about it.  And he's permitted to continue to

8  testify.  He has asked him a completely unrelated opinion to

9  the central issue in this case.  The central issue in this case

10  is what's the value of a one percent limited partnership

11  interest.  I'm back there kind of stunned when he asked the

12  question.  But he asked it and he got an answer.

13        THE COURT:  Go ahead, Mr. Cooper.

14        MR. COOPER:  This case is about valuation and

15  methodology.  And the court ruled they are stuck with the net

16  asset value.

17        THE COURT:  Let's be clear, very clear about what I

18  ruled.

19        MR. COOPER:  Yes, sir.

20        THE COURT:  I ruled that I was not going to permit

21  the plaintiff to introduce evidence to attempt to backtrack on

22  the $5.2 million net asset figure that they argued with the

23  Commissioner, for the very good reason advanced by you, which

24  is precisely correct, that that would run afoul of the variance

25  rule.  And, secondarily, as a corollary to that, I wasn't going

113

1  to let Mr. Pashke come in utilizing a different theory to

2  undermine the $5.2 million.  The essence of my ruling was

3  twofold.  The plaintiff is precluded from attempting to work at

4  cross purposes with itself as to what it previously advanced on

5  net asset.  But at the same time, the jury is free to come up

6  with any figure that it wants to, that was the extent of my

7  ruling on that.  But, and I'm going to give you a few minutes

8  to disabuse me of it, but the question is who swung the door

9  open here.  He didn't elicit from him an opinion on net value

10  on direct examination.  You elicited the opinion on direct

11  value on cross-examination.  Incidentally, I don't mind you

12  consulting with your counsel from time to time.  The way we do

13  it around here, generally speaking, is when you're engaged in a

14  conversation with the court, you stay engaged in the

15  conversation with the court.

16      MR. COOPER:  Excuse me, your Honor, I'm sorry.  If

17  the net asset value is $5.2 million, and they aren't allowed to

18  argue that it's something else, his methodology from the

19  discounts or how he got down do his one percent interest,

20  started from a different starting point.

21      THE COURT:  You are the beneficiary as the

22  government of the variance rule.  The government enjoys the

23  benefit of that rule, as does any other litigant to any other

24  evidentiary rule, as long as you don't open the door.  You've

25  opened the door, now we're going to go ahead.  Bring the jury


114


1  in.  Mr. Smith, would you resume the stand.

2      (The Jury reenters Courtroom C at 1:40 p.m.)

3      MR. COOPER:  All right, Mr. Cooper.

4  BY MR. COOPER:

5  Q.   Mr. Smith, did you arrive at -- you testified earlier you

6  did an analysis as to one percent, what the value of a one

7  percent interest of Smith FLP was?

8  A.   Yes, I did.

9   Q.   In doing that analysis, did you ever form an opinion as

10  to what the net asset value of Smith FLP was?

11  A.   Yes, I did.

12  Q.   And was the net asset value $5.2 million?

13  A.   No, it was not.

14  Q.   Did you arrive at a specific number?

15  A.   I think I looked at a couple different numbers, but in

16  that range.

17  Q.   And you used the assets on the balance sheet?

18  A.   Yes, I did.

19  Q.   And did you use the liabilities on the balance sheet?

20  A.   Yeah, I did that, I looked at a lot of things.  Of

21  course, I had previous knowledge of things that were not on the

22  balance sheet.  Like the asbestosis cases, our diminishing

23  market for are largest asset, stuff like that.  The age of the

24  fleet, kind of some the headaches that we were going to be

25  facing down the road.  As far as renewing the ships, keeping

115

1   them afloat.

2   Q.   You didn't disclose the asbestos liabilities on the

3  financial statements?

4  A.   No, we did not.

5  Q.   Erie Navigation Company wasn't an accrual taxpayer,

6  wasn't it?

7  A.   You mean based on the sales base thing, is that what

8  you're saying -- I don't understand.

9  Q.   As the vice president of Erie Navigation, you regularly

10  reviewed those financial statements?

11  A.   Correct.

12  Q.   Okay.  And did you have an understanding whether or not

13  the accountants used an accrual basis for doing the balance

14  sheets?

15  A.   I don't know, I assume and after listening to Mr. Pashke

16  this morning, that's kind of a standard methodology.

17  Q.   And by that methodology, it means even though you might

18  have a right to payment and haven't received it, you still put

19  it on the balance sheet?

20  A.   Yeah, I would guess that's correct.

21  Q.   Likewise, if you have an obligation to make a payment but

22  still haven't made the payment, it would appear on the balance

23  sheet?

24   A.   That is correct.

25   Q.   Did you know whether an asbestos claim would be a

116

1   contingent liability?

2   A.   Well, there were kind of -- I don't know what you would

3   call it, they were kind of unrealized potential losses.  We had

4   defended a case in 19 -- I believe '96 or '97, where we did not

5   have an insurance company representing us or the lawyers paid

6   by an insurance company.  It cost us about $250,000 to get a no

7   verdict.

8   Q.   Let me back up, do you know what contingent liability is?

9   A.   Define it for me, please.

10   Q.   Well, I'm asking you do you know what it is?

11   A.   Yeah, I guess it would be the potential liability to, you

12   know, contingent on something else happening, which would be a

13   lawsuit or a judgment.

14   Q.   And I believe on your balance sheet you have a type of

15   contingent liability listed which would maybe be a pension

16   benefit?

17   A.   Probably what it was.

18  Q.    This financial statement, for instance, the 1997

19  financial statement, you would provide this to the bankers,

20  correct?

21  A.    That is correct.

22  Q.    And the bankers lended you money and lines of credit,

23  correct?

24  A.    That is correct.

25  Q.    You would negotiate with the banks on a rate of credit?

117

1  A.    That is correct.

2  Q.    As a general principle would you agree with me that if

3  you're a more risky borrower, you have to pay higher rates of

4  interest?

5  A.    That is correct.

6  Q.    And as part of their determination as to the risks

7  associated with Erie Navigation Company, you would provide

8  these financial documents to your bankers?

9  A.    Correct.

10  Q.    And you've testified as to asbestos liabilities, correct?

11  A.    That's correct.

12    Q.    And were these liabilities significant?

13    A.    Yes, in fact, it was father's direct orders, direction to

14    our accountant to leave those off.

15    Q.    So you didn't disclosure your asbestos liabilities?

16    A.    No, we did not.

17    Q.    But now you're using asbestos liabilities to allegedly

18    lower the one percent value interest in Smith FLP, correct?

19    A.    Yeah, if we had told the banks that we had $100,000,

20    excuse me, a 100 pending asbestosis liability, they would have

21    said sorry, no credit, and they would terminated our existing

22    lines on the spot, I'm convinced of it.

23    Q.    So you didn't tell them?

24    A.    We didn't tell them.

25    Q.    I'd like to stay with Exhibit No. 3, please.


118


1    A.    Okay.

2    Q.    And on the screen, I believe with Mr. Delaney, you

3    testified that in 1997 your father made a loan to the company

4    in the amount of $350,000?

5    A.    That's correct.

6  Q.   I believe you also testified that you also made a loan to

7  the company in the amount of $350,000?

8  A.   No.

9  Q.   I'm sorry, I tripped on myself.  Lots of numbers coming

10  out in this trial.  You made a loan to the company in the

11  amount of $100,000?

12  A.   That's correct.

13  Q.   I want to direct your attention to page 4 of the

14  financial statements -- and on there do you see the $450,000

15  that were received as a result of the loan?

16  A.   Yes, the one you've highlighted.

17  Q.   And as well on this document that you've used with Mr.

18  Delaney, with the cash flow statements, correct?

19  A.   Correct.

20  Q.   Then the part of the financial statement that I've

21  directed you to, that also cash flow statements, correct?

22  A.   Say that again for me, please.

23  Q.   I'm sorry.  Page 4 of the 1997 valuation?

24  A.   Okay.

25  Q.   This is also a cash flow statement, correct?

119

1    A.    Yes.

2    Q.    So the $450,000 that Mr. Delaney directed to you on Mr.

3    Pashke's exhibit, correlates to the financial statements,

4    correct?

5    A.    I believe so, yes.

6    Q.    Now, on the same 1997 financial statement, please turn to

7    page 11.

8    A.    Pardon me.

9    Q.    Please turn to page 11.

10   A.    Okay.

11   Q.    So on the cash flow statement we know the company

12   received a loan from you in the amount of $450,000, from you

13   and your father in the amount of $450,000?

14   A.    I believe so, yes.

15   Q.    That's cash flow coming in, right?

16   A.    Right.

17   Q.    And I've now handed you a note payable, meaning ENC has

18   to pay $450,000 back to you and your father, correct?

19   A.    Right.  Well, actually, I think it went to Erie Sand and

20   Gravel or maybe the steamship company.  But because they're

21   consolidated statements, they would all appear as one.

22  Q.    Just as a general principle with what Mr. Delaney told

23  you, we're going to refer to them together?

24  A.    I'm sorry.

25  Q.    So with that $450,000 on a balance sheet, also reflected

120

1  a debt that ENC Company owed you and your father?

2  A.    Right.

3  Q.    Now, do you see next to that $450,000 there's a number 2?

4  A.    Okay.

5  Q.    What does that number 2 indicate?

6  A.    You must go to a note somewhere in the sheets.

7  Q.    Exactly right.  Turn the page to note number 2?

8  A.    Okay.

9  Q.    And it says that the "company's subsidiary also

10  negotiated an additional line of credit in the amount of

11  $1,500,000 with another financial institution."  So did that

12  money come from a financial institution?

13  A.    I would imagine, I think that was the year that we

14  decided to do business with two different banks.  But, I guess

15  when I looked at those numbers before, it was just 450.  I

16   remember loaning money that year.  But, you know, kind of out

17   of context, that's okay.

18   Q.    But the financial statements indicate that the money came

19   from a financial institution?

20   A.    Right, we did borrow extra money from, I think both

21   Marine Bank and National City at the time.

22   Q.    So the financial statements would indicate that the money

23   actually didn't come from you and your father, correct?

24   A.    I believe it did, I think there was some other -- there

25   was some other money shown there on the cash statement.


                                   121


1   Q.    Would you agree with me that the $450,000 credit links

2   directly to note number 2?

3   A.    I don't know, you're asking me about an accounting

4   statement from, I don't know how many years ago.  I do remember

5   writing back a check to the company to be used in their

6   operations.  You know I get paid at the end of the year.  I

7   don't know how else to express it to you.  The 450 on this,

8   that kind of jogged my memory the other day, I don't

9   remember -- you know what I mean, I don't remember precisely or

10   where each one of these amounts of money came from on the

11   balance sheet, I'm not an accountant by trade.

12   Q.   It just jogged your memory just the other day?

13   A.   Actually kind of did.

14   Q.   These were produced back in 1997 as the business was an

15   ongoing concern?

