IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


SIDNEY E. SMITH, III, et al.,
     Plaintiffs


v.              CIVIL ACTION NO. 02-264 ERIE


UNITED STATES OF AMERICA,
     Defendant



JURY TRIAL - DAY NO. 3



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers & Courtroom C,

U.S. Courthouse, Erie, Pennsylvania, on

Wednesday, September 28, 2005.




APPEARANCES:
     W. PATRICK DELANEY, Esquire, and SCOTT T.
     STROUPE, Esquire, appearing on behalf of
     the Plaintiffs.

IVAN C. DALE, Esquire, and LINDSEY W. COOPER,
JR., Esquire, Tax Division, U.S. Department of
Justice, appearing on behalf of the Defendant.


Ronald J. Bench, RMR - Official Court Reporter


2

1              I N D E X

2

3                        PAGE

4

5   DEFENSE'S CLOSING ARGUMENT -           4

6

7

8   PLAINTIFFS' CLOSING ARGUMENT -          15

9

10

11   COURT'S JURY CHARGE -           31

12

13

14  JURY'S VERDICT -                    57

15

16

17

18                  - - -

19

20

21

22

23

24

25


                              3


1              P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 8:44 a.m., on

4   Wednesday, September 28, 2005, in Judge's Chambers.)

5

6          THE COURT:  Let's go on the record.  Two things.  We

7   inserted in the charge the names of the experts, you'll notice

8   they were not in there before.  And then there was a charge

9   submitted by the plaintiff relative to the testimony of Mr.

10  Smith.  That has been included in this charge.  Beyond that,

11  before we get going, does anybody have anything to add, to

12  detract?

13        MR. DELANEY:  No.

14        MR. DALE:  At the close of the evidence, your Honor

15  gave the United States an opportunity to consider whether it

16  wished to move certain exhibits.  We went over the exhibits

17  that were identified, we've only identified I believe 3, 4 and

18  5 have already been moved to be admitted.  We just had two more

19  exhibits that were identified that we wished to move, they're

20  exhibits 10 and 14.

21        THE COURT:  Okay, any objection?

22        MR. DELANEY:  No.

23        THE COURT:  The only thing is once we're done here,

24  we'll just double check to make sure the exhibits that are sent

25  out are in fact the exhibits that were identified.  You can

4

1   talk to my law clerk and make sure that that is squared away.

2   All right, maybe we can get started a little early.

3        (Proceedings recessed at 8:47 a.m., in Judge's

4   Chambers; and convened in Courtroom C at 9:00 a.m.)

5        THE COURT:  All right, are we ready to go.  All

6   right, Mr. Cooper.

7        MR. COOPER:  Good morning.  When I first got up

8   before you I used a single word, the word was reliability, if

9   you remember.  And I hope you kept that word in mind as we went

10  through this trial.  Because at the end of the evidence the

11  United States, as I told you, we provided you with a valuation

12  of the one-percent interest of the Smith FLP that was based

13  upon an accepted methodology.  It was based upon independent

14  statistical data.  And then using that methodology and the

15  data, we were able to give you a specific number as to the

16  valuation.

17        And as Mr. Burns showed you, on January 5, 1998,

18  when the two gifts were given by Mr. Smith to his children, a

19  one-percent interest in Smith FLP was worth $40,798.  Later

20  that year, on New Years Eve, on December 31st, he gave a second

21  gift.  One to his son and his daughter again.  And a

22  one-percent interest at that time, based upon the same

23  methodology, the statistical data came out to $38,740.

24          Now, when he came up and explained it to you, we

25  used this chart.  Can you all see it, okay.  This laid out the


                                    5


1  specific methodology that our expert went through --

2          THE COURT:  I'm sorry to interrupt you, can you

3  increase that just a little bit, zoom it just a little bit.

4          MR. COOPER:  Mr. Burns started with the net asset

5  value.  And what is the net asset value.  It's an assets minus

6  liability.  That gave you $5.2 million on January 5th; and $5.3

7  million on December 31st.  Then he took a pro rata share or a

8  piece of the pie, how much of a gift was given of the 100

9  percent of the limited partnership interest.  As of that date,

10  the piece of the pie was 6.856 percent limited partnership

11  interest.  And, again, keep in mind the 6.856 is one gift.

12  There were two gifts given on each day.

13          So to get to the pro rata share, what do you have to

14  do.  You take the big number, 5.2, and you multiply it.  And

15  that gives you the small piece of the pie.

16          There's two discounts that are involved.  And we did

17  a lot of talking about discounts.  And the big concept of the

18   discount is used every day.  And you hear it, sort of like GM's

19   employee discount, it just means something is less than what

20   the value is.

21          There's two discounts that both experts talked

22   about.  One was lack of control, and the second one was lack of

23   marketability.  The lack of control methodology, both experts,

24   both experts presented in this case relied on the exact type of

25   data.  And in their analysis came to almost the exact same

6

1   numbers.

2          Mr. Burns in January found the lack of control

3   discount was 4.9.  And the later date on New Years Eve, the

4   lack of control discount was 11.4.  As Mr. Burns explained to

5   you, the methodology, grounded methodology.  You multiply the

6   pro rata share times the amount of the lack of control discount

7   and it drops out at the discounted figure, the rebate, if you

8   will.

9          At that point in time then you have to determine the

10   lack of marketability.  And as we told you, we went to

11   independent data.  You remember we put this chart in front of

12  you.  From the 1960's to the late 1990's.  Every one of these

13  was an independent analysis done as to restrictions on

14  marketability.  Thirty years of data he relied on.

15      In analyzing that data, he demonstrated to you the

16  lack of marketability was 12 percent.  Based upon that grounded

17  methodology that he was able to verify to you with exact

18  numbers.  He went and then tested his results against Professor

19  Bajaj.  As you saw Professor Bajaj told you, there was a range

20  between 10 and 14 percent.  His number was consistent with

21  other independent analyses done of the marketplace.  From that

22  he came to 12.5 percent.  Because you remember fair market

23  value, remember that concept.  It's what a hypothetical buyer

24  and seller would pay for something that would change hands.

25  And because he came to a range, he said, well, the hypothetical

7

1  buyer would not do better than the hypothetical seller, they'd

2  meet in the middle.  So he got 12.5 percent.

3      Then he made an adjustment for lack of diversity,

4  because Smith FLP holds one asset.  And that asset is the stock

5  of Erie Navigation Company.  Down on the bayfront, it's that

6   way, I believe.  It's where their operations are, where the

7   boats come in and they load the gravel.  You saw lots of

8   pictures of it.  That's what the one asset it held.

9          Then after that he came up and made the adjustment

10  of five percent for a lack of diversification.  Again, the same

11  methodology.  You take the discounted number after lack of

12  control and you multiply it.  Simple multiplication.  And that

13  dropped out the fair market value of one gift.  On January 5,

14  1998, and on December 31, 1998.

15         The fair market value on one of the gift, as it says

16  here, is $280,000.  December 31st, on New Years Eve, $531,905.

17  The total amount of gifts was over $1.6 million.

18         James Cullen got on the stand and testified that he

19  is an estate tax attorney.  He told you that a gift tax doesn't

20  tax all gifts.  You get a lifetime exemption of $625,000.  And

21  because of the size of this gift, it exceeded that exemption.

22  And these gifts in the one year by approximately a million

23  dollars.  And that's why the government is allowed to tax it

24  because it exceeded the $625,000.  We would ask you to go back

25  and to use this methodology.

1       But we got to talk about what happened about the

2   different portions of this chart.  The net asset value.  Assets

3   minus liabilities.  Where did that number come from for January

4   5th.

5       And let's step back in time.  Let's go back to 1997.

6   Mr. Smith at that time was 71-years-old.  Mr. Smith wanted to

7   give stock in ENC to his children.  Mr. Smith went to his

8   accountant, Mr. Finnecy.  They discussed it and then they went

9   to his estate attorney that drafted his wills.  And they

10  suggested to him a family limited partnership.  So in order to

11  effectuate this, they went and hired Mr. Pashke.  And they

12  hired him, ladies and gentlemen, before this litigation started

13  and they hired him even before they submitted their timely

14  refund.

15      Mr. Pashke independently, based upon the information

16  given to him by the plaintiffs, came up with a number of $5.2

17  million using the net asset approach.  That is the only number

18  that has been given to you as the value of that date.  And

19  that's the number that was given to you by the plaintiffs.

20  Using the same methodology, our expert on December 31st, net

21  asset value.  It increased, it was $5.3 million.  Mr. Pashke

22  has been part of this litigation, analyzed the same type of

23  information when he came up with the $5.2 million.  Before this

24  litigation started and he agrees that it's $5.3 million.  Those

25  are the only two numbers that you've been given in this

9

1  litigation as to a specific amount.  And it's the only two

2  numbers that are based upon a specific methodology.

3       Now, there's been some insinuations during this

4  litigation that maybe the net asset value isn't what

5  plaintiffs' own expert told you.  There's been insinuations,

6  and the largest insinuation, I believe, came from Mr. Smith,

7  III.  He insinuated there might be something different.  But

8  did he give you a number, no.  Did he give you a methodology,

9  no.

10      Mr. Smith also got on the stand, he gave you a

11  number about what a one-percent interest would be.  Mr. Smith

12  told you no methodology again how he got to that number.  Mr.

13  Smith told you he did the calculation quickly.  Keep my word in

14  mind, reliability.

15          Mr. Smith, we also need to talk about his

16  credibility.  First of all, he told you that if you accept his

17  number he would be given a refund -- so he would receive more

18  money.  Secondly, he told you that in 1997, remember that

19  $450,000 number, he said his father and he had given that money

20  to the company.  And that he had remembered just the other day.

21  But this document produced in 1997, a note to, says

22  specifically that $450,000 came from the banks, from the

23  financial institutions.