16   A.   I think so, yes.

17   Q.   As Mr. Delaney pointed out, actually in 1997 you didn't

18   have an understanding that the Smith Family Limited Partnership

19   had been formed?

20   A.   No, I don't recall that.

21   Q.   And in the same vane back in 1997, had you ever heard

22   about Family Limited Partnerships?

23   A.   No.

24   Q.   And through this litigation have you learned more about

25   Family Limited Partnerships?


122


1   A.   A lot.

2   Q.   And I believe one of your understandings is that you can

3   pass along property through a Family Limited Partnership as

file:///A|/SMITHDY2.TXT

4  discounts, correct?

5  A.   I believe so, yes.

6  Q.   And I believe you told me during deposition that one of

7  your understandings was that you could pass on cash in

8  marketable securities to your children at big discounts?

9  A.   I believe that to be the case, I'm not an expert.  After

10  going through this case, that's what I understand.

11  Q.   And in the case here, your father passed on the ENC stock

12  to you, correct?

13  A.   Well, the Family Limited Partnership owned the stock.

14  Q.   That's a more correct statement, he passed on the

15  partnership interest that owned all the interest in Erie

16  Navigation?

17  A.   Correct.

18  Q.   Now, you testified that a one percent interest in Smith

19  Family Limited Partnership was worth $10,000 to $12,000?

20  A.   That's my number completely.

21  Q.   You said you graduated from the Rochester Institute?

22  A.   Of technology, yes, sir.

23  Q.   Sir, do you have -- are you a certified business

24  appraiser?

25  A.   No, sir.


123


1   Q.   Are you a certified valuation analyst?

2   A.   No, sir.

3   Q.   Are you an accredited senior appraiser?

4   A.   No, sir.

5   Q.   Do you have a masters in business?

6   A.   No, sir.

7   Q.   Are you a CPA?

8   A.   No, sir.

9   Q.   And in coming to the one percent value of Smith Family

10  Limited Partnership, did you use a lack of control discount?

11  A.   No, I really didn't.  I don't, you know, I understand

12  that process now, I just kind of looked at the words and made

13  up my mind from there.

14  Q.   Did you use a lack of control discount?

15  A.   I don't think so.  Other than the fact that I knew that

16  my dad was in charge, as far as things were going to go with

17  him.

18  Q.   Did you rely on closed end funds in arriving at a lack of

19  control discount?

20  A.  No, I did not.

21  Q.  Did you use a qualitative marketability discount model in

22  arriving at a lack of marketability?

23  A.  No, I did not.

24  Q.  Did you rely on restricted stock studies in coming to a

25  lack of marketability?


124


1  A.  No, I did not.

2  Q.  Do you have an understanding if your expert relied on

3  that kind of data in coming to a value?

4  A.  Yes, I do.

5  Q.  You said you came to a $10,000 to $12,000 value for a one

6  percent interest?

7  A.  Correct.

8  Q.  Is that for January 5, 1998 or December 31, 1998?

9  A.  I would say probably year end, to December of '98.

10  Q.  You probably would say or do you know, you did the

11  calculation?

12  A.  Well, it's not something I spent a lot of time on, but I

13    would say it was year end, that was typically our focus.

14    Q.    So you didn't spend a lot of time on your calculation?

15    A.    No, I didn't.

16    Q.    Mr. Pashke, your own expert, came to the conclusion that

17    a one percent interest was worth $28,300 on January 5, 1998; do

18    you know that?

19    A.    I do now, yes.

20    Q.    On December 31st he came to a value of $27,600; do you

21    have that same understanding?

22    A.    Yes, I do.

23    Q.    So your value is more than -- less than half of what your

24    expert came to, correct?

25    A.    That's correct.


                                    125


1    Q.    And your value being lower than your expert's, wouldn't

2    that in turn allow a larger refund to be paid to your father's

3    estate?

4    A.    Well, it's complete speculation on my behalf.  You know,

5    again, it's kind of insider trading, if you will, I knew where

6    the problems were.  We didn't disclose anything to the banks,

7   we didn't disclose things to Greg.

8   Q.   I asked a question about refunds, not what you disclosed

9   to the banks?

10  A.   I'm sorry.

11  Q.   If the value, because your one percent interest value is

12  less than what your own expert came to --

13  A.   Okay.

14  Q.   We together so far?

15  A.   I'm with you.

16  Q.   That because the value is less, do you have an

17  understanding that a lower value would allow for your father's

18  estate to receive a larger tax refund in this litigation?

19  A.   Yes, I understand that.

20  Q.   And, sir, you're one of the co-executors of your father's

21  estate, correct?

22  A.   Correct.

23  Q.   In the same regard you're also one of the beneficiaries

24  of your father's estate, correct?

25  A.   Right.

126

1  Q.   So through your own testimony, you would gain to benefit

2  through a larger tax refund, correct?

3  A.   Right.  But if we have more money in my dad's estate,

4  we'd have to pay more additional estate taxes.

5  Q.   But isn't always more money better?

6  A.   I would say so.

7        MR. COOPER:  That's all the questions I have.

8                  REDIRECT EXAMINATION

9  BY MR. DELANEY:

10  Q.   Mr. Smith, I forgot to ask you, just some housekeeping.

11  I'm going to show you what we've previously marked as exhibits,

12  Plaintiff's Exhibits 5, 6 and 7, are those familiar to you?

13  A.   Yes, they are.

14  Q.   Would you tell us what they are?

15  A.   Exhibit 5 is the consolidated financial statements and

16  compilation for Erie Navigation subsidiaries from 93 to '94.

17  Exhibit No. 6 is the same thing, compilation report for 1996

18  and 1995.  And this one is the compilation report for Erie

19  Navigation for '97 to '98, Exhibit No. 7.

20  Q.   Thank you.  Mr. Cooper asked you some questions about

21  this loan that you participated in, you thought it was in 1997?

22  A.   I believe so.  I know we were trying to buy a new house,

23  I had to loan money back to the company, that kind of messed

24  things up for me for a while.

25  Q.    You personally?

127

1  A.    Yes.

2  Q.    Is that how you recall the transaction?

3  A.    Yes.

4        MR. DELANEY:  That's all I have.

5        THE COURT:  Mr. Cooper.

6        MR. COOPER:  I have no more examination of this

7  witness.

8        THE COURT:  All right, thank you.

9        MR. DELANEY:  Your Honor, Mr. Smith is our last

10  witness.  I want to make sure I moved for the admission of

11  Exhibits 1 through 7 were documents, and 8 through 19 were

12  photographs, and I would move their admission.

13        THE COURT:  Any objection to any of that?

14        MR. DALE:  Other than the objection stated in

15  chambers.

16        THE COURT:  I don't remember the objection, was it

17  to an exhibit?

18      MR. DALE:  We objected in chambers to the

19  introduction of the photographs --

20      THE COURT:  All right.  That's overruled, they're

21  all admitted.

22      MR. DELANEY:  With that, your Honor, the plaintiff

23  rests.

24      THE COURT:  Members of the jury, you're going to

25  feel like track stars, but I've got to ask you to go back in


                                128


1  just for one more minute, if you would.  I apologize for the

2  inconvenience.

3      (Jury excused from the Courtroom at 2:04 p.m.)

4      THE COURT:  Mr. Delaney, when we had the

5  conversation in chambers about Mr. Smith testifying, and the

6  record would speak for itself on this, but it was my

7  recollection that you suggested, when I precluded your expert

8  from weighing in on asset value and different theories, and Mr.

9  Smith as well, you suggested that Mr. Smith should be permitted

10  to weigh in on value insofar as it related to the one-percent

11  issue.  Based upon the discount issues that were in play before

12  the Commissioner, isn't that right?

13          MR. DELANEY:  I'm not sure what you mean by with

14  regard to the discounts.  There are, all the discount is the

15  difference between the proportionate share of one-percent of

16  net asset value and the perceived current value of one-percent,

17  if it's lower than that proportionate share, that's all the

18  discount is.  The experts Will use phrases like a discount for

19  marketability or a discount for control.  And I don't believe

20  that I ever suggested that Mr. Smith went through any such

21  analysis as such.  What he testified to, if I can anticipate

22  your point --

23          THE COURT:  My point is this, not to interrupt you.

24  If he comes in and broadly testifies to value, without

25  delineating the basis for it, and you did not walk him through


                              129


1  any methodology on direct at all, you just asked him to express

2  an opinion, which he did.  And if the government is entitled to

3  test the basis and the reliability for that -- have I put the

4  government between a rock and a hard place by essentially

5   letting a witness get up there and express an opinion.  In

6   other words, all the while his opinion was based upon a

7   fundamental difference in the net asset value with his own

8   expert.

9       MR. DELANEY:  That isn't the record.  He never asked

10  him whether a lower net asset value was the keystone to his

11  opinion about the current value of the family limited

12  partnership interest.  He never asked that question.  I believe

13  that Mr. Smith would have said no, I'll assume it's 5.2.  But

14  my current opinion about a one-percent interest is --

15      THE COURT:  He did ask him whether he was

16  considering any other discount factors and he said no?

17      MR. DELANEY:  He said I don't know that I went

18  through a discount analysis on control.  I know that my father

19  was in control.  That's essentially what a lay person would

20  understand as the lack of control discount.  He was never asked

21  whether he thought about the issue of marketability, and

22  whether that would drive the value lower.  He was never asked

23  about that on cross-examination.  Ultimately, judge, this whole

24  discount business is unnecessary for any witness.  An expert

25  can come in and say I'm not doing anything with discounts.  I

130

1  found four other companies just like Erie Navigation, here's

2  what was paid for them, and that's the approach I'm going to

3  use.  There is nothing magical about discounts.

4        THE COURT:  Mr. Cooper, I'm giving you one more

5  chance here to talk to me about this.

6        MR. COOPER:  Listening to what he said --

7        THE COURT:  Why did you ask him the question, there

8  had been nothing elicited from this witness on net asset value

9  on direct.  Nothing, that I heard.  And then you ask him do

10  you, in essence, do you agree with your expert, who says it's

11  5.2.  What did you expect him to say?

12        MR. COOPER:  Well, I mean I expected him to say no.

13  Because I think that's what they're doing here.  Is they're

14  coming in and talking about asbestos liabilities that aren't

15  even on balance sheets and pumping up this idea that it's bad

16  business and driving down fair market value.  And then whatever

17  that may be, there is no methodology on what he did.  Do you

18  apply lack of control, my father controlled it.  Did you do an

19  analysis, nothing.  I asked him, did you look at this.  And

20  then on lack of marketability.  Did you use a model, no.  This

21  is the government's position, like you said, they come in with

22  bland value, what are we supposed to do.

23          MR. DELANEY:  That is what lay opinion testimony is

24  all about.