24          Now, let's talk about financial institutions.

25  Because this is where the company got its money from.  Mr.


                              10


1  Smith told you he gave the banks this document.  And they

2  relied on this document when they lent money to ENC.  This is

3  serious.  He told you about the company's vessels.  He talked

4  about asbestos.  Then he told you that they did not disclose

5  any of this document that he gave the banks.  Why did they not

6  disclose it.  Because he told you the banks wouldn't give him

7  the money.  Mr. Smith told you he misrepresented the financial

8  condition of his company to the banks in order to get money.

9  What is to say that again there isn't a misrepresentation being

10  made in order for him to get money from the United States

11  government through a tax refund.

12        Now, let's talk what matters here, what the experts

13  said.  Lack of control.  They're in agreement.  It's easy.

14  Lack of marketability.  Now, this is where the beef is.  As we

15  showed you, Mr. Burns went out and relied on this independent

16  data and the independent studies and came up with a number.

17  And I think it's telling after he told you that story in direct

18  examination, we walked you through it, I'm sure it was in

19  excruciating detail, but we walked through every step because

20  we wanted to educate you as to how to do this.  When

21  plaintiffs' counsel got up there and cross-examined him, did he

22  ask a single question about whether or not the data he relied

23  on was good.  No.  It's because it's rock solid.

24        Let's talk about their expert and about how he came

25  up with a discount for marketability.  Mr. Pashke told you that


11


1  he had gone to a seminar in 1997 before he did this valuation.

2  During that seminar that's where he learned about this

3   quantitative discount, QMDM model.  Do you all remember that, I

4   still have trouble with that, it's a mouthful.  He learned

5   about the QMDM model.  And the same year that he applied it

6   here.

7          And this model has two inputs that were critical in

8   our analysis.  One was that rate of return of 20 percent.  That

9   was one input into this model.  He used the approximate number

10  of 20 percent.  That data, that sheet that I put up there that

11  had the values within the industry.  This is independent data

12  again, showed that 20 percent was unreasonable.  But the 20

13  percent went into the model.  And what was the range of

14  discounts that dropped out of that model.  That is a discount

15  to 15 percent, all the way to a discount of 99 percent.  That's

16  an 84 percent variable, that is huge.

17         The second critical input data that's put in there.

18  Was a holding period.  How long was the person going to hold

19  the investment.  The partnership agreement that he was valuing.

20  There is no requirement that an owner of a limited partnership

21  interest hold it.  If he bought it and found a buyer the next

22  day, he could sell it.  There was no prohibition against

23  selling the partnership interest.

24         Mr. Pashke, however, used a holding period range

25  between 7 years and 15 years, and plugged that into the model.

12

1  Now, do you remember -- now, you remember our standard, it's

2  fair market value.  It's what a hypothetical buyer and seller

3  are doing.  These are fictional people.  Just make em up,

4  they're fictional, they don't exist.  But the very essence of

5  putting an intent within a fictional purpose -- let me back up,

6  of putting intent on a fictional purpose, you can't do that

7  because specific people have intent.

8        We're talking about hypothetical people.  They don't

9  have intent.  And that's the very core of this, that's why this

10  model is faulty.  But he put it in there and he came out with

11  another range.  It wasn't 15 to 99, but it dropped, 67 to 93.

12  Still a pretty big range.  And it's still a pretty high

13  discount, 67 percent discount only on lack of marketability.

14  Mr. Pashke couldn't even -- so he dropped it down to 50 on the

15  outside range of his own model.

16        Then through the series of litigation, remember the

17  partnership agreement had the right of first refusal in it.

18  Meaning a partner, if they wanted to sell their interest had to

19   first offer it to the partners in the partnership.  And then if

20   they sold it to a third person, the partnership or partners

21   could then buy it back from the third person.  They didn't have

22   to pay cash up front for it.  They got to pay them with a note.

23   And that note had a 15-year length.  The applicable federal

24   rate, which is the average rate the government lends money.

25   The government got pretty good credit there.

13

1        After taking that right of first refusal out, he

2   dropped it.  His lack of marketability discount down to 42 to

3   43 percent.  And what was his methodology for coming up with

4   that seven to eight percent difference.  It was completely

5   subjective.  It wasn't grounded in any data.  It wasn't

6   grounded in an economic analysis.  It was just what he felt.

7        I would think when you compare Mr. Pashke's

8   methodology against Mr. Burns' methodology, the numbers we

9   provided you with are the reliable numbers as to the lack of

10   marketability discount.  Because, as I told you, what we were

11   going to do is we're going to provide you with a valuation that

12   was an accepted methodology, he broke it down into

13  multiplication steps.  Small pieces.  It was based upon

14  independent data, statistical data, and we came up with a

15  specific number.

16          Now, I want to show you what I told you in the

17  beginning.  Because you're going to be asked to do a

18  one-percent valuation, instead of the total value of the gifts,

19  you remember the $1.6 million, you're going to be asked to

20  value a one-percent interest in the partnership.  And that's

21  easy to do.  Because if you look at the chart in front of you,

22  the only thing you do is you take out that 6.85 and you put in

23  one.  Because one percent is just a one-percent interest.  The

24  6.85 was an actual piece of the pie.  It's easy.  Just put in a

25  one on the numbers.  You drop through the same analysis.


14


1          And as this chart shows you, when you put in that

2  one on January 5th, a one-percent interest is $40,798.  On the

3  December 31st, on New Years Eve, it was $38,740.

4          And I'm going to ask you what if you had to come up

5  with the value of Smith Limited Partnership.  What if you had

6  to do this.  What if you had to explain your methodology to the

7   client.  How would you do it.  Would you make a subjective

8   decision and pull it out or would you go look to data that you

9   could show people.  Would you go to independent sources that

10   you could verify.  You would go to independent sources because

11   you wanted to be able to back it up.  That's what we've done

12   here.

13          Now, I'm going to ask you, again, when we met about

14   a month ago, we all set down and had a short interview with

15   each other.  It was asked of you because gift taxes are

16   involved, because taxes are involved, can you still give us an

17   impartial decision.  Your answer was yes.  We have that deal

18   with each other.  And I want you to give an impartial decision

19   you told us you would give.

20          This is the last time I'm going to be able to talk

21   to you all.  I hope you consider what I told you and consider

22   that I started with reliability and showed you it was reliable,

23   and now demonstrated to you again what I told you I was going

24   to do we did.  And it is reliable.

25          Mr. Dale and myself would like to thank you for your

15

1    time and attention.  If you'd all like after this is all over,

2    I'd be happy to give you bow tie lessons.  You all have a good

3    day.

4            THE COURT:  All right, Mr. Delaney.

5            MR. DELANEY:  Thank you, your Honor.  Good morning.

6    I have a secretary by the name of Stacy, who did a lot of work

7    to get me ready for this trial.  And she stopped in Monday to

8    see some of the proceedings.  I saw her last night and she

9    asked me if there was anything she could do for me.  And I said

10   no, I have to get ready for closing, I'll have to do that

11   myself.  And she said well you better start by apologizing to

12   that jury.  I said well, did I do something.  She said you told

13   them it would be interesting and it wasn't.  It is interesting

14   to me, I guess you have to be immersed in it, perhaps you have

15   to know the Smith family to make it a little more interesting.

16   I find it interesting.

17           Mr. Cooper touched on some things that I wanted to

18   talk about at the very beginning.  That is what are you going

19   to do when we're done talking, when the judge is done

20   instructing you, what are you going to do when you go back into

21   the jury room.

22          You're going to receive a one-page questionnaire and

23  it's going to ask you three questions.  The first question is

24  did the Internal Revenue Service make a mistake in valuing the

25  gifts that Mr. Smith made in 1998.  If you say yes to that

                                16

1  question, then you're asked what is the value of a one-percent

2  limited partnership interest in January of 1998 and also in

3  December of 1998.  Just asks for one number from you.  You

4  don't have to do any math on the form, you just have to give us

5  a value.

6          Once we have that value from you, the judge will

7  take care of the rest of the math, determining what the value

8  of the gifts are, determining if there is any refund that might

9  be due.  So we've tried to simplify it.  The question then that

10  is presented to you is a little more refined than what I

11  suggested in the opening.  We're down to this one-percent issue

12  to make it simpler.

13          What's the standard, what is the standard.  Well,

14  you've heard it a lot, I'm sorry if I'm repeating -- but I have

15  to repeat some of these things.  The standard is fair market

16   value.  And what does that mean.  We've heard a number of

17   people define it for us.  You've heard already that it's

18   something, that it's a definition.  Maybe a definition that

19   comes from the Internal Revenue Service.

20          Fair market value is the price of at which some

21   property would change hands between a willing buyer and a

22   willing seller.  They are hypothetical people, it's not the

23   Smith family.  You shouldn't think about well, it's Jill Smith

24   or Sandy Smith acquiring this one percent.

25          It's purely a hypothetical person.  They are under

17

1    no compulsion.  They again can buy it or they cannot buy it.

2    They're fully aware of the relevant information about the

3    transaction.  They know about the asset, they know what they're

4    buying.  The characteristics of it.  The risks of it.  The

5    potential reward of it.  They're also aware of the alternatives

6    that they have in order to invest their money.  They can put it

7    someplace else if they'd like.

8          So that's the standard by which you should be

9    assessing and deliberating as you go into the jury room and you

10  try to answer these questions.  It is a very subjective,

11  judgmental process.  There's been this reference to all this

12  math, studies, when you get down to it, it's what this

13  particular asset was worth to this hypothetical person.