25          THE COURT:  I normally don't re-till the same furrow


                                131


1  in the field but I thought that was useful here.  In any event,

2  my original ruling stands.  Before we bring the jury back,

3  let's take five minutes.  Who is your first witness, Mr.

4  Cooper?

5          MR. COOPER:  Our first witness is Mr. Burns.

6          THE COURT:  He's your only witness, as I recall?

7          MR. COOPER:  Yes, your Honor.

8          MR. DALE:  Before we go your Honor, I do have a

9  formal Rule 50 motion at the close of the plaintiffs' case.

10          THE COURT:  Absolutely, I should have anticipated

11  that.  Fire when ready?

12          MR. DALE:  Your Honor, the issue in this case is the

13  fair market value of a one-percent interest.  It is the

14   Commissioner's determination of that value is at issue.  The

15   government submits there is no reasonable basis by which the

16   jury could conclude that the Commissioner's determination is

17   erroneous.

18        The plaintiffs had moved some documents into

19   evidence and we have the testimony of three witnesses.  The

20   first witness was Mr. Cullen.  Who provided no evidence of

21   value, he merely discussed the legal nature of the partnership.

22        The second witness was Mr. Pashke, who did not, with

23   regard to the net asset value of Smith FLP or the control

24   discount to be applied, substantially departed with the

25   Commissioner's determination.  The only manner in which he


132


1   departed was on the basis for discount for lack of

2   marketability.  As we've seen, the manner in which he

3   calculated this, requires subjective determination of an

4   assumed holding period based on family dynamics.  And that

5   subjective determination was not based on sufficient rigors,

6   It is not independently verifiable, which is a requirement

7   under Daubert.

   _____

8        THE COURT:  Is this a Daubert motion you're making

————————

9   now?

10       MR. DALE:  Well, I'm arguing sufficiency of the

11  evidence under Rule 50.

12       THE COURT:  Because if it is, my memory gets shorter

13  all the time, but I don't remember pretrial entertaining a

14  Daubert motion which attacked this man's report on the basis it

————————

15  lacks sufficient indicia of reliability.

16       MR. DALE:  Well, we didn't know all about how

17  subjective his determination was until trial.  So we didn't

18  have that.  I'm not making a Daubert motion to strike Mr.

————————

19  Pashke's testimony.

20       THE COURT:  On that basis?

21       MR. DALE:  The Daubert rule is just a general

————————

22  iteration of the concept that an expert's testimony needs to

23  have sufficient reliability and be grounded on sufficient

24  rigors and be independently verifiable for a reasonable juror

25  to be able to conclude along the basis of that expert's

1  testimony.

2         THE COURT:  I take your point.

3         MR. DALE:  We're saying that that was woefully

4  deficient in this regard.  It's also inconsistent with the

5  final concept of subjective determination of family dynamics,

6  is inconsistent with the fair market value determination of

7  which requires a hypothetical willing buyer and seller, even

8  plaintiffs' own jury instructions suggest as much.

9         The third and final witness was the lay opinion

10  testimony of Mr. Smith, who, as we have concluded, has both

11  picked a number out of thin air or, alternatively, based --

12         THE COURT:  When you say we have concluded, you're

13  not including myself in that, are you?

14         MR. DALE:  Oh, no, I certainly don't include the

15  court in we.  But I mean --

16         THE COURT:  In other words, his testimony, not to

17  put words in your mouth, but your position is his testimony was

18  unduly speculative?

19         MR. DALE:  Correct.  It wasn't grounded in any

20  actual fact, to an extent it may have been grounded in

21  testimony that was barred by the time it was elicited, is was

22  sort of back doored in the direct examination of Mr. Delaney.

23      THE COURT:  All right, thank you very much.  What do

24  you have to say, Mr. Delaney?

25      MR. DELANEY:  I don't think Daubert applies to this

———————

134

1  at all.  The appraisal process, valuation process is 90 percent

2  subjective.  And that's what Mr. Pashke indicated, highly

3  subjective.  I get that 90 percent figure from the government's

4  own expert, Mr. Burns, in his deposition.  You have a Rule 50

5  motion, have we presented a prima facie case, we have, your

6  Honor.

7      THE COURT:  All right, the motion is denied.

8      (Recess from 2:14 p.m.; until 2:23 p.m.)

9      (Back in the Courtroom with the Jury present.)

10      THE COURT:  All right, Mr. Cooper.

11      MR. COOPER:  Your Honor, the United States calls

12  Francis X. Burns.

13      FRANCIS X. BURNS, DEFENSE WITNESS, SWORN

14          DIRECT EXAMINATION

15  BY MR. COOPER:

16  Q.    Please state your name?

17  A.    Francis X. Burns.

18  Q.    And, Mr. Burns, by whom are you employed?

19  A.    I'm employed by CRA International.

20        THE COURT:  Xavier, would that be your middle name?

21        THE WITNESS:  Yes, your Honor.

22        THE COURT:  Go ahead.

23  BY MR. COOPER:

24  Q.    Francis Xavier Burns, will you please describe what CRA

25  International is?


                              135


1  A.    CRA International is a consulting firm that helps clients

2  with economic issues, valuations, helps resolve disputes.

3  Sometimes help with business strategies.  We have offices

4  throughout the U.S. and there are some in foreign countries as

5  well.

6  Q.    And just to start out, would you just describe to the

7  jury your educational background?

8  A.    Well, I graduated from St. Ignatius High School in

9    Chicago in 1978.  And then I went on to Stanford University,

10   graduating in 1982.  I moved back to the midwest and worked a

11   couple of jobs, and then went to night school.  I was attending

12   Northwestern University, where I earned a master's degree in

13   management.  My focus was economics, and I got that degree in

14   1986.

15   Q.    And from that time have you been working?

16   A.    Yes.

17   Q.    And just describe to the jury up until the present when

18   you started working, for whom you were working for and what you

19   were doing at the time?

20   A.    Okay.  Well, since 1986, when I started my first job at

21   Peterson Consulting, that was a firm that did pretty much the

22   same things as CRA does.  I spent about four years with

23   Peterson and then was recruited away by some people who left

24   Peterson and started a smaller firm.  And I worked for them,

25   starting in 1991, again, doing the same type of work.  And that

136

1    has since changed names because we merged with a bigger firm, a

2    firm called InteCap.  Then after that we were recently acquired

file:///A|/SMITHDY2.TXT

3   last year by Charles Rivers and Associates or CRA.  And so I'm

4   still in the same desk I was in since 1991, but the names have

5   changed twice since then.

6   Q.    From that period, I believe you said 1991, how long have

7   you been working in valuations, doing valuations?

8   A.    Well, I started even in 1986 doing economic valuation

9   work, sometimes what's known as commercial damages.  Where you

10  have two parties in a dispute, you're trying to figure out what

11  the economic harm is to one or the other parties.  And so I've

12  doing valuation work since 1986.  I think it's been probably in

13  the last 10 years that I've been focusing more on business

14  valuations or valuations of family limited partnerships.

15  Q.    I didn't hear you, this business valuations, does that

16  include family limited partnerships?

17  A.    Yes.

18  Q.    For how long have you been valuing family limited

19  partnerships?

20  A.    It's been around 10 years.

21  Q.    And, in general, how many businesses have you valued?

22  A.    I don't think I ever tallied them up, I would say a low

23  estimate would be 50 or 60.  And about probably about a 100

24  would be the high end.

25  Q.   How many family limited partnerships have you valued?


                                137


1  A.   Probably 30 to 40.

2  Q.   Then do you maintain any certifications that give you the

3  qualifications to give these valuations?

4  A.   Yes, I'm actually a member of the Institute of Business

5  Appraisers.  I'm also a member of the American Society of

6  Appraisers.  And I'm certified with the ASA, that's what they

7  call themselves.  It's called the accredited senior appraiser

8  designation, or ASA.  My specialty is business valuation or the

9  other specialty is ASA.  You could be a real estate appraiser,

10  you could be an equipment appraiser.  Somebody that focuses on

11  one type of asset.  But my discipline is business valuation,

12  that's where I got my accreditation.

13  Q.   What did you have to do to become an accredited senior

14  appraiser?

15  A.   Once you join the society, you come in as a candidate

16  member, that's what it is.  To ultimately get your

17  certification, you need to have at least five years full-time

18  equivalent experience doing valuation work.  That could be 10

19  years doing it half-time or it could be five years doing it

20  full-time.  You need to have five full-time years.  In addition

21  to that, when you start, you need to take an ethics exam and

22  pass that.  You need to take a standards exam, the uniform

23  appraisal standards exam and pass that.  Then there are four

24  examinations of business valuation courses and examinations you

25  need to take and pass the exam.  Once you've done that, you

138

1  submit two reports to a peer review panel, and once they come

2  back and say your reports are approved, you can become an

3  accredited member.

4  Q.    Prior to the United States engaging in this litigation,

5  have you done valuations of family limited partnerships?

6  A.    Yes.

7  Q.    And, approximately, how many have you valued previous to

8  this one?

9  A.    Twelve, 15, would be a guess.

10  Q.    And have you ever been qualified to give testimony before

11  in court?

12  A.    Yes.

13  Q.    Have you in fact ever given expert testimony as to value

14  of family limited partnerships?

15  A.    Yes, on several occasions.

16  Q.    Have you ever not been allowed to testify as an expert?

17  A.    Yes.

18  Q.    Will you explain those circumstances?

19  A.    Sure.  I think it was about five years ago, it was a case

20  involving real estate appraisal of timber property down in

21  Louisiana.  I was asked to consider the value of what is known

22  as a fractional interest or a partial interest in this

23  property.  And I'm not a real estate appraiser, I explained

24  that to the client, that I have to rely on other people down in

25  the area to help fill in the gaps of information.  And when it


139


1  came time for trial, the judge clearly would not allow some of

2  that evidence to come in that was going to support my opinion.

3  So they excluded me from testifying.

4  Q.    All right.  Since that time -- who was the judge, by the

5  way?

6   A.    That was Judge Gerber of the U.S. Tax Court.

7   Q.    Since that time have you testified in front of that

8   judge?

9   A.    Yes, I have.

10  Q.    And were you qualified to give testimony as an expert

11  witness?

12  A.    Yes.

13  Q.    And, actually, what was the issue before the court in the

14  second time you appeared before Judge Gerber and gave expert

15  testimony?

16  A.    It was a family limited partnership.  It also had an

17  underlying business as part of it.

18  Q.    And as I alluded to before, who are you here testifying

19  on behalf of today?

20  A.    The U.S. government.

21  Q.    Have you ever given testimony on behalf of taxpayers

22  before?

23  A.    Yes.

24  Q.    What were you asked to value in this case?

25  A.    In this case we were asked to value a 6.865 percent

140

file:///A|/SMITHDY2.TXT

1   interest in the Smith FLP, which is one of the gifts on the

2   first date.  And I think it was 13.73 percent interest on the

3   second date.