14          Now, let's think about that.  What are we dealing

15  with, what is this property that we're trying to value.  It is

16  a limited partnership interest.  As we have learned in this

17  litigation, there is a limited partnership out there that was

18  the Smith Family Limited Partnership.  Inside of it is Erie

19  Navigation Company.  This business that Sandy Smith described

20  to you, showed you pictures of its assets and its operations.

21  It's one percent.

22          There are two classes of partners in a limited

23  partnership.  The limited partner class, that's the one percent

24  we're talking about.  Has no voice.  There is no vote.  There

25  is no right to dictate management.  There's no right to


18


1  determine where the money is distributed out of the

2  partnership.  No right to be employed.  Can't hire and fire

3  people.  Can't even select who the general partner would be.

4  You can't veto a decision by the general partner.  Can't make a

5  determination whether the business would borrow money or sell

6  its assets or what it would do.  You are an utterly passive

7  investor.  You're at the mercy of the wisdom of the general

8  partner.  So you need to think about that first.  It's a very

9  limited position that you have.

10       In addition to that, when you buy a share of General

11  Motors, you don't get to dictate how the business operates.

12  But the General Motors stock is easily marketable.  As Mr.

13  Pashke said, you go to your broker and you can get rid of it,

14  get your money within a day or two.  The difficulty with a

15  family business is that can't happen.  There is no broker out

16  there who's going to take your one-percent limited partnership

17  interest and turn it around into cash in a day.  That's why

18  they talked about these discounts for marketability.

19       So you're in a business where you don't have any

20  control, you're in a business where there's not a brokerage out

21  there you can go to and sell the asset.  And, then, as you

22  think this through in the jury room, you have this limited

23  role, limited asset, limited control, and what is the business

24  that this Smith Family Limited Partnership is in.  It has one

25  asset itself, Erie Navigation Company.

19

1        What about Erie Navigation Company.  They have a

2   fleet of ships.  You saw pictures of all the ships.  One of

3   them had been in dry dock or at least not operating on the

4   lakes since 1994.  Here you are, you're the hypothetical buyer,

5   not you individually, I'm suggesting that you are thinking

6   about this hypothetical buyer considering a one-percent

7   interest.  What are we talking about.  Well, they've got four

8   ships.  One of them doesn't work.  The other one is a tramp

9   steamer that goes from port to port, very active during the

10   season.  But this business is in transporting construction

11   materials and there are four big competitors out there, ten

12   times bigger than this particular business.  Am I happy about

13   that, does that make it more valuable.

14        Of the fleet of ships, the youngest one in 1998 is

15   54-years-old.  It's a dredge that goes out into the lake once

16   or twice a day to get sand.  As a hypothetical buyer, am I

17   thinking, boy, there's an asset, let's see I could put my money

18   in the bank or I could buy one-percent of the limited

19   partnership that owns this business.  Am I impressed with that

20  particular fleet of ships, I don't think so.  What does that

21  do, it drives down the value to the hypothetical buyer.  It's

22  driving down the value.

23        And then this hypothetical buyer would have even

24  more information than the experts.  That hypothetical buyer

25  with all the knowledge necessary would understand that there

20

1  are certain business risks.  This company that the Smith Family

2  Limited Partnership owns, about 30 percent of its business

3  comes from one customer.  The hypothetical buyer would think,

4  what about that customer.

5        Let's find out about that customer.  1997, 1998,

6  that customer is starting to change.  For years they had a dock

7  and a slip in Marblehead, Ohio.  We were the only company that

8  could service them.  The water was too shallow, our Reiss could

9  get in there, it was there twice a week.  Not bad.  Nice to

10  have that niche.  But then we learn, the hypothetical buyer

11  learns, wait a minute, they're changing everything, why are

12  they changing their dock and building a bigger dock.  Why are

13  they dredging their slip to make it deeper.  So the competitors

14  of ours can come in and take the business away.  For Lefarge it

15  meant driving down the prices.  If I'm the hypothetical buyer,

16  I'm thinking well, that's the business they're in.  Am I happy

17  about it, does that make it more attractive to me.  No, it's

18  not more attractive, the price is going down, the value is

19  going down.

20       Then I look at the financial records.  And I look at

21  cash flow.  Cash is king.  It is the life blood of the

22  business.  You can talk about earnings, but it's all

23  accounting, accrual accounting.  And it's very, very confusing.

24  But always count on cash.

25       So what's the cash situation in this, this business

21

1  that is owned by the Smith Family Limited Partnership.  Well,

2  I'm going to look back six years.  I'm at the end of 1998, I

3  can look at '98, all the way back to '93.  What does that

4  information indicate to us.  This isn't controversial, nobody

5  disagreed with this.  Negative cash flow four of the six years.

6       And in one of the years with positive cash flow,

7  where there was more money coming in than going out, part of

8   that money was a loan.  If you took the loan out, there was a

9   fifth year of negative cash flow.  I'm the hypothetical buyer,

10  I'm thinking am I happy about that, does that make one percent

11  of this Smith Family Limited Partnership more attractive to me

12  or should I go to a mutual fund or a CD or GM stock.  I don't

13  think it's more attractive because of the negative cash flow.

14        And then what about other risks.  Well, the sales

15  were flat for five years.  Right around $15 million in sales,

16  flat for five years, and then I think that Lafarge thing is

17  going to come to roost, too.  Am I happy about that, does that

18  make this a more attractive investment for me.

19        And then the management.  Nice people, interesting

20  people.  Sid Smith was an interesting man.  Worked that

21  business as hard as he could.  But if he's gone, there's the

22  son, and there's one guy over in Sandusky, and that hasn't been

23  real profitable.  Am I happy about that.  Does that make this a

24  more attractive business, a more attractive investment, I don't

25  think so.


22


1         And then I go to any courthouse and figure out that

2    there are lawsuits against this company.  Maybe there's

3    insurance, but this asbestos thing, I'm not happy about that.

4    I asked management are these your employees -- no, these are

5    employees from before we ever owned the company.  Koppers owned

6    the company at that point in time.  Koppers is a big national

7    company that has a presence in Erie.  But I'm not happy about

8    that if I'm this hypothetical buyer.  Is this more attractive

9    to me now, I don't think so.

10          And then what are these alternatives.  Nobody

11    contested what Mr. Pashke said about alternatives.  This

12    hypothetical buyer, as we indicated, can go to the bank, get a

13    CD, put his money in the bank for a year, get five to six

14    percent risk free.  No risk.  The federal government insures

15    the account.  Or he can go straight to the federal government,

16    buy a treasury bill, get five or six percent.  Zero risk.  Zero

17    risk mutual funds.  Individual stocks.  The stock market.

18    Money market accounts.  Sort of like a bank account, little bit

19    higher interest.  1997 and '98, paying the same sort of return,

20    five, six percent.

21          Mr. Pashke told you, you know when I analyzed Erie

22    Navigation Company, I looked at all these warts and I thought,

23  well, I'm going to assign three-percent growth in sales.

24  Three-percent growth, that's what I'll assign.  Are any

25  dividends being paid out by Erie Navigation Company up to this

23

1  Smith Family Limited Partnership so that my -- me as the

2  hypothetical buyer might get some cash flow out of this

3  investment.  Not anything significant.  I think Sandy Smith

4  said we made some dividends up to the family limited

5  partnership, but pay people like Mr. Pashke, Mr. Cullen and the

6  accountant, Mr. Finnecy.  But it's not flowing out to the

7  limited partners, does that make this all more attractive.  I

8  don't think so.  The value goes down.

9          Mr. Burns, the expert for the IRS, said in his

10  report and on the stand, I didn't think this was a risky asset.

11  That's because he never looked at it, at all.  He never looked

12  at it, so it's easy for him to say that.

13          But let me talk to you about the witnesses.  Now,

14  we've examined what this investment is.  And we've talked about

15  all the risks that exist and the very limited reward that seems

16  to apply to this one-percent limited partnership.  Limited

17  voice, lots of business risks, no real return, no reward.

18  Value goes down.

19       Now, we had three witnesses get on the stand and

20  give you opinions.  Remember, I said this process is very

21  subjective, judgmental.  That's why the law ultimately allows

22  eight citizens to make a decision.  It's an opinion, very

23  subjective.

24       Mr. Cooper in his opening statement used the word

25  reliability at least 12 times.  And, of course, he repeated it


                              24


1   in his closing, reliability.  He's suggesting to you that Mr.

2   Burns is the most reliable source of information for you.

3        What about Mr. Burns.  He was hired in March of

4   2003, at the earliest, we don't have a specific date, but you

5   remember his report was dated September of 2003.  He said I was

6   contacted by a lawyer from the IRS at the most six months

7   before.  The IRS had assessed the tax against Mr. Smith in

8   2001.  Two years before, maybe not a full two years before.

9   They have made a determination about value.  You don't see

10  anybody from the IRS coming into court and getting on the stand

11  and saying here's why I thought it was that much tax.  No, they

12  hired an expert later to justify their position.  It's an

13  after-the-fact analysis.

14          What did they tell him.  Remember, the Smith Family

15  Limited Partnership interest, this one percent is really driven

16  by what's underneath the value of this business.  What do they

17  say to Mr. Burns.  Don't worry about the business, just call it

18  $5.2 million, that's good enough for us.  Don't examine the

19  business.  Why.  Because you think the federal government needs

20  to save a few dollars on Mr. Burns's time.  Or it is because

21  no, we don't want to upset that apple cart.  You take a good

22  look at this, if we have somebody else take a good look at it

23  maybe they'll come up with a different number, then it's going

24  to be lower.  They have him look at nothing.  The underlying

25  asset, Erie Navigation Company, is the source of all the risks


                                  25


1   or reward that our hypothetical partner is going to receive and

2   Mr. Burns doesn't even look at it.  Is that reliability, I

3   don't think so.