4   Q.   And did you do that?

5   A.   Yes.

6   Q.   And did you reach any opinions?

7   A.   I did.

8   Q.   What qualified you to reach those opinions?

9   A.   Well, the economical analysis we did, reviewed all the

10   financial records.  My experience doing it, credentials,

11   training.

12         MR. COOPER:  Your Honor, at this time the United

13   States would like to tender Francis Xavier Burns as an expert

14   in the field of business valuation.

15         THE COURT:  All right.  Do you have any voir dire on

16   that?

17         MR. DELANEY:  No objection.

18         THE COURT:  All right, I accept him as such.

19   BY MR. COOPER:

20   Q.   Mr. Burns, can you see the document in front of you?

21   A.   Yes.

22  Q.   And what is this document?

23  A.   This chart was a summary of our conclusions in this case.

24  Q.   And what are your conclusions?

25  A.   Well, if you want to go to the bottom line, which is

                                    141

1   green, I don't think it shows up green on the screen.  The fair

2   market value of the gifted interest for January 5, 1998, is

3   $280,078.  For December 31, 1998, is $531,905.  And that's for

4   the total gifted interest of either 6 percent or 13 percent.

5   Q.   Just for clarification, how many gifts were given on each

6   of those dates?

7   A.   My understanding is that were two gifts on each date.  So

8   four gifts total.

9   Q.   So how would that affect the green value you have at the

10  bottom?

11  A.    Well, if you wanted to look at the total value of the

12  gifts given on January 5th, multiply 280 by two, $560,000 --

13          THE COURT:  Little slower, please.

14          THE WITNESS:  If you want to get the total for

15  December 31, 1998, $531,000 times two, roughly $1,060,000.

16  BY MR. COOPER:

17  Q.   Okay.  Just to start out with, because the plaintiffs

18  gave their valuation as a one-percent interest.  Can you

19  translate those numbers into what they would equal as to a

20  one-percent interest?

21  A.   Yes, I did this on my calculator earlier.  If you take

22  the bottom number, for example, 280,000, and we know it's for

23  6.865 percent, divided 6.865, the value is 40,798.

24  Q.   I didn't hear that, could you repeat that?

25      THE COURT:  40,798, is that right?


                          142


1       THE WITNESS:  Yes, sir.

2  BY MR. COOPER:

3  Q.   And then you need to tell the jury, what would be the

4  one-percent interest you arrived at on December 31, 1998?

5  A.   Doing the same math, you get to 38,740.  That would be

6  compared to, if you look at the top line, 5.2 million and 5.3

7  million, as to the two dates, you look at one-percent interest,

8  you would be at 52,000 and 53,000.  That's kind of a starting

9  point just for the one percent, from there the discounts flow

10   and you get down into the numbers that I just provided.

11   Q.   In general terms, would you describe the methodology to

12   the jury as to how you arrived at your fair market value of

13   gifted interest?

14   A.   Well, we start with the net asset value of the company.

15   This was provided to us, there was a valuation and there was

16   balance sheets of the company, we looked at it.  We were not

17   asked to do an independent valuation of the business.  We were

18   told to go ahead and accept what the taxpayer's had done as the

19   starting point.  We started with net asset value and we looked

20   at elements for lack of control, discount for lack of control,

21   which I think you heard the last couple days, which is a

22   discount there.  And, also, discount for lack of marketability.

23   Our analysis focused on how do you get to a discount that is

24   reasonable in the case.  And then we applied it through.

25   Q.   I want to just give you the same caution, just slow down.


143


1   You also did a fair market value of the gifted interest.

2   What's your definition of fair market value?

3   A.   Well, fair market value has been discussed a lot over the

file:///A|/SMITHDY2.TXT

4   last couple days.  Again, a willing buyer and a willing seller

5   both coming together and agreeing on a price.  So the

6   assumptions you make are it's not a particular person, it's a

7   hypothetical buyer and willing seller, and neither are in a

8   position of power over the other.  In other words, not one

9   party has more information than the other.  The two sides have

10   equal knowledge, they both have a desire to make a transaction

11   and they arrive at a price that seems fair to both of them.

12   Q.   Do you assume that there is a willing buyer available?

13   A.   Yes.

14   Q.   Well, let's start with the first step, net asset value.

15   What did you do to arrive at a net asset value?

16   A.   Well, we looked at the balance sheets of the company and

17   we noted that a lot of the assets that are listed as book

18   values, as was discussed yesterday.  And there was also an

19   appraisal adjustment for vessels which gave you the fair market

20   value.  When you do a valuation, you really don't care about

21   book value.  Book value is pretty much meaningless, it's an

22   accounting term.  So you want to look at what is the fair

23   market value for the assets.  What you do you is start with the

24   book value and you look down the list and say does this asset,

25  is it really worth this amount today or is it worth something

144

1  different amount.  It might be an amount that is higher, in

2  which you adjust it up.  It may be a situation for some reason

3  that the value is lower, you adjust it down.  But you make

4  those adjustments to get the net asset value as of the

5  valuation date.

6  Q.   Have you been in the courtroom while Mr. Pashke,

7  plaintiffs' expert, testified?

8  A.   Yes.

9  Q.   How did his net asset values compare to yours?

10  A.   Well, we were in agreement on the net asset value because

11  it comes off the balance sheets of the company.  The

12  adjustments that were made by Mr. Pashke were vessel

13  appraisals, and we're not vessel appraisers.  So we accepted

14  what the appraisers had done.  We had made the same adjustments

15  and ended up at the same place.

16  Q.   Now, focusing back on Exhibit 11, we just talked about

17  net asset value.  Then what did you multiply the net asset

18  value by?

19  A.   Well, you must start by finding out, as least we wanted

20  to look at what the prorated portion of that net asset value

21  that belongs to each gift.  And so if you look in the columns,

22  you take the starting net asset value, $5.2 million, for

23  example and you multiply it by 6.865 percent and you get the

24  pro rata portion of that net asset value.  That's the amount of

25  value that is assignable to that interest, which is $356,980.


145


1  Q.   And you did the same methodology in December?

2  A.   Yes.

3  Q.   And, again, how many gifts does this represent?

4  A.   One gift.

5  Q.   On each date, correct?

6  A.   Yes.

7  Q.   How many gifts were actually given on each date?

8  A.   Two.

9  Q.   All right, after you got the pro rata amount that you

10  just told the jury about, it looks like you took some

11  discounts.  What discounts were applicable to your analysis?

12  A.    Well, I thought the discount lack of control was relevant

13  because you had a 6 to 13 percent interest in a limited

14  partner, limited partners can't decide what's going to happen,

15  so usually you have an adjustment for that.  We also took a

16  discount for lack of marketability.

17  Q.    And, generally, the concept of a discount, explain that?

18  A.    Well, I think it's pretty straightforward.  It's a price

19  adjustment to reflect some factor about the asset.  If the

20  asset is worth, has a net asset value of a hundred, but you

21  think you're going to have a lower price for someone to buy it,

22  then you make an adjustment.

23  Q.    In the same regard being more specific, can you tell the

24  jury what a lack of control discount is?

25  A.    Well, it's the same concept.  You try to make adjustments

146

1  for price.  Because of the fact you don't have control.

2  Q.    But in this case why don't we have control?

3  A.    Because you're a limited partner, not a general partner.

4  In most partnerships, the general partner controls everything.

5  Limited partners are pretty much along for the ride.  They have

6  full rights to the economic value of the partnership.  If there

7    are distributions, the general partner can't say I want two

8    percent as general partner and I'm going to pay myself 10

9    percent of the money, he can't do that, that's illegal.  If

10   you're six percent owner of a limited partnership, and they

11   make a distribution, you get six percent.  It's just you can't

12   decide what's going on within the partnership.

13   Q.    And the same with lack of marketability, please explain

14   that concept as well?

15   A.    Well, I guess the analogy I would use for a partnership

16   is with the partnership interests, you can't call your broker

17   and sell it.  It's not marketable, it's not as easy to

18   liquidate.  One analogy might be to think about if you were

19   trying to sell a car and you lived out in a rural area, away

20   from the city, and you have a car you want to sell.  In the

21   city, let's say, it's a 2003 Pontiac Grand Am, good condition,

22   worth $10,000.  If you go to the city, you'll see dealers, all

23   of which are selling that type of car in that type of condition

24   for a price of $10,000.  That is the fair market value in the

25   city.  But if you go out to the rural area, where it's a

147

1   20-mile drive, it's going to be harder to find a buyer out

2   there.  So when you put your ad in the paper, you might say

3   I've got to drop the price is little bit because it's not as

4   marketable here as it is in the city.

5   Q.    Okay.  Well, let's start with lack of control.  And what

6   type of information did you rely on for lack of control?

7   A.    Well, it's a pretty standard approach for looking at

8   partnerships and that is to consider closed-end funds.  I think

9   you heard some of the testimony of Mr. Pashke that we looked at

10   similar funds.

11   Q.    Just to -- I have put up on the screen what was

12   previously marked as Defense Exhibit 14.  And, Mr. Burns,

13   please tell the jury what this document is?

14   A.    Well, obviously, you can't see what's on the left side,

15   but that is a copy of the Barron's Financial Publication, which

16   publishes this data on closed-end funds.  They publish it

17   weekly, they'll give you the net asset value and they give you

18   the actual price people were paying when they transact the

19   shares.  So you can see the discounts for premiums that exist.

20   And you can use that to estimate the discount for lack of

21   control.  Now, what we did, we kind of blew up a piece of it,

22   so you can see what we ended up relying on.  On the right side

23  of the page, you'll see the closed-end funds we looked at, I

24  think it's in yellow, with a date of Friday, January 2, 1998.

25  Which was closest date that was published prior to the


148


1  valuation date, that was the date we looked at.  Counsel, if

2  you could roll that up a little bit so the jury can see the

3  bottom.  The column, the second column from the far right, is

4  the actual premium discount data.  If you take all those

5  entries and you average them, you get a discount of 4.9

6  percent.

7  Q.    And you said you relied on -- what was the underlying

8  data?

9  A.    Well, it's closed-end fund data from Barron's Financial

10  Publication.

11  Q.    Do you recall where Mr. Pashke got his data from?

12  A.    I don't.

13  Q.    But your end result, what was your value for lack of

14  control on January 5, 1998?

15  A.    The last one was 4.9 percent.

16  Q.    Do you recall what Mr. Pashke's was?

17  A.   I think he used five percent.

18  Q.   And then skipping forward to the second gift on December

19  31, 1998, what methodology did you use then?

20  A.   The same methodology.

21  Q.   Okay.  And what was your result?

22  A.   11.4 percent.

23  Q.   And do you recall what Mr. Pashke's was?

24  A.   I think it was 10 percent.

25  Q.   More specifically, what was his lack of control discount

149

1  on December 31, 1998?