4           You should rely on experts or anybody's opinion to

5   the extent they can come in and say to you, I know, I

6   understand, I've done the work.  Mr. Burns did not.  He never

7   spoke to management at Erie Navigation Company.  He never

8   visited the facilities of Erie Navigation.  He never viewed the

9   assets, never went around and looked at the equipment.  He

10  never inquired about lawsuits.  He never spoke to Mr. Pashke.

11  He never talked to the appraiser of ships that Pashke had

12  requested be hired.  He didn't do any of that.  How reliable is

13  that.

14          I mean you don't leave your common sense outside.

15  You judge experts and people who give you opinions based on

16  your good common sense.

17          Now, Mr. Burns would answer this criticism by saying

18  yeah, the $5.2 value for the underlying asset, this thing

19  that's going to provide risk or reward to our limited

20  partnership, to our limited partner, $5.2 million was given to

21  us, we knew that and that's enough.  But that's not static,

22  that doesn't stay the same.  And he said well, we knew it on

23  the date of the gift.  Yeah, but what's your hypothetical buyer

24  going to say.  Okay, I'm going to buy something on this date, I

25  don't care what happens in the future.  Of course not.  The

1    hypothetical buyer isn't going to do that.  He's going to think

2    about what's going to happen.  Is it going to go up or down.

3    Does it have risk and reward.  How high is the risk, how high

4    is the reward.  The risk is high and the reward is low.

5         Mr. Pashke at least made an effort.  Mr. Cooper is

6    right, we didn't hire Mr. Pashke because we knew we were coming

7    to court, not like Mr. Burns.  Mr. Pashke was hired, as Mr.

8    Cullen explained to you, because you have to file some report

9    once you make a gift tax return, once you file your gift tax

10   return.  So he was hired back at the time the gifts were being

11   made.  Does that make him more reliable or is an expert who's

12   hired just to come into the courtroom more reliable.  I would

13   suggest the guy who's hired not for litigation, but for

14   business reasons, would be more reliable.

15        Pashke at least made an effort.  He looked at the

16   records.  He reviewed the appraisal that he had requested.  He

17   went to the facilities.  I think he told you he went to

18   Sandusky and went to the docks there to see them.  It wasn't

19   perfect, he didn't expect to be in a courtroom.  He didn't get

20   every piece of information.  He knew that there was customer at

21  30 percent.  He didn't know the story about what was involved

22  with that customer.

23        So it wasn't a perfect analysis.  He didn't know

24  about the lawsuits.  Because they weren't on the financial

25  statements.  Sid Smith didn't want them there.  He had 75

27

1  people working for him.  The bank shuts him down, all those 75

2  people are gone.  And his business is gone.  So he didn't put

3  it on the financial statement.  So Pashke at least had more

4  information, a better understanding.  Again, it's very

5  subjective.  You have to get the information in order to

6  understand what the value is.

7        Pashke at least made that effort.  When he ran his

8  numbers and his model, what did his model tell him.  The value

9  of a one-percent limited partnership interest was down around

10  $15,000, $16,000.  That's what his model told him.

11  Subjectively, he said I moved it up.  Did he think, you know,

12  this is just going to buy litigation with the IRS if I go with

13  15 or 16, I have no idea.  Did he think that well, I just am

14  not comfortable with 15 or 16, I guess that's what he did.  And

15   he moved the number up.  More reliable than Mr. Burns.

16        And then you had Sandy Smith who came in.  I don't

17   believe that Greg Pashke ever spoke to Sandy Smith when he did

18   his work back in 1997.  I know that Mr. Burns did not speak to

19   Sandy Smith when he did his work in 2003, after we were in a

20   lawsuit about this refund.  He told you about the lawsuits.  He

21   told you the story about Lefarge.  The company that was in

22   Marblehead, Ohio.  The 30 percent of our business.  That

23   suddenly they got caught on that we've got their business

24   exclusively and they can drive the price down if they extend

25   their dock and they did that.


                                    28


1        He told you about the loans that he and his father

2   had made.  And there was some dispute, some confusion about

3   which year those loans had occurred.  But there were several,

4   there were at least two, there was a $450,000 loan that was

5   made.  He was the person that told you look, the owners are

6   putting money back in, you're getting a salary out of this, you

7   have to put money back in.  Did they do that just for fun, no,

8   they need it for operating expenses.  And that can change net

9    asset value.

10        Sandy Smith is the person who was on the stand who

11   had the most information to offer.  Reliability is a common

12   sense analysis.  Opinions should be trusted to the extent they

13   are based on good information.  The person with the least

14   information is Mr. Burns.

15        Let me show you this chart.  These are the opinions

16   that you heard about value.  Mr. Burns and Mr. Pashke rendered

17   two different opinions.  That is in terms of the dates.  It was

18   interesting to me, actually, when there was some discussion

19   about net asset value, there was a suggestion that net asset

20   value went up from the beginning to the end of the year in

21   1998.  Isn't it interesting how both the experts indicate that

22   the value of a one-percent interest however go down.

23   Apparently, there's something going on that makes it go down.

24        Mr. Burns suggested about $41,000 that a

25   hypothetical buyer with $50,000 in their pocket would be

29

1    willing to spend $41,000 to buy a one-percent interest in the

2    Smith Family Limited Partnership on January 5th of 1998, and

3  another $38,370 in December.

4        Mr. Pashke ultimately opined that in January a

5  willing buyer would pay 28,300 and 28,700 in December.  But,

6  remember, his model indicated 15,000 to 16,000.

7        And, finally, you have Mr. Smith suggesting to you

8  that the value, after I explained to him, here's what we're

9  talking about, fair market value of one-percent family limited

10  partnership interest, do you understand what that means.  Yes.

11  Where would you place the value.  He's allowed to do that, he's

12  allowed to give an opinion.  He's not an expert in valuation.

13  He is the owner.  At the time he owned a one-percent limited

14  partnership interest.  You'll hear the judge tell you that the

15  law allows an owner to come in and express an opinion about

16  value.  And who is more reliable.  Who would be more reliable.

17  Who would have more information.  Sandy Smith suggests that the

18  value would be between $10,000 and $12,000 for the year 1998.

19  I think he indicated that his assessment would be at the end of

20  1998, so he would have the full information for that particular

21  year.  But that it would be between $10,000 and $12,000.

22        Who has the most reliable opinion.  I would suggest

23  to you and what we are asking -- I would suggest to you that

24    Sandy Smith has the most reliable opinion.  What we're asking

25    is that you return a verdict that establishes a value for these

30

1    gifts that would be in the range of $10,000 to $15,000.  We

2    don't think there is a difference between January and December.

3    There can't be that big of swing in so removed an investment,

4    it's not just the assets of Erie Navigation, it's not the stock

5    of Erie Navigation, it's this one-percent interest in the

6    limited partnership that owns the company.  There can't be that

7    big of swing from January to December.

8        So we are suggesting and asking you to return a

9    verdict in that range, somewhere in the $10,000 to $15,000

10    range.  $10,000 to $16,000 range, given that Mr. Pashke's model

11    came up with a $15,000 or $16,000 figure.

12        Where does the money go.  The money goes back into

13    Sid Smith's estate.  What happens to it.  40 to 45 percent of

14    it goes back to the government.  There is another tax.  An

15    estate tax will then apply to any refund that the judge might

16    calculate based on your decision.

17        What we have here, the judge will tell you in his

18  remarks that he's the umpire, he's the judge of the law, he's

19  the source of the law.  And, ultimately, you're the source of

20  the facts.  You are the fact finder, and the question of value

21  is quite simply, as it has been for centuries, the question of

22  value is a question of fact, that's why we have to rely on you.

23       You've been incredibly attentive and patient with

24  us.  We had a lot of interruptions, I appreciate, this isn't a

25  convenient thing for all of you to do.  It really was

31

1  interesting to work with you on this.  I hope you go away from

2  this thinking it was interesting as well.  Thank you.

3       THE COURT:  Members of the jury, we're going to take

4  five minutes and then I'll come back and give you my charge.

5       (Recess from 9:55 a.m.; until 10:01 a.m.)

6       THE COURT:  Ladies and gentlemen, it is now my duty

7  to tell you about the law that is to be applied in this case in

8  which you be the finders of fact.  You have heard all of the

9  arguments and all of the evidence and it is my function now to

10  charge you on the law which you are required to consider and

11  which will govern your deliberations.

12          For convenience, in the course of these

13    instructions, Sidney E. Smith, III, and Jill P. Smith, who are

14    the executors of their father's estate, may be referred to as

15    the plaintiffs, which is just the legal name for the people

16    filing the lawsuit.  The United States may be referred to as

17    the defendant, which is the legal name for the party against

18    which a suit is filed.

19          Now, as you may have heard throughout the trial, in

20    their individual capacities, I will refer to the father, Sidney

21    E. Smith, Jr., as Mr. Smith.  Jill Smith, who is the daughter

22    of Mr. Smith, will be referred to as Ms. Smith.  And Sidney E.

23    Smith, III, who is the son of Mr. Smith, will be referred to as

24    Mr. Smith, III.

25          Now, this case does not involve any criminal


                                    32


1    violation or criminal prosecution of any kind.  The plaintiffs

2    are not being charged with or accused of any criminal act.  The

3    issues in this case only involve money; that is the liability

4    for the assessed gift tax, and the issues are purely civil in

5    nature.

6         A law adopted by the United States Congress requires

7    that, under certain circumstances, a person who makes a gift

8    must pay a tax on the value of that gift.  This is commonly

9    referred to as the gift tax.  Once it is determined that the

10   gift tax applies, the higher the value of the gift, the more

11   tax the person must pay.

12        Now, in 1998, Sidney E. Smith, Jr., transferred to

13   each of his two children a limited partnership interest in a

14   business entity called the Smith Family Limited Partnership.