2  A.   Ten percent.

3  Q.   And, in general, were you all pretty much in agreement on

4  that?

5  A.   Well, we used the same approach, and so a lot of the

6  closed-end funds are probably the same in his list and my list,

7  we ended up being pretty close on the final result, too.

8  Q.   After you received -- I'm sorry, calculated the lack of

9  control data, hen turning turn back to what's been previously

10  marked as Exhibit No. 11 that is on the screen, tell the jury

11  how that fit into your analysis?

12  A.   It's a straight adjustment.  You take the percentage 4.9

13  percent for the first year -- $356,980, and you multiply that

14  by 4.9 percent, you get an adjustment of negative $17,000.

15  Reduced the value down to $339,488.  And on December 31st you

16  start with $727,000, multiply that by 11.4 percent, and that

17  adjustment is negative $82,000.  And your balance is $644,733.

18  Q.   Just for clarification, what did you subtract the $82,000

19  from to arrive at your value?

20  A.   Well, from the pro rated portion of the net asset value,

21  which was $727,000.

22  Q.   Now, let's move on to lack of marketability discount.

23  How did you arrive at lack of marketability discount?

24  A.   Well, I looked at a lot of the research, empirical data

25  out there that appraisers tend to favor to try to understand


150


1  lack of marketability.  And the best way to try to understand

2  marketability is to look at the real world and see what prices

3  people are paying for as assets, which may have marketability

4  and then maybe the same asset doesn't have marketability, what

file:///A|/SMITHDY2.TXT

5  is that differential.  So that's a good way to understand what

6  the price is that people are charging in fact for

7  marketability.

8  Q.    And what studies did you rely on?

9  A.    Well, we focused on restricted stock studies is what

10  they're known as.

11  Q.    And what is a restricted stock?

12  A.    A restricted stock is a stock that is issued by a company

13  that's not registered with the SEC.  So it's a document, it's a

14  share of stock that looks a lot like a share that could be

15  publicly traded.  But the share is to an institutional buyer or

16  to an individual who cannot sell it then before a period of

17  time, usually is a lockout period.  And so there may be

18  regulations that requires a two-year lockout, you can buy the

19  stock now but you can't sell it for two years.  What these

20  studies do is they look at it and say well, if this stock is

21  priced at $30 per share and then we see that there is a

22  transaction of restricted stock, it's worth $25, in other

23  words, someone paid only $25 for it, we see that there is a $5

24  differential and that was because it was restricted, they

25  couldn't go out and sell it right away.  And so it's a measure

151

1   of the marketability of that, you can't sell.  It, it's a good

2   starting point.

3   Q.    I'm going to pull up what is the second page of what we

4   marked as Exhibit No. 10.  And, Mr. Burns, what does this chart

5   represent?

6   A.    This is a summary of all marketability discount studies

7   that have been done based on restricted stocks.  There's a lot

8   of data up there, appraisers have been looking at this question

9   for decades.  And what you'll notice is that the years covered,

10  which is the middle column, covers data going back to the

11  1960s, all the way through to 1997, 1998.  These are studies

12  that have been going on for a long time.  And each of these

13  line items is a different study done by different a individual

14  or a different appraisal firm.  So I think what's the starting

15  point of this is to look at studies in total and try to

16  understand what is going on.  Why the discounts are the way

17  they are and why they change.

18  Q.    And on there you have something called old SEC rules at

19  the top left-hand corner, what does that mean?

20  A.    Well, those studies in that first grouping were under the

21  old SEC rule, which required a two-year lockout.  And that

22  lockout changed, that's why we broke it out this way.  If you

23  look at the middle group, there was a rule, there was still a

24  two-year lockup during this time period, which the date is

25  1990, all the way down to 1997.  And that middle group in the


152


1   middle column.  During this time period there was a rule change

2   that allowed institutional trading of these shares.  So before

3   you had a situation where basically there was no market, now

4   you have a situation where these institutions can trade you

5   shares, and you see the discounts drop.  Which I think is very

6   telling because it shows you that when there was a market,

7   discounts declined.  The decline was about 12 percent.  That's

8   something, the key to focus on with regard to the studies.

9   Now, if you look at the third grouping, there's another rule,

10  it says new rule, lockout period reduced to one-year.  That was

11  a change from a two-year lockout to a one-year lockout.  When

12  you reduce that lockout period, the discounts came way down.

13  And it makes perfect sense.  Because if you're given a share of

14  stock, let's say it's worth $30, and someone tells you can't

15  sell it for two years.  You're going to say to yourself, what

16  happens if the company's fortunes decline, what happens if the

17  company goes out of business, this may not be worth $30 in two

18  years.  So you're kind of nervous about that and you want a

19  discount price for it.  If it comes back one year, they say the

20  lockout is for one year, you feel better about it, it's not as

21  bad.  The shorter that lockout period, the better the share

22  price is, the closer it will be to full market value.

23  Q.    Just to sum up, that column all the way to the right with

24  the percentages, what do those numbers reflect?

25  A.    Those are the average for median discounts for each of

153

1  the studies.  So, as an appraiser I look at them as a group.

2  Because I don't think that it's appropriate to go in and take

3  one study and say, well, this study came out with a discount of

4  35 percent and, therefore, we're going to rely on it.  I think

5  you look at them together and see what do they tell you.  What

6  this overall chart tells you is that when the rules were a

7  two-year lockout, 34 percent was about the average.  When the

8   rules changed to allow institutions to start trading, there was

9   more of a market, it dropped to 22 percent.  When there was a

10   reduction to a one-year lockout, it dropped even further to 13

11   percent.

12   Q.   I'm going to pull up now what is the first page of

13   Exhibit No. 10 -- first of all, can you see that okay?

14   A.   Could you go up one size, please.  Thank you.

15   Q.   What is this chart, Mr. Burns?

16   A.   This is just a graphic representation of what we just

17   talked about.  The first bar you see, 34 percent, was prior to

18   1990, it was a two-year lockout.  Then the second bar is 1990

19   to 1997.  It was when institutional trading was allowed to open

20   up the market to make them liquid.  And the third bar is when

21   the two-year lockout was reduced to one year.

22   Q.   And you did an explanation to me that clarified, instead

23   of dropping it down, you look at reversal, would you tell the

24   jury what that is?

25   A.   Well, first, I guess the analogy I would make on the


154


1   first two bars, when you start at 34 percent, that's like being

2  out in a rural area trying to sell your car, there's not a real

3  ready market, there's no buyers out there.  The second bar

4  would be if two towns spring up within a couple miles of your

5  house, suddenly there are going to be more buyers, more

6  trading, more activity.  But the market then, the discount

7  drops, you don't have to discount the price of your car as

8  much.  So to me that differential, of 12 percent differential,

9  is a measure of the lack of marketability.  And another way to

10  look at it is to, if you imagine covering up the left-hand bar

11  and looking only at the middle bar, and assume the middle bar

12  was a starting point, and that was the way the market existed.

13  And then the government came and said, you know what, you can't

14  trade anymore, that institutional trading is not going to be

15  allowed.  What's going to happen is your discounts are going to

16  go up on the bar to the left.  So you go from a 22 percent

17  discount up to a 34 percent discount because they have

18  eliminated your market.  I think that's how you use this data

19  to get a starting point for the measure of lack of

20  marketability.

21  Q.   So on the reverse analogy, if you took a piece of paper,

22  like you said, this would be if there was a market, you start

23  with the middle bar?

24  A.   Yes.

25  Q.   And then all of a sudden if the government said lockout,


155


1   you can't trade anymore, it pops up to a higher discount?

2   A.   Right.

3   Q.   Mr. Burns, what is this chart?

4   A.   This chart just summarizes the analysis we did, how we

5   arrived at our final estimate for lack of marketability.

6   Q.   Would you explain that, please?

7   A.   Sure.  You'll note the top line, restricted stock

8   studies, the 12 percent we've been talking about, that was one

9   indicator we looked at for marketability.  We also looked at

10  some current research that's been done in this area.  It's the

11  Bajaj/Denis/Ferris/Sarin research study.  What that is there

12  are four finance professors in economics that got together to

13  research marketability.  And what they did was they looked at

14  private placements of these shares, either registered,

15  unregistered and tried to understand what are the factors that

16  go into discount.  Is it all marketability or is there other

17  reasons why people are dropping the price.  They did extensive

18  research and this is all during the time period we're dealing

19  with here.  Which I think it's 1991 through 1995 time period,

20  if I'm not mistaken.  And they recently just published, I think

21  this is in 2001.  So it's fairly current, but it's had enough

22  years for people to really look at it, study it and analyze it,

23  teach it, so it's been out for a while.  The conclusions of

24  those academic researchers was that a piece of discount for

25  marketability was somewhere between 7 and 14 percent.  That

156

1  there were other reasons that were leading to get to the higher

2  discounts.  Some of those other reasons include, for example,

3  the financial distress of the company.  A lot of times

4  companies that issue placement shares are companies that need

5  cash.  They may have been in some element of financial

6  distress, where they don't want to go and register their shares

7  for whatever reason.  And so they do a private placement.

8  There are also stocks out there that have high volatility of

9  share price.  And so when we talk about a two-year lockout, if

10  I give you a thousand dollars cash and told you you're locked

11  out for two years from doing anything with it, you wouldn't be

12   that concerned because you know in two years you're still going

13   to have a thousand dollars.  And that's the volatility issue.

14   You know the price is going to stay the same.  With a share of

15   stock, the price could go like this.  Then in two years it

16   might be down here and you're concerned.  So with low

17   volatility, the more the stable your price is on your asset,

18   the lower the discount should be.  That makes perfect sense,

19   that's what these researchers were trying to understand.  So

20   their conclusion was marketability of somewhere between 7

21   percent and 14 percent.  And looking at their research, looking

22   at the restricted stock studies, I felt that an estimated

23   discount range of 10 to 15 percent for this type of FLP with an

24   asset value of $5.2 million, was an appropriate starting point.

25   Q.    And then from the 10 to 15 percent range, where did you


157


1   go from there?

2   A.    Well, sometimes an appraisal you get to a range, and you

3   really can't get any farther.  And you say does it make sense

4   to be at this range, how do I pick a number in between without

5   just picking it out of the air.  In this case we back go to a

6    willing buyer and a willing seller negotiation.  You got two

7    parties that have equal positions, basically, 10 to 15, I'm

8    assuming they're going to meet in the middle, 12 and a half

9    percent is going to be a fair result for both of them.

10   Q.    And then after that you made an adjustment?

11   A.    I did.  This is something that when I'm valuating limited

12   partnership interests that have financial assets, I typically

13   don't make this liquidity adjustment.  In this case the fact

14   there was only one asset, Erie Navigation Company, I thought

15   might warrant to study the high marketability discount because

16   you have to find a buyer who's interested in a partnership that

17   owns one asset.  Instead of, let's say, 10 different stocks or

18   bonds or something.  So it's a diversification issue.  So I

19   made the adjustment upward five percent and arrived at a total

20   lack of marketability estimate of 17.5 percent.