15   This transfer by Mr. Smith was made as a gift to his children.

16   Mr. Smith then hired an expert to place a value on the gifts

17   that he had given his children.  The expert, Mr. Pashke,

18   prepared a report expressing his opinion as to the fair market

19   value of the gifts that Mr. Smith had made.  Mr. Smith then

20   filed a gift tax return with the Internal Revenue Service and

21   paid the gift tax.

22        The Internal Revenue Service disagreed with the fair

23   market value that Mr. Smith had assigned to his gifts and

24   required him to pay an additional amount in taxes.  Mr. Smith

25   paid this additional amount as well.  Therefore, with regard to

33

file:///A|/SMITHDY3.TXT

1    the gifts, there is not any question that Mr. Smith has met his

2    obligation to pay taxes on the gifts.

3            Mr. Smith, now deceased, filed this lawsuit in 2002

4    because he disagreed with the Internal Revenue Service about

5    the fair market value of the gifts he gave his children.  Mr.

6    Smith's children, in their capacity as executors of the estate,

7    continues his claim for a refund for a portion of the taxes Mr.

8    Smith paid.

9            In deciding these issues of fact, it is your duty,

10   ladies and gentlemen, to follow these instructions.  In doing

11   so, you must take into consideration all of the instructions I

12   give you, and not pick out any particular instruction and

13   disregard another one.  It is your duty to determine the facts

14   from the evidence that has been produced in open court.  You

15   are to apply the facts as you find them to the law as I give it

16   to you, and neither sympathy nor prejudice should influence you

17   in any way.  Our system of law does not permit jurors to be

18   governed by sympathy, prejudice or public opinion.

19           At the outset, you should understand that I am

20   absolutely neutral in presenting these instructions to you.

21   I will not give you my opinion about any issue of fact to be

22  determined by you.  Nothing in the way in which I give my

23  instructions to you is intended as an expression of my opinion

24  about any fact at issue in this case.

25          Ladies and gentlemen, I will now instruct you on the


                              34


1  substantive principles of law that govern the plaintiffs'

2  claims in this case.

3          Under the Internal Revenue Code in 1998, a taxpayer

4  was entitled to a lifetime tax credit for gifts in the amount

5  of $625,000.  The lifetime tax credit allows a taxpayer to make

6  $625,000 of gifts to anyone during his lifetime without paying

7  gift tax on any of those gifts.  Only after the total value of

8  the gifts exceed $625,000 during the taxpayer's lifetime, does

9  the taxpayer incur any gift tax liability.

10          Additionally, in 1998, taxpayers were entitled to

11  make gifts not to exceed $10,000 in value to as many different

12  people as they wished without incurring any gift tax, and the

13  gifts would not be counted against a taxpayer's $625,000

14  lifetime tax credit.  For example, a taxpayer can make three

15  $10,000 gifts to three different people in 1998 without paying

16   any gift tax, and the $30,000 gifts would not reduce the

17   taxpayer's $625,000 lifetime tax credit for gifts.

18          Because the gifts of the partnership interests in

19   the Smith FLP made by Mr. Smith to his children exceeded Mr.

20   Smith's lifetime credit in the amount of $625,000, the gifts

21   are taxable.  Mr. Smith, who was the donor of the gifts, was

22   required to pay the gift tax.  The amount of the gift tax is

23   determined by the fair market value of the gifts on the date

24   that the gifts were made.

25          Ultimately, the central issue of this case is


                                35


1   whether or not Mr. Smith was required to pay too much tax for

2   the gifts.  As I've indicated earlier, the fair market value of

3   the gift determines the amount of the gift tax.  Therefore, the

4   sole issue for your deliberation is to determine the fair

5   market value of a one-percent limited partner interest in the

6   Smith Family Limited Partnership as of the dates on which the

7   gifts occurred.

8          Now, the law defines a few terms that will be

9   central to your deliberations and I will review these

file:///A|/SMITHDY3.TXT

10  definitions with you now.

11      First, the term fair market value refers to the

12  price at which property would change hands between a willing

13  buyer and a willing seller when the buyer is not acting under

14  any compulsion to buy and the seller is not acting under any

15  compulsion to sell.  It is assumed that both the buyer and

16  seller have reasonable knowledge of all the facts that would be

17  relevant to an agreement on a fair price.

18      For purposes of your deliberations, the buyer and

19  seller would be referred to as purely hypothetical or fictional

20  persons.  When determining the fair market value, you should

21  not assume that the hypothetical buyer and seller are members

22  of the Smith family.

23      When we refer to the buyer and seller not acting

24  under any compulsion, we mean that they are not required to buy

25  or sell.  Thus, the buyer and seller would negotiate a value or


36


1  price without being compelled to act.

2      Now, as you have heard, the property on which you

3  are asked to place a value is a one-percent limited partnership

4   interest in the Smith Family Limited Partnership.  Under

5   Pennsylvania law, a person who acquires a limited partnership

6   interest is referred to as a limited partner.

7        Under Pennsylvania law a limited partner has limited

8   rights.  A limited partner does not have the right to control

9   or even participate in the management of the partnership.

10  Further, the limited partner does not have the right to dictate

11  who will manage the business of the partnership.

12       In order to arrive at the taxable fair market value,

13  you are to determine two facts.

14       First, you are to determine the net asset value of

15  Smith FLP on the dates that Mr. Smith gifted interests in Smith

16  FLP to his children.  The net asset value of a business is the

17  fair market value of all the business' assets, minus the

18  business' liabilities.  In this case Smith FLP has only one

19  asset, a one-hundred percent interest in Erie Navigation

20  Company, and has no liabilities.

21       Second, you are to determine the appropriate

22  discount, if any, that is be applied to the net asset value of

23  Smith FLP resulting from the terms of the partnership

24  agreement.  The discount to be applied, if any, to the net

25  asset value of the gifted partnership interests determines the

37

1   fair market value of the gifts.

2       The Smith FLP partnership agreement in Sections

3   7.3(A), 7.3(B) and 7.5 contains restrictions on a partner's

4   ability to transfer his or her partnership interests to a

5   third-party buyer.  These restrictions on transferability

6   contained in Smith FLP's partnership agreement are commonly

7   referred to as rights of first refusal, because the partnership

8   and/or existing partners have the opportunity to purchase the

9   partnership interests that a partner is attempting to sell

10  before a third-party buyer can.

11      This court has previously determined, as a matter of

12  law, that the right of first refusal contained in the Smith FLP

13  partnership must be disregarded in valuing the partnership

14  interests that are the subject of this case.  Therefore, you

15  are required by law to value the partnership interests gifted

16  to Mr. Smith's children as if the right of first refusal were

17  not contained within the Smith FLP partnership agreement.

18      It is important for you to understand that the right

19   of first refusal contained in Sections 7.3(A), 7.3(B) and 7.5

20   of the Smith FLP partnership agreement is disregarded only for

21   purposes of valuing the transferred partnership interests in

22   Smith FLP for federal gift purposes.  The parties' contractual

23   obligations to each other and the manner in which Smith FLP

24   conducts its affairs are in no way affected by your verdict

25   today.


38


1        In determining the fair market value of the gifts

2    transferred by Mr. Smith to his children on January 5, 1998 and

3    December 31, 1998, you are first to determine the net asset

4    value of Smith FLP on each of these dates.  Changes in value or

5    other events which occurred after the dates of the gifts are

6    not to be considered in valuing property on the date of the

7    gift.

8        After the net asset value is determined, you may

9    apply a discount to the net asset values of Smith FLP, if you

10   find one appropriate.  Once again, the discount you apply to

11   the net asset value of Smith FLP may not take into account the

12   restrictions on transferability imposed by the right of first

13  refusal provisions in Sections 7.3(A), 7.3(B) and 7.5 of the

14  Smith FLP's partnership agreement.

15          Now, this is the law that you must apply to properly

16  determine the value of the gift at issue in this case.

17          I will now give you a few guidelines on how to

18  deliberate upon the evidence you have heard.

19          As I told you at the beginning of this case, the

20  evidence which you are to consider consists of the testimony of

21  the witnesses and the exhibits offered and received into

22  evidence.  The proceedings during the trial have been governed

23  by rules of law, and we had, as you know, a number of

24  conferences to determine what evidence should be allowed to be

25  submitted to you.


39


1          From time to time it has been my duty to rule on

2  evidence to be submitted, and you should not concern yourselves

3  with the reasons for those rulings.  You are not to consider

4  any testimony or any exhibit to which I may have sustained an

5  objection, or any exhibit which may have been ordered stricken

6  from the record, or which has not been introduced into

7   evidence.

8        Now, the attorneys have argued very ably and

9   thoroughly, and they have been well prepared.  But their

10  remarks, that is what they have said to, is not evidence.  They

11  have argued to help you understand the facts and their

12  respective theories of the case, but their arguments, again,

13  are not evidence.  You must consider as evidence only the

14  testimony and exhibits.  If you find that any argument,

15  statement or remark of counsel has no basis in fact, then you

16  should disregard that argument, statement or remark.

17  Similarly, if you find that anything I tell you about the facts

18  is not based on the evidence, you should disregard that, too,

19  because you are the finders of fact.  It is up to me only to

20  tell you what the law is.

21        The next matter about which I will now instruct you

22  is the applicable burden of proof.  The burden of proof is a

23  concept which you must understand in order to give the case

24  proper consideration because a verdict cannot be based on

25  speculation, guess or conjecture.

40

1          Under our system of taxation, the Commissioner of

2   Internal Revenue is charged with the duty and responsibility of

3   determining the tax liability of a taxpayer.  Once the

4   Commissioner makes a determination of a taxpayers' liability

5   and assesses that liability against the taxpayer, the taxpayer

6   has the burden of proving by a preponderance of the evidence

7   that the Commissioner's determination was not correct.