21   Q.    But from a conceptual point of view, does lack of

22   diversification necessarily mean that something is risky?

23   A.    No, not at all.  Because if you have one asset, a

24   business, in this case you have a business that's been around

25   100 years, probably not going anywhere, steady business.  It

1  may not be growing fantastic -- that's not really what I would

2  consider a risky asset.  But it is only one asset.  So

3  sometimes investors might say, you know what, I would like it

4  to have three or four, five assets in a partnership, not just

5  one.  That's why I made the adjustment.

6  Q.    And then after you made the adjustment, what was your

7  final conclusion as to the lack of marketability discount?

8  A.    It was 17.5 percent.

9  Q.    Was this discount based upon your reliance on restricted

10  stock studies?

11  A.    It was with our review and interpretation of the

12  literature that's been done in restricted stock studies and the

13  academic research that's done by independent parties.  By the

14  way, I should point that out, that these research academics are

15  not an appraisal firm that are trying to go come up with a

16  number that maybe supports what they've been doing for 20

17  years.  These are people taking a hard look at this and saying

18  let's understand this better --

19  Q.    Let's go back again to good old Exhibit No. 11.  Tell the

20  jury what you did with the 17.5 percent that you relied on to

21   arrive at that value?

22   A.    The same adjustment for lack of control, simple math, you

23   take - let's go back to the first column, 339,488, which is the

24   lack of control, and then we take an adjustment downward, 17.5

25   percent, which is a negative $59,000, and you get a result of

159

1   $280,000.  The same adjustments may apply to the right column,

2   we reduce the value by another $112,000 and you're left with

3   $531,000.

4   Q.    And, Mr. Burns, again, the $280,000, how many gifts does

5   that represent?

6   A.    Two gifts.

7   Q.    So what would have been the total fair market value of

8   the two gifts given on January 5th?

9   A.    $560,000, roughly.

10   Q.    And, again, for December 31, 1998, what would have been

11   the value of the two gifts that Mr. Smith gave to Mr. Smith,

12   III, and his daughter, Ms. Jill Smith?

13   A.    1,060,000.

14   Q.    What is the total value of the four gifts given in 1998,

15  if you can do that?

16  A.   If you add those two together, it's a 1.6 million,

17  1,600,000.

18  Q.   And just so we have an apples to apples comparison.

19  Using your methodology, what was your conclusion as to what a

20  one-percent interest -- what is a one-percent gifted interest

21  of Smith FLP on January 5th?

22  A.   That was $40,798.

23  Q.   Okay.  And, again, on December 31, 1998, what would have

24  been a one-percent value interest in the gifts given?

25  A.   $38,740.


160


1        MR. COOPER:  Thank you, Mr. Burns.

2        THE COURT:  All right, Mr. Delaney.

3             CROSS-EXAMINATION

4  BY MR. DELANEY:

5  Q.   Mr. Burns, we have met before, haven't we?

6  A.   Yes, sir.

7  Q.   Can you tell us when you wrote your report in which you

8  rendered an opinion about the value of these gifts?

9   A.   I believe the report was written September of 2003.

10  Q.   Is that the first report you wrote about these gifts or

11  have you written prior versions of it?

12  A.   I think that was the first report.

13  Q.   When were you hired?

14  A.   I don't recall, I think it would have been probably

15  within six to eight months before we issued our report, that's

16  typically the timeframe.

17  Q.   You don't have a particular date on this one?

18  A.   I'm sorry, I just don't remember.

19  Q.   How many times have you been hired by the Internal

20  Revenue Service to do this sort of work?

21  A.   I never counted them, I would say -- maybe between 12 and

22  20 times.

23  Q.   An over how many years have you been doing this work?

24  A.   Well, it's been about 10 years valuation work.

25  Q.   Over what period of time have you been working for the


161


1  Internal Revenue Service?

2  A.   Well, my clients during the course of a year would

3   involve both government clients, the IRS, as well as taxpayers.

4   So I did both back in 1996 or 1995, I'm still doing both.

5   Q.   So you've been working periodically for the government,

6   for the IRS, all the way back to, did you say '96?

7   A.   It may go back even a couple years before that.

8   Q.   So the earliest date that we would have you hired for

9   this case, would have been March of 2003?

10   A.   Just a ballpark estimate.

11   Q.   Let me ask you this.  When you were hired, was this

12   lawsuit already filed?

13   A.   I don't know.

14   Q.   Let me show you what we've already identified as

15   Plaintiff's Exhibit 3 -- before I ask you about that exhibit,

16   who hired you?

17   A.   I would have received a call from one of the attorneys at

18   the IRS.  And I don't recall whether it was Mr. Stu Gibson or

19   Mr. Ivan Dale.

20   Q.   But we roughly figured that that must have been about

21   March of 2003 at the earliest?

22   A.   Just based on a very vague recollection.  We're going

23   back a few years, I just don't recall, there's been a lot of

24   cases since then.

25   Q.    Take a look at Exhibit 3.  Am I correct that that is the

162

1   notice that the Internal Revenue Service sent to Sid Smith

2   saying that he owed additional gift tax?

3   A.   I believe so.

4   Q.   In the amount of $360,000?

5   A.   Yes, sir.

6   Q.   When Mr. Gibson hired you or this lawyer from the IRS

7   hired you, did they talk to you about how they had calculated

8   the tax?

9   A.   No.

10   Q.   Now, the tax has to be based on the value of the gifts,

11   does it not?

12       MR. COOPER:  Objection, your Honor, this is a de

13   novo proceeding, what the IRS did below has no relevance.

14       THE COURT:  Let me see you at side bar.

15       (At side bar on the record.)

16       THE COURT:  Okay, Mr. Cooper.

17       MR. COOPER:  What it is they did below doesn't

18   matter here because this is a de novo proceeding.

19          THE COURT:  What they did or even whether it was

20    right or wrong?

21          MR. COOPER:  Exactly.  There is no relevance for the

22    finder of fact here to find in a de novo proceeding.

23          MR. DELANEY:  I'm not suggesting there is some

24    res judicata or collateral estoppel to it.  What they did, they

25    told Sid Smith to pay another 15 percent discount.  Their guy

163

1    comes up with 24 percent discount.  In other words, they made

2    him pay the tax before they ever had his expert report.  Then

3    they came in and asked him to justify it.  And when he

4    justified it or tries to justify it, they're still off by a

5    hundred thousand dollars worth of tax, they never gave it back.

6    That's what I want to ask this man about.  Nothing to do with

7    the proceeding before the Internal Revenue Service.

8          THE COURT:  Look it, we know the critical fact and

9    the critical fact is the amount of tax that the Commissioner

10    determined was owed.

11          MR. DELANEY:  The Commissioner also puts a price on

12    the value of the gifts in the notice.

13          THE COURT:  Presumably, what the Commissioner

14   reached was based on some particular amount of dollars.

15          MR. DELANEY:  I don't think they did.

16          THE COURT:  Doesn't matter.  I mean he could have

17   flipped a coin, the fact of the matter is it's de novo here,

18   what difference does it make how they came to the conclusion

19   they came to because it's a clean slate right now.  The issue

20   is whether that figure is right or wrong --

21          MR. DELANEY:  I'm not going to ask him about the

22   figures then.  I want to know if his work was done after the

23   IRS told him, told Mr. Smith to pay the tax.

24          THE COURT:  Whose work was done?

25          MR. DELANEY:  This gentleman's, it's clear already


                              164


1   from the testimony that it was.

2          THE COURT:  You can ask him that.

3          (End of discussion at side bar.)

4   BY MR. DELANEY:

5   Q.   Was your work done after the tax was paid by Mr. Smith?

6   A.   I assume it was because I understood it to be a refund

7   case.

8   Q.   So you were hired to come up with a number after the tax

9   had already been paid by Mr. Smith -- did you know the amount

10  of the tax that had been paid by Mr. Smith?

11  A.   If I knew, it didn't matter.  It might have been in one

12  of the documents there, it had nothing to do with my valuation.

13  Q.   Did anyone try to indicate to you, provide you with

14  information with regard to what the tax was that was paid?

15  A.   No, sir.

16  Q.   And you believe it was Mr. Gibson that hired you?

17  A.   I'm going back a couple years, I think it would have

18  either been Mr. Gibson or Mr. Dale, I believe.  They were the

19  two main attorneys on the assignment when I started.

20  Q.   Our Mr. Dale here?

21  A.   Yes.

22  Q.   Did you have interaction with those gentlemen as you

23  prepared your report?

24  A.   Not too much really.

25  Q.   When you say not too much, what do you mean?

165

1   A.   Well, initially they'll tell us what the assignment is.

2   At that point we'll ask for documentation, information.  And,

3   typically, we just have it sent to our office.  We review the

4   documents, we do our analysis, we issue a draft report.  And

5   the next time we talk to them might be after our work is all

6   done.

7   Q.   If the Smith family had hired you do to an appraisal or a

8   valuation of a one-percent limited partnership interest, what

9   would have been the first step that you would have gone

10  through?

11  A.   I would have wanted to look at the records, like the

12  partnership agreement, and what is the underlying asset is

13  always an important point.  I would have looked at the

14  financial statements of the underlying asset, wanting to know

15  the net asset value or some other value of the company.

16  Q.   When you testified in response to Mr. Cooper's questions,

17  you said they told me to accept the net asset value of Erie

18  Navigation Company, who is they?

19  A.   That would have been counsel for the government.

20  Q.   Would your preference have been to do your own analysis

21  of the value of the underlying asset?

22   A.   I wouldn't have had a preference either way.  When we got

23   the underlying documentation, we already know that there is an

24   appraisal there by Mr. Pashke, we asked the question, are we

25   supposed to do a valuation of the underlying asset or should we


                                166


1   assume the underlying asset value was okay.  They said don't

2   worry about the underlying asset value, we're going to accept

3   the taxpayer's position on that.

4   Q.   Did they say why they were prepared to accept that rather

5   than having you to do an independent examination?

6   A.   No.

7   Q.   So, really, you've done half a valuation in your work?

8   A.   I've done a full valuation of the family limited

9   partnership interest.  Whose assets, the asset value is known.

10   It's no different than when I value a family limited

11   partnership that holds the market security, the stocks.  We'll

12   have the stock prices, we'll check them on the day of the

13   valuation, we know what the fair market value is, so we're

14   starting with the asset value, that's done for us.

15   Q.   But is net asset value a static thing?

16  A.   No.

17  Q.   It can change from year to year?

18  A.   Yes.

19  Q.   And when we look at fair market value, we look at this

20  hypothetical buyer who might consider buying into the limited

21  partnership, should that buyer -- should that buyer assume that

22  going into the future, net asset value will be the same?