8          The fair weight or preponderance of the evidence

9   means evidence which has more convincing force when it is

10   weighed against the evidence opposed to it so that the greater

11   probability of truth lies therein.  Now, if we were to

12   visualize evidence as something weighed on an ordinary balance

13   scale, and if the evidence admitted in support of a claim made

14   by the party having the burden of proof is more weighty in

15   probative value than the evidence offered in opposition so that

16   it tips the scales on the side of that party, then that party

17   has proved by the fair weight or preponderance of the evidence.

18          If, on the other hand, the evidence admitted in

19   opposition to the claim of the party having the burden of proof

20   outweighs or equally balances the evidence produced in support

21   of the claim, it can be said that there has been a failure to

22   carry the burden of proof imposed by law.

file:///A|/SMITHDY3.TXT

23          Now, it is important to note that we speak here of

24   the quality of evidence, not necessarily its quantity.  Also,

25   all of the evidence admitted in support of, and in opposition

41

1    to, a claim must be considered, and not just the evidence

2    offered by the party having the burden of proof.  In short, the

3    test is not which side brings the greater number of witnesses

4    or presents the greater quantity of evidence, but which witness

5    or witnesses and which evidence you consider most worthy of

6    belief.  Even the testimony of one witness may outweigh that of

7    many, if you have reason to believe his or her testimony in

8    preference to theirs.

9          In this case the Commissioner of the Internal

10   Revenue Service made a determination that the value of the

11   gifts in question were higher than that stated by Mr. Smith,

12   resulting in the payment of a higher tax.  The Smiths have the

13   burden of proving that the Commissioner's determination was

14   incorrect.  Therefore, if after considering all of the

15   evidence, you feel persuaded that it is more probable than not

16   that the fair market value of a limited partner interest is

17  less than the Commissioner's valuation, your verdict must be

18  for the plaintiff.  Otherwise, your verdict must be for the

19  defendant.

20         Now, in deciding the facts of this case, you should

21  consider all of the evidence presented by the parties.

22  Consideration of all of the evidence, however, does not mean

23  that you must accept all of the evidence as true or as

24  accurate.  In this connection, the evidence in this case

25  consists of the sworn testimony of the witnesses, regardless of


42


1  who may have called them; all exhibits received into evidence,

2  regardless of who may have produced them; and all facts which

3  have been admitted or stipulated to by the parties.

4         While you may consider only the evidence in the case

5  in arriving at your findings of fact, you are permitted to draw

6  such reasonable inferences from the testimony and exhibits of

7  counsel, as you feel are justified in light of common

8  experience.  An inference is not a suspicion or guess.  A

9  suspicion is a belief based on circumstances which do not

10  amount to proof.  A guess is speculation or conjecture.  An

11   inference, on the other hand, is a reasoned logical decision to

12   conclude that a disputed fact exists on the basis of another

13   fact that you know exists.  In other words, you may reach

14   conclusions which reason and common sense lead you to reach

15   from the facts which have been established by a preponderance

16   of the evidence in the case.

17        There are times when different inferences may be

18   drawn from the facts, whether proved by direct or

19   circumstantial evidence.  Plaintiff will ask you to draw one

20   set of inferences, while the defendant will ask you to draw

21   another.  It is for you, and you alone, to decide what

22   inferences you will draw.

23        In deciding this case, you are required to pass on

24   the credibility of witnesses.  Credibility simply means

25   believability.  Your function is to decide what is believable,

43

1   who is believable and how much weight to give it.  In doing

2   this, you use your common sense, your varied backgrounds and

3   experiences, the usual indicators of truth that you all use in

4   your daily lives.

5          A witness's testimony depends on the witness's

6    observation and perception of what he or she testifies to.  It

7    also depends on the witness's memory and what he or she

8    experienced at the time, and the witness's ability to create

9    that experience in court.

10         You may consider the degree of the witness's

11   intelligence, the demeanor and the appearance of the witness,

12   the witness's frankness, his or her candor, the evasiveness or

13   responsiveness, as well as the reasonableness or

14   unreasonableness of the witness's testimony in light of all of

15   the circumstances.  You may also consider any interest or bias

16   that might lead a witness to exaggerate, understate or

17   otherwise color his or her testimony, such as a witness's

18   interest in the outcome of the case or a bias or prejudice that

19   a witness might have in favor of or against a party.  Now, this

20   is not to suggest that the interest or bias of a witness would

21   lead the witness to tell you a falsehood or color his or her

22   testimony one way or the other, but bear these factors in mind

23   in passing on the credibility or believability of every

24   witness.

25         I charge you that if you find a witness has lied to

44

1   you in any material portion of his or her testimony, you may

2   disregard that witness's testimony in its entirety.  I say that

3   you may disregard that testimony, not that you must.  If you

4   choose to disregard the testimony of any witness because you

5   believe that the witness has been untruthful with you, it must

6   have been untruthfulness in a material portion of that

7   witness's testimony.  You must be careful, though, that the

8   untrue part of the testimony was not a result of mistake or

9   inadvertence, but was, rather, willful and stated with a design

10  or intent to deceive.

11          Regardless of whether a witness's testimony is

12  untruthful by design or inadvertence, you may reject all or any

13  portion of the testimony, as in the case of any witness, if the

14  testimony is not believable by you.  On the other hand, you may

15  be convinced that, despite the falsity of a part of the

16  witness's testimony, he or she, in other parts, testified

17  truthfully.

18          Now, you may find inconsistencies in the evidence,

19  even actual contradictions in the testimony of witnesses,

20  although, it does not necessarily mean that any witness has

21  been willfully false.  Poor memory is not uncommon.  Sometimes

22  a witness forgets.  Sometimes he or she remembers incorrectly.

23  It is also true that two persons witnessing the same incident

24  may see it or hear it differently.  If different parts of the

25  testimony of any witness or witnesses appear to you to be


45


1  inconsistent, you should try to reconcile the conflicting

2  statements, whether of the same or different witnesses, and you

3  should do so if can be done fairly and satisfactorily.  If,

4  however, you find that there is a genuine and irreconcilable

5  conflict in the testimony, then it is your function and your

6  duty to determine which, if any, of the contradictory

7  statements you will believe.

8           Now, you will recall that Mr. Pashke and Mr. Burns

9  gave testimony as experts.  A witness who has special

10  knowledge, skill, experience or training in a particular

11  science, profession or occupation may give his or her opinion

12  as an expert on any matter in which that witness's skill,

13  experience or training in the particular science, profession or

14   occupation has been shown.  In determining the weight to be

15   given to an expert's opinion, you should consider his or her

16   qualifications and reliability and the reasons given for the

17   opinion.  You are not bound by an expert's opinion merely

18   because he or she is an expert.  You may accept it or you may

19   reject it as in the case of any other witness.  Give it the

20   weight, if any, you think it is entitled to.

21        In general, the opinion of an expert only has value

22   when you accept the facts on which it is based.  This is true

23   whether the facts are assumed hypothetically by the expert,

24   come from his or her personal knowledge, or come from some

25   other proper source, or from any combination of sources.  In


46


1   resolving any conflict that may exist in the testimony of an

2   expert witness, you are allowed to weigh the opinion of one

3   expert against that of another.  In doing this, you should

4   consider the relative qualifications and the reliability of the

5   expert witnesses, as well as the reasons for each opinion and

6   the facts and other matters upon which it is based.

7        You will also recall that Mr. Sandy Smith testified

8    on the nature of the shipping business and its operations, and

9    the fair market value of a limited partnership interest in the

10   Smith Family Limited Partnership.  Mr. Smith is not an expert.

11   However, as is the case here, the Federal Rules of Evidence do

12   permit a witness who is an owner or officer of an entity to

13   give an opinion on the value of that entity, as long as it is

14   based on his own day-to-day participation and knowledge of its

15   affairs.  If you find that Mr. Smith's testimony is based on

16   his personal knowledge and such testimony is helpful to you in

17   understanding the subject upon which he testified, you may

18   consider such testimony in determining the facts relating to

19   this witness's testimony.

20          Now, as I mentioned to you at the outset, the court

21   is entirely neutral about the outcome of this case.  I do not

22   want you to think that anything I have said, any instruction I

23   have given you or any ruling I may have made on the evidence or

24   any statement I may have made either to counsel or to you,

25   implies that I have any position in this case at all, other


47


1    than to give you fairly the law that you are required to apply,

2   and to rule fairly and impartially on the evidence that has

3   been submitted to you.  I have absolutely no interest in how

4   this case resolves itself, only in the procedure by which it is

5   done.

6          As I told you before, it is for you, and you alone,

7   to determine the facts of the case and the credibility of each

8   witness.  If your recollection of the testimony varies with any

9   statements that are inadvertently made by me or counsel for any

10  party in reviewing the testimony, you have to be guided by your

11  own memory and your recollection of the testimony.  You

12  determine the facts from all the testimony that you have heard,

13  and the other evidence which has been received during the

14  trial.  Neither I nor anyone else may infringe on your

15  responsibility as the sole judges of the facts.  On the other

16  hand, and of equal importance, you must accept the rules of law

17  as I give them to you and apply those rules to the facts of the

18  case.

19         We're almost done, I want to give you a few brief

20  instructions on your deliberations.  That is what you are to do

21  when you retire to the jury room.  First, the attitude and

22  conduct of the jury at the outset of the deliberations are

23  matters of considerable importance.  When you retire to the

24  jury room for your deliberations, they should proceed in an

25  orderly way.  The first order of business in the jury room will


48


1  be select one of you to act as foreperson.  You are free to

2  select any one of you to act in that capacity.  The foreperson

3  will preside over your deliberations and will speak for you

4  here in court should that become necessary.  One more thing

5  about the foreperson.  The fact that somebody is a foreperson

6  does not mean that his or her vote is entitled to any greater

7  weight than the vote of any other juror.