23  A.   Well, I don't think they would do that, I think it would

24  be naive.  That asset value, in fact, did go up between January

25  5th and December 31st, so it does change.


167


1  Q.   What is it that can impact net asset value?

2  A.   Well, net asset value simply your balance sheet, what

3  assets you own and what liabilities, what debts you have.  So

4  if you buy, we talked about this, I think it was discussed

5  earlier, if you, for example, buy a piece of equipment, you may

6  have more debt, a million dollars, let's say, it cost you to

7  buy a new vessel or something, you have more debt.  But you'd

8  also have net worth of a million dollars as an asset.  So those

9  offset.  Your net asset value hasn't changed.

10  Q.    Take a situation where it's necessary for a company to

11  borrow money for operating expenses.  Isn't it true that that

12  kind of debt, where you don't add an asset, that kind of debt

13  will deplete or dilute or reduce net asset value over time?

14  A.    Well, that's the way math works, it would reduce it.  But

15  you hopefully are investing in people, their operating

16  expenses, so you can have earnings that will bring the net

17  asset value up.

18  Q.    That's a very interesting point.  Hopefully -- you had no

19  idea when you did your report, anything about the details of

20  the business, other than having Mr. Pashke's report, isn't that

21  correct?

22  A.    Well, we had the financial statements, income statements,

23  balance sheets, Mr. Pashke's report.  And there were other

24  documents in the file that discussed the business and what it

25  was and what they did.


168


1  Q.    But then the lawyers said to you just assume net asset

2  value of $5.2 million, did they not?

3  A.    They said we should assume that, that is correct, and

4   start from that point.

5   Q.    When you began to write your report, were you aware that

6   in the six years from 1993 to 1998, four of those years were a

7   negative cash flow for the company, were you aware of that when

8   you began to write your report?

9   A.    Well, we had looked at the financial statements that were

10  attached to Mr. Pashke's report.  So we had seen that.  But,

11  frankly, the cash flow statement that we had, which was five

12  years, to me was too short of a period to look at cash flows.

13  Cash flows are major investments in cash, and they may pay off

14  10 years down the road.  So I think usually when you analyze a

15  company based on cash flows, you look at least 10 years out.

16  Because you want to pick up that investment cycle.  And if you

17  have a big outlay of cash in year two and you don't expect it

18  to pay off until year eight, if you look at a five-year window,

19  you don't see the pay out, you just see the cash out.  So it

20  looks like you have a negative cash flow.

21  Q.    But as you began to do your report, you didn't ask for

22  any more information, did you, about cash flows?

23  A.    We were told to start with the net asset value, that's

24  what he did.

25  Q.    If you're sitting in the chair or standing in the shoes

169

1    of this hypothetical buyer, all you have in front of you are

2    six years of cash flow statements and four of them are

3    negative, isn't that correct?

4    A.    That's what the numbers are, yes.

5    Q.    You're not thinking about the hypothetical buyer, you're

6    not going to think that, well, four of six years are bad but

7    everything will be rosy, that hypothetical buyer with be a

8    cautious person, will they not?

9    A.    They should be, yes.

10   Q.    You know, you relied on Pashke for the net asset value,

11   do you agree with Pashke's assessment when he indicated that

12   well, I estimated growth to be about three percent for Erie

13   Navigation Company?

14   A.    I didn't analyze it.

15   Q.    You didn't analyze it at all?

16   A.    It was not part of what we needed to do.

17   Q.    You have no reason to contest that issue, is that right?

18   A.    That's correct.

19   Q.    When Mr. Pashke testified to this jury yesterday and

20  today, he talked about alternative investments that might have

21  been available in 1998, did you hear that testimony?

22  A.    Yes.

23  Q.    Did you disagree with the numbers that he had testified

24  to?

25  A.    Which numbers are you talking about?


170


1  Q.    That a certificate of deposit at a bank, a federally

2  insured bank, in 1997 and 1998 would have returned between five

3  and six percent per year?

4  A.    Well, that is an apples to oranges comparison.

5  Q.    That's not my question, sir.

6        THE COURT:  Let him finish his answer.

7        THE WITNESS:  I think I can clarify something.  When

8  you talk about growth, three-percent growth, that can be on top

9  of an existing return.  So let's say your business is making

10  five percent.  You get a three-percent growth, but your return

11  is five percent.  That might compare okay to a government bond

12  or CD.  So the three percent is not a number that you can

13  compare to alternative investments, that is the growth rate.

14  BY MR. DELANEY:

15  Q.   Let's go back and dissect it.  What did you anticipate

16  that a one-percent, the owner of a one-percent family limited

17  partner's share would be receiving in the way of dividends, did

18  you make an assumption about that?

19  A.   When you start with the net asset value, you don't need

20  to make that assumption.

21  Q.   I'm not talking about Erie Navigation, I'm talking about

22  a limited partnership, did you make an assumption there would

23  be dividends being paid?

24  A.   We noted that there were small dividends, but it did not

25  really come into play because they weren't substantial enough

171

1  to really impact value.

2  Q.   So you made an assumption that the buyer, this

3  hypothetical buyer, wouldn't be getting any dividends as a

4  limited partner, isn't that correct?

5  A.   Well, all you can do as an appraiser is look at what

6  happened in the past few years.  There is just a small dividend

7  payment.  But we don't know what's going to happen in the

8  future on dividends, you can't guess as to what dividends are,

9  you can only look at what they were in the past.

10  Q.    But as a hypothetical buyer, given the information that

11  is available, isn't it true you assumed there would be no

12  dividends paid to the limited partner?

13  A.    I don't think I made an assumption either way because we

14  start with net asset value, we weren't focusing on dividends,

15  it wasn't part of the equation.

16  Q.    All right.  So it's not part of the equation, we have a

17  three-percent growth that Pashke has considered.  Now, I want

18  to ask you if you agree that there was an alternative

19  investment for this hypothetical buyer to go to a bank, put it

20  in a federally insured certificate of deposit, the same money,

21  and get five percent, do you agree with that scenario?

22  A.    If that was the correct interest rate at that time for a

23  certificate of deposit, yes, I would agree.

24  Q.    And would you agree that that hypothetical buyer could

25  buy a treasury bill at the same point in time in 1998, January


172


1  or December of 1998, and instead of investing at perhaps a

2  three-percent growth rate in Erie Navigation or the family

3  limited partnership, they could get five or six percent in an

4  absolutely risk-free environment with a treasury note?

5  A.    I think that comparison is little bit different, but yes,

6  they can do that.

7  Q.    You did nothing in the way of an analysis of the

8  potential growth of value in a one-percent of a family limited

9  partnership interest, did you?

10  A.    That's correct.

11  Q.    If you know nothing about potential growth and there is

12  no information indicating there is going to be a dividend, how

13  can you predict what a willing buyer, intelligent and aware of

14  alternative investments, would be willing to pay for one

15  percent?

16  A.    Well, your appraisal is a snapshot in time.  An it's the

17  value as of a given day.  So the best you can do is understand

18  the value of the business on that day.  On the valuation date,

19  we knew the net asset value.  The net asset value of 5.2 or 5.3

20  million is the current value of the business, all its assets,

21  all its liabilities.  So the willing buyer knows that's what

22  they're getting, it's a cash value.

23  Q.    But they know that net asset value is not a static thing,

24  it's not necessarily guaranteed to stay the same, is it?

25  A.    That's correct, no business is static.


173


1   Q.    You made a very interesting comment in your direct

2   testimony.  You talked about looking at these other studies and

3   holding companies, I believe.  And you said when you compared

4   that to the Erie Navigation Company, there wasn't great

5   diversification in the holdings -- I'm sorry, of the Smith

6   Family Limited Partnership, there wasn't great diversification,

7   right?

8   A.    It's one business, right.

9   Q.    But you said it's not a risky business, did you say that?

10  A.    I don't know that I did.

11  Q.    My notes says -- not a risky asset, do you remember

12  saying that?

13  A.    From the standpoint point of the net asset value has been

14  determined and so there is no risks of that number being wrong.

15  In other words, as of the date of valuation, the asset in value

16  by a qualified appraiser is the vessels, and on the balance

17   sheets of the company's books, the value is established as of

18   that date.  There's no inherent risks, is not the same risks as

19   a business in which you're selling widgets to companies and you

20   have a risk of operating risks, meaning that something could go

21   wrong in your plant.  You got competition risks, some

22   competitor comes in and puts you out of business.  You got a

23   price risk, you're not able to increase your prices fast

24   enough.  You got these other risks that aren't captured, the

25   net asset value gives you the current value of the company on


174


1   that day.

2   Q.   But as an investor I have to worry about what that value

3   will be in a year, if I intend to hold it for a year, or two

4   years, if I intend to hold it for two years, do I not?

5   A.   Yes, there's an assumption that the company will have

6   some profits.  Because the net asset value will stay the same

7   as long as there's enough profit to replenish the assets, as we

8   talked about before.

9   Q.   That's the point I'm getting to.  You made an assumption,

10   but you never examined the company, did you?

11  A.    Well, we looked at the company, I knew the company's

12  financials were steady but not growing.  And I looked at the

13  fact that there were earnings every year.  There were other

14  things in there that I couldn't decipher.  For example, there

15  were different company pricing.  They had related businesses

16  where you have an expense, which they charge to another company

17  and we could not get under those numbers to understand whether

18  or not perhaps the company, Erie Navigation, is earning more

19  than what is reflected on their financial statement.

20  Q.    Because the lawyers told you don't go any further, is

21  that right?

22  A.    No, they said accept -- we're willing to accept what the

23  taxpayer put forth as the value of the company.

24  Q.    Have you ever been in Erie before?

25  A.    This is the first time.


175


1  Q.    Did you interview any of the management of Erie

2  Navigation Company?

3  A.    No.

4  Q.    In preparing your report, did you interview the appraiser

5   who looked at the ships?

6   A.   No.

7   Q.   Did you talk to Mr. Pashke, who had done some leg work in

8   doing his report, visiting the facilities and the like?

9   A.   No.

10  Q.   Did you visit the facility of Erie Navigation in Erie?

11  A.   No.

12  Q.   Did you visit the facility of Erie Navigation in

13  Sandusky, Ohio?

14  A.   No, sir.

15  Q.   Did you did inquire about litigation for Erie Navigation

16  Company?

17  A.   No.

18  Q.   Did you view any of the assets of Erie Navigation

19  Company?

20  A.   Not in person.

21  Q.   Did you study, make any inquiries into the navigation

22  industry on the Great Lakes?

23  A.   Only partially.  We looked at the data, which is data on

24  stock prices for various industries and --

25        MR. DELANEY:  That's all I have.

1        THE COURT:  You were in mid sentence, finish what

2  you had to say?