8          Now, in the course of your deliberations if you

9  should find yourself in doubt about concerning any part of my

10  instructions to you about the law, you may request further

11  instructions.  In that event, you should transmit a note,

12  signed by the foreperson, to me through my courtroom deputy.

13  Nobody should try to communicate with the court by means other

14  than a signed writing.  I will not communicate with any juror

15  on any subject relating to the merits of the case except in

16  writing or orally here in court with all counsel present.

17          Let me just tell you, if my law clerk didn't already

18  show you, there is a buzzer or button in the jury room, and if

19  you should have a question or you should need further

20  explication of anything I've said in my instructions, you write

21  that on a note, press that button, my law clerk will come and

22  we will reconvene here.  I should also tell you that I am going

23  to be sending out with you three copies of my written charge.

24  So you'll have that available for your consideration as well.

25       Now, you should not at any time reveal, even to me,

49

1  how you stand numerically until you have reached a verdict.

2  Your responsibility to reach a fair conclusion from the

3  evidence and the applicable law is an important one.  Your

4  verdict should be reached only after careful and thorough

5  deliberations, during which you should consult with each other

6  and discuss the evidence and the reasonable inferences to be

7  drawn from the evidence freely and fairly in a sincere effort

8  to arrive at a just verdict.

9       It is your duty to consider the evidence with a view

10  toward reaching agreement on a verdict if you can do so without

11  violating your individual judgment and conscience.  You must

12    decide the case for yourself, examining any issue in evidence

13    with candor and frankness, and with proper deference to and

14    with regard to the opinion of each other.  Mature consideration

15    requires that you be willing to re-examine your own views and

16    to change your opinions if you are convinced that your opinions

17    lack merit or validity.  On the other hand, while you may

18    maintain this flexibility, no juror is required to surrender

19    his or her honest conviction as to the weight or effect of the

20    evidence because another juror's opinion differs from his or

21    hers, or for the mere purpose of returning a verdict.

22         The verdict must represent the considered judgment

23    of each juror.  In order to return a verdict, it is necessary

24    that each juror agree thereto.  Your verdict must be unanimous.

25         Keep in mind, then, that the dispute between the


50


1    parties in this case is for them a most serious matter.  They

2    and the court rely on you to give full and conscientious

3    deliberation and consideration to the issues and evidence

4    before you.  You should not allow prejudice or sympathy to

5    influence your deliberations.  You should not be influenced by

6   anything other than the law and the evidence in the case.  All

7   of the parties stand equal before the court and each is

8   entitled to the same fair and impartial treatment at your

9   hands.

10          Now, one other thing I want to point out to you,

11  when you go to the jury room, you are going to be taking with

12  you or you will be given this form entitled Interrogatories To

13  the Jury.  It is self-explanatory, and this is essentially

14  another word for your verdict form.  After you have filled this

15  out after you reached a verdict, two housekeeping points are

16  important.  One, you'll see that we have inserted a line for

17  the foreperson, it should be signed by the foreperson and each

18  of the other jurors should sign it as well.  And, finally,

19  you'll note that there is a date line on it, make sure that it

20  is dated.  Does counsel have to see me for any reason at side

21  bar?

22          MR. DALE:  The United States does just for a moment,

23  your Honor.

24          (On the record at side bar.)

25          MR. DALE:  Your Honor, really just a housekeeping

1  matter.  We have three exhibits that I'm not sure the courtroom

2  deputy has.  And while they're deliberating, I will provide a

3  phone number --

4          THE COURT:  We can resolve all this without the jury

5  sitting in the box.

6          (End of discussion at side bar.)

7          THE COURT:  All right, we're in recess then during

8  jury deliberations.

9          (Whereupon, at 10:35 a.m., the Jury leaves the

10  Courtroom to begin their deliberations.)

11          (In Judge's Chambers at 11:20 a.m.)

12          THE COURT:  We have received a communication from

13  the jury and there are two questions and I'll address them

14  seriatim.  First, "can we have a 10 minute smoke break?"  There

15  are three smokers, since they have really not begun their

16  deliberations, I said you guys can have a smoke break.  My

17  clerk took them to a secluded area, they had it, that's it.

18          Now, the substantive matter.  "Can we award damages

19  to reflect our one-percent SFLP number?"  I'm happy to hear

20  from the crowd on this.  My interpretation of that is the jury

21  is asking us whether once they determine what the one-percent

22  figure is, if there is anything else they have to do.  If they

23  have to do the multiplication.  That's the way I interpret it.

24          MR. DELANEY:  Sounds right.

25          THE COURT:  I'll bring them out and say all you have


                                52


1  to do is whatever the figure may be, the value of one-percent

2  FLP, we will do the rest.  Is that acceptable?

3          MR. DELANEY:  It is.

4          MR. COOPER:  Yes, your Honor.

5          THE COURT:  All right, bring the jury out.

6          (Proceedings recessed at 11:22 a.m., in Judge's

7  Chambers; and reconvened at 11:24 a.m., in Courtroom C with the

8  Jury present.)

9          THE COURT:  I received two questions from the jury.

10  The first question is now moot, "can we have a 10 minute smoke

11  break?"  My understanding is my law clerk took the three

12  smokers to a convenient place where you've had your one and

13  only smoke break until the deliberations are over.

14          The second question was, "can we award damages to

15  reflect our one-percent Smith FLP number?"  I want to make sure

16  I understand what you're asking there.  I presume what you're

17  asking, once you come up with the value for one-percent FLP, is

18  there anything else you have to do, is that correct?

19      THE FOREPERSON:  Yes.

20      THE COURT:  The answer is no, don't worry about it.

21  All you have to do, as you look at my charge, you have to

22  assign a value to one percent of the Smith Family Limited

23  Partnership.  Once you do that, the court will take care of

24  everything else, fair enough.  All right.

25      (Proceedings recessed at 11:25 a.m., in Courtroom C;


53


1  and reconvened at 12:15 p.m., in Judge's Chambers.)

2      THE COURT:  All right, I received another question

3  from the jury.  It reads as follows:  "Can we consider pending

4  asbestos lawsuits for determining fare market value?"  What

5  does the government have to say first?

6      MR. DALE:  The government says that asbestos

7  litigation was not submitted in the claim for refund.  It's

8  beyond the scope of this litigation.  If that were relevant,

9    the Commissioner never saw this.  They weren't in the financial

10   statements.  They were purposely not on the financial

11   statements.  They weren't even submitted in discovery at that

12   point in time.

13        THE COURT:  How did you find out about it, how did

14   you find out that they weren't on the financials but should

15   have been on the financials?

16        MR. DALE:  There had been an allusion during Mr.

17   Smith's deposition in a question asked by Mr. Delaney.  He

18   didn't know anything about it.  We still don't know how much --

19   these could $1 claims, these could be $100 claims.  In the

20   exhibit list that was furnished to us in the pretrials

21   disclosures, there was some asbestos claims, a hundred asbestos

22   claims.  We objected to that, we asked what was the theory of

23   relevance.  I don't think at that point in time Mr. Delaney

24   could state a theory of relevance and decided not to introduce

25   those.  We don't know anything about this.  Much of Mr. Smith's

54

1    testimony was a complete surprise to us.

2         MR. DELANEY:  In the testimony in Chicago in March,

3    there was a reference to asbestos litigation.  I told you in

4    March that there were about a hundred claims when these matters

5    were going on.  There was no effort to investigate any further.

6    If you just took that information and you went to the financial

7    statements which were given to the government more than a year

8    prior to that, you would see they weren't listed as a

9    contingent liability.  The answer to the question should be

10   yes, you can consider them.  There has been no objection made

11   in the courtroom.  No argument made it is barred by the

12   Doctrine of Variance.  There's been discussion about it in

13   closing statements, both of the closing statements.  It is fair

14   evidence for them to consider.

15         MR. COOPER:  What about when we asked for

16   documents -- to provide documents to support a value.  And then

17   we come to trial and the first time you see a hundred

18   complaints is on the exhibit list.  He said he told us, I don't

19   remember because what would be the relevance of it if you

20   haven't been given documents -- it's just been a complete

21   surprise.

22         MR. DELANEY:  The point is now we're done with the

23   evidence, where is the objection to it.

24         MR. DALE:  We did place an objection to that, the

25  documents at the original pretrial conference.  At that

55

1  conference you said I do not intend to introduce these.

2      MR. DELANEY:  The complaints, that's right.

3      THE COURT:  Is your point a narrow one, that you

4  argued asbestos in your closing as a component of a bad thing

5  that a ready, willing and able buyer would want to know to

6  crank in, are you saying the absence of an objection waived it?

7      MR. DELANEY:  Sure.  I mean Sandy testified to those

8  things.  That he thought there were about a hundred by the end

9  of 1998.  And he was cross-examined on them.  So why isn't it

10  evidence in the record.

11      THE COURT:  Wasn't there a waiver, fellows,

12  preserving an objection to it?

13      MR. DALE:  That was essentially the judge's ruling,

14  I assume.  It is to net asset value.  It's a liability and it's

15  clear in the trial that net asset is the assets minus

16  liabilities.  We had objected to the argument outside of that

17  on the variance doctrine.  It had been sustained.  And then I'm

18  not sure the scope of the waiver was defined in the court's

19  ruling.  But I don't know how the jury is going to even assign

20  anything to that.

21        MR. DELANEY:  Nor will you ever.  That is within the

22  province of the jury.

23        THE COURT:  All the jury really knows is that there

24  were a hundred lawsuits involving asbestos claims by former

25  employees, presumably, many of whom are seamen of a predecessor


56


1  in interest, is that pretty much it?