3        THE WITNESS:  Well, this relates to Mr. Pashke's

4  QMDM model.  Which requires input into the industry's expected

5  returns.  And in looking at his model, we looked at

6  assumptions.  And one of the things we learned is that while he

7  put in they could expect a return, of something like 20

8  percent, he built up this return and said this is the amount of

9  return you should get in this business.  We polled the data to

10  look at it industry by industry, and there were a couple of

11  industries that I think were called water navigation, it was an

12  industry that was the closest one to this business.  And it was

13  actually what's known as a negative risk adjustment for that.

14  Meaning that the data showed that industry was actually less

15  risky than the S & P 500, which is all businesses combined.

16  That's how you do it, you measure versus the entire population

17  of businesses.  And so we looked at it only from the standpoint

18  of if this business is less risky, generally you get a lower

19  return.  You can't expect a higher return, so it's a less risky

20  business.  So it was part of our review of the QMDM model that

21  we did.  It wasn't to try to determine what the value of Erie

22  Navigation was.

23  BY MR. DELANEY:

24  Q.   I do have one other thing.  Do you have Exhibit 14,

25  Defendant's Exhibit 14?


                                177


1  A.   I don't think so --

2        THE COURT:  It is in the book.  Look at tab 14, Mr.

3  Burns.

4        MR. DELANEY:  Maybe I'll get that on the screen.

5  BY MR. DELANEY:

6  Q.   This was one of the items that you and Mr. Cooper talked

7  about, do you have that available to you?

8  A.   Yes, sir.

9  Q.   Do you see the listing of various -- I gather these are

10  funds?

11        THE COURT:  Can you zoom that a little bit.

12  BY MR. DELANEY:

13  Q.   What kind of funds are these?

14  A.   They're closed-end funds, general equity funds.

15          THE COURT:  Maybe the jury has already heard it,

16    explain to the jury what the term closed-end fund means, what's

17    a closed-end fund for the benefit of the jury?

18          THE WITNESS:  A closed-end fund is an investment

19    holding company.  It's like a mutual fund, like an open-ended

20    mutual fund, where people poll their money together and then an

21    investment manager buys securities, stocks, bonds, whatever it

22    is, and holds them.  So a closed-end fund, like an open-ended

23    fund, is a polling of assets.  The difference is a closed-end

24    fund trades like a regular stock.  You can go and find a price

25    and sometimes it's different than NAV, net asset value.


178


1    Sometimes there is a discount, sometimes there's a premium.  On

2    open-ended funds, if you want to exchange out at the end of the

3    day, you call and say I want to sell at the net asset value

4    price, full price.  Closed-end funds trade differently.

5    BY MR. DELANEY:

6    Q.    What is the title of the column all the way to the right?

7    A.    Fifty-two week market return.

8    Q.    What does that mean?

9   A.   That would be the stock return and investment for the

10  last year.

11  Q.   The increase?

12  A.   Increase or decrease.

13  Q.   And what's the date -- it says Friday, January 2nd, what

14  year?

15  A.   That should be 1998.

16  Q.   Am I reading correctly, that if someone invested in Adams

17  Express, that over a year they would have increased the value

18  of their investment by 33.6 percent?

19  A.   For that previous year, yes.

20  Q.   And if I go down to Liberty -- something growth, do you

21  see the Liberty growth fund, that they would have increased the

22  value of their investment by 42.8 percent?

23  A.   That's correct.

24  Q.   These are alternative investors for our hypothetical

25  buyer, are they not?


179


1   A.   I don't think so.  I think the willing buyer in this

2   case, we're assuming somebody who is interested in owning the

3   Smith FLP.

4   Q.   But under no requirement to buy?

5   A.   That's correct.  The seller or buyer do not have the

6   compulsion to buy or sell.

7   Q.   And with full knowledge of all the alternative

8   investments?

9   A.   Yes, sir.

10       MR. DELANEY:  Thank you, that's all I have, your

11   Honor.

12       THE COURT:  Mr. Cooper, do you have some more?

13       MR. COOPER:  Thank you, your Honor.

14               REDIRECT EXAMINATION

15   BY MR. COOPER:

16   Q.   There was a line of questioning by Mr. Delaney made to

17   you talking about net asset value not being static, do you

18   recall that?

19   A.   Yes.

20   Q.   From January 5, 1998 to December 31, 1998, the net asset

21   value of ENC stock of Smith Family Limited Partnership was not

22   static?

23   A.   No, it was not.

24   Q.    What happened?

25   A.    It went up, I think it was roughly $150,000.


180


1    Q.    And did you review the financials of Erie Navigation

2    Company?

3    A.    Just in passing.

4    Q.    And did you review the earnings of the company?

5    A.    I looked at them, yes.

6    Q.    Did the company have earnings, past earnings?

7    A.    I think yesterday there was a chart put up that showed

8    five years prior to that the valuation year there were earnings

9    every year, yes.

10   Q.    How does cash flow have an effect on the net asset value

11   valuation?

12   A.    Cash flow should have zero effect on net asset value.

13   Q.    There was also a line of questioning about the rate of

14   return that Mr. Pashke used in his QMDM model?

15   A.    Yes.

16   Q.    And what was the rate of return that Mr. Pashke used?

17   A.    I don't recall offhand, I think it was up around 20

18  percent, something like that.

19  Q.   I believe you told Mr. Delaney how you arrived at your

20  conclusion that that was high?

21  A.   Yes.

22  Q.   And what did you rely on?

23  A.   Well, we looked at what's known as bill approach, where

24  you look at the fair market rates at the time and you adjust it

25  for risk.  And so we did a similar analysis.  But Mr. Pashke


181


1  never made an adjustment for the industry risks.  And that's

2  why we went to Ibbotson Associates to look at that data.

3  Q.   I'm going to put in front of you what has been previously

4  marked as Government's Exhibit 31, and what is this document?

5  A.   It's an annual yearbook of return information on the

6  stock market, the various stocks in the industries, published

7  by Ibbotson Associates, which is probably the premiere firm

8  that tracks required rates of return.

9  Q.   So you relied on this independent data in evaluating Mr.

10  Pashke's input, is that correct?

11  A.   Yes.

12  Q.    And you said that Mr. Pashke came up with a value that he

13  expected a return of 20 percent?

14  A.    I'd have to look at his report, but I thought it was

15  something close to that.

16  Q.    Can you tell the jury what the Ibbotson analysis came to

17  as what would be an expected rate of return for a company like

18  Smith?

19  A.    Well, it's going to give you the ending -- what it gives

20  you is what's known in the industry as premium.  Meaning the

21  higher amount or the industry discount based on that industry's

22  performance relative to the rest of the economy.  There's two

23  categories we looked at, and what's the closest SIC Code 442,

24  which is deep sea domestic transportation of freight.  Another

25  one is water transportation of freight, not elsewhere


182


1  classified.  So those were probably the two closest.  The first

2  one was negative 6.9 percent.  Meaning that if you built up

3  your return, you should at the end reduce it by 6.9 percent to

4  get to the part of the return for this type of business.  The

5  other one was a negative adjustment of 4.6 percent.

6  Q.   Is Mr. Pashke's inputs of 20 percent consistent with the

7  data in the Ibbotson report?

8  A.   I would say no.

9        MR. COOPER:  That's all I have, thank you.

10        THE COURT:  Anything further, Mr. Delaney.

11        MR. DELANEY:  Yes, your Honor.

12                    RECROSS-EXAMINATION

13  BY MR. DELANEY:

14  Q.   The return you were just referring to, is it the return

15  you're suggesting for Erie Navigation Company?

16  A.   No, the adjustment, the negative adjustment, that goes

17  to -- it helps you to get the return that's required for Erie

18  Navigation Company.

19  Q.   You're not suggesting historically there was a 20-percent

20  return at Erie Navigation Company?

21  A.   No, not at all.

22  Q.   You're just suggesting this is what we do in the model,

23  to look at perhaps a hypothetical company to compare the

24  current company to an expected standard?

25  A.   What I'm saying is that the 20 percent, if you're going

183

1  to use the model QMDM, which I have other issues with, but if

2  you're going to use the model, you need to make sure that your

3  assumptions are correct.  And one of the assumptions is

4  required return.  In this case you build up the return 20

5  percent and you look at the industry relative to rest of the

6  economy, you've made an adjustment down to 14 percent.  And

7  then that would impact the expected return that goes into the

8  model.

9  Q.   It has nothing to do with the history of Erie Navigation?

10  A.   No.

11       MR. DELANEY:  Thank you.

12       THE COURT:  Thank you, Mr. Burns.  Are all your

13  exhibits moved, Mr. Dale and/or Mr. Cooper?

14       MR. DALE:  Your Honor, we have the list here.  We're

15  just trying to check off --

16       THE COURT:  We can clear that up later.  I'm not

17  going to hold you to it, if you want sometime to make sure

18  you're squared away on that?

19       MR. DALE:  If that's all right, your Honor.

20       THE COURT:  That's fine, that's no problem.  With

21  that are you resting?

22          MR. COOPER:  Yes, the United States rests.

23          THE COURT:  All right, let me see counsel at side

24  bar just for a second.

25          (At side bar on the record.)


                              184


1          THE COURT:  This is what I'm thinking.  They're

2  going to need a break now anyways.  And I don't want to break

3  up the closings and the final charge, I want to do it in one

4  fell swoop in the morning.  So by fiat what I'm saying is I'm

5  sending everyone home.  We'll start fresh at a quarter to nine

6  tomorrow.

7          (End of discussion at side bar.)

8          THE COURT:  Members of the jury, the case is over,

9  except for two important things.  And that is one, the closing

10  arguments of counsel.  And I'm informed that individually

11  they're going to take somewhere around 35, 40 minutes apiece.

12  After that I have to give you the jury charge, which typically

13  takes close to 30 minutes.  It is now pushing a quarter to

14  four, you need a break anyways.  I want you to hear their

15  closings and I want you to hear my charge right after, all at

16  one time, without being broken up, get halfway through and

17  having to go home for the evening.  So I'm going to send you

18  home early.  The good news is the charge and the closings will

19  be done, I misjudged it today, we'll be done tomorrow, you will

20  be deliberating the case.  Remember what I told you, don't talk

21  about the case.  Obviously, you shouldn't form any fixed

22  opinions until you get into the jury room and start

23  deliberating.  And avoid all sources of outside information.

24  All right, we'll start at 9 o'clock tomorrow.  We're in recess

25  until nine, and I'll see counsel at 8:30 tomorrow morning.


185


1        (Whereupon, at 3:41 p.m., the Jury Trial proceedings

2   were adjourned for the day.)

3

4

5                - - -

6

7

8           C E R T I F I C A T E

9

10

11

12      I, Ronald J. Bench, certify that the foregoing is a

13   correct transcript from the record of proceedings in the

14   above-entitled matter.

15

16

17

18   _____

19   Ronald J. Bench

20

21

22

23

24

25