2        MR. DELANEY:  They also know, Sandy described that

3  they decided to try one and it cost them about $200,000 in

4  expenses to try it, to get a no verdict.  I think he meant a

5  dismissal of some sort.  But I know they paid Thompson, Knight

6  that much money, that's what Sandy tells me.  I know they hired

7  Thompson, Knight to do that work, we didn't defend it.

8        THE COURT:  Let me reflect on this a little bit and

9  then call you back in chambers.)

10        (Brief recess was taken.)

11        THE COURT:  With respect to the jury's question,

12  "can we consider pending asbestos lawsuits for determining fair

13  market value?"  I'm going to tell the jury they can.  The basis

14  for that is that there was testimony elicited from a

15  representative of the plaintiff on direct concerning asbestos

16  litigation, unobjected to.  There was cross-examination and

17  there was a substantial portion of the closing argument

18  directed to it, unobjected to.  And in my view any objection

19  has been waived.  Any objection you have to the ruling you can

20  object if you want, but it's preserved for the record.

21          MR. DALE:  Thank you, your Honor.

22          (Proceedings recessed at 12:24 p.m., in Judge's

23  Chambers; and reconvened at 12:26 p.m., in Courtroom C.)

24          THE COURT:  I received the following question from

25  the jury, "Can we consider pending asbestos lawsuits for

57

1  determining fair market value?"  Signed the foreperson.  And

2  the answer is yes.

3          (Whereupon, at 12:27 p.m., the Jury left the

4  Courtroom to resume their deliberations.)

5          (Whereupon, at 12:56 p.m., the Jury returns to the

6  Courtroom with their verdict.)

7          THE COURT:  Members of the jury, I understand you

8    reached a verdict, is that right?

9          THE FOREPERSON:  Yes.

10         THE COURT:  Would you please retrieve the verdict

11   form.  The verdict's in order, you can publish it.

12         THE CLERK:  In the matter of Sidney E. Smith, III,

13   et al., versus United States of America, at Civil Action No.

14   02-264 Erie, the interrogatories read as follows:

15         Number one.  Did the Commissioner of the Internal

16   Revenue Service make an error by setting a value that was

17   greater than fair market value for the gifts given in 1998 by

18   Mr. Smith to his children?  And the jury has indicated yes.

19         Therefore, we proceed to question number two.  If

20   you answered yes to question number one, what is the 1998 fair

21   market value of a one-percent limited partner interest in the

22   Smith Family Limited Partnership as of January 5, 1998?  And

23   the jury has indicated $17,000.

24         Question number three.  If you answered yes to

25   question number one, what is the 1998 fair market value of a

58

file:///A|/SMITHDY3.TXT

1   one-percent limited partner interest in the Smith Family

2   Limited Partnership as of December 31, 1998?  And the jury has

3   indicated $16,300.

4        THE COURT:  And let the record reflect that the

5   verdict form is signed by the foreman and the other jurors and

6   dated today.  Any requests from the government, do you want the

7   jury polled?

8        MR. DALE:  Yes, your Honor.

9        THE CLERK:  Juror number one, would you please

10  stand.  is this your verdict?

11       JUROR NO. 1:  Yes.

12       THE CLERK:  Juror number two, is this your verdict?

13       JUROR NO. 2:  Yes.

14       THE CLERK:  Juror number three, is this your

15  verdict?

16       JUROR NO. 3:  Yes.

17       THE CLERK:  Juror number four, is this your verdict?

18       JUROR NO. 4:  Yes.

19       THE CLERK:  Juror number five, is this your verdict?

20       JUROR NO. 5:   Yes.

21       THE CLERK:  Juror number six, is this your verdict?

22        JUROR NO. 6:  Yes.

23            THE CLERK:  Juror number seven, is this your

24   verdict?

25            JUROR NO. 7:  Yes.


59


1            THE CLERK:  Juror number eight, is this your

2   verdict?

3            JUROR NO. 8:  Yes.

4            THE COURT:  Thank you.  Members of the jury, let me

5   take this opportunity to thank you for your attention, you

6   clearly are a very attentive jury.  And anytime you have a case

7   where there are a lot of numbers flying around, it's sometimes

8   not easy.  And everybody paid very close attention.  I know

9   some of you came from considerable distance, I appreciate that

10   as well.  As I tell all the jurors who come through here on all

11   my trials the same thing, it's worth repeating.  And that is

12   the short time you've spent in this courthouse, you've seen the

13   security personnel downstairs, Clerk's Office employees, you've

14   seen some of my staff, you've obviously had contact with

15   lawyers, you've seen at least one judge.  But of all the people

16  in this courthouse, nobody is more important than the jurors.

17  Because the fact of the matter is that without you, the jury

18  trial system that we have would simply grind to a screeching

19  halt.  So you leave with my thanks.  As soon as I get off the

20  bench here, I want to chat with you briefly without my robe on

21  back in your jury room.  And in about five minutes I want the

22  lawyers to come back into chambers, we have a little molding to

23  do of this verdict.  All right, these proceedings are now

24  adjourned.

25         (Whereupon, at 1:00 p.m., proceedings recessed in


                              60


1  Courtroom C; and at 1:10 p.m., reconvened in Judge's Chambers.)

2         THE COURT:  Let's go on the record.  A few moments

3  ago we received the jury's verdict, where the jury gave the

4  value of a one-percent limited partner interest.  Pursuant to

5  our agreement, we in essence are molding our verdict to reflect

6  the total value of the gifts.  That essentially is a

7  multiplicative factor as I understand.  Both sides agreed what

8  that figure should be?

9         MR. DALE:  Yes, your Honor.

10          THE COURT:  Go ahead.  What was the figure for both

11  gifts?

12          MR. DALE:  The total value of gifts made in 1998,

13  using the jury's calculation of one-percent interest, would be

14  $681,008.

15          THE COURT:  That is for what date?

16          MR. DALE:  That is for both dates all gifts made

17  within 1998.

18          THE COURT:  That's the total.  That's all we really

19  need to know.  The thing we don't have to concern ourselves

20  with here is refund or anything like that -- walk me through

21  that?

22          MR. DELANEY:  There's a refund and interest.

23          THE COURT:  Does that get reduced to judgment here

24  or what?

25          MR. DELANEY:  I presume it would be.  It would have


                                    61


1  to be reduced to judgment, I don't know how else we end this

2  case.

3          THE COURT:  What do you fellows suggest, how does

4  this play itself out in the real world?

5      MR. DALE:  What we can do is take this figure, put

6  it into a gift tax return that was submitted by the plaintiffs

7  and come up with the tax liability for that year.  And the

8  difference between what they have paid, which is agreed, minus

9  what would be assessed, which I believe that Mr. Delaney and I

10  can agree to, because this was the only disputed matter on that

11  return.  So if I can run the calculations, Mr. Delaney can run

12  the calculations, we can agree then at that point.

13      THE COURT:  I presume it is simply a question of

14  going to the appropriate manual to determine at what percent it

15  should be taxed, a purely mathematical thing?

16      MR. DALE:  Yes.

17      THE COURT:  Well, let's see then.  As a technical

18  matter, it makes no sense to enter judgment in this case for

19  six-hundred whatever thousand dollars, because that isn't the

20  judgment.

21      MR. DELANEY:  Right.

22      THE COURT:  I think for present purposes it makes

23  sense to enter judgment in favor of the plaintiff only, and

24  leave it at that.  With the expectation that in a short amount

25  of time you fellows will be back here filing a pleading that's

62

1  mutually agreed upon, which will reflect the amount of the

2  refund.  And then on that amount I will enter judgment.  Does

3  that make sense?

4        MR. DELANEY:  That makes sense.  I presume the

5  service will also calculate the interest.  There's interest on

6  the refund.  And we'll double check that.

7        THE COURT:  All right.

8        MR. DALE:  There is one question in this regard.  I

9  believe that based on these figures that the numbers that we

10  come up with will be numbers in excess of that submitted in the

11  claim for refund.  We did have a motion in limine to that

12  effect.  I'm not sure there is an explicit ruling to that

13  effect.

14        THE COURT:  There may not have been.  There was an

15  implicit one.  If you're asking for purposes of your planning

16  how to go about this -- my view is in a case like this that has

17  been submitted to a jury, the amount requested by the taxpayer

18  is not necessarily the cap as to what the jury can do.  So that

19  would be my view of it.  Let's go off the record.

20          (Discussion held off the record.)

21          THE COURT:  Let's go on the record.  And I invite

22  anybody's comment.  For appeal purposes, is this running from

23  the time today, for instance, when judgment is entered in favor

24  of plaintiff, or should it run properly run from the time of

25  the actual monetary judgment, I'm not even sure I can enter

63

1  judgment in favor of the plaintiff today.  The verdict slip

2  will say verdict in favor of the plaintiff.  It seems the

3  appellate time will run from the time it's reduced to judgment,

4  do you agree with that?

5          MR. DALE:  I do agree.

6          THE COURT:  Do you agree with that, also?

7          MR. DELANEY:  I agree with that.  Assuming that we

8  can accomplish this ministerial act within like 10 days, is

9  that a reasonable period of time to do the calculations.  I

10  mean, by tomorrow my office will have a number with interest.

11  Is 10 days sufficient?

12          MR. DALE:  Absolutely.

13          THE COURT:  I will expect to get the figure that I

14  can reduce to judgment filed within 10 days, all right.

15        MR. DALE:  I assume, also, that post-judgment

16  motions, would run from the date of judgment?

17        THE COURT:  Everything, the clock doesn't start

18  ticking until the monetary judgment is filed.

19

20        (Whereupon, at 1:17 p.m., the proceedings were

21  concluded.)

22

23                    - - -

24

25



                              64



1            C E R T I F I C A T E

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

file:///A|/SMITHDY3.TXT

8

9

10

11

12    _____

13    Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25